

**COURT REPORTING**

**LEGAL VIDEOGRAPHY**

**VIDEOCONFERENCING**

**TRIAL PRESENTATION**

**MOCK JURY SERVICES**

**LEGAL TRANSCRIPTION**

**COPYING AND SCANNING**

**LANGUAGE INTERPRETERS**





**(800) 528-3335**

**N A E G E L I U S A . C O M**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

IN RE:

MICHAEL STEPHEN GALMOR,          Case No. 18-20209-RLJ-7

        Debtor,
and

GALMOR'S/G&G STEAM                Case No. 18-20210-RLJ-7
SERVICE, INC.,

        Debtor.

KENT RIES, TRUSTEE,

        Plaintiff,

v.                                Adversary No. 20-2003

GALMOR FAMILY LIMITED
PARTNERSHIP and GALMOR
MANAGEMENT, L.L.C.,

        Defendants.
_____

**DEPOSITION OF**

**MICHAEL STEPHEN GALMOR**


**TAKEN ON**
**WEDNESDAY, MARCH 24, 2021**
**9:45 A.M.**


**BROWN AND FORTUNATO PC**
**905 SOUTH FILLMORE STREET, FIRST FLOOR**
**AMARILLO, TEXAS 79101**

EXHIBIT "B"

Michael Gaimor    March 24, 2021    NDT Assgn # 36389-1

1                              **APPEARANCES**

2

3    **Appearing on Behalf of the Plaintiff, Trustee:**

4    KENT RIES, ESQUIRE

5    **Ries Law Offices**

6    2700 South Western Street, Suite 300

7    Amarillo, Texas 79109

8    (806) 242-7437

9    (806) 242-7440 (fax)

10   kent@kentries.com

11

12   **Appearing on Behalf of the Plaintiff, Trustee:**

13   JERRY McLAUGHLIN, ESQUIRE

14   **McLaughlin Law Offices**

15   2700 South Western Street, Suite 1000

16   Amarillo, Texas 79109

17   (806)371-9110

18   jmclaw@suddenlinkmail.com

19

20

21

22

23

24

25

```
 1                   APPEARANCES CONTINUED

 2

 3   Appearing on Behalf of the Defendant, Leslie Pritchard:

 4   DAVOR RUKAVINA, ESQUIRE

 5   Munsch Hardt Kopf & Harr PC

 6   500 North Akard Street, 3800 Ross Tower

 7   Dallas, Texas 75201

 8   (214) 855-7500

 9   (214) 855-7584 (fax)

10   drukavina@munsch.com

11

12   Appearing on behalf of the Debtor/Deponent:

13   MATT W. SHERWOOD, ESQUIRE

14   Brown and Fortunato PC

15   905 South Fillmore Street, Suite 400

16   Amarillo, Texas 79101

17   (833) 228-6300

18   (806) 345-6363 (fax)

19   msherwood@bf-law.com

20

21

22

23

24

25
```

1                       APPEARANCES CONTINUED

2

3    **ALSO PRESENT:**

4    Randy Hopper, Videographer

5    Leslie Pritchard

6    Brandon Galmor

7    Monique Galmor

8    Shawn Zaiontz

9    Laramie Jernigan

10   Charlotte Trew (via Zoom)

11   Traci Coleman (via Zoom)

12   Thomas Berghman (via Zoom)

13   Maison Vasek (via Zoom)

14   Derek Reddell (via Zoom)

15

16

17

18

19

20

21

22

23

24

25

```
 1                      EXAMINATION INDEX

 2                                            Page

 3

 4  EXAMINATION BY MR. RUKAVINA                 10

 5

 6  EXAMINATION BY MR. RIES                    263

 7

 8  FURTHER EXAMINATION BY MR. RUKAVINA        276

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                         EXHIBITS INDEX

2    Exhibit                                    Page

3

4      1      SUBPOENA TO TESTIFY AT A           37

5             DEPOSITION

6

7      2      2017 PARTNERSHIP RETURN            73

8

9      3      SUMMARY OF ASSETS AND              142

10            LIABILITIES FOR

11            NON-INDIVIDUALS

12

13     4      ADVANCES                           146

14

15     5      STATEMENT OF FINANCIAL AFFAIRS     167

16            FOR NON-INDIVIDUALS FILING FOR

17            BANKRUPTCY

18

19     6      DECLARATION CONCERNING DEBTORS     175

20            AMENDED SCHEDULES

21

22     7      STATEMENT OF FINANCIAL AFFAIRS     182

23            FOR NON-INDIVIDUALS FILING FOR

24            BANKRUPTCY

25



1                    EXHIBITS INDEX CONTINUED

2    Exhibit                                        Page

3

4      8      2016 PARTNERSHIP RETURN              183

5

6      9      2017 INDIVIDUAL RETURN               193

7

8     10      PROFIT & LOSS ALL TRANSACTIONS       197

9

10    11      PROFIT & LOSS ALL TRANSACTIONS       199

11

12    12      PROFIT & LOSS ALL TRANSACTIONS       200

13

14    13      2018 S-CORPORATION RETURN            209

15

16    14      2016 S-CORPORATION RETURN            212

17

18    15      2016 PARTNERSHIP RETURN              214

19

20    16      CUSTOMER QUICKREPORT                 216

21

22    17      EMAIL CORRESPONDENCE AND OTHER       217

23            DOCUMENTS

24

25



1                          EXHIBITS INDEX CONTINUED

2    Exhibit                                              Page

3

4     18      ORDER EXCEPTIONS TO CONVEYANCE        229

5              AND WARRANTY

6

7     19      UNANIMOUS WRITTEN CONSENT             235

8

9     20      INVOICES                             242

10

11    21      AMENDMENT AND RATIFICATION OF        276

12            COMPROMISE AND SETTLEMENT

13            AGREEMENT

14

15

16

17

18

19

20

21

22

23

24

25

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

1                         **DEPOSITION OF**

2                  **MICHAEL STEPHEN GALMOR**

3                           **TAKEN ON**

4                 **WEDNESDAY, MARCH 24, 2021**

5                          **9:45 A.M.**

6

7          **VIDEOGRAPHER:**  This is a videotape deposition of

8  Mr. Michael Stephen Galmor in re case number 18-20209-RLJ-7

9  and case number 18-20210-RLJ-7 and adversary 20-2003.

10 Today's date is March 24th, 2021, and the time is

11 approximately 9:45 a.m.

12          Will counsel present please state whom they

13 represent, on the record?

14          **MR. RUKAVINA:**  My name is Davor Rukavina.  I

15 represent Leslie Pritchard.

16          **MR. RIES:**  Kent Ries.  I represent the bankruptcy

17 estates.

18          **MR. SHERWOOD:**  Matt Sherwood, represent Steve

19 Galmor.

20          **MR. McLAUGHLIN:**  Jerry McLaughlin.  I'm co-counsel

21 on the bankruptcy estates.

22          **VIDEOGRAPHER:**  Court reporter, please swear the

23 witness.

24          **THE REPORTER:**  I have to do a quick statement for

25 the record.



```
 1          It's my pleasure to serve as your professional

 2  reporter in today's matter.  I would like all attorneys

 3  present to stipulate that the testimony will be captured by

 4  a professional digital reporter and that all present agree

 5  to this method of recording, preserving today's record by

 6  audio and visual means.

 7          Mr. Rukavina, do you agree?

 8          MR. RUKAVINA:  Yep.

 9          THE REPORTER:  Mr. Sherwood, do you agree?

10          MR. SHERWOOD:  Yes.

11          THE REPORTER:  Mr. McLaughlin, do you agree?

12          MR. McLAUGHLIN:  Yes.

13          THE REPORTER:  Mr. Ries, do you agree?

14          MR. RIES:  Yes.

15          THE REPORTER:  Mr. Galmor, please raise your right

16  hand.

17          THE WITNESS:  Yes, sir.

18          THE REPORTER:  Do you solemnly swear or affirm the

19  testimony that you are about to give will be the truth, the

20  whole truth, and nothing but the truth, so help you God?

21          THE WITNESS:  Yes, sir.

22  MICHAEL STEPHEN GALMOR, having been duly sworn, was

23  examined, and testified as follows:

24  EXAMINATION

25  BY MR. RUKAVINA:
```



Michael Galmor    March 24, 2021    NDT Assgn # 36389-1

```
 1      Q.   Mr. Galmor, if you'll please state your full name

 2  for the record.

 3      A.   Michael Stephen Galmor.

 4      Q.   And what's your date of birth?

 5      A.   10 in 12 in '55.

 6      Q.   Where do you live, sir?

 7      A.   Shamrock, Texas.

 8      Q.   What's your residence address, please?

 9      A.   Seven -- 6535 U.S. 83.

10      Q.   Okay.  Is that the only residence that you stay at

11  periodically or do you have other places where you spend the

12  night sometimes as a residence?

13      A.   I stay at the lake a little bit.

14      Q.   What's that address, sir?

15      A.   I don't know the address.

16      Q.   Okay.  How would -- How would you tell me where it

17  is if you -- if I -- if you invited me over for dinner or

18  something?

19      A.   It's on Highway 44A going into the park, state

20  park.

21      Q.   Which lake, sir?

22      A.   Lake -- Lake Altus-Lugert

23      Q.   Okay.  So have you been deposed before?

24      A.   Yes, sir.

25      Q.   Okay.  So you understand it's your job to give
```

1   honest answers and my job to ask clear questions, right?

2       A.   Yes, sir.

3       Q.   Okay.  Do you hear just fine or are you a little

4   bit hard of hearing?

5       A.   I'm a little hard hearing.

6       Q.   Okay.  That plus my accent, if you don't

7   understand or hear my question, please just ask me to

8   restate it or to repeat it, okay?

9       A.   Yes, sir.

10      Q.   Are you on any kind of medication that would

11  affect your ability to testify today?

12      A.   No, sir.

13      Q.   Okay.  Did you do anything to prepare for today's

14  deposition?

15      A.   I visited with Mr. -- my attorney.

16      Q.   Okay.  Other than that, which I don't want to hear

17  about, did you talk to anyone else about this deposition?

18      A.   No, sir.

19      Q.   You didn't talk to Mr. Ries?

20      A.   Yes, sir.

21      Q.   Okay.  When did you talk to Mr. Ries and what did

22  you talk about?

23      A.   Monday, and we discussed just the case.

24      Q.   Okay.  Do you have a general understanding of what

25  this lawsuit is about?

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

1    A.   Yes, sir.

2    Q.   **What's your understanding?**

3    A.   That we're protesting my claims in the bankruptcy

4  record about the authenticity of what they are.

5    Q.   **What claims are you referring to, sir?**

6    A.   The two million or something, whatever's in the --

7  my statement for the bankruptcy.

8    Q.   **Okay.  So the -- the claims that the family**

9  **partnership owes you money and owes Galmor's/G&G money,**

10 **right?**

11   A.   Yes, sir.

12   Q.   **And you understand that that's in dispute in this**

13 **lawsuit, correct?**

14   A.   Yes, sir.

15   Q.   **Okay.  Have you read the trustee's complaint in**

16 **this lawsuit?**

17   A.   Yes, sir.

18   Q.   **Okay.  Have you read my answer and counterclaim?**

19   A.   I don't think so.

20   Q.   **Okay.  Other than talking to your counsel and Mr.**

21 **Ries, did you talk to anyone else about today's deposition?**

22   A.   No, sir.

23   Q.   **Did you talk to Ms. Carter?**

24   A.   Yes, sir.

25   Q.   **Okay.  What did you talk to her about, and when?**

 1      A.    We just -- We were all in the same room together.

 2      Q.    Got it.  That's okay.

 3            Other than when you met with Mr. -- when you met

 4   with counsel and Ms. Carter, did you talk to Ms. Carter at

 5   any other time about this deposition?

 6      A.    No, sir.

 7      Q.    What about Ms., is it Fox?  Fuchs?  How do you --

 8   How do you pronounce her name?  Do you --

 9      A.    Fuchs.

10      Q.    Fuchs?

11      A.    Yes, sir.

12      Q.    Did you talk to Ms. Fuchs about this deposition?

13      A.    Hadn't talked to Kellye Fuchs in four or five

14   years.

15      Q.    Okay.  You didn't talk to any of your siblings

16   about this deposition?

17      A.    No, sir.

18      Q.    Any of your children about this deposition?

19      A.    No, sir.

20      Q.    I asked you whether you've been deposed before,

21   and you said yes.  How many times, please?

22      A.    Once after the bankruptcy started in Newsom and

23   Young's office over there.  And then when I was trying to

24   get custody of my children, there in like '84,'85, something

25   like that.

1      Q.    Okay.  What -- the most --

2            The more recent one, the one at Young's office, do

3   you recall what the topic of that deposition was or what the

4   lawsuit was?

5      A.    No, sir, I don't remember that.  I know it was

6   kind of a whirlwind deal.

7      Q.    But it was after the bankruptcy?

8      A.    We were at the adversary or a meeting or something

9   or we were at the creditors' meeting or something when Mr.

10  Carruth and Leslie came in and claimed that I owed them a

11  million dollars.

12     Q.    I understand.

13           Are you referring perhaps to the Section 341

14  meeting of creditors?

15     A.    Maybe so.  I don't know what that -- I don't know

16  those numbers.

17     Q.    Okay.  But sitting here today --

18           And you're not a lawyer obviously, right?

19     A.    No, sir.

20     Q.    Sitting here today, you -- you remember that being

21  a deposition perhaps?

22     A.    Yes, sir.

23     Q.    Do you recall if these claims of yours against a

24  family partnership for unpaid amounts was discussed at that

25  deposition?

1    A.    I can't remember that.

2    Q.    Okay.  Did you ever get a transcript of that

3 deposition, to your memory?

4    A.    No, sir, that I remember.

5    Q.    Okay.  Do you recall if that one -- that one was

6 videotaped as well?

7    A.    I don't think so.  It was pretty quick.

8    Q.    I'm going to ask you a series of questions about

9 yourself and your family.

10        Please tell me about your educational background?

11    A.    Graduated from Shamrock High School.  Had one year

12 or a half a year at Panhandle State University, then I went

13 into work.

14    Q.    Okay.  Where'd you go into work at?

15    A.    I worked up here at Aircraftsman at the airport

16 for a little bit.  Then I went back to work at Shamrock and

17 we started that G&G Steam Service, me and my dad.

18    Q.    When did you start G&G Steam Service?

19    A.    '75, maybe.

20    Q.    And you started it with your dad right at the

21 beginning?

22    A.    Yes, sir.

23    Q.    Okay.  So I -- I reckon you graduated high school

24 around '73?

25    A.    '4

```
 1        Q.    '74.

 2              Okay.  Have you ever been arrested?

 3        A.    No, sir.

 4        Q.    Okay.  Then obviously you have no criminal record,

 5  right?

 6        A.    No, sir.

 7        Q.    Are you married?

 8        A.    No, sir.

 9        Q.    Have you been married before?

10        A.    Four times.

11        Q.    Four times.

12              So are you divorced right now or a widower?

13        A.    Divorced.

14        Q.    When did you divorce?

15        A.    I don't remember.  '13 or '14, something like

16  that.

17        Q.    And what was the ex-wife's name?

18        A.    Becky Counts.

19        Q.    Okay.  And what about the wife before that, what

20  was her name?

21        A.    Bonnie, I think.

22        Q.    Okay.  And when do you, to the best of your

23  memory, when did you divorce her?

24        A.    I -- I can't recall that.

25        Q.    Okay.  And what was the name of the wife before
```

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

1  that?

2      A.    Connie Hurley.

3      Q.    Okay.  Do you recall about when you divorced or

4  when -- when you all got divorced?

5      A.    No, sir.

6      Q.    Okay.  And what about the first wife?

7      A.    Well, I guess there are five times, 'cause there

8  was the -- Donna was my second wife.

9      Q.    Okay.  Do you remember her last name?

10     A.    Glover.

11     Q.    And then what was your first wife's name?

12     A.    Charlotte Smith.

13     Q.    Do you remember approximately when you and -- and

14  Ms. Glover and Ms. Smith were divorced?

15     A.    No, sir.

16     Q.    Okay.  Do you have any children?

17     A.    Yes, sir.

18     Q.    How many?

19     A.    Have six.

20     Q.    Six children, okay.

21     A.    Mm-hmm.

22     Q.    And do you have any living siblings?

23     A.    Yes.

24     Q.    Okay.  I know the answers to some of these

25  questions, so I'm just asking you for the record.  I'm not

1  as stupid as --

2      A.    Okay.

3      Q.    -- as my questions might make it sound.

4            And obviously Leslie is one of your siblings?

5      A.    Yes.

6      Q.    Okay.  And then tell me about the other siblings?

7      A.    Be Traci Coleman, Rudas or Mark Galmor, and Shawn

8  Zaiontz.

9      Q.    Okay.  Did you ever have any siblings that are no

10 longer alive?

11     A.    No, sir.

12     Q.    Okay.  You're the oldest of these five siblings?

13     A.    Yes, sir.

14     Q.    Okay.  How would you describe your relationship

15 with your siblings?  And we can go one by one or you can

16 just tell me in your own words, however you'd prefer?

17     A.    All -- You can ask the questions.  I thought it

18 was all good for a long time, but I don't know that.

19     Q.    Well, how would you describe your relationship

20 with Leslie Pritchard today?

21     A.    Not very well.

22     Q.    You don't like her and she doesn't like you?

23     A.    I assume that's the truth.  I mean, I don't -- I

24 love her; she's my sister.  But, you know, I don't know.

25 That's what we got to deal with.

1    Q.    Why do you think that the relationship is not very

2  well today?

3    A.    Well, we wouldn't be here if it was very well.

4    Q.    Is that it or are there other things between you?

5    A.    I -- I don't know what it might be, sir.

6    Q.    Okay.  When did your relationship with Ms.

7  Pritchard go south?

8    A.    I guess after my mother passed away.

9    Q.    Before that, it was more or less okay?

10    A.    Yeah, I think so.

11    Q.    What about your relationship with your sister

12  Traci, how would you describe that today?

13    A.    It was always well, I think.

14    Q.    You think it's well today?

15    A.    I don't think so because of this litigation.

16    Q.    So when did that relationship kind of take a turn

17  for the worse?

18    A.    I guess really kind of after my mother passed

19  away.  Right there around the time my mother did pass away.

20  I'm not real sure about all that.

21    Q.    Okay.  And what about your brother, Mark?  I guess

22  he goes by -- by Rudas?

23    A.    Rudas.

24    Q.    How's your relationship with him today?

25    A.    It's okay.  I mean Rudas is just Rudas.  You just

1  have to take him for what he is.

2      Q.    What do you mean by that, sir?

3      A.    Well, he's up and down.  He drinks a lot and just

4  have to depend on what -- what day of the week it is with

5  him.

6      Q.    Okay.  What about your sister Shawn, how would you

7  describe that relationship today?

8      A.    Well, we used to be pretty close.  She was

9  probably the closest one of the mess.  But, you know, I

10 don't know.  I haven't spoke to her in a long time either.

11     Q.    From before your mother passed away or after?

12     A.    All through the periods when my mom and dad were

13 having trouble and the things that happened, Shawn was

14 probably the one that was there to help my mom and dad the

15 most.  And, so I mean, it always -- she's had trouble

16 herself, but it was always -- we could always kind of talk

17 through things and visit about things and got through that.

18 So I mean, that's -- I mean, I was probably closer to her

19 than I was any of them.

20     Q.    So is it fair to conclude that it's really when

21 the litigation concerning your parents' estates, et cetera,

22 when that litigation began, that you started having issues

23 with -- with some of your  siblings at least?

24     A.    I would say so.

25     Q.    Okay.  And tell me about your parents, sir.  What



```
 1   was your dad's name?

 2        A.   Bobby Don Galmor.

 3        Q.   Okay.  And when did he die?

 4        A.   April the 3rd in '13.

 5        Q.   And what was your mom's name, sir?

 6        A.   Shirley Jo.

 7        Q.   And when did she die, sir?

 8        A.   The 23rd of March, five years ago, I think.

 9        Q.   Okay.  So 2016?

10        A.   (Nods head)

11             THE REPORTER:  Is that a yes?

12             MR. SHERWOOD:  You can't nod your head.  You got

13   to --

14             THE WITNESS:  Yes, sir.

15             MR. SHERWOOD:  -- give verbal answers.

16             THE REPORTER:  Thank you.

17   BY MR. RUKAVINA:

18        Q.   And, and how was your relationship with your

19   parents before they passed?

20        A.   It was good.

21        Q.   With your dad in particular, 'cause you all were

22   in business together?

23        A.   We've always done some type of business together,

24   yes, sir.

25        Q.   Okay.  And with your mom, were you pretty close
```

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

1  with her as well?

2       A.   I became closer with her after my dad passed away.

3  But, yes, my mom was always there for me and they -- I

4  always had a family that -- always had a house to go home

5  to, whether it was right or wrong and indifferent, I still

6  had a place to go.

7       Q.   Okay.  So you mentioned that you started the G&G

8  Steam, was it the steam business, steam cleaning business,

9  with your dad in about 1975?

10      A.   '75, yes, sir, I think so.

11      Q.   And that was called --

12           What was that name of that --

13      A.   G&G Steam Service.

14      Q.   Okay.  And what did that business do?

15      A.   Steam rods and tubing in the oilfields, steam -- I

16 mean that's vessels and -- basically worked in the oilfield.

17      Q.   Was that the business since 1975 until it field

18 bankruptcy?  Is that what the business did?

19      A.   That was the -- the start company, yes, sir.

20      Q.   Okay.  And your dad and you started that company?

21      A.   Yes, sir.

22      Q.   And did you all grow that company into a

23 successful company?

24      A.   Yes, sir.

25      Q.   Can you give me kind of a top-level kind of just

1  how it went year-by-year or decade-by-decade?  I mean, tell

2  me just in your own words from '75 until the bankruptcy how

3  that company did.  How did it grow?  How many employees did

4  it have?  Revenues?

5      A.   Well, I don't know the revenue part.  I know in

6  '75, it was myself and my brother, that's why we called it

7  G&G.  And then we grew there 'til '85 until Penn Square went

8  broke and there wasn't any work for us to work, so we ended

9  up at Elk City.  And when I went to Elk City, there was five

10 hands went with me and we started working out at Elk City.

11     Q.   And about when -- About when was that?

12     A.   '85.

13     Q.   Okay.

14     A.   It was a -- I'd say it was like April of '85, when

15 I moved over there.

16     Q.   And then how did the business do after '85?

17     A.   It's a typical oilfield business.  It'd struggle.

18 It'd go up.  It'd go down, and just depend on the -- the

19 frame of the -- the price of the oil and the -- and the gas

20 markets.

21     Q.   When would you say that that business was doing

22 its best, approximately what years?

23     A.   '09 to '10, probably.

24     Q.   Okay.  Can you give me an idea of the -- of the

25 annual revenue during that period of time for G&G?  We're

1  talking about millions of dollars?

2      A.    There was millions of dollars, but I can't give

3  you the numbers.  I never looked at that.  I mean, we looked

4  at reports on Fridays, and that's what I worked my stuff off

5  of.

6      Q.    Would you estimate that it was more than $10

7  million a year when it was at its best or less than $10

8  million a year?

9      A.    Probably less.

10      Q.    Okay.  And approximately how many employees did it

11  have when it was doing its best?

12      A.    I remember around 200, I think.  I don't -- I'm

13  not going to say that's accurate, but I know that somewheres

14  in that neighborhood.  There's a lot of going and coming.

15      Q.    Okay.  And did -- did that business acquire

16  physical property during all those years; machinery,

17  equipment, et cetera?

18      A.    Yeah, we -- a lot of equipment, yes, sir.

19      Q.    Okay.  What was the nature of that equipment?

20  What -- What type of equipment are we talking about?

21      A.    Sir?

22      Q.    What -- What was the nature of that equipment?

23      A.    What do you mean, the nature?

24      Q.    Well, was it vehicles?  Was it machinery?  I mean,

25  I don't know what a steaming business --

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800) 528-3335
NAEGELIUSA.COM

1       A.    All -- all it --

2       Q.    -- is.  So what all did it have?

3       A.    It was an oilfield construction business after --

4   later on in the life, we did -- we had a group that was

5   roustabouts.  We had a group that were dirt work people.  We

6   had a group that hauled rock.  And then we had a pipeline

7   outfit.

8       Q.    Okay.  What's a roustabout?

9       A.    They just do kind of like plumber work.

10      Q.    Okay.  So at the height of that business, do you

11  remember what the book value of all of its assets was?

12      A.    The assets would be based on who might want them

13  or what they were -- who was involved in it, because it --

14  it's -- it's not any different than a car or a tractor.

15  It's -- It's what it's worth to somebody.  I mean, I don't

16  know if you can put a number on it all.  We -- We actually,

17  you know, tried to sell it two or three times, and it never

18  would come up to what we thought it was worth, you know.

19      Q.    So you never sold the G&G business?

20      A.    Yes, sir, we did.  There when we sold to

21  Advantage, whenever that was.

22      Q.    Okay.  Tell me about that, sir.  So you sold to

23  Advantage?

24      A.    Yes, sir.

25      Q.    So the G&G business was sold to a company called



1  Advantage?

2      A.    Yes, sir.  Well, G&G and -- and the Galmor's, they

3  were combined.

4      Q.    **Okay. Let's talk about that before we talk about**

5  **the sale then.**

6            **What was Galmor's when it started?**

7      A.    Damor was my dad's start company and he sold rope,

8  dope, and soap.  He would service the rigs in the oilfields

9  with that, that's what it -- bottom hole pumps.

10            And I don't know when the transition came.  But

11  when I bought it from my folks in '99, we operated it like

12  two or three years and we had two separate sets of books.

13  And I told them then, instead of having two sets of

14  liability and all this complicated paperwork, we merged them

15  together.  And I don't know the dates of all that.  It was

16  done by CPAs and attorneys.  But I don't know the dates on

17  that.

18      Q.    **Okay.  So, so Galmor's, when did your dad start**

19  **Galmor's; do you remember?**

20      A.    He didn't start -- He started Damor.

21      Q.    **I'm sorry.  Damor, okay.**

22            **So how did Damor becomes Galmor's?**

23      A.    In '99, he came to me and said that we were going

24  to break him.  And I said, well, we don't want that either.

25  So he owed $2 million approximately.  I'm not going to give

1  the exact numbers.  And he talked to my mother and he talked

2  to my brother.  And he told my brother, he said, if you want

3  to -- if you can come up to $2 million, you can have it, but

4  I -- I want out.  So that's what we done.  And they signed

5  the stocks all over to me in '99 and early 2000.

6      **Q.   Okay.  So, so your dad started a company called**

7  **Dalmor?**

8      A.   Damor.

9      **Q.   Damor.**

10     A.   D-a-m-o-r.  Yes, sir, Damor.

11     **Q.   When did he start that company?**

12     A.   '64 or '65.

13     **Q.   Okay.  And up to '99, was he the only owner of --**

14  **of Damor?**

15     A.   Yes, sir.

16     **Q.   Okay.  And then in '99, did he sell it all to you?**

17     A.   Yes, sir.  Well, he had a interest in the G&G

18  Steam Service, sir, but I don't know what percentage his

19  interest in that was.

20     **Q.   Okay.**

21     A.   But I know him and my mother and my brother had to

22  sign off for me to get the stock.

23     **Q.   The stock of Damor?**

24     A.   G&G.

25     **Q.   Okay.  I thought you started G&G with your father**

1  in 1975?

2      A.    I did.

3      Q.    Okay.  So I want to focus on Damor right now.

4      A.    Okay.

5      Q.    So, so in 1999, is it correct that you purchased

6  Damor from your father?

7      A.    Yes, sir.

8      Q.    You and you alone?

9      A.    Yes, sir.

10     Q.    Okay.  And then when did it become Galmor's?

11     A.    A few years later.  I mean, I don't know the dates

12  on that.

13     Q.    Do you know if it was just a name change or was it

14  actually a new company that was created to be Galmor's?

15     A.    It was just a name -- a transfer of some type,

16  sir, is all -- I mean, it had to go through all the -- the

17  hoops to get the -- the money back to where we have tax

18  numbers and stuff to go to with that.

19     Q.    Okay.  And then at some point, Galmor's was merged

20  with G&G?

21     A.    Yes, sir.

22     Q.    Okay.  And after that it was Galmor's/G&G?

23     A.    Yes, sir.

24     Q.    You're nodding --

25            And approximately when was the -- when was it

1  merged?

2      A.   I can't tell you that date; I don't know that.  I

3  mean --

4      Q.   **Was it shortly around 1999?**

5      A.   No, no, no, no.  It'd be a few years past that.  I

6  don't know.

7      Q.   **Were you able to buy out your father when you**

8  **bought Damor?**

9      A.   I had to pay that $2 million worth of debt off.

10     Q.   **So you assumed the debt?**

11     A.   Yes, sir.

12     Q.   **Okay.  Now, you mentioned something about G&G,**

13  **that your brother and your mother had to sign off on it.**

14  **Did I understand that correctly?**

15     A.   Well, in '99, that's what -- when it all came to a

16  head, my mother -- what started G&G was a -- they were two

17  different entities.  And my dad, when he asked us to take it

18  over or to liquidate it, whatever we needed to do, he had to

19  sign off, my mother had to sign off, Mark had to sign off,

20  and then they signed the stock over to me.

21     Q.   **The stock of --**

22     A.   G&G.

23     Q.   **-- Damor?**

24     A.   No, G&G.  There never was any stock in Damor.

25  Damor was always my dad's.  But --

1     Q.    Okay.

2     A.    -- I assumed all of that in '99.

3     Q.    So it sounds like Damor was never a corporation,

4   it was just a business that your dad ran through his --

5   through a, what's called a dba?

6     A.    I don't know.  I couldn't answer that.

7     Q.    Okay.  So to go back to G&G.  Your father and you

8   started that in 1975?

9     A.    Yes, sir.

10    Q.    And then at some point did your brother Mark and

11  your mother acquire interests in that company?

12    A.    Two or three years after we formed the G&G, my dad

13  wanted that all to come up and it was starting to grow.  So

14  that's when he built, I think he had a guy named Jim Fling

15  or someone draw up the papers for that corporation for G --

16  it was just a -- I don't think it was even a corporation.  I

17  think it was just a -- a company.

18         And that's how we -- they -- I mean, my mom owned

19  -- they owned half of it and I think Rudas and I owned 25

20  percent a piece, that's what I think.

21    Q.    Did -- Did Rudas work for these companies back

22  then?

23    A.    Off and on, he'd work for us awhile there and then

24  he went off on his own pipeline welding.

25    Q.    Do you want a water, by the way?  We have some

 1  waters.

 2       A.    I'd sure like to have one.

 3       Q.    I don't think it's cold, but...

 4       A.    That's all right.

 5       Q.    Anyone else?  Okay.

 6             So did your dad continue working with Damor,

 7  slash, Galmor's after he sold it to you in 1999?

 8       A.    Yes, sir.

 9       Q.    Okay.  And did your dad continue working with you

10  in G&G?

11       A.    Yes, sir.

12       Q.    Did your dad ever like retire or just stop working

13  or did he keep working until he died?

14       A.    Worked every day since I've known him.

15       Q.    Okay.  What did your -- What did your dad die of?

16       A.    He had stage 3 or 4 cancer.  He had a prostate

17  cancer, then he has a colon cancer which went into his

18  lungs.  And anyways, I think it was a stage 4 cancer that

19  finally went into his lungs and it -- it killed him.

20       Q.    So it was not pleasant?

21       A.    Sir?

22       Q.    It was not -- it was -- it was a painful --

23  painful process?

24       A.    He was on morphine the last three weeks of his

25  life, yes, sir.

1    Q.    Other than Damor and G&G, did your dad, to your

2 knowledge, ever own other businesses?

3    A.    Lots of other businesses.

4    Q.    What?  In the '80s?  In the '90s?  In the 2000s?

5 Or...

6    A.    My dad never let us know really what he was doing

7 and what he wasn't doing, sir.  But I know he had a partner

8 named Davenport.  I know he had a partner named Barker.  I

9 know he had a guy named Basil Hindman one time; they had

10 water trucks.

11       My dad made his own energy all the time and he

12 didn't include me in any of that type of stuff.  I'd know

13 about it later, but most of the things he done, no one --

14 not even my mother knew he was doing it most of the time.

15    Q.    And I don't mean to be personal or disrespectful.

16 But were -- were they a happily married couple there to the

17 end?

18    A.    Yes, sir.

19    Q.    So just kind of like an old-fashioned guy, he just

20 didn't share all -- all the business details with his wife?

21    A.    Yes, sir.  He didn't even let my mother know --

22 She wasn't on his checking account 'til he found out he had

23 this cancer real bad.

24    Q.    Okay.  But it's fair to say that through the

25 course of his life, your dad built up some pretty decent

```
 1   wealth, right?

 2       A.   Yes, sir.

 3       Q.   He started -- He started acquiring, whether

 4   directly or indirectly, land and oil and gas interests and

 5   all that stuff?

 6       A.   Yes, sir.

 7       Q.   So he was a hard-working, successful man?

 8       A.   Yes, sir.

 9       Q.   Did he -- Did he come from money or did he come

10   from humble means?

11       A.   Humble.

12       Q.   Where did he -- Where was he born and where did he

13   grow up?

14       A.   Mobeetie, Texas.

15       Q.   Is that where he grew up, too?

16       A.   No.  I grew up in Shamrock.

17       Q.   No, no.  Where did your dad grow up?

18       A.   At Mobeetie in --

19       Q.   And I'm sorry.  I do not know where Mobeetie is.

20       A.   It's six -- 11 miles west of Wheeler or 40 miles

21   east of Pampa on 152.

22       Q.   Okay.  So let's say by the year 2010, your dad had

23   a net worth probably in the millions of dollars?

24       A.   I wouldn't know that.  I know he had a lot of

25   things going on.
```

1       Q.    Okay.  So we mentioned that he had acquired some

2    land and he acquired some oil and gas interests, right?

3       A.    Yes, sir.

4       Q.    Do you know of other significant assets that he

5    had been able to acquire during his life?

6       A.    Like I said, I don't know all of his business.  He

7    never would tell me all of his business.

8       Q.    Okay.  Did he have like a confidante or a lawyer

9    or an accountant that -- that he would tell all his business

10   to, or a business partner or someone?

11      A.    Well, like I said, Mr. Barker, Rodney Barker and

12   Roy Barker were his first partners in that oil and gas

13   business.  And, and then him and Vernon Davenport did some

14   things together.

15            But a lot of those things that happened, you know,

16   we wouldn't know they were even happening, they were just

17   happening.  But I don't know of a -- Like I said, I didn't

18   know his business.  I didn't ask his business.

19      Q.    No, I respect that.  I'm just wondering if you

20   knew of someone that he did have that knew all of his

21   business, like a close friend or an accountant or someone.

22      A.    Well, I -- there's a few attorneys and stuff.  I

23   know at one point, you say those things, he was a member of

24   the -- he was on -- a board member of the bank over there.

25      Q.    Which bank, sir?

```
 1        A.    First State Bank, I think was it, or something.
 2   And -- But that's another thing, sir, I don't know -- my dad
 3   never included me in none of that stuff.  I mean, we'd find
 4   out about it later.  I mean, he -- through -- I mean he was
 5   kind of funny about those things.  That was his business.
 6        Q.    Did your dad use the Underwood Law Firm a lot?
 7        A.    Yes, sir.
 8        Q.    Okay.  Do you know how long he used that law firm?
 9   Like are we talking about '80s, '70s, or...
10        A.    He used Ken Fields for as long -- he used -- I
11   can't remember the first attorneys he was using.  I
12   mentioned it while ago.  But I think that he -- him and
13   mother, when he started getting things kind of together, he
14   used Ken Fields for most of his business 'cause Ken was a
15   local boy.
16        Q.    Was he up in Shamrock?
17        A.    I think it was Pampa.
18        Q.    Pampa, okay.
19              Now, how long were your parents married?  Or what
20   year did they get married in, do you know?
21        A.    Well, they were born in '36, and they were married
22   March 17th in probably '54, '55.
23        Q.    So they were married for almost 60 years before
24   your dad passed?
25        A.    Yes, sir.
```

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

1    Q.    Did your mom ever have a job of her own or -- or

2  any kind of business interest of her own?

3    A.    She had a greenhouse, yes, sir.

4    Q.    Was that it?

5    A.    Well, she -- early on when they first started, she

6  worked for J.R. Barber.  She was keeping books to help make

7  income for us.  And, and then but most of the time she was a

8  housewife.  But I said after the girls, after everyone kind

9  of got out of school, I think she started that Shamrock

10  Greenhouse and Floral she called it.

11    Q.    What -- What land was that on?

12    A.    It was on their property there in Section 64.

13    Q.    Is that the homestead property?

14    A.    Yes, sir.  Mm-hmm.

15    Q.    Okay.  Other than that, do you know of any

16  significant assets that she would have had in her own name

17  when your dad died?

18    A.    Whatever my dad left her.

19    Q.    So to the best of your understanding, whenever

20  your dad died, she would have had her community property and

21  then whatever your dad left her, right?

22    A.    Yes, sir.

23    Q.    Okay.  We'll talk some more about that.  I'd like

24  to first introduce into evidence this subpoena.  Pardon me,

25  sir.  This is going to be Exhibit 1.

```
 1              (WHEREUPON, Exhibit 1 was marked for

 2   identification.)

 3          MR. RUKAVINA:  Want me to throw it at you?

 4          MR. RIES:  You can just pass it through Steve.

 5          THE WITNESS:  Yours is -- Are they the same or --

 6          MR. SHERWOOD:  You keep -- You keep that one,

 7   Steve.

 8          THE WITNESS:  Keep that one?

 9          MR. SHERWOOD:  Yeah.

10          MR. RUKAVINA:  I'll just -- I'll walk it over.

11   BY MR. RUKAVINA:

12      Q.   Sir, have you seen this subpoena before?

13      A.   Saturday a week ago I saw this first page of this.

14   I think this is the same document.

15      Q.   Were you not served by a process server at the

16   post office with this subpoena last fall?

17      A.   Yes, sir.

18      Q.   So did you see it -- So the process server says

19   that he served it -- oh, I'm not sure of the date right now.

20   But would it have been September of last year, somewhere

21   around there?

22      A.   I -- I wouldn't know.  I know that someone gave me

23   some papers at the post office, yes, sir.

24      Q.   Okay.  But the process server, if he says that he

25   gave it to you at the post office last September or October,
```

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

1  would you disagree with that?

2      A.    No, sir.

3      Q.    Okay.  Did you look at the subpoena then when you

4  received it?

5      A.    I read through it, yes, sir.

6      Q.    Okay.  And did you, other than, well, before Mr.

7  Sherwood, did you talk to a lawyer about this subpoena?

8      A.    I contacted Mr. Ries and asked him what this might

9  be.

10     Q.    Okay.  Was -- Was there some problem, to your

11 knowledge, with the process server serving you?  Why did he

12 serve you at the post office, do you know?

13     A.    I -- I couldn't answer that.

14     Q.    Did you ever see the process server coming onto

15 your property and try to avoid him serving you?

16     A.    No, sir.

17     Q.    Okay.  You -- Do you see that this subpoena

18 requests you to produce various documents?  Do you see that,

19 sir?

20     A.    I saw that, but, you know, I had no documents.

21 Mr. Ries has got all my documents.

22     Q.    When you received the subpoena, did you understand

23 that it was asking you to produce certain documents?

24     A.    I saw that, but that's when I called Mr. Ries.

25     Q.    Okay.  So other than calling Mr. Ries because he

1    had these documents, did you take any other steps to try to

2    find any documents included here?

3        A.    There's no documents to be had.  Mr. Ries took

4    them.  They took a computer and took all the stuff that -- I

5    mean, when they -- when I filed that bankruptcy and they

6    came got my equipment at Twitty, that's the last I've seen

7    of any of -- I had -- I saw the computer the other day when

8    I was at Mr. Ries' office.  That's the first time I saw the

9    computer in four years.

10       Q.    So you don't have any personal tax returns in --

11   in your personal possession at all?

12       A.    No, sir.

13       Q.    Okay.  No appraisals of any properties?

14       A.    No, sir.

15       Q.    Okay.  You're -- You are testifying under oath

16   that all of the documents requested here were turned over to

17   Mr. Ries whenever the Chapter 7 happened?

18       A.    Well, I don't -- I'm not going to say that 'cause

19   I'm not sure what all this means.  I'm not an attorney.

20            But I know that all the -- the records that I -- I

21   surrendered them to Kent Ries and -- I forget my other

22   attorney, the other one, they showed up out there, and Mr. -

23   - Leslie's attorney.  And they put them all in the back of a

24   Suburban car.  We loaded two cars full of paperwork.  And

25   they said that's all that they needed, and then they left

 1  with it.

 2       Q.    So you mentioned a computer.  You -- Did you

 3  surrender to Mr. Ries a computer that you had that would

 4  have had some of this?

 5       A.    Yes, sir.

 6       Q.    Okay.  And that --

 7             Was that right around the time of the Chapter 7?

 8       A.    I'm -- I don't know that.  I just know that Kent

 9  and my -- the attorney that I had hired to help me out of

10  Elk -- of Amarillo here --

11       Q.    Is that Swindell?

12       A.    Yeah, Mr. Swindell.  And then Leslie's attorney,

13  they were all there at Twitty that day.  And they wanted to

14  look at what we were all talking about and -- 'cause I

15  remember that day that we'd run out of propane, didn't have

16  money for propane.  So there wasn't no heat in the building.

17  It was like today.

18             So we gathered up all the information that -- that

19  everybody wanted.  They wanted to see what -- what we were

20  dealing with.  And we took everyone to see everything.  And

21  then they took those computers, and that's the last -- Kent

22  asked me to close that office, and that's what I did.

23       Q.    So was Mr. Ries there with Mr. Swindell and

24  Leslie's attorney?

25       A.    Yes, sir.

1    Q.    Okay.  And is that when Mr. Ries took the

2  computer?

3    A.    Huh?

4    Q.    Was that when Mr. Ries took the computer?

5    A.    Yes, sir.

6    Q.    Okay.  Did you give Mr. Ries any passwords that he

7  might need to open that computer?

8    A.    Yes, sir.  I've been open with Mr. Ries, whatever

9  he needs.  I mean, I don't -- Sir, I don't know how to even

10 open a computer.  I couldn't even start the computer if you

11 asked me.

12    Q.    Did Ms. Carter help you a lot with that?

13    A.    Yes, sir.

14    Q.    Okay.  Do you know -- I mean, you might not know.

15 Did that computer have QuickBooks files?

16    A.    Well, I'm sure if you say it's there, it's there.

17    Q.    I -- I don't know.  But do you know what --

18    A.    I --

19    Q.    -- QuickBooks is?

20    A.    Yes, sir, I know.  I think that's how all these

21 documents were generated, with QuickBooks.

22    Q.    Okay.  Did that computer have any -- do you --

23          Do you use email?

24    A.    A little.  Not very much.

25    Q.    Did you use email in the 2015, 2016, 2017, 2018

1  time frame?

2      A.   I -- I could have, I could not.  Most of my stuff

3  I did was text.

4      Q.   Okay.  Did you --

5           Do you know if that computer had your emails on

6  it?

7      A.   You know, I -- I think that it might, because I

8  know after Mr. Ries took my computer and then we quit using

9  the -- the people at Elk City that backed our computers up,

10 I lost all my emails, because way I understand it -- and I'm

11 not an electronic guru.  I know there -- it comes in on

12 this, and they had a deal to protect for the cyber whatever

13 it was.

14          Well, that -- my email, when they shut that

15 service off, got lost in -- in between them two deals.  I

16 didn't get emails for four or five years.  I just now

17 started getting emails about four months ago.

18     Q.   Do you --

19     A.   I had to change my address.

20     Q.   Do you remember if it was one computer that Mr.

21 Ries and the others took or were there multiple computers?

22     A.   I just think one, the main one.  The main computer

23 that had all the -- what -- where we all worked off of or

24 them girls worked off of.

25     Q.   So when you -- when you received this subpoena,

1  you called Mr. Ries and you told him what?

2       A.   I asked him what -- what I was looking at.

3            And he said, well, I'm not sure what you're

4  looking at.  He said, I didn't request it.

5            But I said, well, it's got your name on it and it

6  says it --

7            And he said, well, I'm not sure what it might

8  mean.

9            And so I didn't -- I didn't say no more about it.

10 I just left it alone.

11      Q.   Did Mr. Ries tell you to do or not to do anything

12 in response to this subpoena?

13      A.   No, sir.

14      Q.   Okay.  So let me ask again.

15           Other than calling Mr. Ries, did you take any

16 steps to see whether you might could have had some of these

17 documents in your possession?

18      A.   I'm about 99 percent sure I don't have any of

19 those documents, 'cause they picked up everything what --

20 when we did this -- when we went through the QuickBooks,

21 Kellye Fuchs had access to our computers all the time.  So

22 all the information that was gave come off of that computer,

23 and that's what Mr. -- I told Mr. Ries, anything that was

24 dealt with was dealt with that computer.  And that's what

25 they wanted to have.

 1          And then, like I said, you asked about Kellye

 2  Fuchs.  She had access 'cause she was always reviewing it

 3  'cause we were so busy at that time, to keep us in

 4  compliance with everyone.

 5      **Q.   So do you -- do you think a -- I understand you're**

 6  **not a computer expert.**

 7          **Do you think she had what's called remote access**

 8  **to that computer?**

 9      A.   No, I don't think so.

10      **Q.   So she was there physically at --**

11      A.   Oh, no.  She had remote, yes, sir.

12      **Q.   Okay.**

13      A.   Kellye did.  She -- She actually had a -- She

14  could type in and access what we were doing.  I guess you

15  could see it, the girls could see it when she accessed it,

16  so they know that she was there.  But --

17      **Q.   Who's the girls; Ms. Fuchs and Ms. Carter?**

18      A.   Yeah, basically.

19      **Q.   Anyone else?**

20      A.   Well, anyone that was in the management part of it

21  could see it.  I mean, I don't know that there was -- there

22  was like three or four of those girls that were there.  I

23  mean, but I -- I don't know.  I can't answer that, I guess.

24      **Q.   On site?  Were they on site, the girls?**

25      A.   No, there was a shop.  We had a place at Elk City

1  and we had a place there at the rock pit.  Then we had a

2  place there at Twitty.

3      Q.   Okay.  So I think -- I think Ms. Carter already

4  said this at the meeting of creditors.  Galmor's and G&G

5  kept its books in Quick Kept -- QuickBooks, correct?

6      A.   Yes, sir.

7      Q.   Did you keep your personal financials or books on

8  QuickBooks?

9      A.   I think they're all in that same computer on the

10  back side of that.

11     Q.   But did you -- did you keep --

12          Did you personally as a human being, Michael

13  Stephen Galmor, keep your financial records in a QuickBooks

14  file?

15     A.   It'll -- it -- in the same computer, yes, sir.

16     Q.   So the answer is yes?

17     A.   Yes, sir.

18     Q.   Okay.  So Ms. Fuchs had access to it and Ms.

19  Carter had access to it, and maybe a couple three more girls

20  that will just do what, data entry?

21     A.   Mm-hmm.

22     Q.   Yes?

23     A.   Yes, sir.

24     Q.   Okay.  Do you know what the cloud is?

25     A.   No, sir.

 1      **Q.    Do you know if any backups of that computer or the**

 2  **QuickBooks files exist anywhere?**

 3      A.    Dynaturn is what -- where all that went in to

 4  secure us there at Elk City.

 5      **Q.    Deena?**

 6      A.    Dynaturn.

 7      **Q.    Is that a name of a person?**

 8      A.    It's a -- No, that's a --

 9      **Q.    Company?**

10      A.    It's a company.  There's like six individuals that

11  operate it, and that's what they do is backup and it's out

12  of Elk City.

13      **Q.    Okay.**

14      A.    If there's anyone would have something like that,

15  it would be Dynaturn 'cause they were the one that -- that

16  kept track of the computer.  We -- We leased all the

17  equipment or bought the equipment from them and run it

18  through their -- their servers there.

19      **Q.    So the business, Galmor's/G&G paid Dynaturn for**

20  **this service?**

21      A.    Mm-hmm.

22      **Q.    Yes?**

23      A.    Yes, sir.

24      **Q.    And at least in your understanding, that would**

25  **have included some level of backup?**

 1      A.    Yes, sir, I think that's what it was for.

 2      Q.    Okay.  Do you know whether you or anyone like Ms.

 3   Carter ever instructed them to preserve records or anything

 4   like that?

 5      A.    No, sir, I don't know that.

 6      Q.    Do you know if anyone ever asked them to turn over

 7   any backups or records that they might have?

 8      A.    No, sir, I don't know that.

 9      Q.    Did you -- I'm try -- And I'm struggling.  I'm not

10   trying to set you up, okay.  I'm trying to use non-legal

11   words here 'cause I know that you're not a lawyer.

12          But did you ever basically tell anyone who was

13   working for you to preserve records because there might be

14   litigation in the future?

15      A.    No, sir.

16      Q.    Why you didn't do that?

17      A.    Well, I mean, I assumed that we had to keep those

18   records for the government and everyone else so we keep

19   accurate records.  And that's why we went to Dynaturn is to

20   preserve those deals in case -- 'cause the books were

21   getting so big that, you know, we had to have -- we're --

22   there would be flaws all the time.  And I don't know about

23   all that.  I just know that we could call them and they

24   could repair what we were doing.  We paid them for that

25   service.

NAEGELI
DEPOSITION & TRIAL                CELEBRATING 40 YEARS IN BUSINESS        (800) 528-3335
                                                                         NAEGELIUSA.COM

1    Q.    But other than that, you never told anyone to

2 preserve books and records because there might be

3 litigation?

4    A.    No, sir.

5    Q.    Okay.  Dynaturn, they're in Elk City, Oklahoma?

6    A.    Yes, sir.

7    Q.    And was G&G paying them until the bankruptcy?

8    A.    Yes, sir.  I think -- Well, I don't know when it

9 stopped; I don't know that.

10    Q.    Okay.  Do you have any memory, and I -- I don't

11 blame you if you don't -- as to how long they might have

12 been required to preserve those records?

13    A.    I have no idea.

14    Q.    Okay.  Do you remember the name of any gentleman

15 or lady there if I wanted to call them to talk about this?

16 Do you remember that?

17    A.    No, sir.

18    Q.    Is that something that Ms. Carter might have dealt

19 with more than you or someone else?

20    A.    Yes, sir.  Deena would probably know that.

21    Q.    Okay.  Did you ever --

22          Did you personally ever destroy intentionally any

23 books and records of yourself or of Galmor's/G&G?

24    A.    No, sir.

25    Q.    Did you, to your knowledge, ever accidentally

1  destroy any of those records?

2      A.   I don't know how to accidentally destroy them.  I

3  never...

4      Q.   Okay.  To your knowledge, were any of the books

5  and records of you personally or of Galmor's/G&G stolen by

6  anyone?

7      A.   Not that I'm aware of.

8      Q.   To your knowledge, were any of those records ever

9  destroyed in a fire or flood or whatever, tornado?

10     A.   No, sir, not that I'm aware of.

11     Q.   Did you ever burn any computers or hard drives or

12  anything like that?

13     A.   No, sir.

14     Q.   Did you ever ask anyone --

15          So now not you, but did you ever ask anyone else,

16  your relatives or -- or anyone working for you to destroy

17  any books and records?

18     A.   No, sir.

19     Q.   Okay.  Again, not thrown them in the garbage, not

20  burned them, nothing like that?

21     A.   No, sir.

22     Q.   Okay.  So as you sit here today, to the best of

23  your knowledge, under oath, whatever records there were as

24  of bankruptcy are going to be either with Mr. Ries or were

25  taken from Twitty that day by the lawyers you mentioned?

```
 1        A.    Yes, sir.

 2        Q.    Okay.  Did you check your personal house or the

 3   lake house for whether you might have any of -- any paper

 4   files for these records in my subpoena there?

 5        A.    There's -- There's no record at the lake.  The

 6   lake was just a recreation place.  My house is at my

 7   mother's now and we never kept anything there.  I mean, my

 8   dad had an office there, but he didn't use it for none of

 9   that.

10        Q.    So is it fair to summarize that -- Well, let me --

11   let me --

12              Do you agree with me that you have not produced to

13   me a single document in response to my subpoena?

14        A.    I assume that's true if that's what you say.

15              MR. RIES:  I'm going to object.  He's already

16   testified that he produced a number of documents, in fact,

17   loaded up the back of a Suburban full of documents to Mrs.

18   Pritchard's counsel after the 341 meeting.

19              MR. RUKAVINA:  Well --

20              MR. RIES:  So he's produced, my -- my recollection

21   is it's 20, 40 boxes.  It was a significant number of boxes

22   that --

23              THE WITNESS:  Yes, sir.

24              MR. RIES:  -- we released to her.

25              THE WITNESS:  And we've -- we've loaded the --
```

1 Patrick's van plumb full. And you had a pretty big bunch

2 for yourself.

3 **BY MR. RUKAVINA:**

4     **Q.  Now, Mr. Ries will ask you questions later.**

5     A.  Okay.

6     **Q.  So right now he's going to object and it's back to**

7 **me.  Let me ask -- Let me ask a different question.**

8         **You did not -- You personally did not send to me**

9 **or my office any documents in response to the subpoena,**

10 **correct?**

11     A.  No, sir.

12     **Q.  Okay.  Because you believed that whatever you**

13 **might have had in response to the subpoena was no longer in**

14 **your possession, correct?**

15     A.  Yes, sir.

16     **Q.  Okay.  And to the best of your knowledge sitting**

17 **here today, that's still true, you don't have any documents**

18 **in your possession in response to that subpoena?**

19     A.  No, sir.

20     **Q.  Okay.  Did you ever discuss with Mr. Ries, after**

21 **you received the subpoena, that he might have the documents**

22 **that are responsive?**

23     A.  No, sir.

24     **Q.  Okay.  Was it only that one conversation you had**

25 **with Mr. Ries about the subpoena back when you called him**

**NAEGELI**
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

1  after you got it?

2      A.   Yes, sir.

3      Q.   Okay.  And since that time, you have not discussed

4  with Mr. Ries the subpoena?

5      A.   I hadn't talked to Mr. Ries until I got whatever

6  you all sent me the other day on a Saturday.

7      Q.   Okay.  For this deposition, right?

8      A.   Yes, sir.

9      Q.   Well, you understand that -- that -- that I

10  noticed your deposition last fall, but we all agreed to move

11  it because there was COVID issues and all that, right?

12      A.   I don't know what the reason for moving it was.  I

13  know it didn't happen.

14      Q.   Okay.  So let's go back -- And by the way, any

15  time you need a break, just tell us that you need a break.

16          Let's go back to -- to your parents now and the

17  beginning of how the family partnership and all the trust --

18  all these trusts got set up, okay.

19      A.   Okay.

20      Q.   Do you know what the Galmor Contribution Trust is

21  or was?

22      A.   I just know what the words are on -- on the label.

23      Q.   Do you know what the Galmor Family Trust was?

24      A.   I know that my dad decided he wanted to do

25  something different and come to Mr. King to build that

1  trust.  I brought him up here for that, yes, sir.

2      Q.    Okay.  So, so would you agree with me that, that

3  there around 2010 or thereafter, your dad started doing what

4  we call estate planning?  Have you heard that term before,

5  estate planning?

6      A.    Yes, sir.

7      Q.    Do you know what it means?

8      A.    Yes, sir.

9      Q.    Did your dad at some point in time start doing

10  some estate planning?

11     A.    We came up here and talk -- Well, he already

12  started that estate planning.  He -- I took him and my

13  mother to a place up in Booker, Oklahoma or somewheres one

14  day, and they met with a gentleman.  And I think that's when

15  they started that Galmor Contribution Trust or something

16  like that, sir.

17     Q.    Okay.

18     A.    And that's when -- 'Cause I drove him and my

19  mother up there, and I didn't really play a part in what

20  they were doing.  They went in the office and dealt with the

21  gentleman.  I don't know what his name was.

22          And then things sat still for a long time.  And

23  then, like I said, in '10, my dad decided he wanted to build

24  a -- that Galmor FLP, and -- and that's when, I mean, I -- I

25  knew about those things.

1    Q.    Well, did you discuss with your dad what he was

2    trying to accomplish with this estate planning?

3    A.    No, sir.

4    Q.    Okay.  You didn't discuss with him that he was

5    trying to provide for his children upon his passing?

6    A.    Well, and I -- I realize that's what he had on his

7    mind, yes, sir, I do.  But I know that he, when we got into

8    the discussion of all those things, he -- he got kind of

9    upset one day.  And I don't know what triggered him, but we

10   got up and left the first time we was up there.  And it took

11   him nearly a year to go back and re-discuss it all.

12          But he never finished fully putting the pieces in

13   either one.  He didn't finish -- That's why we've got these

14   two corporations, I guess, or two entities, because he

15   didn't -- instead of taking all the parts and putting them

16   into one, he never did finish implementing all of those

17   things.

18          But about that time he was getting sick and the

19   checks he was receiving, he didn't want to put them into --

20   and I'm not saying what he said.  I'm saying what Deena told

21   me.  He didn't want -- He said those checks were his checks

22   and they didn't belong to that trust or that relationship

23   there.

24   Q.    Okay.  Well, again, I understand you're not a

25   lawyer.  I don't -- I'm not asking you for perfection, okay.

1    A.    Yeah.

2    Q.    I'm asking you for your understanding.

3    A.    Well --

4    Q.    So, so what is your understanding as to what your

5    dad was trying to accomplish with all these trusts and

6    companies he was setting up?

7         MR. RIES:  I'm going to object.  This is

8    speculation.  He doesn't know what his dad intended.

9    BY MR. RUKAVINA:

10    Q.    Please answer the question.

11    A.    Well, he just -- I think he was planning on for --

12    for us for our family, yes, sir.

13    Q.    Okay.  And you mentioned that some of these trusts

14    weren't done or something?  What -- What's your

15    understanding of --

16    A.    I don't understand all -- I just know what I've

17    heard from all the different attorneys is that there's why

18    there are two -- instead of him taking his interest in --

19    and putting everything where it was supposed to be, it never

20    really got completed, sir.  That's what I do know.

21    Q.    It was kind of a mess, huh?

22    A.    Yes, sir.

23    Q.    Yeah.  I can tell you that just from looking at

24    it.

25         So cut through all the legal crap.  What -- What

1  do you think or do you understand your dad was trying to

2  effectuate at the end of the day by going through all this

3  estate planning?

4          MR. RIES:  I'm going --

5          THE WITNESS:  Leave something --

6          MR. RIES:  -- to object --

7          THE WITNESS:  -- for us --

8          MR. RIES:  -- again.

9          THE WITNESS:  -- kids.

10         MR. RIES:  This is speculation and hearsay both.

11  BY MR. RUKAVINA:

12     Q.   Go ahead, please.

13     A.   Leave something for all of us kids, I -- what I

14  would think.

15     Q.   Do you have an understanding as to whether he was

16  trying to leave things equally for all five kids or

17  preferring one kid to another?

18     A.   I think it was all for every one.  I think that at

19  one point he -- Shawn had some troubles and he took her

20  plumb out of everything.  And, but I think everyone was

21  aware of all of that.

22          But as far as the girls didn't know the daily

23  operations; I understand that.  And Rudas was there.  I

24  mean, it -- he just kind of left it to me to -- to deal with

25  it all, I guess.

```
 1       Q.    But at the end of the day, you think your dad was

 2   trying to provide for all five of you equally?

 3            MR. SHERWOOD:  Objection.

 4            THE WITNESS:  All four.

 5            MR. RIES:  Objection.

 6            MR. SHERWOOD:  Mischaracterizes his testimony.

 7            MR. RIES:  And we're also talking about -- Let's

 8   get to the best evidence.  We've got documents that talk

 9   what the trust said.

10            MR. RUKAVINA:  It's my deposition, Mr. Ries.  You

11   can object.

12            MR. RIES:  And I understand it's your --

13            MR. RUKAVINA:  You can object.

14            MR. RIES:  -- deposition.  But I'm just saying

15   this -- there's better evidence than what he remembers the

16   documents might say.  We've got documents that say exactly

17   what his parents meant to do.

18            MR. SHERWOOD:  Hey, Davor.  Real quick.  I'm not

19   trying to interrupt.  Are you hearing something from the --

20   You hear anything from the computer or is that just me?

21            MR. RUKAVINA:  That needs to be mute.  Yeah, you

22   shouldn't hear anything.

23            THE WITNESS:  I don't hear anything.

24            MR. SHERWOOD:  Okay.  Maybe I'm just -- all right.

25   Sorry.  Go ahead.
```

```
 1          MR. RUKAVINA:  Well, if you -- it should be mute.

 2   BY MR. RUKAVINA:

 3      Q.    I think you, in answer to my question, you said

 4   all four kids.  Is that, were you referring to when he cut

 5   Shawn out?

 6      A.    Yes, sir.

 7      Q.    Okay.  Was it also your understanding that your

 8   father was going trying to provide for your mother upon his

 9   passing?

10      A.    Yes, sir.

11      Q.    Okay.  Was that something to do with these trusts

12   as well?

13      A.    Yes, sir, I'm sure.

14      Q.    Okay.  Did your father, other than the time that

15   you drove him to the -- the two times that you drove him to

16   the lawyer's offices, did your father discuss with you, I

17   guess as his oldest son, what it was that he was trying to

18   do here?

19      A.    Not necessarily.  I mean, he had his idea, 'cause

20   --

21          MR. RUKAVINA:  Hold on a second.  Hey, Maison, you

22   got to be on mute.  Make sure that anyone there is on mute.

23          MR. SHERWOOD:  Yeah, there -- there's -- there's

24   some --

25          MR. RUKAVINA:  Something.  Yeah, there's
```

```
 1  something.

 2          MR. SHERWOOD:  Yeah, there's one of the Zoom I can

 3  see at the top doesn't have a mute button on it.

 4          MR. RIES:  Okay.  So do we have somebody else

 5  here?

 6          MR. RUKAVINA:  Yeah, my expert witness and Traci

 7  is sick with the COVID, the other daughter, the other

 8  sister.

 9          MR. SHERWOOD:  Yeah.  Can we -- Can we get at

10  least an announcement on the record as to who's present in

11  person and on Zoom.

12          MR. RIES:  Yeah, I mean, we've got --

13          MR. RUKAVINA:  We'll get -- we'll get --

14          MR. RIES:  We've got five people here, I don't

15  even know who they are.  And now apparently we find out

16  we've got other people that are listening to this --

17          MR. RUKAVINA:  Yeah, no problem.

18          MR. RIES:  -- that aren't here that aren't even

19  announced.

20          MR. RUKAVINA:  On here is Thomas Berghman; he's my

21  -- he's my partner.  On here is Maison Vasek.

22          MR. RIES:  Who?

23          MR. RUKAVINA:  Vasek, V-a-s-e-k.  He's my expert

24  accountant.  Remind me who Derek is.

25          MS. PRITCHARD:  Charlotte Trew.
```

1          **THE REPORTER:** Do you want this on the record or -

2 -

3          **MR. RIES:** Yeah, I'll --

4          **MR. RUKAVINA:** Yeah. Yeah. We'll -- We'll get

5 back to this in a moment. And then let's -- let's take --

6 let's announce who is in here.

7          **MS. PRITCHARD:** I'm Leslie Pritchard. I'm sister

8 to Steve.

9          **MR. RUKAVINA:** Just announce your name.

10         **MS. ZAIONTZ:** Shawn Zaiontz.

11         **MR. RIES:** Shawn?

12         **MS. ZAIONTZ:** S-h-a-w-n.

13         **MR. RIES:** And Dykes?

14         **MS. ZAIONTZ:** No.

15         **MR. SHERWOOD:** Zaiontz.

16         **MS. ZAIONTZ:** Z-a-i-o-n-t-z.

17         **MR. B. GALMOR:** Brandon Galmor.

18         **MS. JERNIGAN:** Laramie Jernigan.

19         **MR. RUKAVINA:** Good time for a break?

20         **MR. SHERWOOD:** Whenever.

21         **MR. RUKAVINA:** It's been an hour.

22         **MS. M. GALMOR:** Monique Galmor.

23         **MR. RUKAVINA:** If everyone's okay, let's take a

24 short break. It's been an hour and --

25         **MR. SHERWOOD:** That's good.

1          **MR. RUKAVINA:**  -- coffee's working.

2          **VIDEOGRAPHER:**  Going off the record; it's 10:37.

3          **(WHEREUPON, a recess was taken.)**

4          **VIDEOGRAPHER:**  Back on; it's 10:45.

5          **MR. RIES:**  So I'm going to go ahead and invoke the

6   rule and all these people that are not expert, expert --

7   your expert and your associate are fine, but -- and

8   obviously your client is.  But the rest of the people need

9   to be gone.

10          **MR. RUKAVINA:**  So you believe that the rule

11  applies in Federal Court depositions?

12          **MR. RIES:**  I'm going to go ahead and invoke the

13  rule.  They all need to be gone.  We don't need all these

14  people in this room.

15          **MR. RUKAVINA:**  Well, the deposition's already

16  started.

17          **MR. RIES:**  Well, you just announced who was -- I

18  didn't even realize there's however many people you have on

19  the laptop that weren't announced as well.  No one else was

20  announced at all in this deposition, so...

21          **MR. RUKAVINA:**  So what do you propose to do?  I

22  need to go look at the law.  I don't -- I don't think the

23  rule applies -- It does apply in state.  I don't know --

24          **MR. RIES:**  Well --

25          **MR. RUKAVINA:**  -- if it applies in federal.

```
 1              MR. RIES:  -- who -- whoever isn't your expert or

 2   your associate or your client doesn't need to be in here.

 3              MR. RUKAVINA:  It's an open deposition.  There's

 4   no -- There's no court order limiting the scope of who can

 5   be here.

 6              MR. RIES:  You can go forward if you want.  I'm

 7   just telling you, that's -- I don't think they need to be

 8   here.

 9              MR. RUKAVINA:  Well, I'll go forward and I'll run

10   that risk.

11   BY MR. RUKAVINA:

12       Q.   Mr. Galmor, we discussed some of these trusts.  So

13   I get you don't know the details.  But, but there was at

14   least an attempt to create a contribution trust, right?

15       A.   Yes, sir.

16       Q.   Do you have any idea what the purpose of the

17   contribution trust was?

18       A.   Like you said while ago, I think it's all for --

19   for my dad's retirement for -- for our family, to -- to

20   support.  I mean to leave something for everybody to have.

21       Q.   Okay.  And then -- And then there was that Galmor

22   Family Trust, right?

23       A.   Yes, sir.

24       Q.   And is -- is your understanding of the purpose of

25   that trust the same?
```

```
 1        A.    Yes, sir.

 2        Q.    Do you have any understanding as to why there were

 3   these two trusts created as opposed to just one trust?

 4        A.    I think I explained that to you while ago.  I

 5   mean, I don't know why he didn't finish what he did, but he

 6   just didn't do it, sir.

 7        Q.    Were there also individual trusts created for each

 8   of the children?

 9        A.    I don't know anything about that.

10        Q.    Okay.  Do you have an understanding as to whether

11   these trusts failed for some reason?  Or -- Or what do you

12   mean that he didn't complete what he did?

13        A.    The word that I understood, he didn't -- he didn't

14   put his interest into one or the other.  They were split --

15   He started putting things into one and then he quit.  And I

16   think he put everything into the -- the contribution trust

17   when he started, if I'm -- understand that.  But then when

18   he started the FLP, he just took half of that and put them

19   in the FLP and didn't finish implementing them into the

20   other one, sir.  I don't -- I don't know.  That's just the

21   way I understood it.

22        Q.    That's all I'm asking for, just what you -- what

23   you understood.

24              Was there also a marital trust or a trust for your

25   mom?
```

```
 1      A.    There -- I think there -- I've heard that term,

 2  yes, sir.

 3      Q.    Okay.  Do you have any memory of what that might

 4  have been called?

 5      A.    No, sir.

 6      Q.    Okay.  Other than those three trusts, the

 7  contribution, the family, and maybe one for the marital, are

 8  you aware of any other trust that your dad might have tried

 9  to create as part of this estate planning?

10      A.    No, sir, not that I know of.

11      Q.    So you are familiar with an entity called the

12  Galmor Family Limited Partnership, right?

13      A.    Yes, sir.

14      Q.    Okay.  And you are familiar with an entity called

15  Galmor Management, L.L.C., right?

16      A.    And I think they all fell in at the -- under one

17  of the other of those.  When they went to those attorneys, I

18  remembered there's a lot of things that were done, yes, sir.

19      Q.    Well, is it your understanding that the Galmor

20  Management, L.L.C., is the general partner of the Family

21  Limited Partnership?

22      A.    I can't answer that.

23      Q.    Okay.  Do you have an understanding of who

24  controlled, until the bankruptcy, the Galmor Family Limited

25  Partnership?
```

1    A.    I assume it was myself and my mother 'til it --

2  'til she passed away.

3    Q.    **Do you have an understanding of who the limited**

4  **partners in the Galmor Family Limited Partnership are?**

5    A.    No, sir, I don't.

6    Q.    **Cutting through all the legalese, do you believe**

7  **that it's the children?**

8    A.    If that's what you say, I'll believe you.  I don't

9  know.  I --

10    Q.    **But you -- you just have no --**

11    A.    I -- I don't -- I don't understand any of that,

12  sir, at all.

13    Q.    **That's -- That's a fair answer.  I'm not --**

14    A.    Yeah.  I don't --

15    Q.    **If you think --**

16    A.    -- understand --

17    Q.    **-- I'm putting words in your mouth just say I**

18  **don't understand.**

19    A.    I don't -- I don't understand it.

20    Q.    **Okay.  Did you have an understanding of why the**

21  **Family Limited Partnership was created?**

22    A.    Like we said awhile ago, I think it was for

23  retirement for my -- for my mom and dad and for our kids --

24  our -- my siblings.

25    Q.    **Okay.  Do you agree with me that at the beginning**

1  of that family partnership, your dad, your mom, and you were

2  the three managers?

3      A.    If you say that's true, that's probably true.

4      Q.    You don't -- But you don't have any memory of

5  that?

6      A.    There was a lot of legal things happening, sir,

7  and there was a lot of -- it happened quick and fast and I

8  don't -- I don't -- I can't grasp it.  I don't understand

9  that.  I never have understood really.  I mean, Deena could

10 help me with it and the attorneys that drew it up would help

11 me with it, but I can't answer that.

12     Q.    Well, who -- who were the attorneys that drew it

13 up?

14     A.    Well, Mr. King was one of them and Ken Fields was

15 one of them; the Underwood Firm.

16     Q.    Okay.  So you relied on Ms. Carter to some degree

17 to help you understand all this?

18     A.    Yes, sir.

19     Q.    And you relied on the attorneys to help you

20 understand some of this?

21     A.    Yes, sir.

22     Q.    Did you rely on anyone else to help you understand

23 some of this?

24     A.    No, sir.

25     Q.    Okay.  When your dad and your mom died, who do you

 1   understand was the manager of the Galmor Family Limited

 2   Partnership?

 3        A.    Myself.

 4        Q.    Well, as the manager, did you not have some

 5   understanding of who the partners in that partnership were?

 6        A.    Yes, sir.

 7        Q.    Okay.

 8        A.    I think so.

 9        Q.    Who did you understand, right or wrong, who did

10   you understand were the partners in the Galmor Family

11   Limited Partnership?

12        A.    My other three siblings.

13        Q.    Okay.  So again, not Shawn, because your dad, for

14   whatever reason, cut her out?

15        A.    Mm-hmm.

16        Q.    Yes?

17        A.    Yes, sir.

18        Q.    Okay.  Did you feel --

19              So you were a partner and the other three

20   siblings, right?

21        A.    All of us were partners, yes.

22        Q.    Did you feel like you owed any duty to that family

23   partnership since you were the manager?

24              MR. RIES:  I'm going to object to -- to the fact

25   we're talking about two different things, I think.  You're

 1  asking him who the partners are as opposed to who the

 2  beneficiaries are.  I think he's answering one question and

 3  you're asking a different question.

 4          MR. RUKAVINA:  Well, again, you get to object.

 5  Please don't give a speaking objection.  And you get to ask

 6  him questions at the end of this.

 7          I'm asking him who the partners of the limited

 8  partnership were.

 9          THE WITNESS:  And I said the four siblings.

10  BY MR. RUKAVINA:

11      Q.   That's right.

12          Did you feel like you had a duty as the manager of

13  the Family Limited Partnership to the partners?

14      A.   Yes.

15      Q.   Okay.  What did you understand your duty to be?

16      A.   To make sure that everyone knew where we were at.

17      Q.   Did you have an understanding as to any duty that

18  you had with respect to when you personally would interact

19  with that family partnership?

20      A.   No, sir.  I -- I mean -- I'm not real sure what

21  you're asking me.

22      Q.   Well, I'm -- I'm trying to use -- I'm trying to

23  use common English words, okay, so that I don't mislead you.

24          Have you heard the term self dealing ever?

25      A.   Well, I -- I've heard the term, but I don't know

1  what it means.

2      Q.   Have you heard the term fiduciary duty ever?

3      A.   I've heard the term.

4      Q.   Did you feel like back then when you were the sole

5  manager of the family partnership that you had any fiduciary

6  duty?

7          MR. SHERWOOD:  I'm going to object to the extent

8  it calls for a legal conclusion.

9          THE WITNESS:  Well, I just think that, you know,

10 my role was to keep it going as best I could, whatever it

11 took for me to make it stay at what it was.  I mean, that's

12 what I understood from that, but...

13 BY MR. RUKAVINA:

14     Q.   And who were you trying to benefit by keeping it

15 going and making it stable?

16     A.   My family.  My mother and dad's estate.

17     Q.   And the partners, right?

18     A.   The partners, yes.

19     Q.   Partners, right.

20          Okay.  Were you also a trustee on any of these

21 trusts we discussed?

22     A.   I'm sure I was.  I mean, I don't know that.  I

23 can't answer that.

24     Q.   You never heard anyone tell you that you were a

25 trustee on any of these trusts?  Other than, I -- I don't --

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

1   I do not want to know what Mr. Sherwood told you, so just

2   forget about that.  But --

3       A.   I hadn't talked to Mr. Sherwood about any of that.

4       Q.   Okay.  Well, I don't want to know what you talked

5   about with him.

6       A.   No, I don't --

7       Q.   Did you --

8       A.   -- know --

9       Q.   Did you never have anyone tell you that you were a

10  trustee on any trust?

11      A.   Well, I'm sure that I was.  I mean, I'm not gonna

12  -- I'm not -- I said I don't understand these terms and the

13  things we're doing; I don't understand that.  But I'm sure

14  if I was a trustee, Ken Fields or Mr. Charles would have

15  told me.  I mean, 'cause when I had troubles, I dealt with

16  them direct.  I mean, what -- what do we need to do here, is

17  what I done.

18      Q.   Let me give you an example to try to explain to

19  you what I'm asking.

20           So one of the businesses that G&G eventually

21  transacted in was extracting rock from the quarry, right?

22      A.   Yes, sir.

23      Q.   Okay.  And the quarry was owned by the family

24  partnership, right?

25      A.   Yes, sir.

1     Q.    So the business was owned by G&G, but the quarry

2   was owned by the family partnership, right?

3     A.    Yes, sir.

4     Q.    Did you have any understanding as to whether you

5   had any duties to the family partnership in transacting that

6   business between the two companies?

7     A.    Well, my dad, we had a little contract signed up

8   where I'd pay him a royalty for the mineral, for what we

9   sold out of there, yes, sir.

10    Q.    We'll talk more about that maybe later.  What is

11  --

12          Do you understand what the word vest means, like

13  to vest something?

14    A.    What's that?

15    Q.    Vest, v-e-s-t.

16    A.    I don't know what that term means.

17    Q.    Okay.  Do you have an understanding of what your

18  father put into the family partnership, the Galmor Family

19  Limited Partnership when it was created?

20    A.    Well, the land and -- and those things, yes, sir,

21  and the wells he owned.

22    Q.    So some land, some wells.  Anything else?

23    A.    Not that I'm aware of.

24    Q.    Okay.  The -- Your home right now, your homestead

25  is your parents' former home, right?

```
 1        A.    Yes, sir.

 2        Q.    Did -- Do you know whether he put that home into

 3   the limited partnership?

 4        A.    I believe it was homesteaded and none of those

 5   things happened until he passed away, maybe.  I mean it's

 6   what I understood.

 7        Q.    Do you believe or understood, did you understand

 8   that the limited -- the Family Limited Partnership at any

 9   point in time owned any part of -- of your current

10   homestead?

11        A.    I know there's a -- I made payments to one of

12   those entities after my mother gave me her part, and my

13   dad's part, I had to pay out.  So I was making payments to

14   one of those entities; I'm not sure which one it was.

15        Q.    Let me -- I'll try to make this a little easier so

16   you have something in front of you.

17        A.    Okay.

18        Q.    We'll mark the 2017 tax return for the family

19   partnership as Exhibit 2.

20             (WHEREUPON, Exhibit 2 was marked for

21   identification.)

22   BY MR. RUKAVINA:

23        Q.    Now, sir, do you remember ever signing tax returns

24   for the Family Limited Partnership?

25        A.    I'm sure if Kellye Fuchs told me to sign them, I
```

```
 1  signed them, yes, sir.

 2       Q.    Is she the one that --

 3             Was she the one at PK & Company in Elk City that

 4  would prepare these tax returns?

 5       A.    Yes, sir.

 6       Q.    Okay.  To your understanding, was she a licensed

 7  accountant?

 8       A.    Yes, sir.

 9       Q.    Okay.  So if -- if we look at this and if you go

10  to the next page, page 1, this is called a depreciation

11  schedule.  Do you see that, sir?

12             Do you need -- Do you need glasses?

13       A.    Well, I -- I don't have either/or.

14             I see a prior something depreciation.  I see a --

15       Q.    Okay.

16       A.    I see at the top federal -- okay.  I gotcha, up

17  here at the top.

18       Q.    Let me ask you first, and maybe it's a question

19  for Ms. Carter or Ms. Fuchs, do you know whether the family

20  partnership ever prepared 2018 tax returns?

21       A.    No, sir, I don't know that.  I mean, I know when

22  the litigation -- when all this started, pretty much all

23  that stopped when I filed bankruptcy.

24       Q.    So as you're sitting here today, and, again, maybe

25  you're just not the right person to ask, but you don't know
```

1  of any tax returns filed after 2017 for the family

2  partnership, do you?

3      A.   No, sir.

4      Q.   Okay.  So you may not be able to read this.  I'm

5  going to try to read it.  And I'm going to represent to you

6  that I'm not lying, that I'm reading it correctly.  But if I

7  -- if I'm misstating it, there's two lawyers that can tell

8  you.

9          So the first line is rent house improvements.  Do

10  you have any idea what -- what that line item would have

11  referred to?  It says date acquired December 15th, 2009.

12      A.   I'm not real sure.

13      Q.   Okay.

14      A.   I'd have to go back and...

15      Q.   Was there -- Was there a property at the family

16  partnership that you all called the rent house?

17      A.   There was two or three of those properties that

18  were rent houses.

19      Q.   Okay.  Do you remember their addresses or just

20  give me a general --

21      A.   I --

22      Q.   -- idea of where they were?

23      A.   -- recall there was a trailer house and a house on

24  the Pitcock Place.

25      Q.   Those are two different houses, right?

```
 1        A.    Yes.   There's a trailer house and a -- and a house
 2   there that -- that would -- they leased.
 3        Q.    Okay.
 4        A.    And I guess that's -- that's the two that were
 5   there, yes, sir.
 6        Q.    The next line item says 2005 Clayton mobile --
 7   mobile -- mobile home.  Was that the trailer you mentioned
 8   or is this --
 9        A.    That's the trailer.
10        Q.    That's the trailer?  Okay.
11        A.    Uh-huh.  I'm --
12        Q.    And next --
13        A.    -- sure it is.  I mean, I don't know -- I mean,
14   that would be the only reason it'd be on there.
15        Q.    Okay.  What -- And then the next line item says
16   Twitty septic.  Do you have any idea what that is?  It says
17   acquired in May 2011.
18        A.    I don't know that.
19        Q.    Okay.  The next line items says improvements
20   Bartlett.  Do you know what that's referring to maybe?
21        A.    No, sir.
22        Q.    Okay.  The next line items says skirting Twitty.
23   Do you have any idea what -- what that is?  It's --
24        A.    I would think that would have to do with the motor
25   -- mobile home up there.
```

1      Q.    Okay.  So the mobile home was on -- on some land

2  in Twitty?

3      A.    Yes, sir.

4      Q.    Okay.  Do you know if that land in Twitty was

5  owned by the family partnership?

6      A.    Yes, sir.

7      Q.    Okay.  The next line items says rent house of --

8  improvements.  That's kind of like before, you don't know

9  what that refers to other than maybe the trailer or the

10 Pitcock Place?

11     A.    No, sir, I don't know.

12     Q.    Okay.  All right.  We'll -- We'll go to other

13 stuff here.  We're not going to go through this line by

14 line, I promise you.

15          There's a -- Beginning at the bottom of that page

16 and going onto the next page there are a series of pickup

17 trucks and vehicles.

18     A.    Mm-hmm.

19     Q.    Did -- Did your dad transfer into the family

20 partnership any trucks or vehicles that someone else might

21 have owned?

22     A.    I -- I don't know that.

23     Q.    Okay.  Do you know if the family partnership ever

24 purchased its own vehicles?

25     A.    Sometimes he did, yes, sir.  I mean, I don't know

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

```
 1  which ones are -- he traded and dealt with a lot of cars.

 2      Q.   Well, sir, but this -- this says that as of

 3  December 31, 2017, the family partnership claimed that it

 4  owned these assets or --

 5           So I'm -- So I'm going to ask you, based on your

 6  memory or your knowledge, as of December 31, 2017, did the

 7  family partnership own any vehicles or pickups or trucks?

 8      A.   Well, if it's on this schedule, I have to believe

 9  that they were.

10      Q.   So Ms. Fuchs would have prepared these returns,

11  right?

12      A.   Yes, sir.

13      Q.   Would anyone have helped Ms. Fuchs prepare these

14  returns?

15      A.   I don't know that.

16      Q.   Well, would you have given her records to help

17  her?

18      A.   I'm sure that Deena or the secretaries gave them.

19  But Kellye had access to what was put into the computer.

20      Q.   And you have no reason to believe that Ms. Fuchs

21  would do something not true -- that -- that's not truthful,

22  right?

23      A.   That's correct.

24      Q.   So, so if she believes that these were accurate

25  entries, you would think that she believed that in good
```

1  faith and not for any improper purpose?

2      A.   Yes, sir.

3      Q.   Okay.  Would you review these returns before they

4  were filed?

5      A.   No, sir, I didn't.

6      Q.   You would rely on Ms. Fuchs and the other people

7  to get it right?

8      A.   Yes, sir.

9      Q.   Okay.  So it talks about like a -- an '08 King

10 Ranch pickup that was sold in June 15 -- on June 15, 2017.

11 Do you have any memory of such a truck?

12     A.   There was -- My dad, there was a lot of trading

13 when -- I don't know.  I don't know what it means.

14     Q.   Well, sir, your -- your dad -- and I don't mean to

15 be disrespectful.  But your dad had passed away by June 15,

16 2017.

17     A.   Yeah.  Like I said, I'm not sure how everything

18 was carried in these books, sir.  I just -- If it's there,

19 I'll have to say that it's -- it's true.

20     Q.   Okay.  There's a line item here for an '09 CPS

21 belly dump trailer; date sold, January 31, 2017.  Do you

22 have any memory of anything like that?

23     A.   No.

24     Q.   Okay.  There are several vehicles that are shown

25 as having been sold in 2017.  I can go through them for you

1  if you can't read that fine print.

2          Do you have a memory of any vehicles owned by the

3  family partnership sold in 2017?

4      A.   Well, if they're on this record, there'd be

5  records to show that it happened in the computer.

6      Q.   Okay.  Do you have any --

7          But other than that, you have no personal memory

8  of that?

9      A.   No, sir.

10     Q.   Okay.  Do you have any personal memory of any sale

11 proceeds being paid to the family partnership for -- for

12 selling any trucks?

13     A.   Sir, if it's not in here, I mean...

14     Q.   Okay.  Let me give you another example here, so --

15 so -- I'm on -- on line 54, it says '06 Ford dually; date

16 acquired, July 17, 2008, and it does not have a date sold.

17 Do you have any knowledge or memory of an '06 Ford dually?

18     A.   It's still there.

19     Q.   Where is it, sir?

20     A.   It's there at my mother's.

21     Q.   Okay.  That would be your property?

22     A.   Yeah.  Well, it's...

23     Q.   And, and if it's -- And if it's true that it's

24 family partnership property as opposed to your own property,

25 would you have any problem with surrendering that to the

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

1  family partnership?

2      A.    No, sir.

3      Q.    Who do you --

4            Do you have any current belief as to who owns that

5  '06 Ford dually?  Any belief?  I mean, do you personally

6  have any belief just from your memory?

7      A.    No, I -- I think they're both -- both those

8  vehicles are still sitting there.

9      Q.    What's the other vehicle you're talking about?

10     A.    Well, there's two of those one tons just --

11     Q.    Okay.

12     A.    -- they're sitting there.

13     Q.    Okay.  What about a 2010 white Jeep, do -- do you

14  --

15     A.    It's sitting in the carport.

16     Q.    So that -- So that vehicle exists?

17     A.    Yes, sir.

18     Q.    Do you have any present understanding as to who

19  owns that vehicle?

20     A.    It shows here it belongs to my -- my family, so...

21     Q.    Well --

22     A.    I mean --

23     Q.    But other than -- other than this document, do you

24  have any understanding as to who owns that vehicle?

25     A.    Well, I know it belongs to --

1      Q.    To the family partnership?

2      A.    Family partnership.

3      Q.    Okay.  Then, then I am going to go through these

4  one by one.  But I'm going to go through them quickly, okay.

5  But we can certainly slow it down if you need to.

6           It lists a '97 International grain truck.  Do you

7  know what that vehicle is and whether it still exists?

8      A.    It's there at the house, yes, sir.

9      Q.    And the '08 King Range pickup that it shows as

10  being sold in June 2017, you have no memory of what happened

11  -- whether that sale even happened and no memory of where

12  the proceeds went?

13     A.    No, I -- I can't answer that.

14     Q.    You just have no memory, is that why you can't

15  answer?

16     A.    Well, I, I mean, I don't -- there's a lot of

17  things going on.  I -- I can't answer that.  I don't -- I

18  can't tell you with a straight face what happened.

19     Q.    If you cannot give me an answer that you believe

20  is truthful, then just say I don't answer -- I can't answer,

21  that's fine.

22          All right.  The -- The next item is '01 Ford one

23  ton pickup.  Is that the -- the second dually that you just

24  mentioned?

25     A.    I'm sure that is.

1    Q.    Okay.  Is that still at -- at the mother's house?

2    A.    Yes.

3    Q.    Okay.  There's a GMC grain truck.  It doesn't give

4    me a year, but it looks like it's very cheap, not worth a

5    lot.  Do you know what that is?

6    A.    No, I really can't tell you.  There's -- There's

7    three or four of those trucks around there, little grain

8    boxes that were bought.  They're -- They're just around the

9    house there.

10   Q.    What about there's a listing here for a '91 Ford

11   fuel truck.  Do you know what that vehicle is?

12   A.    He had two fuel trucks, I mean, and they're still

13   around there somewheres, yes, sir.

14   Q.    Okay.  The next category talks about buildings.

15   There's a line item for a cone, c-o-n-e, style grain bins.

16   Do you have any idea what that is?

17   A.    Yes, sir.

18   Q.    Okay.  Do those still exist?

19   A.    Yes, sir.

20   Q.    Where?  Where is that?

21   A.    They're there at Twitty.

22   Q.    Okay.  Twitty.

23   A.    Mm-hmm.

24   Q.    And I'm sorry, sir.  I might have asked you this

25   before.  What land is that in Twitty?



1    A.    I don't know.  It's on -- We call it the Pitcock.

2  I mean, it's -- they're sitting on Deena Carter's property

3  right now.

4    **Q.    Okay.  Is there any reason why they're sitting on**

5  **Ms. Carter's property?**

6    A.    When they sold the Gin Yard, we moved all the

7  property off of that, not knowing who owned it or where it

8  was going.  So we moved everything that was of value off of

9  it.

10    **Q.    Okay.  And that's -- that's just temporarily being**

11  **stored by Ms. Carter until the courts figure it out?**

12    A.    We just moved it across the road there, yes, sir.

13    **Q.    And, and Mr. Ries authorized you and asked you to**

14  **do that, right?**

15    A.    No, sir.

16    **Q.    Okay.  So, so Mr. Ries sold the Gin Yard, right?**

17    A.    He sold the Gin Yard.

18    **Q.    Okay.  So who got the idea to -- to move stuff off**

19  **the Gin Yard?  Who told you --**

20    A.    It was my -- I mean, I was under the understanding

21  that anything that was -- that wasn't affixed to the Gin

22  Yard and that might be part of the -- my family or part of -

23  - Mr. Weatherly had power up, there's a bunch of things that

24  were there, and we just moved the stuff to secure them.

25    **Q.    Okay.  And you moved it to Ms. Carter's property**

1    'cause it's just very convenient to --

2        A.    Yes, sir.  It's right across the street there.

3        Q.    Okay.  And since that -- Since that was moved off

4    the Gin Yard, has any of that property been transferred or

5    sold?

6        A.    No, sir.

7        Q.    None of it's been destroyed or trashed?

8        A.    No, sir.

9        Q.    Okay.  The next line item, sir, says barn Bradley

10   land.  Do you know what that is?

11       A.    I have no idea.

12       Q.    Okay.  Then there's a line item for grain bins.

13   That sounds like it's the same that we've already discussed,

14   right?

15       A.    I --

16       Q.    Or you don't -- you don't recall?

17       A.    I don't know what that means even.

18       Q.    The next line item is mobile home 592.  Do you

19   have any idea what that's referring to?

20       A.    It's the same one we talked about earlier.

21       Q.    The next category here talks about improvements.

22   It talks about a barn from 1990 and then stock pens from '01

23   and '03.  Do you have any idea what that's referring to?

24       A.    No, sir.

25       Q.    Okay.  What -- help me.  I'm -- I'm a city guy.

1    What is a stock pen?

2        A.    A what?

3        Q.    A stock pen.

4        A.    That's where you pen your animals.

5        Q.    Animals?

6        A.    Cattle.

7        Q.    Cattle?

8        A.    Yes, sir.

9        Q.    Did, to your knowledge, did -- did you or Galmor's

10   or any entity that you know of own any stock pens?

11       A.    My dad.  We built them on all those properties.

12       Q.    Okay.  Are -- Is a stock pen fixed to the property

13   or is it moveable?

14       A.    No, sir, they're built in the ground.

15       Q.    Okay.  So whatever property that's on, they're

16   going to stay on?

17       A.    Yes, sir.

18       Q.    Okay.  Gotcha.

19             Is -- Is that the same thing as a cattle pen?

20       A.    I --

21       Q.    Do you --

22       A.    Sir, I don't know.

23       Q.    Okay.  'Cause it talks about cattle pens acquired

24   in 2006, do you have any knowledge about that?

25       A.    No, sir.

1    Q.   Okay.  All right.  Now let's move on to land.  It

2    talks about the Gin Yard land.

3    A.   Where is this on --

4    Q.   Sir, now it's -- it -- on the top -- I'm sorry.

5    On the top here it says page 3, on the top right.

6    A.   Top of page 3?

7    Q.   Yeah.  And then on the bottom you'll see category

8    land.

9    A.   Okay.

10   Q.   Do you see it?

11       MR. SHERWOOD:  Yep.

12       THE WITNESS:  Mm-hmm.

13   BY MR. RUKAVINA:

14   Q.   Gin Yard, it says date sold January 2017.  Do you

15   know what that's referring to?

16   A.   Yes, sir.

17   Q.   Okay.  What is that referring to?

18   A.   Well, when things started getting tight with my

19   mom and them, we was running short of money, I bought the

20   Gin Yard back and put money in my momma's checking account

21   so she could pay her bills.

22   Q.   Okay.  So you bought --

23       So you're the one who bought that Gin Yard?

24   A.   Yes, sir.

25   Q.   I got it.  Okay.

1          So you agree that it was owned by the family

2    partnership, but then you bought it out from --

3        A.   My mother was aware of the transaction.

4        Q.   I understand.

5             Do you remember how much you paid for that?

6        A.   25,000, maybe.  Whatever -- Whatever was gave for

7    it.  I -- I give them their money back.

8        Q.   What do you mean, whatever was -- was gave for it?

9        A.   Whatever my dad and mother bought -- purchased

10   them for, I matched those purchases back.

11       Q.   Okay.  Did you try to look at what the fair market

12   value was or it was just whatever the original purchase was?

13       A.   Well, like I said while ago, that those numbers

14   could be whatever anybody wanted them to be, just if you

15   wanted it.  I mean, I told my mother, I said, I'll do this

16   if -- and that's what we done.

17       Q.   Who did you pay the $25,000 to?

18       A.   To whoever the -- owned the property.

19       Q.   Was it to the family partnership?

20       A.   I -- I don't know that.  I know I went and signed

21   the papers and that's that.

22       Q.   I had thought that we discussed a few minutes ago

23   that Mr. Ries also sold the Gin Yard.  Were there two gin --

24       A.   It was in my possession when I filed bankruptcy.

25       Q.   Okay.  So there was one, one thing called the Gin

1    Yard?

2         A.    Yes, sir.

3         Q.    Okay.  I see.  I see.

4              So, so because you owned it, to your

5    understanding, Mr. Ries got it because he's the trustee, and

6    then he sold it?  I understand.

7              MR. SHERWOOD:  Be sure and answer out loud.

8              THE WITNESS:  Yes, sir.

9    BY MR. RUKAVINA:

10        Q.    Okay.  The next line item says land Emeritt.  Do

11   you know what that's referring to?

12        A.    Yeah, that's Section 5.

13        Q.    Section 5.

14             And, and please understand that you guys use

15   terminology for land, the Gin Yard, the mulberry, but I have

16   no idea what that is.

17        A.    I understand.

18        Q.    So I'm not trying to be a smartass asking these

19   questions.

20        A.    I understand.

21        Q.    And to your understanding, that land -- or do you

22   have an understanding as to who owned that land?

23        A.    It's Galmor, the family limited partners, I

24   assume.

25        Q.    Do you understand whether that's part of the land

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

1   that your dad originally transferred to the family

2   partnership as part of funding it?

3       A.   Yes, sir, I remember that.

4       Q.   Is -- Are there any improvements or were there any

5   improvements on that Emeritt land?

6       A.   Yes, sir.

7       Q.   Okay.  What was on there?  Or what's on there?

8       A.   Well, I built a -- about $100,000 worth of pens on

9   it.  And I built two barns.

10      Q.   Were those the barns and pens we were talking

11  about a few minutes ago?  Different?

12      A.   Different.

13      Q.   You're -- You're shaking your head, so --

14      A.   No, sir.

15      Q.   Okay.

16      A.   Different.

17      Q.   When you say you built $100,000 of pens and two

18  bars, what do you mean by you or -- or me?

19      A.   Galmor, slash, G&G Steam Service.  My dad asked us

20  to go and build those pens on those properties.

21      Q.   Got it.  Okay.

22      A.   'Cause the -- we were operating from town, then we

23  moved to the gin -- out to Twitty.  That's where we put all

24  of our cattle when we received them and shipped them.

25      Q.   Okay.  So the family partnership owned the land,

1  but Galmor's and G&G paid for the pens and --

2      A.   We built the pens.  My dad was supposed to pay us.

3  We built the pens for him.

4      Q.   So who paid for the pens and the barns?

5      A.   I paid for them out of -- G&G Steam Service paid

6  for them.

7      Q.   G&G?

8      A.   Yes, sir.

9      Q.   So, so help me understand.

10         So did Galmor's/G&G also have cattle or livestock?

11     A.   No, sir.  We were helping my father.

12     Q.   I'm sorry?

13     A.   We were helping my father.

14     Q.   I got it.  So your -- your dad owned some

15  livestock -- okay.  I think I understand.

16         Did -- And again, please understand I'm not being

17  a smartass.  I'm a city boy.

18         Did you also own any cattle or livestock?

19     A.   Yes, sir.

20     Q.   Okay.  Did you ever use that Emeritt land for your

21  personal cattle or livestock?

22     A.   I may have, yes, sir.

23     Q.   To graze or other things?

24     A.   Yes, sir.

25     Q.   Did you ever pay the family partnership for that?

1      A.     No, sir.

2      **Q.     The next --**

3      A.     But -- Let me finish my statement.

4      **Q.     I'm sorry.  I'm sorry.**

5      A.     But my mother had cattle on me in Oklahoma.  And

6  these girls know about it 'cause they went and took pictures

7  of them.  But at one point in this whole operation, I had a

8  kid named Hayden Duncan.  And for some reason he put cattle

9  where they shouldn't have been.  And my mother's cattle were

10 on me or the FLP's cattle on me and my cattle were -- it

11 just depend on how they divvied the cattle up.  But they

12 were all branded different.  My brands are in the -- the rib

13 cage and my dad's brands on the hip.

14     **Q.     So can I conclude that back then, you and your dad**

15 **and your mom were so tight that it didn't really matter; you**

16 **all were helping each other?**

17     A.     We knew the headcount and whose cattle belonged to

18 who.

19     **Q.     Well, in -- in the business of cattle raising, do**

20 **you typically pay the owner of land for grazing?**

21     A.     Or you trade.

22     **Q.     The next -- The next line items says Bradley land,**

23 **603 acres.  Which -- which land -- Do you know what land**

24 **that is?**

25     A.     Yes, sir.

1      Q.    What -- What land is that, sir?

2      A.    I can't give you the section.  It's east of town,

3  a half -- about a mile and a half.

4      Q.    And did you understand that the family partnership

5  owned that land?

6      A.    Yes, sir.

7      Q.    Was there any improvements on that?

8      A.    My dad built a fence when he first started.  Then

9  I went in and put some -- had city water, and I put some

10  tanks in for him to get water to the cattle.

11      Q.    Okay. So was that land used for grazing?

12      A.    Yes, sir.

13      Q.    Okay.  Anything other than grazing?  I mean like

14  slaughter?  Again, I don't know the terminology.  Was it

15  just grazing?

16      A.    Just grazing.

17      Q.    Okay.  Did you have any of your personal cattle on

18  that land ever?

19      A.    I'm sure at one time I did, but not -- if there

20  were cattle there, there were cattle other places.  I mean,

21  I didn't just use it for myself.

22      Q.    Let me ask you this.  Did you ever pay the Family

23  Limited Partnership ever anything for using its land to

24  graze your personal cattle?

25      A.    No, sir.

1    Q.    The next line item says land S of Jack's house.

2    I'm taking it S means south of Jack's hose.

3    A.    Yes, sir.

4    Q.    Do -- Do you know what land that is?

5    A.    Yes, sir.

6    Q.    What -- what is -- What was that land, sir?

7    A.    It was part of the Tindal properties.

8    Q.    Okay.

9    A.    And my dad sold that property to Jack Ledford, and

10   he didn't have the clear title to sell that property.  That

11   property, when they come in and surveyed it, the property

12   went right through the middle of Jack's house.  So my dad

13   did some trading.

14        Then after my dad passed away, Mr. Tindal came

15   back in and claimed ownership of that property.  I

16   reimbursed Mr. Ledford his money for that land.

17    Q.    Did you reimburse it out of the family partnership

18   or out of G&G or somewhere else?

19   A.    It was out of the family partners.  And my mother

20   was aware, I -- 'cause I told her.  I said, you know, we've

21   got this -- this is coming here now, so we're going to have

22   to repay Jack his money.

23    Q.    Do you remember how much you repaid him?

24   A.    Whatever's in this list right here.  I think there

25   was two -- There may be two transactions in there, too.

1    Q.    Okay.  'Cause I was going to ask, this says date

2  sold January 1, 2017.  Do you know what that's referring to?

3  Does --

4    A.    I think that's when we had to correct the...

5    Q.    Okay.  Okay.  What -- What land was the rock

6  quarry on?

7    A.    Six and five.

8    Q.    Okay.  Was that -- That's the land Emeritt that we

9  looked at earlier?

10    A.    Yes, sir.

11    Q.    Okay.  Gotcha.  Okay.

12         How -- So that's a whole section, 640 acres?

13    A.    Yes, sir.

14    Q.    Okay.  Now, the next many line items talk about

15  machinery and equipment.

16         Did the family partnership, to your understanding,

17  own a -- the machinery and equipment generally listed on

18  here?

19    A.    I'm sure they do if it's on that list, sir.

20    Q.    Okay.  For example -- I'll look at the bigger

21  priced items.  I won't bore you with the little stuff.

22         There's an entry for Kubota four-wheel tractor.

23  Do you know what that is?

24    A.    Yeah.  My dad bought and sold a lot of Kubota

25  tractors.

1    Q.    Okay.  But do you know what a Kubota four-wheel

2  tractor purchased in August 2006, do you know what -- what

3  that one in particular was?

4    A.    Not knowing what -- what was bought, I can't say

5  what it is, no, sir.

6    Q.    Okay.  Here -- Do you know of an existing Kubota

7  four-wheel drive tractor anywhere on your property or other

8  properties that this might be?

9    A.    Well, there's -- there's Kubota tractors there,

10  but I own some and -- and, I mean, I'm not sure what this

11  tractor's listed.  I'd have to see the serial number to know

12  what we've got.

13    Q.    Okay.  When you say that there's some tractors

14  there, where are you talking about?

15    A.    Well, my son's got some tractors there.  And that

16  Spanish boy that works for us, he's got some tractors there.

17  There's a lot of equipment there.

18    Q.    Any on your personal property, like the mother's

19  house?

20    A.    Yes.

21    Q.    Okay.  So we'd have to look at the serial number?

22    A.    Yes.

23    Q.    Okay.  Gotcha.

24        There's line item for case tracking hoe, line 20.

25  Do you know what that is?

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

```
 1        A.    Yeah, I know where that is.

 2        Q.    Where is that?

 3        A.    Sitting on Barker Productions -- or Rodney

 4   Barker's homestead property north of the Pitcock.

 5        Q.    Do you know why it's there?

 6        A.    Rodney and my dad were partners on that tractor.

 7   And we cleaned the bottom out with it, the Pitcock we call

 8   it, and then they moved it up to Rodney's property, was

 9   cleaning that property up.  And then I haven't saw that

10   tractor in ten years, but I'm -- I would assume that it's

11   still sitting right where they left it.

12        Q.    Okay.  It talks about a swather, s-w-a-t-h-e-r.

13   What is -- what is a -- How do you pronounce that?  And what

14   is that?

15        A.    Well, it's a -- it's what you cut hay with.

16        Q.    Okay.

17        A.    Yeah.

18        Q.    Do you recall anything like that being sold in

19   January 2017?

20        A.    Not really.

21        Q.    Okay.  Nearer to the bottom, it talks about a 1400

22   Steiger tractor.  Do you know what that's referring to?

23        A.    Yeah.  Dad had a Steiger, yes, sir.

24        Q.    And it says that it was sold in January 2017.  Do

25   you know anything about that?
```

1    A.   Yes, sir.  We sold it to IronPlanet, and the

2  proceeds -- we sold it and I think maybe that swather, maybe

3  that's what you're seeing right there when we say that.  I

4  mean, 'cause we sold some equipment to generate some money.

5    **Q.   Do you remember about how much you sold that**

6  **equipment for?**

7    A.   No, sir, I have no idea.

8    **Q.   Do you know what happened to that money, the --**

9  **the proceeds?**

10    A.   They went into my mom's account.  And I think then

11  she owed me some money and I -- I paid the money to some of

12  my debt.

13    **Q.   Okay.  Was it like just a few thousand dollars or**

14  **was it a few tens of thousands or --**

15    A.   Sir, I can't tell you what that was.  I don't

16  know.  It was a pretty -- pretty weak sale.

17    **Q.   Okay.  On the next page, there's several tractors**

18  **again, a JD 4960, a JD 9300, a JD 9600 combine.  Do you know**

19  **what those three or any of those are?**

20    A.   I know the combine is sitting there at the -- on -

21  - on a piece of property by Bob Weatherly's.  And I'm not --

22  I'm not sure if the tractor's -- I'm not sure what's there.

23  No, sir, I don't know that.

24    **Q.   Okay.  Do you know whether any of those three**

25  **tractors are on property that you or Ms. Carter own?**

```
 1        A.    I don't think so.

 2        Q.    Okay.  Do you remember the family partnership ever

 3   owning a JD 4960 tractor?

 4        A.    Yeah, my brother and my dad bought one.

 5        Q.    Do you know whatever happened to that tractor?

 6        A.    I'm not sure.  I talked to Rudas the other day.

 7   He -- I think it's sitting there at Weatherly's maybe.  But

 8   he's claiming that tractor his self.  I mean, I don't know

 9   that.  I just know what he said.

10        Q.    And I apologize.  What is Weatherly's?

11        A.    Sir?

12        Q.    What is Weatherly's?

13        A.    Oh, it's a -- just a piece of property down from

14   the flats or from Section 5.

15        Q.    Is Section 5 the flats?

16        A.    Both of them Section 4 and 5 are the flats.

17        Q.    That helps a lot.

18              Who -- Do you know who owns the -- that Weatherly

19   property?

20        A.    Quincy Weatherly now.  Bob passed away, I think.

21        Q.    Okay.  The JD 93000 -- I'm sorry.  The JD9300

22   tractor, do you -- do you know what that is or was?

23        A.    Well, we had a -- a farm tractor, a big tractor.

24   But the -- the transmission's out of it and I'm not sure

25   where it's at.  I mean, they -- they were using it to farm
```

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

1  with and the -- the transmission went out of it.

2      Q.    Who was using it to farm with?

3      A.    We leased it out to Mr. Weatherly.

4      Q.    Did Mr. Weatherly pay any -- anything in return?

5      A.    No.  He actually -- we bartered some work.  He put

6  some wheat in for -- in the flats for us, for some grazing,

7  and they used our tractor and he furnished the -- the wheat

8  and the fertilizer to install it.  And we used it all three

9  places.

10     Q.    Did the family partnership ever own its own

11  livestock or cattle, do you know?

12     A.    Lots of them, yes, sir.

13     Q.    Okay.  So did the family partnership also graze

14  its cattle on the flats and other lands?

15     A.    They didn't use the flats as much as used the

16  grass.  Most of the money that they got, we went through a -

17  - a crossroads out of San Anton and we brought -- we planted

18  wheat and we'd run cattle on it in the wintertime.  And then

19  there at the last, Mr. Weatherly and -- and Glenda

20  Weatherly, they ran cattle on it.  But all the money that --

21  that was generated with that was deposited straight into the

22  Happy State Bank.

23     Q.    'Cause they had a lien on that property?

24     A.    They didn't have a lien on it.  The -- The money

25  that was generated off those properties belonged to the



 1  family.  So the -- those moneys, I had them deposit them

 2  straight into the Galmor account there at Happy State Bank.

 3      Q.   I gotcha.  The -- The Family Limited Partnership

 4  account?

 5      A.   Yeah.  The money that was generated off those

 6  properties went straight to the -- to that checking account.

 7      Q.   So you think that that, that JD 9300 tractor might

 8  still be in existence somewhere?

 9      A.   Somewheres, yeah.  I'll have to look and see about

10  that.

11      Q.   What about the JD 9600 combine from 1991?

12      A.   It's sitting on Mr. Weatherly's.

13      Q.   That's the one you mentioned is over --

14      A.   Yes, sir.

15      Q.   -- at Mr. Weatherly's?  Okay.

16           Was that tractor ever sold or bartered to Mr.

17  Weatherly?

18      A.   No, sir.

19      Q.   Okay.  So if -- if it was owned by the family

20  partnership, should it still be owned by the family

21  partnership, to the best of your knowledge?

22      A.   Yes, sir.

23      Q.   There are several -- several entries here, sir,

24  for irrigation system, big dollars; one for 58,000, one for

25  78,000, one for 58,000.  Do you have any idea what these

1  entries for irrigation system and irrigation equipment refer

2  to?

3      A.    You'd have to go back and see what the checks were

4  written for.  Item -- I mean, I'm sure -- it takes a lot to

5  operate those pens.  I don't know what actually happened.  I

6  don't know what those charges are.  I don't know that.

7      Q.    Would they have been irrigations systems and

8  equipment for land owned by the family partnership?

9      A.    Yes, sir.

10     Q.    Okay.  Which of that land has some pretty good

11  irrigation?

12     A.    Section 4.

13     Q.    Section 4, okay.

14          Do you have any idea when it says irrigation

15  system as to whether it's something that's buried underneath

16  the ground or -- or is it one of those big above ground ones

17  that moves around and -- and waters?

18     A.    Sir, I told you I have no idea.  It -- there's --

19     Q.    Fair.

20     A.    All the irrigation is in Section 4.  So if it's

21  got some of the better irrigation, that's the only

22  irrigation that any of this family ever owned is right there

23  on that Section 4.

24     Q.    Understood.

25          And that was only used to grow wheat for cattle

1   grazing?

2       A.    Wheat and hay grazing, yes.

3       Q.    But only -- but -- But only for grazing?  Never to

4   sell to third parties?  Like did the -- did the -- did the

5   wheat ever get cut and sold off the property or was it

6   always just for the cattle?

7       A.    Just for the cattle.  I think one time we -- my

8   dad and I cut some for hay when it got the bindweed in it.

9   But the rest of the time, that's how we operated; we planted

10  wheat and ran gang cattle on them.

11      Q.    There's a -- There's an entry here for a

12  Caterpillar CH85C, apparently sold in January 2017.  Do you

13  know what -- what that -- what that Caterpillar was?

14      A.    That was that same with that sale for the

15  IronPlanet.

16      Q.    The Iron Planning (sic)?

17      A.    That's who sold it all.

18      Q.    Okay.  There's an entry on the next page -- well,

19  actually, it's on page 6 now.  It says three Harrows, also

20  sold January 2017.  Would that have been part of that sale?

21      A.    Yes, sir, I'm sure.

22      Q.    And I think you mentioned before that -- that the

23  family partnership did -- did that sale back then because it

24  needed some money?

25      A.    Yes, sir.

1    Q.    Okay.  And it used the proceeds to pay your mom

2  and then your mom paid you what -- what she owed you?

3    A.    I'm not sure how it cycled through, but we -- we

4  were shuffling money to stay afloat, yes, sir.

5    Q.    Who was needing to stay afloat?

6    A.    We were trying to pay our bills for the FLP and

7  even my personal self, 'cause this was about the time all of

8  the rock pits and everything, we were all having trouble

9  generating money.

10    Q.    And then the -- the final category there talks

11  about livestock, bulls, buffalo, et cetera, cows; dates

12  sold, various.

13        So did there come a time when the family

14  partnership no longer had any livestock of its own?

15    A.    No, sir.  They had livestock up until this

16  liquidation deal.

17    Q.    Okay.  Approximately --

18    A.    But I -- I can't answer those questions on that,

19  'cause there's -- there's -- you see how many head of cattle

20  went through there.

21    Q.    Sure.  Sure.

22    A.    And it's pretty hard to deal with.

23    Q.    Well, I'm far more interested in what happened in

24  2019 when the Chapter 7 happened.

25        Can you give me an estimate -- No one's going to

1  hold you to precision.  Can you give me an estimate as to

2  what kind or number of livestock the family partnership

3  owned in 2019?

4      A.   I don't think they owned anything in '19.

5      Q.   Okay.  What about in 2018?

6      A.   I'd have to go back and look when the last sale

7  events come on these things, sir.  I -- I don't know.  I

8  can't answer that.

9      Q.   Okay.  So did there come a time when the family

10  partnership no longer owned livestock?

11     A.   Yes, sir.

12     Q.   Okay.  Why?  Why did it no longer own livestock?

13     A.   We were spending what we could to keep the money

14  coming in to pay our bills.

15     Q.   So what happens with livestock?  I guess they're

16  sold for slaughter or --

17     A.   They were sold and then they were -- the moneys

18  are all put -- they should all be -- all these transactions

19  are there, even with the crossroad transactions.  Anything

20  that was there went right back to my mom and dad's estate or

21  whatever the FLP was, sir.

22     Q.   So whenever the family partnership sold its

23  livestock in whatever year that was, the money should have

24  gone, it'll be in the books, records of the family

25  partnership?

1    A.   Yes, sir, should -- should reflect that.

2    Q.   Do you recall, was it one bulk sale of whatever

3  was left at some point?  Or did you just slowly sell it off

4  into due course of a business?

5    A.   I -- I can't answer that, 'cause when the cattle

6  get weak or whatever happens, you just move things as they

7  go.  I -- I can't answer that.

8    Q.   Did you have someone in charge for the family

9  partnership of the cattle operation, a ranch hand or

10  someone, or were you personally handling it?

11    A.   If you look back at the books, whenever we let

12  Hayden Duncan go, 'cause we couldn't afford to pay him and

13  Bob O'Gorman anymore, we started doing it ourselves.  So --

14    Q.   So let -- let's talk about the family partnership

15  at a high level here.  So obviously it had some revenue and

16  obviously it had some expenses, right?

17    A.   Yes, sir.

18    Q.   Do you know what -- what positive cash flow means?

19  Do you know what that term means?

20    A.   Yes, sir.

21    Q.   Okay.  Was the family partnership ever able to

22  positively cash flow?

23    A.   I don't think it ever was real positive.  Kellye

24  Fuchs told that we were asset rich and cash poor is the term

25  she used.

 1     Q.    Okay.  So the revenue that the family partnership

 2   had there in 2016, 2017, 2018, I'd like to talk about the

 3   types of revenue it had.

 4          Did it have revenue from the rental of some of

 5   these properties that we mentioned?

 6     A.    Yes, sir.

 7     Q.    So third parties would pay rent to the partnership

 8   for the trailer or the house or whatever?

 9     A.    Yes, sir.

10     Q.    To the best of your understanding, was -- were

11   those rent checks always deposited into the family

12   partnership?

13     A.    Yes, sir.

14     Q.    Okay.  What other kinds of revenue did -- did the

15   family partnership have?  Did it have oil and gas revenue?

16     A.    The oil and gas wells went to negative.  There

17   wasn't any -- that's why we got in trouble with the land

18   payments and stuff, 'cause my dad had all these things on

19   long-term payments and we were running short of money to

20   make the payments.  And we still had the rock pit and we

21   were putting some money up until '18, when we shut the rock

22   pits down that the revenue -- all the rock pit's money was

23   put on a dot matrix.  And every load that came out of there

24   reflected what came out of that pit.  And those were one of

25   the ways we kept the thing going was by paying, you know,

1  running for the -- running that rock pit.

2      Q.   Well, let me break it down a little bit.  So -- So

3  the family partnership was receiving oil and gas revenue,

4  but that went down because of the fluctuation in the price

5  of oil?

6      A.   Yes, sir.

7      Q.   Okay.  Did -- Do you know whether the family

8  partnership ever owned any wells itself or did it have

9  leases or working or override interest?  What did it own; do

10  you know?

11     A.   To the best of my knowledge, my mom and dad owned

12  50 percent of Barker Production.

13     Q.   Is that a company?

14     A.   That's a production company.  And they owned half

15  the mineral rights, 50/50 partners in those mineral leases.

16          And then they started a Shamrock Limited Partners,

17  which we own 25 percent of and Rodney Barker and Martha

18  Barker own 25 percent of.  Then a guy named Jason Bradley

19  out of Dallas owned 50 percent of.  So, but I think all

20  those mineral interests were listed in the Galmor FLP and

21  the...

22     Q.   Yeah.  Do you know whether in this time frame,

23  '16, '17, and '18, there were any -- any charges against

24  these mineral interests, jibs or anything like that?  And

25  any plugging liabilities?  Any -- Any extraordinary charges

1 **against the mineral interests?**

2      A.   I know right before we had that -- the mediation

3 and I let Leslie have the management position, that the

4 bills I was getting from Barker, the last one I paid was

5 $22,000 to stay in the Barker Production and the -- and the

6 Shamrock Limited Partners.  They were going into negative.

7 And the -- the daily operations and the cost for the meters

8 and all that, I mean, I just go by what Annie Barker told

9 me, and she would send me a bill.

10          And I made -- if there's any -- it should reflect

11 in the checkbook where I paid them two different draws for

12 their money to keep operating those wells.

13      **Q.   Do you have an understanding today as to whether**

14 **the family partnership should still own its wells and -- and**

15 **mineral interests?**

16      A.   You'd have to ask Leslie, she runs that part of it

17 now and I don't know.  I, I mean, and whenever that

18 transaction happened, I stepped back, and she was the

19 manager.  And whatever happened with that, that's her

20 business; I don't know.

21      **Q.   So let me ask you about that.**

22          **After you stepped back and it became her business,**

23 **did you receive any royalty or other checks after that time?**

24      A.   If I received anything with my mom and dad's name

25 on it, it was put in a Happy State Bank checking account.

 1      Q.    Okay.  Who owned that Happy State Bank checking

 2   account?

 3      A.    My -- Galmor FLP and the contribution trust.

 4      Q.    Two different accounts or one account?

 5      A.    I think there's two different accounts there.

 6      Q.    So after you stepped back and Leslie took over, do

 7   you remember whether you received any checks or moneys

 8   belonging to the family partnership after Leslie left --

 9   after you stepped back is what I'm asking.

10      A.    If I received any money at all, sir, it went in

11   that checking account.

12      Q.    Well, again --

13      A.    But I don't remember receiving any money.

14      Q.    That -- That was my question.  You don't, sitting

15   here today, you don't remember --

16      A.    I don't remember receiving any money.  If I did

17   receive that money, it went into my mom and dad's account.

18      Q.    Okay.  Two -- One of the two checking accounts at

19   Happy State Bank?

20      A.    It went in the Galmor FLP if I had to deposit it,

21   'cause Leslie knows this, Mrs. Weatherly, when they sold the

22   properties, they had that property leased, and Glenda had

23   already paid the lease.  And so Glenda had to be reimbursed

24   for the end of the lease.  Leslie talked to Mrs. Weatherly

25   about it.

1        Q.    Okay.

2        A.    And, 'cause Glenda told me and she said she got

3    her money back.  So I mean, that wasn't my part to take care

4    of, but I know that that's what happened.  So Leslie should

5    know that, 'cause they paid the money and she had to get

6    reimbursed for it, for the lease.

7        Q.    So to round off the discussion on the -- on the

8    oil and gas and the mineral interests, to the best of your

9    knowledge, the family partnership did not sell those

10   interests to anyone else as long as you were manager?

11       A.    As long as I was there, it's like it was when my

12   mom and dad was there.  And when she took over the manager,

13   that's her deal; I don't know.  I have no -- She needs to

14   talk to Amy or the people involved.  I don't know that.

15       Q.    So we've talked about the -- the revenue from

16   tenants.  We've talked about the revenue from oil and gas.

17   And that -- that -- The oil and gas revenue declined

18   sharply, I take it --

19       A.    Yes, sir.

20       Q.    -- right around when, 2016, 2017?

21       A.    I don't remember all that.  I just know it all

22   happened.

23       Q.    Were the costs of production greater than the

24   revenue that -- that was -- should have been received, do

25   you know?  Is that what you're talking about --

1     A.    On the gas wells?

2     Q.    -- the -- yeah.

3     A.    Yes, sir.

4     Q.    Okay.  Then, then you mentioned the rock quarry

5  revenue, right?  So, so I think we established before G&G

6  would -- would take or extracted lime rock from property

7  owned by the family partnership and G&G would pay a royalty

8  in return, right?

9     A.    Yes, sir.

10     Q.    Was that a part of a written contract?

11     A.    There was a contract my dad wrote, yes, sir.

12     Q.    So this would have been back even when your dad

13  was alive?

14     A.    Yeah, he -- he's the one that got it started in

15  that rock business, yes, sir.

16     Q.    Do you remember seeing that contract in the last

17  few years?

18     A.    No, I -- I think it was for like 40 cents a ton or

19  -- sir, I can't remember.  It was a -- we come up with a

20  term, whatever RB&J had been paying him for the other lease

21  that they had on the Section 4, we matched that lease in

22  Section 5.

23     Q.    So RBJ was a third party that was also extracting

24  rock?

25     A.    They were there first, yes, sir.

1       Q.    And, and to the best of your memory, when was that

2    contract done with your dad for whatever it was, 40 cents a

3    ton?

4       A.    I can't remember all that stuff.  I can go back

5    and look when I started buying rock equipment.  I mean, I --

6    I don't recall that.  I can't say.

7       Q.    But it was back when your dad was alive?

8       A.    Yeah, my dad was still alive.

9       Q.    Okay.  Do you have any belief or -- or even a

10   hypothetical possibility as to where that contract might be

11   today?

12      A.    No, sir.

13      Q.    Do you have any belief that it was ever copied and

14   given to some lawyer or some accountant or that there might

15   be a copy of it existing today?

16      A.    Sir, I don't have any idea.

17      Q.    I think you mentioned that at your meeting of

18   creditors early on, that there was one or two safe deposit

19   boxes like in Oklahoma or somewhere; do you remember that?

20      A.    Yes, sir.

21      Q.    Okay.  Did you ever, since the bankruptcy, go take

22   a look at what's in those safe deposit boxes?

23      A.    I don't think so.

24      Q.    But I think you mentioned that it would -- it's

25   going to have contracts and old records.  I mean, was that -

1  **- does that ring a bell?**

2      A.   You know, I had some property in there myself.

3  And when all this started, I went and got what I owned out

4  of it.  We all just shared boxes.  And when that happened, I

5  went and got my belongings that I had in there, but I never

6  looked at my dad's business in there.

7      **Q.   So, so that would have been your dad's papers in**

8  **some of -- one of those boxes?**

9      A.   Yeah, there -- there's still, I assume there's

10  still paperwork in those boxes.

11     **Q.   Do you -- Do you suspect or have any reason to**

12  **suspect that this contract might be in one of those boxes?**

13     A.   I -- It might be if it -- If my dad put it in

14  there, it would still be there, yes, sir.

15     **Q.   Do you have any memory at all as to when the last**

16  **time was or where it was when you actually saw that**

17  **contract?**

18     A.   About the time that Mr. Ries come got all the

19  paperwork and asked us to move that off that facility.  He

20  said they -- He said it's tied up in litigation and it would

21  be better for me if you didn't operate out here.

22          So when we left there, we boxed all those things

23  and took them to the rock pit.  And, and then, when the rock

24  pit sold, I mean, I got in trouble.  So people that were

25  helping me, we were hauling some documents or whatever was

1  left in those, and one of the drawers fell open on one of

2  the files and had papers all up and down 83.  I mean, I

3  don't know -- it's -- that's the last time I saw it was when

4  Mr. Ries and them come got the -- asked us to move our

5  office.

6      Q.   Is that the time that Mr. Ries came up with Mr.

7  Swindell and Leslie's lawyer?  Is that the --

8      A.   Yes, sir.

9      Q.   -- same time?

10         Okay.  So you think that the contract might have

11  been amongst those documents that Mr. Ries and Mr. Swindell

12  and Leslie's lawyer --

13     A.   I can't say that.  I don't know that.

14     Q.   Let me just be clear.  There was only one time or

15  was there more than one time that Mr. Ries came and got

16  documents?

17     A.   One time.

18     Q.   You said that -- that you -- that someone moved it

19  to the rock pit, though, didn't you?

20     A.   We moved it all to the -- I mean, what -- what

21  part to keep the rock pit going and to keep what little bit

22  I had going then going, that we moved them to that rock pit,

23  yes, sir.

24     Q.   So let me --

25     A.   That office at the rock pit.

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

 1       Q.   And I apologize for being so detail-oriented, but

 2   let me see if I understand.

 3            So Mr. Ries, Mr. Swindell, and Leslie's old lawyer

 4   came and took, I think you said two SUVs full of documents

 5   up, right?

 6       A.   Yes, sir.

 7       Q.   Okay.  But then there were other documents that

 8   they didn't take that you moved to the rock pit, right?

 9       A.   Yes, sir.

10       Q.   Okay.  And those are the -- the --

11       A.   Most of those documents were payload documents

12   from the -- the company and had private information on them.

13       Q.   Okay.

14       A.   So, 'cause we had so many people working.  And I

15   don't know how long that information is good.  But all those

16   payroll files that I had, I moved them.

17       Q.   Would the payroll files of Galmor's/G&G?

18       A.   Yes, sir.

19       Q.   Okay.  So the -- the documents that went to the

20   rock pit, they were the books and records of Galmor's/G&G,

21   mostly in the form of payroll records?

22       A.   They're all -- They were all old records.  There

23   was nothing -- All the current records we kept up for the

24   IRS or whatever we had to do.  That's where we stayed at on

25   that.

```
 1            And, but you're talking about documents that

 2   started back in '64.  I mean, my dad never threw nothing

 3   away.  There was piles of documents, and I can't tell you

 4   what was in any of it.

 5        Q.    Okay.  Let me --

 6            So Mr. Ries and Swindell and Leslie's lawyer took

 7   some documents from your property, right?  Right?

 8        A.    They took all the current documents they needed to

 9   deal with the bankruptcy.

10        Q.    And then other documents were sent to the rock

11   pit, right?

12        A.    Yes, sir.

13        Q.    And those are mainly old records, right?

14        A.    Payroll records, basically.

15        Q.    Did any documents stay on your property after

16   these two things were taken away?

17        A.    I don't guess I know what you're asking me.

18        Q.    Okay.  So that was the Twitty property where all

19   these documents were at one point, right?

20        A.    Mm-hmm.

21        Q.    Mr. Ries took some of them away from the Twitty

22   property, right?

23        A.    Mm-hmm.

24        Q.    And you moved some to the rock pit, right?

25        A.    Yes, sir.
```

1      Q.    Okay.  Did any documents after that remain on the

2  Twitty property?

3      A.    There were some documents there, yes, sir.  And

4  then when the property sold, we went and finished getting

5  all the rest of the -- the cabinets and the stuff that were

6  there.

7           There were some documents that had to do with the

8  Marion oil stuff, the leases and stuff.  They picked up a

9  bunch of them.

10          But all those documents that might have been

11 critical for somebody later on to purchase those properties,

12 we took all that stuff with us.

13     Q.    Well, where did you move those documents?

14     A.    Well, we took them to Twitty.  And then after we

15 left Twitty, most of that stuff was destroyed, because there

16 was nothing else -- there's no reason to keep any of the

17 rest of it.

18     Q.    I'm sorry.  I got to start again.

19          Before the bankruptcy was filed, Galmor's/G&G kept

20 its books and records in Twitty, right?

21     A.    There -- For a long time it was at Elk City 'til I

22 sold out to Advantage.  Then we moved what was left over of

23 the companies I kept back to Elk -- to Shamrock at Twitty.

24     Q.    Okay.  And maybe I misheard you.  But I thought

25 you said a little bit ago that you moved documents to Twitty

 1  later.  So that's why I'm going through this.

 2      A.   No, that --

 3      Q.   So after -- after you moved them out of Elk City,

 4  more or less, the books and records of Galmor's/G&G were in

 5  Twitty, right?

 6      A.   Yes, sir.

 7      Q.   Would that have also included your personal

 8  finances?

 9      A.   Yes, sir.

10      Q.   Okay.  Mr. Ries, we've already established, with

11  the lawyers, took some of those away, the more recent ones,

12  right?

13      A.   Yes, sir.

14      Q.   You moved some of the more older ones and pay --

15  payroll records to the rock pit, right?

16      A.   Yes, sir.

17      Q.   Okay.  At that point in time, did any -- did any

18  documents remain in Twitty?

19      A.   No, sir.

20      Q.   Okay.  So once Mr. Ries took them away and once

21  they went to the rock pit, there were no more documents in

22  Twitty?

23      A.   There were some in -- still in the -- the office

24  there at Twitty, which we were trying to purchase it back.

25  But when we realized we couldn't purchase it back when we

1  moved the tanks and all that other stuff off of those

2  properties, we got all the -- the things that had anything

3  to do with the old business with us and destroyed them.

4      **Q.    Okay.  With the oil business?**

5      A.   No, no, no, no.

6      **Q.    The old business I mean.**

7      A.   No.  I mean, all of the old records we had all

8  those years.  And when we lost all of the property and we

9  lost all the business, there was no reason to keep any of

10 those documents.  I mean, they wouldn't be any good for

11 anyone to have.

12     **Q.    Okay.  And again, I'm not trying to be a smartass.**

13 **But I asked you an hour ago whether you destroyed and books**

14 **and records of the business, and you said no.**

15         **Now you're saying that -- that -- that some of**

16 **these very old records were destroyed.**

17     A.   They were all payroll records.  There's nothing

18 that would do anything with the day-to-day business of

19 anything.

20     **Q.    I understand.**

21     A.   I mean, all I kept was the -- the IRS documents,

22 the stuff that needed to be kept to keep us out of trouble

23 with the IRS.

24     **Q.    And were those the documents moved to the rock**

25 **pit?**

1    A.    Yeah, but except they run out of their cycle when

2  they got there, I believe.  I mean, I don't know.  I just

3  know that -- that the --

4        When you asked me awhile ago about those

5  documents, I'm -- I'm thinking the documents that we needed

6  to -- to satisfy Mr. Ries and the business I done before

7  then.  But --

8    **Q.    Okay.**

9    A.    -- there's nothing that I would say was prudent to

10  -- to keep any of that documents that were there.  They were

11  all terribly old documents.

12    **Q.    The documents that were removed to the rock pit,**

13  **what happened to those documents?**

14    A.    That's what I said, they were -- they lost the --

15  the people that were moving some of them, they fell off the

16  trailer.  I mean, there just a bunch of different things and

17  -- and I think the -- most of them were destroyed or they

18  were left set outside and they're all ruined.  There was no

19  place to put them.

20    **Q.    When, when Galmor/G&G would extract rock from the**

21  **quarry, was there any kind of paper ticket or whatever it's**

22  **called, created to evidence the tonnage, the date of**

23  **removal, et cetera?**

24    A.    Every truck that came in there, we had to -- we

25  had LOADRITE scales on all our loaders.  And anyone that

1  come purchased a load of rock would have to go down -- they

2  had to have a credit with us and we had to set them up an

3  account.  And then when the trucks were in the yard, the

4  boys on the loaders would call the rock office and tell them

5  truck number such and such and such and such, we put 28 tons

6  on this truck.

7        By the time they would get to the office, the boys

8  had a dot matrix, they loaded -- showed everything that was

9  loaded and everything that was moved.  And those boys had to

10  sign that because they couldn't run down the highway without

11  a bill of lading on their trucks.  So everyone had to have a

12  copy of what they had on, in their possession the whole

13  time.  And then that's how we kept track of all that.

14        **Q.    So what you're saying is the detailed records were**

15  **removed as to the quantity of rock removed?**

16        A.    Yes, sir.

17        **Q.    I'm sorry.  Detailed records were kept --**

18        A.    Yes.

19        **Q.    -- as to the quantity of rock removed?**

20        A.    Yes, sir.

21        **Q.    Okay.  And, and I think that the rock business**

22  **kind of also took a turn for the worse in around 2017, or**

23  **so, right?**

24        A.    Yes, sir.

25        **Q.    Okay.  How was the rock business in 2016?**



```
 1    A.    It was -- it was pretty -- I mean, I wouldn't have
 2  sold that if it wasn't doing well.  I mean, that's why I
 3  focused on just selling rock and, and working there where my
 4  folks were at.
 5    Q.    When was the high point, to your belief, of the
 6  rock business?  When was it doing the most revenue or...
 7    A.    Oh, I couldn't answer that.
 8    Q.    But it was before 2017?
 9    A.    It was right there around 2016 or 2017, I'd say.
10    Q.    And can you give me an estimate on a daily or
11  weekly basis as to how many trucks would come out of there
12  or how many tons of rock would be extracted?
13    A.    I couldn't answer that.
14    Q.    Okay.  Are we talking about --
15    A.    There was -- There were lots.
16    Q.    More than one truck a day?
17    A.    Yes, sir.
18    Q.    Okay.  More than ten trucks a day on average?
19    A.    Just depends on the day.
20    Q.    Okay.  Where did -- And I'm asking you these
21  things, as I'm sure you know, is because, as I understand
22  it, part of the debt that the family partnership owes to you
23  is for advances against royalties, right?
24    A.    Yes, sir.
25    Q.    That's why I'm -- That's why I'm asking you these.
```

 1             Do you have any understanding as to where these

 2   dot matrix records would be today?

 3        A.   No, sir, I -- I don't know that.  I know -- I

 4   don't know that -- they turn them in in invoices.  Everyone

 5   had an invoice and it all went back to the -- to billing the

 6   customer.  But I don't -- As far as knowing where all that -

 7   - that is, I have no idea.

 8        Q.   So let -- So let's break this down in some detail.

 9             So G&G or Galmor's had its own rock business,

10   right?

11        A.   Yes, sir.

12        Q.   Okay.  Did -- So G&G's --

13             Did G&G have its own trucks that would remove that

14   or was that contracted out?

15        A.   I owned those trucks early on and I sold them.

16   Then there at the last, we had one old truck that we used.

17   But no, as far as -- we mainly -- it was more we just sold

18   it to people.

19        Q.   Okay.  And, and I think I heard that -- that G&G's

20   had some awesome huge machine out there that would actually

21   cut the rock or something, right?

22        A.   That's correct.

23        Q.   Okay.  And that was G&G's property, right?

24        A.   Yes, sir.

25        Q.   Okay.  So I guess here's what I'm building up to.

1  Did -- Did G&G itself remove -- I'm sorry -- extract and

2  remove the rock?  Was G&G the only customer or were there

3  other people that were allowed to go there, other companies

4  that were allowed to go there and remove rock?

5       A.    That's what I told you.  They had to set up

6  accounts for all of them.  There was counties.  There was

7  businesses.  There was oil companies.

8       Q.    Okay.  So that -- that's what I'm trying to

9  understand.

10           So it's not like -- So it's not like G&G extracts

11  the rock and then sells it out to all these other companies.

12  Those other companies could go in there themselves and

13  actually physically remove the -- the rock.

14       A.    They go and get a --

15       Q.    I got it.

16       A.    -- truckload and they sell it, yeah.

17       Q.    And would they then pay the same 40 cent or

18  whatever it was royalty to the -- the family partnership?

19       A.    No.  We made the rock.  G&G built the rock 'cause

20  you had to have those big machines to build it.  Then you

21  had to have big trucks to haul it and screen it and clean it

22  up.

23       Q.    That's what I'm getting at.  That's what -- so --

24           So G&G would pay the -- the royalty for the

25  unprocessed crap.  G&G would then incur the expense to

1  remove it and shape it or whatever it is.  And then G&G

2  would sell it to third parties.

3      A.   We'd pay the royalty off what was a sellable

4  product.

5      Q.   Got it.  Excellent.  Okay.

6           Is there -- Is there any dispute that G&G should

7  have paid the family partnership the -- the set royalty per

8  ton of rock?

9      A.   No, sir.

10     Q.   Okay.  And you mentioned that G&G set up credit

11 and accounts for these customers, right?

12     A.   Yes, sir.

13     Q.   Okay.  And then ultimately the -- the final

14 product was an invoice that would go out to these customers,

15 right?

16     A.   Yes, sir.

17     Q.   Okay.  And I take it that -- that a reasonably

18 smart accountant or bookkeeper could look at those records

19 and figure out how much rock was actually extracted, right?

20     A.   Yes, sir.

21     Q.   Okay.  So to the best of -- to the best of your

22 knowledge, were these the records, any of these, the credit

23 and account set up, the dot matrix, the invoices, were these

24 the records given to Mr. Ries when he came out there with

25 Mr. Swindell and Leslie's lawyer?

1    A.    They were all in the computer, yes, sir.

2    Q.    **So they're on the computer.**

3          **Those were stored electronically?  You got --**

4    **you're shaking --**

5    A.    When the girls loaded the material on the dot

6    matrix, they were tied into our computer at Twitty at the

7    Gin Yard.

8    Q.    **Okay.**

9    A.    So we knew what was going and coming every day.

10   Q.    **Did --**

11   A.    But the girls at the rock pit actually generated

12   their own invoices to go, but we just picked them up off of

13   the computer, what they billed out.

14   Q.    **Do you know -- And we're almost ready for lunch.**

15         **Do you know whether all that would have been kept**

16   **in QuickBooks or was there a separate program on that**

17   **computer?  Do you know or would that have been separate?**

18   A.    I don't think -- I think the dot matrix is the

19   only thing we had to -- we had to have it so we could build

20   a bill of lading for the trucks to haul the rock out of

21   there with, so they'd be legal.

22   Q.    **Do you know whether there was a file cabinet or**

23   **storage location where these bills of lading --**

24         **Do you know whether there's any or was there any**

25   **file cabinet or -- or paper files of where these bills of**

1  ladings or dot matrices or invoices, copies of them would

2  have been kept?

3      A.    They would have all been there with those girls

4  when they made them.  But you know you're talking -- When

5  they get the bill of lading, all the -- that was just to get

6  the trucks out of there.  And if you would have kept every

7  one of those documents -- I mean, we -- we sent a copy of

8  the document to the buyers.  But after that was done, we

9  didn't need a copy of the -- of the other stuff as long as

10 we got our -- got paid for it.  I mean, if we got paid for

11 it, then we could reverse what we were at.

12     Q.    Sir, I'm not suggesting that there's anything

13 wrong with getting rid of --

14     A.    Yeah.

15     Q.    -- trivial documents.  I'm just asking whether --

16 whether when the bankruptcy was filed there would have been

17 a location where those documents would have been kept.

18     A.    Well, they were at the gin -- at the -- at the

19 rock yard there on Section 5.

20     Q.    But primarily they should have been on the

21 computer, right?

22     A.    They're all on the computer.

23     Q.    Okay.

24     A.    Yeah.

25     Q.    And again, we're almost done for -- for lunch.

```
 1   But I just want to round off this discussion.

 2            Did -- Did Galmor's/G&G do a markup or charge

 3   every customer the same price or was it different per

 4   customer or per volume?

 5        A.   It was all the same.

 6        Q.   All the same.  So if --

 7        A.   Well, I take that back.  The county got a little

 8   bit different -- a cut because they bought more material.

 9   But they -- it might -- if it was $9 a ton that we were

10   selling it for, we might give the county for 7.50.  But

11   whatever the market was is where that came from.

12        Q.   Well, do you know what -- what the term reverse

13   engineer means?

14        A.   No.

15        Q.   Okay.  I guess I'm trying to say if -- if we can't

16   get the actual records from that computer for whatever

17   reason, do you think I'm able to go get the actual invoices

18   from the county and then reverse figure out how much rock

19   the county actually extracted?

20        A.   Yes, sir.

21        Q.   Okay.  Would that be information on the invoices?

22        A.   It'd be on the invoice.  Yes, it's listed on the

23   invoice.

24        Q.   And would -- so --

25            So Galmor's/G&G would pay the family partnership
```

1    the royalty, right?

2        A.    Yes, sir.

3        Q.    Was that the subject of any kind of paper or

4    electronic invoices?

5        A.    We used the invoices off the computer.  What we

6    generated through the computer's what we based their --

7    their royalty on.

8        Q.    Okay.  But would -- would the family partnership

9    send a formal invoice to G&G and say, here's how much you

10   owe me in payment?  Anything like that?

11       A.    No.  I just gave my dad what we'd sold when he was

12   alive, then my mom what we sold for the -- for the month, so

13   they'd have an idea what they had coming.

14       Q.    What do you mean you would give it to them?  You

15   mean --

16       A.    I'd give them a total of the -- what we'd invoiced

17   for the month.  You know --

18       Q.    You --

19       A.    -- if we sold 10,000 tons, sir, I'd say, well, you

20   all, you've got a royalty for 10,000 tons coming.  That's

21   what I'd tell them.

22       Q.    Okay.

23       A.    But they never sent me a bill.

24       Q.    But, but -- But hear me, sir.

25             Did you give your mom and dad that information or

1  did you give them the actual money for that royalty when

2  they --

3       A.   Both.

4       Q.   -- were alive?  Both?

5       A.   Both.

6       Q.   Okay.  And, and then after, after your mom died,

7  did -- did Galmor's/G&G physically pay to the family

8  partnership the royalty?

9       A.   Yes, sir.

10       Q.   Okay.  But there was never a formal bill from one

11  to the other?

12       A.   No, sir.

13       Q.   You would just take information at Galmor's and

14  calculate the royalty and then -- and then pay it?

15       A.   Yes, sir, off the computer.

16       Q.   Do you remember what the terms for payment were?

17  Like net 30 days, net 90 days, or right then and there?

18       A.   No, sir.

19       Q.   Okay.  You have no memory of whether it was

20  payment in arrears or anything like that?

21       A.   I -- No, sir.

22            MR. RUKAVINA:  Okay.  Is it okay if we take an

23  hour lunch?

24            MR. SHERWOOD:  That's great.

25            MR. RUKAVINA:  We're going to be here for a while,

1  so I think it's good to have a decent lunch.  So back at

2  1:00?

3           MR. SHERWOOD:  Sure.

4           VIDEOGRAPHER:  Going off the record; it's 12:01

5  p.m.

6           (WHEREUPON, a luncheon recess was taken.)

7           VIDEOGRAPHER:  Back on; it's 1:10 p.m.

8  BY MR. RUKAVINA:

9      Q.   Mr. Galmor, back to this rock quarry.  I think you

10 said that you thought it might have been a 40 cent a ton

11 royalty, but you weren't certain, right?

12     A.   Yes, sir.  I'm not sure what it was.

13     Q.   Okay.  Was it ever 75 cents a ton?

14     A.   I don't think so.  But I mean, we can go back and

15 look at the checks I wrote them and see.

16     Q.   Well, was there ever a time when the amount of the

17 royalty changed or was it always whatever it was?

18     A.   It was always whatever it was.

19     Q.   So, so at no point in time did the royalty go down

20 from some number to 40 cents a ton?

21     A.   No, sir.

22     Q.   Okay.  And you mentioned that --that there was a

23 sale of Galmor/G&G, right?

24     A.   Yes, sir.

25     Q.   To Arrow, was it?  Who -- who --

1    A.    No.  It was Advantage.

2    Q.    **Advantage.  I apologize.**

3         **Okay.  When did that sale -- Did the sale actually**

4    **take place?**

5    A.    In '16, I think, yes, sir.

6    Q.    **At the end of '16, you said?**

7    A.    I'm not -- Underwood handled the case for me, and

8    they'll -- those documents will prove when it happened.

9    Q.    **What was the last thing you said?**

10   A.    Mr. -- The Underwood Firm helped me close that

11   deal out, so I don't know when it all was final or -- or

12   not.  But I know I got the documents to prove where it sold.

13   Q.    **Okay.  So did you come back into ownership at some**

14   **later point in time?  Did you buy it back from -- from them?**

15   A.    No, sir.  My son -- They owed me $2 million.

16   Q.    **Okay.**

17   A.    And they were fixing -- they were liquidating

18   equipment and trying to -- They were, what I understood were

19   on the verge of losing a lot of that equipment.  So I talked

20   my son into making a deal with them, Justin, to get what we

21   could get back and get what cash I could get out of them so

22   I could pay some bills.

23   Q.    **Okay.  Let's -- Let's break that down.**

24        **So you think the sale might have closed at the end**

25   **of 2016, but it might have been some different time?**

 1      A.    I don't know the dates on that.

 2      Q.    **Well, would it have been 2017?**

 3      A.    I don't know the dates.

 4      Q.    **Okay.  Okay.  Did you receive any money from Arrow**

 5 **for the sale?**

 6      A.    Advantage?

 7      Q.    **I don't know why I keep saying -- I apologize.**

 8      A.    I think I got like a million four maybe, or

 9 million three, something like that.

10      Q.    **That would have been cash money?**

11      A.    They wrote me a check, yes, sir.

12      Q.    **Okay.  Did they give you any other form of**

13 **consideration, like a earn-out or any future payments or**

14 **anything like that?**

15      A.    They told me they'd -- I carried like two million,

16 I think.  You'll have to go back and look at the documents.

17 But I think they carry -- I carried $2 million like a open

18 note.  But then they got -- they couldn't pay their note.

19      Q.    **Okay.  So the -- the -- the sale price was 1.3,**

20 **1.4 cash, and around 2 million that they owed you going**

21 **forward?**

22      A.    Yes, sir.

23      Q.    **Okay.  And then for a period of time, were they**

24 **the -- the sole owner of Galmor's/G&G?**

25      A.    Yes, sir.

1    Q.    Okay.

2    A.    Well, except -- no, I had the -- the rock quarry.

3    I had a pump shop.  And I had my cattle and stuff.

4    Q.    Well, I'm saying, whatever Galmor's/G&G owned, was

5    there a point in time when Advantage owned that, because --

6    A.    Yes, sir.

7    Q.    -- they --

8          How long did they own it before it -- it came back

9    to you or to your son?

10   A.    You know, I'm thinking in '16, but I don't know

11   that.

12   Q.    But was it one month later?  Six months later?  A

13   year later?  Can you give me an estimate?

14   A.    About 18 months, I'd say.

15   Q.    Were they paying you on that note in the meantime?

16   A.    They didn't pay me anything between the time they

17   paid me and then.

18   Q.    Okay.  So then, then what did you do when they

19   weren't paying you?

20   A.    Well, we started asking them to get -- get our

21   money.  And when it wasn't going to happen, we went and

22   renegotiated a deal.  I said my son renegotiated a deal with

23   them for partial, just to get something back from nothing.

24   Q.    Okay.  And your son's name again, sir?

25   A.    Justin.

1      Q.    Justin.

2            Okay.  So let me see if I understand.  So these

3   guys owed you money and they weren't paying you, but they

4   owned Galmor's and G&G and were liquidating it, right?

5      A.    Yes, sir.

6      Q.    And you were very worried that as a result of that

7   liquidation they'd have no ability to pay you in the end?

8      A.    That's what I was afraid of, yes, sir.

9      Q.    Was there any litigation involved?

10     A.    I don't think so.  I think we negotiated it

11  through ourselves, or Justin did.  I mean, I don't know.

12  Justin did all that his self.

13     Q.    So how did you come -- come to own Galmor's/G&G

14  again?

15     A.    Well, it never did liquidate 'cause Advantage took

16  -- they didn't take my name.  They took part of it, but they

17  didn't take -- 'cause I still had to operate.

18     Q.    Ah.  Okay.  So let -- so, okay.

19           So do you know what an asset sale is?

20     A.    Yes, sir.

21     Q.    Okay.  So, so Advantage bought the assets of

22  Galmor/G&G, but they didn't buy actually Galmor's/G&G?

23     A.    No, sir, they -- they didn't buy the name.  They

24  bought the --

25     Q.    Gotcha.  Gotcha.

```
 1              So they owned these assets and then your son

 2      negotiated a deal where the assets would come back to

 3      Galmor/G&G?

 4         A.    Mm-hmm.

 5         Q.    Yes?

 6         A.    Yes, sir.

 7         Q.    Okay.  And what was that deal, just on a -- on a

 8      high level?

 9         A.    I don't know that deal.  I -- He made that his

10      self.  I told him he could have the equipment, I just needed

11      the money to pay bills.

12         Q.    What do you mean, he could have the equipment?

13         A.    Well, anything he bartered back.  I don't know

14      what he did, 'cause I didn't give him any money to make the

15      deal.  But whatever he could gain to help himself out of the

16      deal, but I needed the cash that -- whatever cash we could

17      get, I needed the cash to pay bills.

18         Q.    So did Advantage pay back some of that $2 million

19      at the end of the day?

20         A.    Yes, sir.  I don't -- I think it was like 80 --

21      800,000 or something like that.  And I -- I put it in the

22      bank and was paying bills with that.

23         Q.    Okay.  And then, then your son somehow acquired

24      some of the equipment back from Advantage?

25         A.    Yes, sir.
```

1    Q.    All of the equipment or just some of it?

2    A.    I don't know what he got back.

3    Q.    Do you know if he paid them for that?

4    A.    No, I don't -- I said I think he traded it for

5  that debt that they owed me, that $2 million that they were

6  supposed to pay me.

7    Q.    Okay.  So if they were supposed to pay you $2

8  million, then why did they transfer equipment to your son?

9    A.    Because he's the one that bartered the deal.

10    Q.    By bartered the deal, you mean he -- he brokered

11  it, he -- he --

12    A.    He --

13    Q.    -- brought it together?

14    A.    He's the one that brought the deal to the table to

15  get me the money that I could get so I could pay bills with

16  it.

17    Q.    Okay.  Do you -- Do you know approximately how

18  much worth of equipment Justin got back from Advantage?

19    A.    I have no idea.

20    Q.    Do you know whether Justin paid Advantage anything

21  for that equipment?

22    A.    I don't think he paid them anything, no, sir.

23    Q.    Okay.  Well, when -- when Galmor's/G&G filed

24  bankruptcy it had an operating business, right?

25    A.    Yes, sir.

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

1    Q.    And that operating business was the rock quarry,

2  right?

3    A.    Yes, sir.

4    Q.    Okay.  So did Galmor's/G&G ever sell the rock

5  quarry to Advantage?

6    A.    No, sir.

7    Q.    Okay.  I see.  So again, I'm going back to it was

8  an asset sale.

9         So only a limited number of the property of

10 Galmor's/G&G was sold to Advantage?

11   A.    Yes, sir.

12   Q.    Okay.  Got it.

13        And what would that, that equipment generally have

14 consisted of?  Like what business was sold?

15   A.    The trucking part of the business.

16   Q.    Okay.

17   A.    The roustabout part of the business.  The dirt

18 work part of the business.  And I think that, that covers

19 all of that.

20   Q.    And the purchase price was more or less 2.3, 2.4

21 million dollars?

22   A.    I don't know.  I can't tell you the exact numbers.

23 They -- They've jockeyed those numbers.  We -- We bartered

24 for six months, and I don't know what the last numbers were.

25   Q.    Okay.  And is it fair to say that when your son

 1  Justin got that equipment back, it would have been worth

 2  north of $1 million?

 3      A.    I'm not going to say that.  I don't know what he

 4  got back.

 5      Q.    Okay.  But this would have happened within four

 6  years of the bankruptcy, right?

 7      A.    It was in '16, like June of '16 or something, or

 8  May.  I don't know.  He started his own deal.  You can go

 9  back and look it up; it's GRS, called Galmor Roustabout

10  Service that he --

11      Q.    Well, I'm --

12      A.    -- started.

13      Q.    I'm not saying that you're lying.  I'm just trying

14  to get --

15      A.    Yeah.

16      Q.    -- to an understanding.

17      A.    'Cause that's --

18      Q.    This is news to me.

19      A.    I mean, I can go look at that date when that

20  started, because that's when he started his little business.

21      Q.    Okay.  Did -- When you sold --

22            When Galmor's/G&G sold the assets to Advantage, do

23  you know if Galmor's retained any kind of lien or security

24  interest to secure the repayment of that promissory note?

25      A.    I can't answer that.  It's in that -- If you go to

1  Mr. Under -- or Ken Fields and them handled the transaction,

2  and there was -- it's as thick as all that right there.  And

3  I just assumed my attorneys knew what we were doing, so

4  that's the way I left it.

5      Q.   Do you recall whether Galmor's/G&G released

6  Advantage of its -- of the money that it was owed whenever

7  it paid back the 800,000 or so?

8      A.   Well, no.  I don't know how that all fit back

9  together because there's litigation over that when we come

10 into this, because there was a -- a problem with who paid

11 the taxes on the equipment.  And, so I don't know all of

12 that, though.  That's what I do know.

13     Q.   Okay.  Is -- is -- Is your son's business still in

14 operation today?

15     A.   Somewhat.

16     Q.   Okay.  Is any of that equipment still around in

17 his business today?

18     A.   I can't answer that, 'cause I don't have anything

19 to do with his operation.

20     Q.   Are you employed today?

21     A.   No -- Well, I am, yes, sir.  I got -- I check

22 wells and I draw Social Security.

23     Q.   Okay.  Is that the only work you've done since you

24 filed bankruptcy?

25     A.   No, sir.  I do day work.  I run equipment for

```
 1  people.  I do whatever I can do to make a living.

 2       Q.   You mentioned that some of the rock that was --

 3  What's the word?  Mined?  Extracted?  Quarry?

 4       A.   Strip mined.

 5       Q.   Some of the rock that was mined was sold to the

 6  county?

 7       A.   Yes, sir.

 8       Q.   Okay.  Can you give me an estimate of how much,

 9  what percentage of that business was the county as against

10  other customers?

11       A.   No, sir.

12       Q.   Was the county more than half the business?

13       A.   At the last, probably so.

14       Q.   Okay.  Okay.  Let's keep talking about Galmor/G&G.

15  And just so that you have something in front of you, I'm

16  going to give you a couple of documents; if you'll just bear

17  with me, please.

18            So we're on Exhibit 3, correct?

19            THE REPORTER:  Correct.

20            MR. RUKAVINA:  I'm sorry.  I have them right here.

21            (WHEREUPON, Exhibit 3 was marked for

22  identification.)

23  BY MR. RUKAVINA:

24       Q.   Exhibit 3, Mr. Galmor, are the schedules filed by

25  Galmor's/G&G in its Chapter 11 bankruptcy case.
```

```
 1              Sir, you're familiar with these schedules?

 2       A.   Yes, sir.

 3       Q.   Okay.  And you signed them under oath and penalty

 4  of perjury, correct?

 5       A.   Yes, sir.

 6       Q.   Okay.  And sitting here today, do you have any

 7  reason to believe that these were wrong when they were

 8  filed?  I know it was a couple years ago, but...

 9       A.   I don't think so.

10       Q.   Okay.

11       A.   Mr. Tarbox's secretary come out and helped me --

12       Q.   Okay.

13       A.   -- work on them for two or three weeks.

14       Q.   I'd like for you, sir, if you see on the top it

15  says page x of 32.  If you'll go to page 6 of 32, on the

16  very top, and if you'll let me know when you're there, sir.

17       A.   Okay.

18       Q.   Okay.

19       A.   So I got 9 of 32.

20       Q.   Try to find 6 of 32, sir.  It's on the top.  Did I

21  give you the wrong --

22       A.   You got equip --

23       Q.   May I see it?

24       A.   Pardon me.

25       Q.   It's going to be -- It's going to be up here.
```

 1      A.    I get to eight.

 2      Q.    Up here, 6 of 32.  You might need your glasses for

 3 that.

 4      A.    Well, I might ought to get me some.

 5      Q.    So if you take a look at this, line item 74 says,

 6 Amount owed to debtor by Galmor Family Limited Partnership.

 7      A.    Yes, sir.

 8      Q.    But then it's -- it's $186,000.  You see that?

 9      A.    Yes, sir.

10      Q.    Okay.  It says, Debtor operated a rock quarry in -

11 - on Galmor Family Limited Partnership land and paid a

12 royalty of 50 cent per ton of product.

13            Does that refresh your memory that it might have

14 been 50 cents?

15      A.    Yes, sir, probably so.

16      Q.    Okay.  Do you have any reason to dispute that it

17 was 50 cents per ton?

18      A.    No, that's...

19      Q.    Okay.  Debtor gave an advance to Galmor Family

20 Limited Partnership to cover their personal expenses and

21 bills.  After the death of Steve Galmor's father, Steve's

22 mother couldn't pay her bills.  Debtor advanced money on the

23 rock to be sold so his mother could pay her bills.

24            Is that all true and correct, sir?

25      A.    Yes, sir.

1    Q.    Okay.  So, so G&G was advancing money to the

2 family partnership so that the mother could pay for her

3 bills?

4    A.    Yes, sir.

5    Q.    Why wasn't G&G advancing the money to the mother?

6 I mean let me ask you this way.  Why was it the family

7 partnership's responsibility to pay your mom's bills?

8    A.    Well, I don't know.  I can't answer that, I don't

9 guess.  I mean, I'd assumed that my mother, if she needed

10 money, we needed to get her some money.

11    Q.    Okay.  Do you know how that amount of $186,000 was

12 calculated?

13    A.    Out of the computer, like I told you while ago.

14 Whatever was stripped from the mine went on those computer

15 and we took those numbers right off of the -- what was

16 computed in the computer.

17    Q.    Did Ms. Carter do that?

18    A.    Ms. Carter, and then there was another lady.  I --

19 I can't recall her name.  But she was kind of the boss.  And

20 a guy named Mike Hobbs.  They ran the rock pits and did

21 those things.  So that -- that's how it was put in the

22 computer.

23    Q.    Okay.  Did you personally do that calculation?

24    A.    No, sir.

25    Q.    You relied on them to do it, correct?

```
 1        A.    Yes, sir.

 2        Q.    Okay.  Was this debt ever memorialized by like a

 3  written promissory note or something in writing?

 4        A.    No, sir.

 5        Q.    Okay.  I think I -- I might have something to --

 6  that I wanted to ask you about on this, if you'll just give

 7  me a second to see if I --

 8              Here it is.  This will be Exhibit 4.

 9              (WHEREUPON, Exhibit 4 was marked for

10  identification.)

11  BY MR. RUKAVINA:

12        Q.    Sir, have you seen Exhibit 4?

13        A.    Yes, sir.

14        Q.    Okay.  Do you know who prepared Exhibit 4?

15        A.    A guy named Matt Brooks.

16        Q.    Okay.  And what do you think Exhibit 4 is?

17        A.    It shows the actual what was bought and what was

18  advanced and crossed them up off of the...

19        Q.    Okay.  So this would be, let's just call it a

20  reconciliation or -- or evidence supporting that $186,000

21  number?

22        A.    Yes, sir.  Parts of it, yes, sir.

23        Q.    Okay.  And to your knowledge, this gentleman did

24  it by looking at the actual computer records?

25        A.    Yes, sir.
```

1      Q.    Okay.  So it looks like the first royalty advance

2  was on May 27, 2015, right, for $15,000?

3      A.    Probably so.

4      Q.    Why was -- Why was there a royalty advance back in

5  2015, when -- when things were presumably going well?

6      A.    Well, I can't answer that unless Mother had

7  something that needed to be paid, we knew that we'd get some

8  money later on.  I mean, I -- I can't answer that.

9      Q.    Okay.  So are you -- are you saying that every one

10  of these advances listed on this left column was triggered

11  by your mom needing something to be paid?

12      A.    Well, it wasn't -- wasn't just my mom.  It was

13  land payments and operating expense for the FLP.

14      Q.    Okay.  So some of the expenses were for your mom

15  and some of the expenses for -- for -- were land payments

16  for the FLP?

17      A.    Well, I don't -- I don't really think it would be

18  all for my mother.  I think it'd be for the operation of the

19  FLP.  I mean, my mother -- her house was paid for.  She

20  didn't have very many expenses.  I mean...

21      Q.    Well, but if you look at Exhibit 3, it says, After

22  the death of Steve Galmor's father, Steve's mother couldn't

23  pay her bills.  Debtor advanced money on the rock to be sold

24  so his mother could pay her bills.

25      A.    Well, I'm not sure why Mrs. -- or that secretary

 1 at Tarbox put that in there.  But we discussed that, and she

 2 asked me what it was for.  I said, help pay the expenses for

 3 my mother.  And I -- I can't answer to how it's typed in

 4 there.

 5     Q.    Okay.  But you just said that you told her it was

 6 to help pay for the expenses of your mother.

 7     A.    Yeah.

 8     Q.    Okay.  But now you're telling me that it was to

 9 actually pay the expenses of the family partnership?

10     A.    Well, and I assume that's all part of the family.

11 When you say my mother, she was the owner of that operation

12 or -- or her -- I mean, she was the last heir to operate it,

13 so, yes, sir.

14     Q.    Did you have an understanding at that time that

15 your mother was a partner in the limited partnership, the

16 Family Limited Partnership?

17     A.    I think her and I were co-operators, if I'm -- I

18 mean, I don't know.

19     Q.    Okay.  And then the right column talks about

20 advance payments back to Galmor's/G&G.  Do you see that?

21     A.    Yes, sir.

22     Q.    Now, here's what I want to know.  And you may not

23 understand my question and you may not know the answer, so

24 be careful.

25     Q.    These two columns, did they show all of the



1  transactions back and forth or only the ones that were

2  related to royalty advances?  In other words, did -- would

3  these show regular royalty payments that were made to the

4  family partnership that were not advances?

5      A.   I'm not going to answer it.  I'm not sure what

6  you're even saying to me.

7      Q.   Yeah, it's -- it's complicated.

8           How often would G&G pay the family partnership

9  royalties, like on a daily basis? weekly basis? monthly

10 basis?

11     A.   I would think it'd be monthly.

12     Q.   Okay.  What I'd like to know is, looking at

13 Exhibit 4, it says, royalty payments given to FLP, right?

14 We've already established that's the advance, right?

15          But do you know, and maybe you don't, whether

16 these were the only payments from G&G to FLP, or were there

17 other payments from G&G to FLP that were straight royalty

18 payments and not advances?

19     A.   I -- I don't know that.

20     Q.   And I asked that because all these are very round

21 numbers, $7,000; $10,000.  I would have thought that a

22 royalty payment would have some decimal or something like

23 that.

24     A.   God, I can't answer that for you.

25     Q.   Okay.  And if you look at the second page of

1    Exhibit 4, it says advance payments back to Galmor's/G&G.

2    And the last advance payment was April 30th.  Do you see

3    that?  On the second page, sir.

4        A.    I'm on the second page.

5        Q.    Is that Exhibit 4, sir?

6        A.    That's the second page?

7        Q.    I'm sorry.  I -- Okay.  Mine are double-sided,

8    that's the problem.  On -- On the third page, sir, the one

9    that's the bottom, it says 16725.

10       A.    Which -- Which one are you talking about now here?

11       Q.    The -- The right-hand column, April --

12       A.    Okay.

13       Q.    -- 30th, 2018.

14       A.    Mm-hmm.

15       Q.    Two -- 2,848.68, do you see that?

16       A.    Yes, sir.

17       Q.    Okay.  All of these payments back, most of them

18   rather, are down to the penny.  You see that?

19       A.    Yes, sir.

20       Q.    Is it fair to conclude that those were actual

21   invoices for -- for royalties that were -- that were

22   basically forgiven, and that's how the family partnership

23   was repaying the debt?

24       A.    I'm not going to answer.  I don't know that.

25       Q.    Okay. I'd have to talk to that gentleman to -- to

1   get more information?

2       A.   Mrs. Fuchs or Matt or --

3       Q.   **Yeah.**

4       A.   -- whoever.  Matt's the one that built it.  You

5   can contact Matt and visit with him about it.

6       Q.   **Okay.  So it's fair to conclude that you just**

7   **don't know about this particular document, you just know**

8   **about the general transactions?**

9       A.   That's correct.

10      Q.   **Okay.  And when did G&G stop extracting rock from**

11  **that quarry?**

12      A.   I can't answer that.

13      Q.   **When did G&G go out of business?**

14      A.   Whenever -- When did the final bankruptcy, when I

15  went from 7 to 11, or whenever that was.

16      Q.   **You mean when you went from 11 to 7?**

17      A.   Eleven to 7, yeah.

18      Q.   **Does that sound like it would have been late 2018**

19  **maybe, early 2019?**

20      A.   I'm not gonna -- I don't know.

21      Q.   **Okay.  Well, whatever -- but what --**

22           **So whatever the conversion was, that's when it --**

23  **it ceased business, right?**

24      A.   Yes, sir.

25      Q.   **Okay.  Was that extracting rock, was G&G**

 1  extracting rock at that quarry until pretty much the day it

 2  ceased business?

 3      A.  Probably so.

 4      Q.  Okay.  Was it paying its royalties to the FLP

 5  there at the end?

 6      A.  I assume that we were.  If we had the money to pay

 7  them, we did.

 8      Q.  Okay.  But if you didn't have the money to pay

 9  them, you didn't?

10      A.  I'm not gonna say one way or the other, I don't

11  know.  I don't know that.

12      Q.  Well, they -- Again, I'm not trying to set you up.

13  I'm asking that, we know that as of April 30th, 2018, the

14  family partnership owed $186,000.  That's the numbers that

15  are calculated here.

16          What I'm asking you is -- is, did some of that

17  $186,000 get repaid after that because rock was extracted

18  that royalties weren't paid on?

19      A.  I can't answer that.  I don't know.

20      Q.  If there are no payments after April 30th, 2018

21  for -- for royalties to the family partnership, would you

22  agree with me that that should be deducted from $186,000?

23      A.  I'm not going to agree to any of that, no, sir.

24      Q.  That's fine.

25          Let's go back to Exhibit 3, sir.  Exhibit 3.  You

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

1    can put that spreadsheet aside, the other exhibit.

2            The -- The next entry on the next page, sir, it

3    says, Amount owed to debtor by Galmor Family Limited

4    Partnership, $384,000.  Do you see that?

5        A.    384,000?

6        Q.    Yeah.  Do you see that, sir?

7        A.    Yes, sir.

8        Q.    Okay.  So then it says, Michael Stephen Galmor

9    loaned funds to Galmor's/G&G Steam Service, Inc.  In turn,

10   Galmor's/G&G Steam Service, Inc., distributed those funds to

11   Galmor Family Limited Partnership to pay payroll obligations

12   and medical insurance for the partnership employees and also

13   for medical aid for the care of Michael Stephen Galmor's

14   mother.  Do you see that, sir?

15       A.    Yes, sir.

16       Q.    Sitting here today, do you still believe that that

17   is true and accurate?

18       A.    Yes, sir.

19       Q.    Okay.  How was that $384,000 number calculated, do

20   you know?

21       A.    It came out of the check -- out of the computer.

22       Q.    Did you pull that number out or did someone do it

23   for you?

24       A.    Someone did it for me.

25       Q.    Okay.  Is there any kind of written contract or

1  promissory note that you're aware of where the family

2  partnership promises to pay that back?

3      A.   No, sir, I don't guess.

4      Q.   Is there any kind of written document or partner -

5  - or -- or promissory note between you and Galmor's/G&G

6  where Galmor's/G&G promises to pay you that back?

7      A.   No, sir.

8      Q.   When -- when you --

9           So when you loaned these funds to Galmor's/G&G,

10  did you expect Galmor's/G&G to pay you back those funds?

11      A.   Yes, sir.

12      Q.   Okay.  You didn't think it was just contributing

13  to your equity position to protect your equity?

14      A.   No, sir.

15      Q.   Okay.  Why didn't you do a promissory note?

16      A.   Well, I'm not used to sitting with guys like you.

17  Usually a handshake gets you there.

18      Q.   But you can't shake hands with yourself, right?

19      A.   Yeah, that's it.  Well, I don't -- So all I'm

20  saying is, those moneys were spent for my mother and they

21  come out of my pocket, so...

22      Q.   The 384,000?

23      A.   Yes, sir.

24      Q.   Okay.  Do you -- Do we know or do you know when

25  those $384,000 were accrued, like over what period of time?

1     A.    They're in the register in the checkbook.  I mean,

2   they're in the computer.

3     Q.    **The computer that Mr. Ries has?**

4     A.    Yes, sir.

5     Q.    **Okay.**

6     A.    Yes, sir.

7     Q.    **Do you know whether they were somehow accounted**

8   **for in that computer as a loan or -- or -- or I mean, are**

9   **they -- are they somehow -- somehow labeled in a way that we**

10  **could add them up to this $384,000 number?**

11    A.    They may have advances on them or -- I don't know

12  that.

13    Q.    **Okay.  The next line item, sir, Amount owed to**

14  **debtor by Galmor Family Limited Partnership.  Michael**

15  **Stephen Galmor loaned funds to Galmor's/G&G Steam Service,**

16  **Inc.  In turn, Galmor's/G&G Steam Service, Inc., distributed**

17  **those funds to Galmor Family Limited Partnership to pay off**

18  **a handicap van for his mother that was financed at First**

19  **State Bank.**

20    A.    Yes.

21    Q.    **Did I read -- okay.**

22          **Sitting here today, do you believe that to be**

23  **correct?**

24    A.    Yes, sir.

25    Q.    **Okay.  And true?**

 1     A.    Yes, sir.

 2     Q.    Okay.  The family partnership never owned that

 3 handicap van, did it?

 4     A.    I'm not sure how it's titled.

 5     Q.    If the family owner -- partnership owned that

 6 handicap van, would you have expected it to be listed on the

 7 tax schedules?

 8     A.    I don't know about that, sir.

 9     Q.    Okay.  So tell me about this, this handicap van.

10 Who was -- It was purchased for your mom, I take it?

11     A.    Yes, sir.

12     Q.    Do you know when it was purchased?

13     A.    No.  She broke her leg completely off up here.

14 She had a lung worked on at BS -- at one of the hospitals.

15 And her and Becky Morgan, they come up to get inspected and

16 she stepped on a rail like, kind of like today, and her foot

17 slipped through the side rail on the car and it broke her

18 leg in three places and her ankle.  So she couldn't get

19 around.

20         And rather than -- all the pickups that we owned

21 had -- were F-150s or bigger, she had to crawl up in them.

22 So we purchased that van through the bank so we could get

23 her back and forth, 'cause Becky couldn't handle her.  She

24 was hard for me to handle her.  So we bought that van to get

25 her back and forth to her doctor.

1      Q.   But do you remember who actually purchased that

2   van, who actually owned the title to that van?

3      A.   I -- No, I don't know how it's titled.  I know

4   that the -- we still have it.

5      Q.   Okay.  Where is the van?

6      A.   It's at my mother's.

7      Q.   Okay.  Is it used at all?

8      A.   No, it's just kind of sitting there right now.

9      Q.   Do you remember who got the loan at First State

10  Bank to finance that van?

11     A.   Mmm.  No, I sure don't.

12     Q.   Okay.  Do you know whether there is any promissory

13  note or written agreement whereby the family partnership

14  promises to pay back that amount?

15     A.   No, sir.

16     Q.   There is no such agreement --

17     A.   No, sir.

18     Q.   -- written agreement?  Okay.

19          Then the last, the last entry says, Amount owed to

20  debtor by Galmor Family Limited Partnership.  Michael

21  Stephen Galmor loaned funds to Galmor's/G&G Steam Service,

22  Inc.  In turn, Galmor's/G&G Steam Service, Inc., distributed

23  those funds to Galmor Family Limited Partnership to pay the

24  wages of Michael Stephen Galmor and Deena Carter because the

25  Galmor Family Limited Partnership couldn't support the

```
 1  wages, $500,000.

 2          Do you see that, sir?

 3      A.   Yes, sir.

 4      Q.   Do you still believe that that is true and correct

 5  sitting here today?

 6      A.   Yes, sir.

 7      Q.   Okay.  Were you entitled to wages by the -- or

 8  from the Galmor Family Limited Partnership?

 9      A.   Yes, sir.

10      Q.   Had you ever collected wages from the family

11  partnership?

12      A.   I think I collected one check.

13      Q.   Do you remember when that was?

14      A.   Right after my dad died.

15      Q.   Was there a -- a set annual amount that you think

16  you should have been paid?  Like was -- was there a salary?

17      A.   My dad told me he'd pay me $100,000 a year to

18  operate the FLP or the company -- the -- his operations

19  after -- if he passed away, and that's where that number

20  come from.

21      Q.   Okay.  Did you ever really expect to get that

22  money back for working for the family partnership?

23      A.   I damn sure did.

24      Q.   Why didn't you pay yourself a salary then when you

25  could have?
```

1      A.    There wasn't no money to pay a salary.

2      **Q.    There was never any money since 2014, to pay a**

3  **salary?**

4      A.    Not enough to pay me a salary and -- and pay

5  everyone else.

6      **Q.    So you believed that you were entitled to**

7  **compensation for managing the -- the family partnership?**

8      A.    Yes, sir.

9      **Q.    Okay.  Did you ever share that with any of your**

10  **siblings?**

11      A.    Sir?

12      **Q.    Did you -- Did you ever say that to any of your**

13  **siblings?**

14      A.    No, sir.

15      **Q.    Okay.  Was that written down in any kind of**

16  **agreement or employment agreement or anything?**

17      A.    No, sir.

18      **Q.    Okay.  And Deena Carter, did she work for the**

19  **family partnership?**

20      A.    Yes, sir.

21      **Q.    But she worked for Galmor's/G&G as well, right?**

22      A.    Yes, sir.

23      **Q.    And for some of the other businesses?**

24      A.    Whatever we had going on, Deena worked for us,

25  yes, sir.

1    Q.    So how much of that $500,000 do you -- do you --

2  do you think should have been her wages?

3    A.    I can't answer that.

4    Q.    Why would you think that she'd be entitled to any

5  wages?

6    A.    She did all the -- all the paperwork for the FLP.

7    Q.    And did she ever receive a salary or paycheck from

8  the FLP?

9    A.    She drew one check also.

10    Q.    When was that, sir?

11    A.    About two months after my dad passed away.

12    Q.    Are you saying, sir, that she worked for the FLP

13  for five years, expecting to be paid, but was never paid

14  after that?

15    A.    Yes, sir.

16    Q.    Have you discussed that with her?

17    A.    I told her she ought to sue them, yes, sir.

18    Q.    Sue the family partnership?

19    A.    Yeah, for what she had coming.

20    Q.    You're the manager of the family partnership and

21  you told her to sue the company that you were managing?

22    A.    For not getting paid.  I mean, she has a right to

23  get paid what she's got.  Just because she got caught in

24  this doesn't mean she has to suffer through it.

25    Q.    How -- how -- okay.  And I'll depose Deena Carter

1    tomorrow, so she might know more about it.

2            But was Deena Carter's sole employment for your

3    companies or did she work for other people as well?

4    A.    I can't answer that.

5    Q.    Okay.  The work that she did for Galmor's --

6            So she worked for Galmor's/G&G, right?

7    A.    Yes, sir.

8    Q.    How much per year was her salary at Galmor's/G&G?

9    A.    I don't know that.

10    Q.    Okay.  Didn't you expect her, as part of her job

11    for Galmor's/G&G, to do work for the other companies?

12    A.    No, sir.

13    Q.    So you're saying that, that you had an

14    understanding with Ms. Carter that she would be paid

15    separately by the family partnership for the work she did

16    for the family partnership?

17    A.    That's what my dad told her.

18    Q.    That's what your dad told her or you?

19    A.    Yes, sir, her.

20    Q.    Her, okay.

21            Is there any written contract or agreement that

22    you know of that would support that, that salary?

23    A.    No, sir.

24    Q.    So that $500,000, that would be from shortly after

25    your father passed away until the filing of this document?

```
 1        A.   I would assume.

 2        Q.   Okay.  The -- The $24,000 for the van, when was

 3   that, sir?  When did that arise?

 4        A.   I went to probate my mother's will, and we needed

 5   to clear that van so we could get the probate done.  And

 6   that's when Leslie protested all that.  So that's when it --

 7        Q.   Well, your mom -- your mom was still alive when

 8   you bought that van, right?

 9        A.   Yes.  She was hurt.  She was hurt, yes, sir.

10        Q.   So it would have been before July of 2016?

11        A.   What'd you --

12        Q.   It would have been before -- I'm sorry -- June of

13   2016?

14        A.   What's --

15        Q.   I'm sorry.  I apologize.

16             Your mom died in 2016?

17        A.   Yeah, April -- I mean in March 23rd, yes, sir.

18             MR. RIES:  I think it's 2017.

19             MS. ZAIONTZ:  It's 2017.

20             THE WITNESS:  Twenty-seven?

21   BY MR. RUKAVINA:

22        Q.   I'm sorry.  Your mom died in 2017?

23        A.   I thought it was 23.  But maybe it is 27.  I don't

24   know.

25             MS. ZAIONTZ:  It was the 23rd.
```

```
 1          THE REPORTER:  What's your name, ma'am?

 2  BY MR. RUKAVINA:

 3      Q.   Of what year?

 4          MS. ZAIONTZ:  Shawn.

 5          MS. PRITCHARD:  2017.

 6          MR. RUKAVINA:  Twenty seven -- okay.

 7          MR. RIES:  I filed a certificate.  Just so, I mean

 8  I'm not picking a number out of thin air.

 9          MR. RUKAVINA:  Yeah, that -- that ought to be

10  ascertained.  Okay.  That's --

11          MR. RIES:  Yeah.

12  BY MR. RUKAVINA:

13      Q.   Do you remember now that your mom died in 2017?

14      A.   Yeah, I -- I do.

15      Q.   Okay.  'Cause I -- I'd written down earlier you

16  said 2016, but people -- that's a simple mistake.

17          Okay.  So that debt would have arisen, at the

18  latest, before March 23rd of 2017?

19      A.   Sir?

20      Q.   Yeah.  That $24,000 debt --

21      A.   Came after her death.  I mean that's when I paid

22  that money.

23      Q.   Oh.  You paid off the -- the van after her death?

24      A.   Yes.

25      Q.   Okay.  Do you --
```

1        Was it soon after her death or late after her

2   death?

3        A.   I'll have to go back and look when we did the --

4   we were getting ready to file for the probate.

5        Q.   Okay.  The -- Going back to the lineup -- line

6   item before, the $384,000, again, you always considered that

7   a loan, right?

8        A.   Advance.

9        Q.   Michael Stephen Galmor loaned funds to

10  Galmor's/G&G.  We're not talking about the rock quarry

11  advance now.  We're talking about the $384,000.

12       A.   Sir, Mrs. -- the Tarbox's secretary helped me fill

13  this out.  I can't run a typewriter.  So if that's what they

14  put on there, I mean, I -- I could -- I got to say that's

15  okay.  But I -- that's not -- as far as I'm concerned, it

16  was all advances.

17       Q.   Were you literally speaking to the secretary as

18  she was typing this out?

19       A.   Deena and I both were sitting there when we were

20  working these things out.  The -- She sat there.  She come

21  on a Thursday, a Friday, and a Saturday, I believe, to help

22  us and like three weekends to do it, yes, sir.

23       Q.   Okay.  Define for me what you mean by advance when

24  you just said advance.

25       A.   Well, that's just like I said, it's advances due

```
 1  to come back.

 2       Q.   Okay.  That $384,000, you see that there, sir?

 3  Over what period of time did -- did that accrue or arise?

 4       A.   I can't tell you that.

 5       Q.   Was it over a multiple number of years or was

 6  there one or two huge things that happened that necessitated

 7  that?

 8       A.   I can't answer that to you.  It's in the computer.

 9  We can go to the computer and dissect it from there, if you

10  want.  I mean --

11       Q.   But you understand that I'm not trying to be

12  funny.  I don't have that computer.

13       A.   Well --

14       Q.   And Mr. --

15       A.   -- I'm sorry.  I just --

16       Q.   Mr. Ries hasn't --

17       A.   I just assumed that you had access.

18       Q.   No, I do not, that's why I'm asking these

19  questions.

20       A.   Leslie's got all the --

21       Q.   No, sir.

22       A.   We give her the --

23       Q.   We'll talk --

24       A.   -- card out of the deal.

25       Q.   We'll talk about it with Mr. Ries later, but we
```

 1    don't have that.

 2        A.    Okay.

 3        Q.    In fact, that's why I was asking you about the

 4    passwords.

 5        A.    Okay.

 6        Q.    Okay.  And in the first -- the first category,

 7    $186,000, to the best of your knowledge, that -- that would

 8    have arisen on the dates that we saw on Exhibit 4?

 9        A.    Yes, sir.

10        Q.    Okay.  Good.

11              Why did you, in all those years of being owed

12    those moneys, not take any action against the family

13    partnership to collect on those moneys?

14        A.    I felt like if we keep this all together, we keep

15    our family together, the land and what my mom and dad built,

16    but...

17        Q.    Okay.  Was -- okay.

18              So the family partnership was running some

19    businesses at a loss, right?

20        A.    Pretty much, yes, sir.

21        Q.    The grazing business, right?

22        A.    Yes, sir.

23        Q.    Okay.  Why didn't you just end those non-

24    profitable businesses?

25        A.    I can't answer that.  I -- I really thought it's

```
 1  just farming is like gambling, you know next year might be a

 2  better one.

 3       Q.   Did you ever ask any of the other partners to

 4  approve those loans?

 5       A.   No, sir.

 6       Q.   Okay.  The next exhibit is Exhibit 4.

 7            THE REPORTER:  Exhibit 5.

 8            (WHEREUPON, Exhibit 5 was marked for

 9  identification.)

10            MR. RUKAVINA:  Which one was Exhibit 4?

11            THE REPORTER:  There's -- your spreadsheet.

12            MR. RUKAVINA:  Mr. Galmor, may I have the

13  spreadsheet back?  Looks like I forgot to label it.  Thank

14  you.  You know what?  I didn't put a label on it.

15            MR. SHERWOOD:  Thank you, sir.

16  BY MR. RUKAVINA:

17            Exhibit 5, Mr. Galmor, is the statement of

18  financial affairs filed by G&G in its Chapter 11 case.

19       A.   Are you through with this?

20       Q.   Yes, sir.

21            Sir, I take it you've seen this document before?

22       A.   Yes, sir.

23       Q.   Okay.  And you -- you did sign it under penalty of

24  perjury?

25       A.   Yes, sir.
```

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

1    Q.    Okay.  Sitting here today, do you have any reason

2  to doubt the accuracy of this document at the time that it

3  was signed?

4    A.    No, sir.

5    Q.    Okay.  So in the year 2016, gross revenue of G&G

6  was $4.2 million and change?

7    A.    If that's what they read, that's probably true.

8    Q.    Okay.  You're going to have to work with me a

9  little bit 'cause this is some kind of small print.  But on

10  the -- on page 3 out of 10, there's a line item says line 4,

11  Payments or other transfers of property made within one year

12  before filing this case that benefited any insider.

13    A.    Which line's it on, sir?

14    Q.    It's line 4, line item 4.

15    A.    Okay.

16    Q.    It's -- It's small print.  I apologize.

17        But it's asking you to list payments or transfers,

18  including expense reimbursements, made within one year

19  before filing this case on debts owed to an insider, et

20  cetera, et cetera.

21        Do you remember discussing this with the secretary

22  at Mr. Tarbox's firm?

23    A.    I don't -- I don't believe.  I'm sure we did, but

24  I don't remember that.

25    Q.    Okay.  Here's by question.  Do you -- I know

1  you're not a lawyer, okay.

2        But do you have any understanding as to whether

3  the family partnership was an insider of Galmor's/G&G?

4      A.   No, sir.

5      Q.   Okay.  My question is, on -- on -- on question 3,

6  which looks at 90-day payments and question 4, which looks

7  at one-year payments to insiders, I don't see any payments

8  to the family partnership for quarry royalties.

9        Do you have any explanation for why they're not on

10  there?

11      A.   No, sir.

12      Q.   Again I'm going -- I'm going back to my question

13  as to whether after that spreadsheet was prepared, the --

14  the -- G&G just didn't pay the family partnership for that

15  rock because the family partnership owed it money back.

16        You don't have any memory of anything like that?

17      A.   No, sir, I don't.

18      Q.   But you have no explanation for why no payments to

19  the family partnership are listed in this section 4?

20      A.   No, sir.

21      Q.   Okay.  Go to question 13, please; it's going to be

22  on page 6 of 10.

23      A.   Okay.

24      Q.   Okay.  Page (sic) 13 says, List any transfers of

25  money or other property by sale, trade, or otherwise.

```
 1            This does not list any sale to Advantage, right?
 2   Now, it only asks you to go back two years.  It only asks
 3   you to go back two years.
 4        A.    Okay.
 5        Q.    So that would mean that the -- that -- that you
 6   would have had to answer that only if the Advantage had
 7   happened before, let's say July 2016.
 8        A.    Right.  Okay.
 9        Q.    So we got to go back and look at when the
10   Advantage sale actually happened.
11        A.    Okay.  That's fine.
12        Q.    Okay.  But, okay.  Well, I -- I won't burden you
13   with that.  We'll just go back and find out when that sale
14   happened.
15        A.    I guess why were you making loans to G&G and then
16   G&G making advances to the family partnership?  Didn't G&G
17   just have its own money to do that?
18        A.    I can't answer that.  I'm sure someone advised me
19   to do it that a way, but I -- I'm not sure why it happened
20   that way.
21        Q.    Okay.  I'd like to go back, sir, to Exhibit 2;
22   that's the 2017 partnership agreement.
23            Before we go into it, I remember you saying that
24   one of those tractors we discussed was on your son's,
25   Jason's property.  Do you remember that?  Or some -- some
```

1  vehicle was on his property.

2      A.    No.  What -- I mean which --

3      Q.    I might be -- I might be wrong.  But, but I

4  thought that when we were talking about some of those

5  tractors of the family partnership, that you said that one

6  of them was on your son's property?

7      A.    No, I don't --

8      Q.    Okay.

9      A.    I don't think that.

10     Q.    Okay.  To the best of your knowledge, is any

11 property of the family partnership, any of these vehicles,

12 et cetera, on your son's property today?

13     A.    I'm -- Not that I'm aware, but I don't know.

14     Q.    I could be wrong.  I could be wrong.

15            If you'll go into this -- into this part -- into

16 this tax return, please, and it's going to be a few pages

17 in, it's called Schedule L.

18            Are you on Schedule L, sir?

19     A.    No, sir, not yet.

20     Q.    Might I help you or just --

21     A.    Yes, sir --

22     Q.    -- you keep going?

23     A.    -- that's fine.  You know what you're looking for,

24 not me.

25     Q.    I do.  The mess here is that I've given you the

 1  single-space one -- single-page ones and I've take the

 2  double-page one.  So it's going to take me a second.

 3  Schedule K, Schedule -- Schedule J, K, L.  There it is.

 4            Are you there, Matt?

 5            MR. SHERWOOD:  No.  What's -- it's -- okay.

 6            THE WITNESS:  Five.

 7            MR. RUKAVINA:  On -- On yours -- It's the seventh

 8  page in on yours, Matt.

 9            MR. SHERWOOD:  Okay.  Thanks.

10            MR. RUKAVINA:  And the top of it says page 5 --

11            MR. SHERWOOD:  Okay.

12            MR. RUKAVINA:  -- for some reason.

13            MR. SHERWOOD:  Okay.

14  BY MR. RUKAVINA:

15       Q.   Are you there by any chance?

16       A.   Yep.

17       Q.   Okay.  What I want to ask you about here, Mr.

18  Galmor, is the portion of Schedule L that talks about

19  liabilities and capital.  Line 19a says loans from partners.

20       A.   Okay.

21       Q.   And those are blank, right?

22       A.   Yes, sir.

23       Q.   Line 19b says mortgages, notes, bonds payable in

24  one year or more, $640,000 and 593 at the end of the year.

25  Do you see that, sir?

1       A.   Yes, sir.

2       Q.   That was just a mortgage on some of the land,

3   right?

4       A.   I -- I can't answer that.

5       Q.   Okay.  Then it says other liabilities, attach

6   statement.  And those are zero, right?

7       A.   Yes, sir.

8       Q.   And it says above it on line 17, it says, other

9   current liabilities, see statement 4, $174,000.  Do you see

10  that?

11      A.   Yes, sir.

12      Q.   This is the partnership return for 2017 for the

13  family partnership, by which time you are saying that the

14  family partnership owed G&G more than a million dollars for

15  loans and advances.

16           And I'm asking you why aren't those loans and

17  advances listed here as liabilities of the family

18  partnership's to G&G?

19      A.   I can't answer that.  I don't -- I don't know why.

20      Q.   Ms. Fuchs prepared this?

21      A.   Yes, sir.

22      Q.   Okay.  And you trusted her to do it right?

23      A.   Yes, sir.

24      Q.   And you made all the information available to her

25  that she would need to have available to her, right?

1    A.    She had access to the computer, yes, sir.

2    Q.    Did you ever discuss with Ms. Fuchs these advances

3 or loans that G&G and you were making to the family

4 partnership?

5    A.    No, sir, I don't think so.

6    Q.    But you -- And you haven't talked to her in four

7 or five years?

8    A.    At least.

9    Q.    Okay.  Has she tried to reach you in the last few

10 months?

11    A.    Not that I'm aware of.

12    Q.    Okay.  So if there is a mistake here, it would be

13 Ms. Fuch's mistake?

14    A.    Well, I would assume.  I -- I'm not gonna point a

15 finger at anybody; I don't know.

16    Q.    But you have no memory discussing with Ms. Fuchs

17 what should or should not appear on this Schedule F?

18    A.    No, sir.

19    Q.    What, by the way, when we talked about the G&G

20 advances and loans, in your own mind, when would those

21 advances and loans be repaid by the family partnership?

22    A.    When they started receiving money when we got

23 flush again.

24    Q.    So no set number of years?

25    A.    No, sir.

```
 1        Q.    Okay.  I'm handing you now Exhibit 6.  These are

 2   your amended schedules filed in your personal Chapter 11

 3   case.

 4              (WHEREUPON, Exhibit 6 was marked for

 5   identification.)

 6   BY MR. RUKAVINA:

 7        Q.    And if we go some pages into it, sir -- I'll point

 8   you to where.  Question 4, 4.1, talks about aircraft, a 1955

 9   Cessna.  Did you own that, that aircraft?

10        A.    Yes, sir.

11        Q.    Do you still own it?

12        A.    No, sir.

13        Q.    How'd you come to own that aircraft?

14        A.    Bought it from some people at Elk City?

15        Q.    It wasn't your dad's aircraft?

16        A.    No, sir.

17        Q.    Did your dad ever own an aircraft?

18        A.    Yes, sir.

19        Q.    What did he own, do you know?

20        A.    A Mark 21 Mooney.

21        Q.    What year, do you know?

22        A.    '64.

23        Q.    What happened --

24        A.    '63.

25        Q.    What happened to that aircraft?
```

 1      A.    Sitting in the hangar.

 2      Q.    **Where?**

 3      A.    Shamrock.

 4      Q.    **Okay.  Who owns that now, do you know?**

 5      A.    I guess the family limited partners or however

 6 it's registered.

 7      Q.    **What hangar in Shamrock?**

 8      A.    Just one.

 9      Q.    **I mean -- I'm not trying to be smart.**

10            **Is there like a little airport there or --**

11      A.    There's a airport at Shamrock and it's in the

12 hangar.

13      Q.    **Okay.  Have you been paying for -- for that hangar**

14 **all these -- all this time?**

15      A.    No, sir.

16      Q.    **Okay.  Do you own that property that the hangar**

17 **sits on?**

18      A.    No, sir.

19      Q.    **Okay.  So if you go to page 15 of 20, please.  On**

20 **the top right, there's a 15 of 20.**

21            **And line 30, sir, talks about other amounts**

22 **someone owes you.**

23      A.    Yes, sir.

24      Q.    **Amount owed to debtor by Galmor Family Limited**

25 **Partnership, claim, $1,310,807.  Do you see that?**

```
 1        A.    Yes, sir.

 2        Q.    Okay.  Is that still true and correct to your

 3   knowledge?

 4        A.    If I put it on there, that's what -- it should be

 5   correct.

 6        Q.    Okay.  When did you personally advance or loan

 7   those funds to the family partnership?

 8        A.    Sir, there'd be in the computer.

 9        Q.    Was it over the course of multiple years?

10        A.    Yes, sir, I'm sure.  I mean, I can't answer that.

11        Q.    Where'd you have the money?  Where did the money

12   come from for you to be able to -- to advance such large

13   sums to the family partnership?

14        A.    Well, I can't answer that either.

15        Q.    When you say it would be in the -- in the

16   computer, would it be in the Family Limited Partnership's

17   books or in your personal books?

18        A.    All of those are in that computer.  Both -- All of

19   it's listed in there, 'cause they're on the back side in

20   that computer.  So the numbers was generated out of that

21   computer for this.

22        Q.    Is there any kind of written agreement or

23   promissory note evidencing this $1.31 million loan?

24        A.    No, sir.

25        Q.    Can you give me any information, sir, from memory,
```

1  as to how often or when or what the largest amount of these

2  loans or advances was?

3      A.   No, sir.

4      Q.   Were they always done by check?

5      A.   Yes, sir.

6      Q.   Okay.  Were they ever done by cash?

7      A.   No, sir.

8      Q.   Why were you loaning money to the Galmor Family

9  Limited Partnership?

10     A.   To keep it operating.

11     Q.   So both you personally were loaning money and

12 Galmor's/G&G was loaning money to the family partnership to

13 keep it operating?

14     A.   Yes, sir.  That's how it's wrote down.  That's how

15 it was -- That's how it was wrote out of the checkbooks.

16     Q.   And you can't tell me over the course of how many

17 years that was?

18     A.   No, sir.

19     Q.   Well, if we go back to Exhibit 2, Mr. Galmor, the

20 first page of the actual tax return.  So it's a few pages

21 in, sir. It's Form 1065, if you'd let me know when you're

22 there.

23     A.   How many pages in, you think?

24     Q.   Well, that's the problem 'cause you got the

25 single-sided one.  You know it's faster if I just flip it

1    for you.  Thank you.

2              There you go, Mr. Galmor.  Are you looking at the

3    top it says Form 1065?

4        A.   Yes, sir.

5        Q.   So it looks like in the year 2017, the limited

6    partnership lost about $96,000.  Do you see that?

7        A.   Yes, sir.

8        Q.   Okay.  So it had about $80,000 in gross receipts,

9    right?  At the top.

10       A.   Okay.  Yes, sir.

11       Q.   And it had a loss from its farming operation of

12   137,000.  You see that?

13       A.   Yes, sir.

14       Q.   And then Ms. -- I apologize.  I speak German.  But

15   for me --

16       A.   Fuchs.

17       Q.   Yeah.  For me to pronounce that in German would be

18   rude.

19            Ms. Fuchs calculated that there was a loss of

20   96,000.  You see that?

21       A.   Yes, sir.

22       Q.   And is that about the case that every year or so

23   the family partnership was losing about $100,000 or -- I

24   mean, do you remember?  Or we just have to go through each

25   of these records?

```
 1       A.    Well, I don't remember, but...

 2       Q.    Okay.  Well, I mean, my question to you, and I'm

 3  not trying to be a smartass, is, if the family partnership

 4  is losing $100,000 a year and you're financing it, then how

 5  do we get to a $2.5 million number that you and G&G have

 6  financed in the course of five or six years?

 7       A.    Sir, you'll have to -- it's all in the computer.

 8  I took all those numbers out of that computer.

 9       Q.    You took the numbers out of the computer?

10       A.    No, I didn't take it.  They were taken from the

11  computer.

12       Q.    Yeah.  So every time -- Well, let me ask this as

13  well.  This one point -- Going back to your schedule.  The

14  $1.31 million that is owed to you --

15       A.    Yes, sir.

16       Q.    Was each one of those a transfer from you to the

17  family partnership?  Or were some of those where you are

18  personally paying a bill of the family partnership or buying

19  a -- a TV, I mean, whatever, for the family partnership?  Do

20  you understand my question?

21       A.    Yes, sir.

22       Q.    Okay.  So what --

23             Was it a combination of these?  Or was it always a

24  -- a check from you for the family partnership?

25       A.    I -- from -- A check straight across so we could
```

```
 1  track it.
 2       Q.   And you actually expected to get that money back
 3  from the family partnership?
 4       A.   Yes, sir.
 5       Q.   As a debt of the family partnership?
 6       A.   Yes, sir.
 7       Q.   Did you have any -- any sense of when you would
 8  get that debt back; in other words, what time?
 9       A.   No, sir.
10       Q.   I'm -- I don't want to know what you discussed
11  with Mr. Tarbox.
12            But before you listed these debts of the family
13  partnership to you and G&G, did you tell anyone else that
14  those debts were actually owing to you?
15       A.   No, sir.
16       Q.   No, you did not?
17       A.   Hmm-mm.
18       Q.   Did you believe that by listing these debts that
19  the family partnership was owing to you, that you would get
20  money back from the bankruptcy?
21       A.   No, sir.
22       Q.   Okay.  Did you believe that if you listed the debt
23  from the family partnership to G&G, that you would get money
24  back from its bankruptcy?
25       A.   No, sir.
```

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

1    Q.    So why did you list these debts?

2    A.    They told me to be authentic.

3    Q.    Okay.  Did you expect that Mr. Tarbox -- I'm

4  sorry.

5         Did you expect that Mr. Ries would eventually sue

6  the family partnership to get these moneys back?

7    A.    No, sir; had no idea of that.

8    Q.    Sir, Exhibit 7 is going to be the statement of

9  financial affairs filed in your personal Chapter 11 case.

10        (WHEREUPON, Exhibit 7 was marked for

11  identification.)

12  BY MR. RUKAVINA:

13    Q.    Do you have any reason --

14        Well, first of all, do you remember signing these

15  --

16    A.    Yes, sir.

17    Q.    -- under penalty of perjury?  Right?  In the --

18    A.    Yes, sir.

19    Q.    Did your --

20        Do you have any reason, to date, to doubt that

21  they're -- that they were correct when you prepared them?

22    A.    I feel like they were correct, yes, sir.

23    Q.    Okay.  We might look at these a little bit in the

24  future, but just set them aside for now.

25        Just to round off this discussion about

```
 1  partnership returns, I'm going to give you the 2016

 2  partnership return for Galmor Family Limited Partnership,

 3  which is going to be Exhibit 8.

 4           (WHEREUPON, Exhibit 8 was marked for

 5  identification.)

 6  BY MR. RUKAVINA:

 7      Q.   If you'll just give me a second, sir.  Each one of

 8  these is different every year.

 9           So if you look at Form 1065.  Again, it's a few

10  pages in.

11      A.   Okay.

12      Q.   Do you see that at the bottom it says ordinary

13  business loss, $99,000 and change?

14      A.   Yes, sir.

15      Q.   Do you have any reason to dispute that amount?

16      A.   No, sir.

17      Q.   Okay.  Do you have any reason to believe that you

18  would have advanced or loaned the family partnership more

19  than $99,000 in the year 2016, to cover its losses?

20      A.   I have no idea.

21      Q.   Did you ever advance the family partnership money

22  to purchase a hard asset?

23      A.   Not that I'm aware of.

24      Q.   Okay.  And a few pages in, sir, we're going to

25  look at that Schedule L again, as in Larry.  Please let me
```

 1  know when you're there.

 2          Here, let me -- I might just help you.  I do

 3  apologize 'cause ours are -- yours are single-paged and mine

 4  are double-paged. It's right here.

 5          So again, Schedule L --

 6      A.   Thank you.

 7      Q.   -- I want to focus on the liabilities and capital.

 8  Zero for loans from partners.  Zero for other liabilities.

 9  And then there's 677,000 for mortgages and $174,000 for

10  other current liabilities.  You see that, sir?

11      A.   Yes, sir.

12      Q.   Do you have any explanation --

13          Okay.  By -- By the end of 2016, would you agree

14  that the family partnership owed more than a million dollars

15  to you and G&G by that time?

16      A.   I -- If that's what the books show, that's what

17  they show.

18      Q.   Okay.  Well, that's 'cause that's -- that's

19  because Schedule L says balance sheet per books, right?

20      A.   Yes, sir.

21      Q.   So this should be, the accountant should just be

22  taking whatever's on the books and putting it here, right?

23      A.   Yes, sir.

24      Q.   Do you have any explanation for why Ms. Fuchs

25  wouldn't list the -- the loan that the partnership owed to

```
 1  you and to G&G?

 2      A.   No, sir.

 3      Q.   Okay.  By the way, Schedule 4 -- You don't have to

 4  look at it.  I'll tell you -- I mean you can, but --

 5           If you look at this balance sheet liabilities and

 6  capital, line 17, other current liabilities, the $174,000

 7  amount, it says, see statement 4.  Statement 4 says, sale

 8  advance 174,000 and change.

 9           Do you have any idea what sale advance is?

10      A.   No, sir.

11      Q.   Okay.  If the 2015, 2014, and 2013 tax returns do

12  not list any debts like we just looked at here, to G&G or to

13  you personally -- I'm just going to tell you that they

14  don't, but --

15      A.   Okay.

16      Q.   -- rather than wasting time going through it.

17      A.   Yes, sir.

18      Q.   Would you have any explanation for why they would

19  not?

20      A.   No, sir.

21      Q.   Okay.

22           MR. SHERWOOD:  Davor, are you at a transition spot

23  or a --

24           MR. RUKAVINA:  Yes, I am.

25           MR. SHERWOOD:  Can we take a break?
```

1          MR. RUKAVINA:  Yeah, of course.

2          MR. SHERWOOD:  Thanks.

3          VIDEOGRAPHER:  Going off record; it's 2:12.

4          (WHEREUPON, a recess was taken.)

5          VIDEOGRAPHER:  Back on the record; it's 2:26.

6   BY MR. RUKAVINA:

7      Q.   Mr. Galmor, you personally and G&G, you all -- you

8   all were making advances to the family partnership because

9   the family partnership didn't have enough revenue to cover

10  its costs; is that --

11     A.   Basically, yes.

12     Q.   Okay.  And the costs of the family partnership,

13  some of them were for some mortgages on the lands, right?

14     A.   I can't answer that.

15     Q.   Do you have any memory as to whether there were

16  any liens against the lands that the family partnership

17  owned?

18     A.   I'm not aware of any liens, except for the ones

19  that was financed.

20     Q.   That's what I mean.  What -- okay.

21     A.   Great Plains Bank and the Capital Credit.

22     Q.   That's what I'm -- so, okay.

23          Great Plains Bank and Capital Credit financed some

24  of the land that the family partnership owned, right?

25     A.   Yes, sir.  Mm-hmm.

1    Q.    And the family partnership had to be making

2 periodic payments to them, right?

3    A.    Yes, sir.

4    Q.    And did you always basically keep those payments

5 current to avoid a foreclosure?

6    A.    Best we could, yes, sir.

7    Q.    Okay.  Did any of those two banks ever try to

8 foreclose on the property of the family partnership?

9    A.    Great Plains did, yes, sir.

10    Q.    Did they actually foreclose?

11    A.    I think they had the sheriff's sale couple of

12 times, yes, sir.

13    Q.    What happened, do you know?

14    A.    No, I don't know what stopped it.  I just know

15 that they -- they had a -- a sheriff's sale that they bought

16 at.

17    Q.    Okay.  So is it -- is it your view that -- that

18 the sheriff's sale actually closed and -- and the family

19 partnership lost some real property that it owned?

20    A.    I don't think they ever closed.  I think Leslie

21 bought the -- the note out from Great Plains Bank.

22    Q.    Did the family partnership in '15, '16, '17, '18,

23 have employees other than you and Ms. Carter?

24    A.    Early on there was the -- the labor hands, like I

25 said, Justin Stroup and Hayden Duncan and Bob O'Gorman, and

 1  Kuco (phonetic), the Mexican boy that works for us.

 2      Q.    **When -- Did they ever stop being employees?**

 3      A.    Sir?

 4      Q.    **Did they ever not --**

 5            **Did they ever stop being employees, those people**

 6  **you mentioned?**

 7      A.    Yes.

 8      Q.    **When?  When was that?**

 9      A.    When we realized that there wasn't enough money to

10  keep paying them.

11      Q.    **Approximately what year was that?**

12      A.    I can't remember that.  I can go look at the

13  payroll schedules and see when I quit paying them.

14      Q.    **Did the family partnership have other periodic**

15  **expenses, like utilities and insurance and stuff like that?**

16      A.    Yes, sir.

17      Q.    **And you -- you made it very clear and you were**

18  **passionate about it that you were advancing money to help**

19  **pay for your mom, right?**

20      A.    Well, if that's how you want to say it; the FLP,

21  the family operation.

22      Q.    **The family operation was -- was paying for some of**

23  **the mother's expenses, but you and G&G were advancing money**

24  **to the FLP to let them pay that, right?**

25      A.    Yes, sir.

1     **Q.   Okay.  Why did your mom need money?**

2     A.   Her gas checks become minimal.  I mean there

3 wasn't money to -- the Barkers -- there wasn't any money

4 coming in to help pay the bills.

5     **Q.   Well, your mom owned her house free and clear,**

6 **isn't that correct?**

7     A.   Yes, sir.

8     **Q.   Okay.  Your -- I take it your mom was on Medicare?**

9     A.   Yes, sir.

10     **Q.   And she probably had some supplemental private**

11 **insurance?**

12     A.   Oh, I don't know about that.

13     **Q.   You don't know about that, okay.**

14          **What other expenses did your mom have?**

15     A.   Well, I don't -- just to -- electric, taxes.

16 Those things like that, just normal operating expense for a

17 house.

18     **Q.   Can you estimate the -- well, did you -- let me --**

19 **let me put it this way.**

20          **So your father died in 2013.  Was it only after**

21 **that, that the family partnership started paying for your**

22 **mom's expenses?  Or was it already paying for her expenses**

23 **before your father died?**

24     A.   There was already some transition of equipment and

25 -- Dad was running out of money and we did whatever we could

1  to keep him in what he needed to operate.

2      Q.    I guess --

3      A.    I can't -- I can't tell you exactly when those

4  times started and when they didn't start.

5      Q.    **Is it fair to say that you advanced the family**

6  **partnership over a million dollars to help pay for your**

7  **mom's expenses?**

8      A.    I'm not going to say yes or no on that; I don't

9  know that.

10      Q.    **Is it more than $100,000, do you think?**

11      A.    I'm -- I'm not going to answer that.  I don't know

12  how much it was.  Have to look in the computer and see what

13  the checks were wrote for.

14      Q.    **Okay.  But if you go back to Exhibit 3, that's the**

15  **schedules for G&G.  And I apologize, my accent.  Exhibit 3;**

16  **one, two, three.**

17      A.    Yes, sir.

18      Q.    **Turn to page 6 of 32.**

19      A.    Yes, sir.

20      Q.    **So for the $186,000 entry, you say -- G&G says,**

21  **Debtor advanced money on the rock to be sold so his mother**

22  **could pay her bills.**

23      A.    Okay.

24      Q.    **And then for the $384,000, you talk about to pay**

25  **payroll obligations and medical insurance for employees and**

```
 1   also for medical aid for the care of Michael Stephen

 2   Galmor's mother, right?

 3       A.   Yes, sir.

 4       Q.   Then the $24,000 was for a van for her benefit,

 5   right?

 6       A.   Yes, sir.

 7       Q.   So doesn't it sound like maybe around $500,000 was

 8   advance for your mother's expenses?

 9       A.   I'm not gonna say that.  I -- I'm not gonna --

10       Q.   Well, did your --

11       A.   I --

12       Q.   -- mom have any extraordinary expenses that needed

13   to be paid?  Did she --

14       A.   Not necessarily.

15       Q.   Did she lead an extravagant life?

16       A.   No, sir, pretty simple.

17       Q.   Okay.  Her house is paid off and obviously she had

18   utilities and other things, but --

19            Well, wow much do you think she needed every year

20   to support her life?

21       A.   I -- I can't answer that.

22       Q.   And I -- I don't mean to be disrespectful to your

23   father.  But didn't your father leave money to take care of

24   her when he passed?

25       A.   He left that oil and gas interest.  And when it
```

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

1  was producing, there was enough money to take care of all of

2  his debts plus the land and everything.

3         But when the rail -- when the gas prices dropped

4  and there wasn't no money coming in, we had to do what we

5  could do to -- to keep the money, keep everything like it

6  was in place, hoping that maybe the gas market would come

7  back.

8      **Q.   Okay.  So the -- the gas revenue was financing**

9  **your mother's expenses?**

10     A.   The gas -- The gas supported my dad in every

11  adventure he went in.  But when the profits went down from

12  the gas, things got slim 'cause he put everything on such

13  long-term payments.  And if the gas would stay at $5 or $6 a

14  thousand, we wouldn't have had any of these troubles at all.

15     **Q.   But sir, I'm trying to focus just on your mother's**

16  **--**

17     A.   That's --

18     **Q.   -- expenses.**

19     A.   -- what I'm saying.  That's -- That money was left

20  there for her to live on and to -- for all of us to have.

21  But I can't include the fact that it's -- it didn't happen

22  that way.

23     **Q.   Well, I'm not saying that it didn't.  I'm just**

24  **trying to figure out how much of the money that you earned**

25  **--**

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

1    A.   I don't know.

2    Q.   But sitting here today, can you remember any

3 extraordinary expense, by extraordinary I mean unexpected

4 large expense or large expense that your mom had towards the

5 end of her life?

6    A.   No, sir.

7    Q.   Did your dad leave any cash money to help your mom

8 after he passed?

9    A.   Not that I'm aware of.

10    Q.   Exhibit 9, sir, is your individual 2017 tax

11 return.

12         (WHEREUPON, Exhibit 9 was marked for

13 identification.)

14 BY MR. RUKAVINA:

15    Q.   Before we go into this, real quick, do you know

16 who the trustee of the contribution trust was after your dad

17 passed?

18    A.   No, sir.

19    Q.   And you don't think you were ever the trustee?

20    A.   I'm not going to say that; I don't know.  I don't

21 understand that part of that -- the whole system, sir.

22    Q.   But in your mind, understanding that you're not a

23 lawyer, you don't think that you were a trustee?

24    A.   I'm not going to answer that question.

25    Q.   Okay.  What about the family trust?  Were you ever

1  the trustee of the family trust?

2      A.   I'm not going to answer those questions, sir.

3      **Q.   Just because -- just because you --**

4      A.   I don't understand the -- I never understood the

5  whole principle of all the -- that they built.  I never

6  looked at it.  I, when -- if I needed something, I would

7  call the attorneys and visit with them.

8      **Q.   You're not refusing to answer my question; you**

9  **just don't feel like you can because you don't understand?**

10     A.   That's correct.

11     **Q.   Okay.  And I'm going to ask you the same question**

12 **for the marital trust, were you ever the trustee of that?**

13     A.   Well, I don't know that.

14     **Q.   Okay.  Do you have any understanding of what those**

15 **trusts, any of those trusts were funded with?**

16     A.   No, sir.

17     **Q.   Do you have any understanding of -- of whether**

18 **those trusts had any cash money in them when your dad passed**

19 **that was intended to support your mom's life?**

20     A.   I can't answer that.

21     **Q.   Did your dad have a gambling problem?**

22     A.   Yes, sir.

23     **Q.   Okay.  Was it a pretty serious gambling problem?**

24     A.   I don't know to the extent of it all.  I just know

25 the stories that I've been told.

1    Q.    Did you ever go take him up to Oklahoma to the

2  casino or go there with him?

3    A.    I went with him twice.  Once we went to Tulsa to a

4  business meeting and then once we went to -- I took him over

5  to Clinton.  But I just, I couldn't do that.

6    Q.    Did your dad lose a lot of money at the casinos

7  towards the end of his life?

8    A.    I can't say what he lost.  I know what my brother

9  told me and I know what the people around him told.

10    Q.    What did your brother tell you?

11    A.    He asked dad -- He said, what are we doing?  We're

12  spending a lot of money here.  And he said, it's none of

13  your business; I made it and I'll keep it.  I don't need

14  your help, sis.

15         But, no, I don't know how much he lost or what he

16  spent, but...

17    Q.    I'm just trying to explore, it sounds like your

18  dad was a hard-working man and built a decent estate for

19  himself and his wife.  And, and I'm trying to find out why

20  there was very little or no money there when he died, to

21  take care of your mom.

22    A.    Like I said, if we'd have had gas prices like they

23  were supposed to be and everything would have went like he

24  thought it would be, there would have been a lot of money

25  for everybody.

1    Q.    Did the family partnership pay for a remodel of

2 the mother's house?

3    A.    They put her bathroom stuff on, yes, sir.

4    Q.    When was that?  While she was alive?

5    A.    Yeah.  My mother -- My dad had just passed away, I

6 think, when we built that.

7    Q.    Do you have any idea of how much that cost?

8    A.    I don't know.  Seventy-five, 80 thousand dollars

9 maybe; I don't know.  She paid them every week.

10    Q.    She paid who every week?

11    A.    The carpenters.

12    Q.    But the family partnership ultimately paid for --

13    A.    Well, mother paid.  I don't know.  I mean, mother

14 talked to the people that were building all that.  I mean, I

15 lined the contractors up, but mother dealt with them, what

16 she wanted done.

17    Q.    Okay.  In 2014, do you think that your mom was

18 receiving enough oil and gas revenue to pay for her

19 expenses?

20    A.    I'm not going to say that.  I don't know that.

21    Q.    Again, I'm trying to -- I'm trying to help you

22 explain to me when the loans that you made to the

23 partnership began to help your mom.  I'm just -- I'm trying

24 to -- I'm trying to understand.

25    A.    Well, sir, alls I can tell you, it -- they're in

1  that computer that Mr. Ries -- if you don't have the

2  computer, maybe Mr. Ries'll let you use the computer.

3          All these things that are in these documents came

4  out of that computer.

5      Q.   With Ms. Carter's assistance and with Mark -- Max

6  Tarbox's assistant's assistance?

7      A.   I assume that's true, yes, sir.

8      Q.   So to the best of your understanding in that

9  computer certain expenses or payments were coded as a loan

10 from you or from G&G?

11     A.   All those transactions that are in these documents

12 came off of that computer, sir.

13     Q.   Okay.

14     A.   And I don't know -- I can't say which are what or

15 -- I don't understand that.  But I know they all come out of

16 the computer.

17     Q.   Okay.  Well, we'll put that exhibit aside for a

18 second, sir.  We'll move on to a different topic.

19          Okay.  I need a -- Exhibit 10, Mr. Galmor.

20          (WHEREUPON, Exhibit 10 was marked for

21 identification.)

22 BY MR. RUKAVINA:

23     Q.   Sir, you probably have no personal knowledge of

24 this.  But this is a profit and loss and the balance sheet

25 of Galmor's/G&G.

```
 1            Have you seen documents like this before?
 2      A.    Yes, sir.
 3      Q.    Did you -- Would you ever ask Ms. Carter to give
 4  you a P&L or a balance sheet or anything like that?
 5      A.    We looked at everything on Fridays, yes, sir.
 6      Q.    Would you ever give something like this to Ms.
 7  Fuchs to help her prepare tax returns?
 8      A.    Oh, I'm not sure about that.  I don't know that.
 9      Q.    Well, what I'd like to look at is a few pages in,
10  Mr. Galmor.  There's something called a balance sheet.  Let
11  me know when you're there, where --
12      A.    Okay.  I'm there.
13      Q.    -- it says balance sheet.  Okay.
14      A.    Okay.
15      Q.    And the top half of it you see talks about assets?
16      A.    Yes, sir.
17      Q.    Okay.  And the bottom half talks about
18  liabilities.  Do you see that?
19      A.    Yes, sir.
20      Q.    You got accounts payable.  You got other stuff.
21      A.    Mm-hmm.
22      Q.    Okay.  And we're going to look at the computer
23  that Mr. Ries has.
24            But do you have any explanation for why this
25  balance sheet of Galmor's/G&G doesn't show as an asset the
```

1  loan that it made to the family partnership?

2      A.   No, sir.

3      Q.   Do you have any explanation why this balance sheet

4  doesn't show as a liability of Galmor's/G&G of what it owes

5  you for the advances you made to it in order to enable it to

6  make advances for the family partnership?

7      A.   No, sir.

8      Q.   I'm going to show you Exhibit 11.

9          (WHEREUPON, Exhibit 11 was marked for

10  identification.)

11 BY MR. RUKAVINA:

12      Q.   This is also what we call a P&L and the balance

13 sheet of Galmor's/G&G.  And this is a more robust version.

14 And we can go through it in detail.  But I'm going to tell

15 you that these two are different.

16          So I'd like to ask you flat out, did you maintain

17 two sets of books for Galmor's/G&G?

18      A.   No, sir.

19      Q.   Now, you did say that at one point before the

20 merger, your dad's company, Dalmor or Damor, and -- and G&G

21 kept different books and you wanted to merge those, right?

22      A.   Yes, sir.

23      Q.   After that, was there two sets of books

24 maintained?

25      A.   No, sir.

1    Q.    Do you have any understanding for why Exhibits 10

2  and 11 are different?

3    A.    No, sir.

4    Q.    Okay.  Exhibit 11, I'm going to ask you the same

5  question on the balance sheet.  It shows no asset being a

6  loan to the family partnership.  Take a look at it, see if

7  I'm wrong.

8    A.    I'm sure you're right.

9    Q.    Okay.  And it shows no liability to you for the

10 advances that you made that -- so they could finance the

11 partnership.  We can take a look at it, but I certainly

12 don't see it.

13   A.    Okay.

14   Q.    And you don't have any explanation for why those

15 things would be missing, do you?

16   A.    No, sir.

17   Q.    Okay.  And you have no explanation for why these

18 two documents would be different?

19   A.    No, sir.

20   Q.    Exhibit 12, Mr. Galmor, will be the P&L and

21 balance sheet for the family partnership.

22         (WHEREUPON, Exhibit 12 was marked for

23 identification.)

24 BY MR. RUKAVINA:

25   Q.    Would Ms. Carter prepare documents like this for

1    you to review on behalf of the family partnership?

2        A.   She would put the input in, but most of when we

3    dealt with this, I dealt with Kellye.

4        Q.   Okay.  And I think you already said Ms. Fuchs had

5    access to the QuickBooks, right?

6        A.   Yes, sir.

7        Q.   Okay.  If you go on to the balance sheet, please,

8    I'm looking at liabilities.  I see liabilities and the

9    nature of accounts payable.  I see a couple credit cards.  I

10   see long-term liabilities, farm credit, et cetera, Kubota.

11            I see a line that says loan payable, Steve Galmor.

12   Do you see that, sir, here in the middle of that, that --

13   that page?

14       A.   Yes, sir, I see that right there.

15       Q.   And do you see that it says 15, one five, thousand

16   dollars?  Well, I know it's small print.

17       A.   I -- I'm showing $7,000.

18       Q.   Well, I --

19       A.   Loan receivables, Steve Galmor; is that what

20   you're saying?

21            MR. SHERWOOD:  Loan payable.

22            THE WITNESS:  Loan payable.

23   BY MR. RUKAVINA:

24       Q.   Loan payable, Steve Galmor.  At the -- At the far

25   right, it says $15,000.

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

 1           Okay.  Sir, you're looking -- you're looking on

 2    the -- on the assets.

 3      A.    You said the --

 4      Q.    Please look --

 5      A.    -- balance sheet.

 6      Q.    Yeah, yeah.  But you're looking at the assets.

 7    I'm asking you now to look at the liabilities.

 8           So this is where the family partnership's books

 9    and records are showing its liabilities, sir.

10      A.    Okay.  All right.

11      Q.    And near the middle of there, it says, loan

12    payable, Steve Galmor, $15,000.

13      A.    Okay.

14      Q.    Do you have any explanation for why that says

15    $15,000 and not a million dollars?

16      A.    No, sir.

17      Q.    Okay.  Do you have any explanation for why there's

18    no line entry that says loan payable Galmor's/G&G?

19      A.    No, sir.

20      Q.    Okay.  Do you have any idea what the Lincoln

21    Automotive Financial $40,000 or so liability is?

22      A.    Mother's car, I guess; I don't know.

23      Q.    Okay.  What kind --

24           What car does she have?

25      A.    Had a Lincoln.

1    Q.    Does that car still exist?

2    A.    No, sir.

3    Q.    What happened to that?

4    A.    I'd have to go back and look.  I don't -- I don't

5    know that.

6    Q.    Was it a Lincoln Navigator?

7    A.    Yes, sir.

8    Q.    Okay.  Was that -- Do you know was that --

9          Was that car titled in the family partnership or

10   your mom?  And if you don't know, you don't --

11   A.    I don't know.

12   Q.    Sir, now let's go back to Exhibit 9, which was

13   your individual return for 2017.  And I don't care about the

14   first few pages, what are -- what is your depreciation

15   schedule.

16         I'd like for you, if you could, go to Form 1040.

17   And I'd be happy to point him to it, if you like.

18         MR. SHERWOOD:  Thank you.

19   BY MR. RUKAVINA:

20   Q.    Are you there on line (sic) 1040, Mr. Galmor?

21   A.    1040, yes, sir.

22   Q.    Okay.  For, for wages, et cetera, it lists 100 --

23   $111,000 and change for 2017; do you see?

24   A.    Yes, sir.

25   Q.    And then a capital gain of $115,000 here in the

1  middle of that, do you see that?

2       A.   Yes, sir.

3       Q.   Do you know what that capital gain was?

4       A.   No, sir.

5       Q.   Okay.  And then a farm loss of $76,000, you see

6  that?

7       A.   Yes, sir.

8       Q.   And a net operating loss on line 21 of $45,000,

9  you see that?

10      A.   Yes, sir.

11      Q.   Okay.  Do you believe that, that this Schedule

12  1040 -- I know you're not an accountant, nor am I.  But do

13  those numbers sound like the money that you actually made in

14  2017 personally?

15      A.   If Kellye put them in there, that's what happened.

16      Q.   And I'm taking it that whatever money you made in

17  2017, you had your own expenses, right?  I mean your own

18  car, your own lifestyle, right?

19      A.   Yes, sir.

20      Q.   So if you were advancing money to the family

21  partnership from your personal funds in 2017, where did that

22  money come from?

23      A.   I can't answer that.

24      Q.   Between 2013 and 2018, did you have a savings

25  account?  Personally, you Steve Galmor, did you have a

```
 1  savings account?

 2      A.   Mmm.  I got a 401(k).  I don't know when we

 3  started them.  But I don't -- As far as me ever saving money

 4  in a -- I had a life insurance policy once.  But I don't

 5  remember having a savings account.

 6      Q.   Did you ever cash out that life insurance policy?

 7      A.   No.

 8      Q.   I'm sorry?

 9      A.   I never did use it.

10      Q.   Okay.

11      A.   I think I quit paying on it.

12      Q.   Did -- What was the maximum amount of money --

13  well, let me --

14           Did you ever take money out of your 401(k)?

15      A.   No, sir.

16      Q.   Okay.  And you don't remember having a savings

17  account?

18      A.   No, I don't remember -- I mean -- No, I don't

19  remember ever owning a savings account?

20      Q.   Did you -- Did you own checkings -- checking

21  accounts personally as Steve Galmor?

22      A.   Yes.

23      Q.   Okay.  Did you have a -- anything more than a

24  couple hundred dollars of cash saved anywhere?  Like I mean

25  physical cash saved anywhere?
```

1    A.    I -- I don't -- I've always put it in checks and

2 stuff.

3    Q.    **What is the biggest amount of money that you,**

4 **Steve Galmor, remember having at any given point in time,**

5 **that you could immediately access?**

6    A.    When I sold out to Advantage.

7    Q.    **Okay.  That was like the 1.2 or 1.3 --**

8    A.    Whatever that number was, yes, sir.

9    Q.    **And then did you use some of that money to pay**

10 **debt immediately?**

11    A.    Yes, I paid off all my land and stuff.

12    Q.    **How much of that 1.2 or 1.3 million can you**

13 **estimate was left over after you paid off the land?**

14    A.    I can't answer that.

15    Q.    **Was it a large amount of money?**

16    A.    I'm sure it was if it was close to a million

17 dollars.

18    Q.    **So I -- I'll ask it again, Mr. Galmor, and I've**

19 **asked it before.**

20        **You loaned a million dollars from yourself to the**

21 **family partnership and you loaned more than a million**

22 **dollars from yourself to G&Gs that then loaned the money to**

23 **the partnership.  So that's more than $2 million.  Where did**

24 **that money come from, sir?**

25    A.    I'm not sure.  I can't answer that.

1      Q.   Before you sold G&G to Advantage, can you estimate

2  what the most amount of money you had at any given point in

3  time since the year 2000 to then was?

4      A.   Not really, no, sir, I can't.

5      Q.   Did you ever keep cash in a safety deposit box?

6      A.   No, sir.

7      Q.   Did you ever own any securities?  Do you know what

8  a security is?

9      A.   No.

10      Q.   No, you don't know what a security is?  Or no, you

11  never had securities?

12      A.   I -- I don't -- I don't know what a security is

13  and I never owned one, I don't guess.

14      Q.   Did you ever own stock?  I mean not -- not your

15  own company.  But did you ever own like stock in any --

16      A.   No.

17      Q.   -- company but your --

18      A.   No, I never did any of that.

19      Q.   Do you ever remember selling any significant asset

20  for cash money that you then used to loan to the

21  partnership, the family partnership?

22      A.   The only money I loaned them was the money I got

23  from Advantage.

24      Q.   But you can't tell me how much of that Advantage

25  money went to the family partnership?

1       A.    No, sir.

2       Q.    And you can't tell me when that sale to Advantage

3  was, it's with the lawyers?

4       A.    No, I can't.

5       Q.    So is it fair to conclude that all the money you

6  loaned to the family partnership came after that Advantage

7  transaction or had you already been loaning money before

8  that?

9       A.    I -- I can't answer that.

10      Q.    You just don't know?

11      A.    I don't know.  That's -- I mean, if I knew, I'd

12  tell you, sir.

13      Q.    Well, I -- I'm not -- okay.  I'm not trying to be

14  a jerk, okay.

15            When you say I can't answer that, it could have

16  two meanings.  I just wanted to clarify that it's because

17  you don't know?

18      A.    I don't know.

19      Q.    Do you -- Do you think that you would have

20  disclosed on your tax returns or that Galmor/G&G would have

21  disclosed on its tax returns the sale to Advantage?

22      A.    It should be there, yes, sir.

23      Q.    Does Galmor's/G&G, to your knowledge, is it

24  consolidated for tax purposes with SGM Leasing?  And if you

25  don't know, just say you don't know.

1    A.    I don't know.

2    Q.    Okay.

3    A.    I mean, I -- There was a business man came in and

4 helped put a bunch of those things together, and it never

5 did pan out; none of it ever worked.  Well, I mean, so I

6 don't --

7    Q.    The reason why I'm asking you is because I asked

8 Mr. Ries whether he has the tax returns for Galmor's/G&G,

9 and Mr. Ries told me that he thinks that it was part of the

10 same tax return as SG&M.

11          Does that sound right or does that sound wrong to

12 you?

13    A.    I don't know.  I can't answer that.

14    Q.    Okay.  That'll be -- That'll be a Ms. Fuchs

15 question?

16    A.    Probably so.

17    Q.    Okay.  We're going to mark as Exhibit 13, the 2017

18 return of SGM Leasing.

19          (WHEREUPON, Exhibit 13 was marked for

20 identification.)

21 BY MR. RUKAVINA:

22    Q.    This is a very complicated return, sir, so it's

23 going to take a second.

24          But generally, what is or what was SGM Leasing?

25    A.    Sir?

1      Q.    Yes.   What is or what was SGM Leasing?

2      A.    I think they put equipment in and -- I don't

3  really know what -- Like I said, there's a gentleman from

4  Tennessee or a - a man named Mac -- Ben Jarman came and was

5  setting things up so we could do some different stuff or

6  whatever this is.  He said it was a business plan.  And he

7  started it, but we never did really get it off the ground.

8  And none of the -- There was like four entities built with

9  this SGM Leasing.  But I don't know -- None of them ever

10  really got off the ground.

11      Q.    One second, please.

12            Were you the sole owner of SGM Leasing?

13      A.    I assume.

14      Q.    Okay.  Do you think that you had any partners or

15  any other shareholders in SGM Leasing?

16      A.    Not that I'm aware of.

17      Q.    Okay.  If you go to Federal Schedule K, it's about

18  the tenth page in, the fifth page for us.

19            MR. RIES:  I can help you find it.

20  BY MR. RUKAVINA:

21      Q.    Or actually, go to form 8903.  Looks like this.  I

22  think you might have passed it.  8903.

23      A.    8903?

24      Q.    Yes, sir.

25      A.    Okay.

```
 1        Q.    Are you there?

 2              Okay.  It says line 1 is domestic production gross

 3   receipts, $6,014,000 and change.  Do you see that?

 4        A.    Yes, sir.

 5        Q.    Do you have any idea what that is?

 6        A.    Yes, sir, that was I think when -- when we started

 7   the -- the mining project, that looks like the numbers that

 8   would go with the mining project.

 9        Q.    The mining project --

10        A.    Strip mining.  The strip mines.

11        Q.    The -- The quarry deal are we talking about?

12        A.    Yes, sir.

13        Q.    Okay.  Okay.  So help me understand.

14              Did SGM run the mining company or did -- did

15   Galmor/G&G?

16        A.    I can't answer that.  I know that that's how they

17   set it up to do business.

18        Q.    Okay.

19        A.    And I know that SGM was buying that equipment,

20   'cause those -- that's -- when you talk the six million,

21   that's -- that's where those numbers came from.

22        Q.    That being the -- the large equipment that

23   actually did the mining?

24        A.    Yes, sir, that's the stuff that...

25        Q.    Okay.  You know, I know now why this has been
```

 1  confusing, 'cause the 2017 return is just confusing.  Let me

 2  get the 2016, okay.  I confused myself and you in the

 3  process.  I apologize.

 4          Exhibit 14 is the 2016 return for SGM.

 5          (WHEREUPON, Exhibit 14 was marked for

 6  identification.)

 7  BY MR. RUKAVINA:

 8      Q.   So if we go quite a bit into this, there's a Form

 9  1120S.

10      A.   Okay.  1120S.

11      Q.   Yes.  And it -- it shows gross receipts of $6.5

12  million.  Do you see that?

13      A.   Yes, sir.

14      Q.   Okay.  And I think a few pages on -- just go off

15  the record here for a second.

16          MR. SHERWOOD:  Sure.  That's fine.

17          VIDEOGRAPHER:  Going off; 3:00 p.m.

18          (WHEREUPON, a recess was taken.)

19          VIDEOGRAPHER:  Back on the record.

20  BY MR. RUKAVINA:

21      Q.   Mr. Galmor, you're on that form 1120S, right?

22      A.   The one you got for me, yes.

23      Q.   Yeah.  And then the second page of that, the next

24  page of that talks about Galmor's/G&G Steam Service.  You

25  see that?

1      A.    I see it right here.

2      Q.    Okay.  On the one I marked?  Yeah.  Yeah.  Yeah.

3  Okay.

4            According to this, SGM Leasing owned, at that

5  time, 100 percent of Galmor's/G&G.  Does that sound right to

6  you?

7      A.    I assume.

8      Q.    Do you remember when you created SGM Leasing?

9      A.    We'll have to get with Kellye.  I mean, she's the

10  one that prepared all this stuff.

11     Q.    But if we go back to the first page of this Form

12  1120S, the $6.5 million revenue in 2016, just it's the very

13  -- it's the page right before that one.

14           You think that that's from the actual sale of the

15  rock, correct?

16     A.    I'm going to assume that, yes, sir.

17     Q.    Well, did SGM have any income other than from the

18  potential sale of rock?

19     A.    I don't know that.  That's something Kellye can

20  answer, I'm sure.

21     Q.    So you, you just don't feel qualified to talk

22  about that?

23     A.    No, sir, I don't --

24     Q.    Then I'm -- then I'm going -- That's okay.  I'm

25  not going to ask a bunch about it.  I'll -- I'll save my

1  questions for Ms. Fuchs or -- you know, I told you, I'm not

2  trying to set you up.

3      A.   Like I said, I -- I'm -- this is all Greek to me.

4      Q.   Yeah.

5           MR. SHERWOOD:  You're not the only one.

6  BY MR. RUKAVINA:

7      Q.   I'll ask Ms. Fuchs about that.

8      A.   Okay.

9      Q.   I also wanted to discuss the Galmor Management,

10 L.L.C., partnership return briefly.  I have the 2016 one,

11 which will be Exhibit 15.

12          (WHEREUPON, Exhibit 15 was marked for

13 identification.)

14 BY MR. RUKAVINA:

15     Q.   Now, Galmor's Management never had any real

16 revenue of its own, did it?

17     A.   Not that I'm aware of.

18     Q.   All the business would have been through the

19 family partnership, right?

20     A.   I assume that, yes, sir.

21     Q.   Okay.  I just want to ask you again, if you go to

22 Schedule L.  It's page 759 on the bottom right.  That might

23 help you out.

24     A.   Okay.

25     Q.   And we go back to that like we looked before,

1  liabilities and capital.  It shows no amounts owing to

2  either you or G&G, Galmor's for loans, right?

3     A.    Yes, sir.

4     Q.    Okay.  Do you have any explanation for why that's

5  the case?

6     A.    No, sir.

7     Q.    Okay.  Very briefly, to go back to the rock

8  quarry, the rock business.

9           You don't remember when Galmor/G&G was supposed to

10 pay the family partnership for the royalties, whether it was

11 30 days later, 10 days later, or 60 days later?  You don't

12 remember that at all?

13    A.    I assume it's 30.

14    Q.    Okay.  Would that have been standard in the

15 business?

16    A.    I assume.

17    Q.    Is it fair to say that at the time that

18 Galmor's/G&G filed bankruptcy, it owed money to the family

19 partnership for unpaid royalties, some amount?

20    A.    I -- I'm not -- I don't know that at all.

21    Q.    Okay.  Well, do you know whether Galmor's/G&G was

22 current on its royalty payments to the family partnership

23 when it filed bankruptcy?

24    A.    I'm not -- I don't know that.

25    Q.    One way or the other, you don't know that?

```
 1      A.   I don't know that.

 2      Q.   This will be Exhibit 16.

 3           (WHEREUPON, Exhibit 16 was marked for

 4 identification.)

 5 BY MR. RUKAVINA:

 6      Q.   So, sir, this -- this is a document produced by

 7 your lawyer, not your current lawyer, but the prior lawyer,

 8 and it printed out December 10th, 2018.  And it looks like

 9 it's a report of the royalty payments and royalty advances

10 from Galmor's/G&G to the family partnership.  Do you see

11 that, sir?

12      A.   Yes, sir.  Mm-hmm.

13      Q.   And it shows that there towards the end, beginning

14 in 2016, there's a lot of royalty advances.  Do you see that

15 near the bottom?

16      A.   Yes.

17      Q.   Okay.  Before that, it talks about royalty

18 payments up there.  You see all through 2016 and 2015?

19           I'd like to know, sir, do you know what this

20 document is and why it was prepared?

21      A.   No, sir.

22      Q.   Okay.  Do you -- Do you have any explanation for

23 why this document, after June 8th, 2016, shows no royalty

24 payments, just royalty advances?

25      A.   No, sir.
```

```
 1      Q.    Okay.  Do you have any idea who prepared this

 2  document?

 3      A.    I would assume Matt Brooks.

 4      Q.    Okay.  The gentleman we discussed before?

 5      A.    Yes, sir.

 6      Q.    Okay.  One moment, please.

 7            The next document -- The next document will be

 8  Exhibit 17, a document produced by the Lovell firm.

 9            (WHEREUPON, Exhibit 17 was marked for

10  identification.)

11  BY MR. RUKAVINA:

12      Q.    Before I give you this document, just one second,

13  please.

14            Have you ever seen this binder before?

15      A.    I'm not sure.

16      Q.    Take a look at it.

17      A.    I don't know.  I -- There's a bunch of those

18  binders at the office.

19      Q.    Okay.  Do you recall ever preparing an accounting

20  on behalf of the family partnership at the request of Ms.

21  Pritchard or her lawyer?

22      A.    No, sir.

23      Q.    Do you know what a -- an accounting under Texas

24  law is?

25      A.    Well, I'm not sure.
```

1    Q.   Okay.  Well, what I've given you, Exhibit 17, is a

2  page-by-page copy of this binder.

3    A.   Okay.

4    Q.   And the first page of it is an email from --

5         MR. RIES:  Is this 17 or 18?

6         MR. RUKAVINA:  I'm sorry.  This is Exhibit 17.

7  Isn't it?

8         MR. SHERWOOD:  I thought this two-page --

9         THE WITNESS:  Seventeen.

10         MR. SHERWOOD:  -- one was 17.

11         MR. RUKAVINA:  Did I make another mistake?

12         THE REPORTER:  No, I've got -- I've got --

13         VIDEOGRAPHER:  Seventeen.

14         THE REPORTER:  -- Exhibit 17.

15         MR. RUKAVINA:  Yeah.

16         MR. RIES:  I think this is 16.

17         THE REPORTER:  Yes, that was Exhibit 17, the last

18  one you --

19         MR. RUKAVINA:  Yeah, the two-page thing is Exhibit

20  16, Kent.

21  BY MR. RUKAVINA:

22    Q.   Okay.  Sir, you remember that, that there was a

23  mediation held at some point with Ms. Pritchard and other

24  people?

25    A.   Yes, sir.

```
 1        Q.    All right.  Help me.  In the summer of '19?

 2        A.    We had two or three; I'm not sure.

 3        Q.    Okay.  And I apologize, I don't know if I got your

 4   answer.

 5              Do you know what an accounting under Texas law is?

 6        A.    No, sir.

 7        Q.    Okay.  Do you have any memory at all of anything

 8   like -- like you were preparing an accounting with other

 9   people's assistance, of the Family Limited Partnership?

10        A.    No, sir.

11        Q.    Do you have any memory at all that you were doing

12   something in response to a request from Ms. Pritchard's

13   lawyer, to provide details as to the Family Limited

14   Partnership's assets and liabilities?

15        A.    Deena sent some correspondence back for Leslie,

16   and it wasn't suitable for what they wanted.  I remember

17   things happening that way, yes, sir.

18        Q.    Well, this, this very first page here, is an email

19   from Matthew Merriott to Deena Carter and it looks like

20   yourself.

21              Is that your email address?

22        A.    At that time it was, yes, sir.

23        Q.    Okay.  And it looks like Mr. Merriott is -- is

24   writing a -- a -- or copying Texas law that talks about

25   Contents of Accounting.  Do you see that, sir?
```

1      A.    Yes, sir.

2      Q.    Do you remember receiving this email?

3      A.    No, sir.

4      Q.    Okay.  Nothing about this jogs your memory?

5      A.    No.  But it was, like I said, after the

6   bankruptcy, I didn't have any email at all.

7      Q.    Okay.  And seeing that, that binder there, didn't

8   refresh your memory at all?

9      A.    Well, I saw binders.  There's a pile of them

10  binders that, that were at the shop back in the day.

11     Q.    Okay.  But that was the binder at the Lovell firm.

12     A.    Well, I must have brought it to them.

13     Q.    Was the Lovell firm helping you with respect to

14  the limited -- the Family Limited Partnership?

15     A.    Yes, sir.

16     Q.    Okay.  Were they helping you at that mediation?

17     A.    I believe so.

18     Q.    Okay.  So this is going to be a little tricky.

19  But two-thirds of the way through, there's a tab.  And I'll

20  let your lawyer look at this, and if he needs to make

21  another copy, he can.  There's a big tab that says

22  liabilities.

23          MR. SHERWOOD:  See that.

24  BY MR. RUKAVINA:

25     Q.    And I'm going to give you the original here and

1  I'm going to try to help the other lawyers find it.

2          Kent, this is at tab -- Are you there on

3  liabilities?

4          MR. RIES:  Yeah.

5          MR. RUKAVINA:  Oh, you're faster than me.  Well,

6  good.

7  BY MR. RUKAVINA:

8      Q.   Mr. Galmor, do you have any memory as to what this

9  tab, liabilities, was prepared for, or why?

10          It's going to be -- You're getting there, Matt.

11  You're almost there.  Let me give you a sticky.  I'm sorry.

12  I should have done this before.

13          MR. SHERWOOD:  Got it.  Thanks.

14          THE WITNESS:  I don't know who we made it for.  I

15  remember we talked about it 'cause we were looking at the --

16  what my family owed.

17  BY MR. RUKAVINA:

18      Q.   Who'd you talk to about it?

19      A.   Well, I can't remember that.  I just remember

20  seeing, there -- wanted to know about expenses and stuff.

21      Q.   Who wanted to know about expenses and stuff?

22      A.   I can't remember that.  I just remember the

23  conversation.

24      Q.   But you don't remember the word accounting at all

25  used in that conversation?

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

1     A.    No, sir.

2     Q.    Okay.  You don't remember the -- the reason why

3  this was prepared, other than someone asked for it?

4     A.    That's -- That's all done...

5     Q.    Do you know whether this was provided to Ms.

6  Pritchard's lawyer at that time?

7     A.    I have no idea.

8     Q.    Okay.  Did you help prepare this, this tab here

9  called liabilities?

10    A.    No, sir.

11    Q.    Did you look at it?

12    A.    No, I -- I mean, the loan numbers and stuff, they

13 were all in a file there.  I mean, I -- I...

14    Q.    Have you seen this, to the best of your memory

15 sir, have you seen this document before today?

16    A.    Seems like I have.

17    Q.    Okay.  And if you --

18          Please look through here and tell me if you see

19 any liability listed here to you or to Galmor/G&G?

20    A.    No, sir.

21    Q.    Okay.  So if I -- If I represent to you that this

22 was a formal accounting that your lawyers helped you prepare

23 to send to Ms. Pritchard's lawyer, you -- that does not ring

24 your memory at all?

25    A.    No, sir.

1      Q.   Okay.  Sir, well -- well, please give me that

2 binder back and we'll -- I'll -- I'll leave this binder in

3 its current state if anyone ever questions it in the future.

4           And also, Kent, also the Lovell firm scanned it

5 and has a copy of it if you ever --

6           MR. RIES:  Okay.

7           MR. RUKAVINA:  -- need to see, you know, something

8 other than this.

9 BY MR. RUKAVINA:

10     Q.   Sir, I'm going to try to be respectful, okay?  I'm

11 not trying to be a jerk.

12          But you blame Ms. Pritchard for years of

13 litigation against you and that that caused a rift in your

14 family, fair?

15     A.   Yes, sir.

16     Q.   Okay.  And you think she was unfair by alleging

17 that you forged your mother's will, right?

18     A.   Yes, sir.

19     Q.   And you think she made that up?

20     A.   Yes, sir.

21     Q.   Okay.  And, and you feel that her, all that

22 litigation was just a waste of everyone's time and just

23 everyone pissing in the well, fair?

24     A.   I think so, yes, sir.

25     Q.   But you understand today, sir, that Mr. Ries has



1  sued the family partnership based on your statements that it

2  owes you money; do you understand that, sir?

3      A.    Yes, sir.

4      Q.    Okay.  And sir, we've looked at tax returns.

5  We've looks -- We've looked at balance sheets.  We've looked

6  at what purports to be this accounting here, and we don't

7  see anywhere, where before this bankruptcy you said that

8  there was any debt.  Am I --

9          MR. RIES:  Well, I'm going to object.  It's --

10         MR. RUKAVINA:  Am I --

11         MR. RIES:  That's not the evidence --

12 BY MR. RUKAVINA:

13     Q.    Am I wrong about that?

14     A.    You're right, I guess, yes, sir.

15     Q.    Do you have --

16          And you have no explanation for that?

17     A.    No, sir.

18     Q.    Do you think --

19          Do you know, putting the computer aside, do you

20 know of any human being that could support your -- the debt

21 owed to you and to Galmor's/G&G?

22     A.    Do what now?

23     Q.    Yes.  I'm trying --

24          Is there any witness that you know of, whether Ms.

25 Carter or Ms. Fuchs or anyone, that can testify, you think,

1    under oath, that that debt actually exists?

2        A.    I'm the only one, I guess.

3        Q.    And then you can't point me to a single document

4    before your bankruptcy case where you recorded that debt,

5    can you?

6        A.    No, sir.

7            MR. RIES:    Again I'm going to object to that.

8    We've got records you put in here today that were presented

9    that -- beyond the bankruptcy case, so -- that were

10   prepared.    I mean you put exhibits in today that refute what

11   you just said, so...

12           MR. RUKAVINA:    That's fine.    That's what a judge

13   is for.

14           I think we're getting near done.    Let's take a

15   longer break, maybe 15 minutes, and I'll try to wrap it up

16   in the next session.

17           MR. SHERWOOD:    Okay.    That's a promise, right?

18           MR. RUKAVINA:    It's not a promise, but I'll do my

19   best.

20           VIDEOGRAPHER:    Going off record, 3:21.

21           (WHEREUPON, a recess was taken.)

22           VIDEOGRAPHER:    You're back on; it's 3:48.

23   BY MR. RUKAVINA:

24       Q.    Mr. Galmor, if you could, please -- I'm sorry.

25   I'm at that age where these things kill me.

1          Will you go back to Exhibit 12?  This was the

2  balance sheet for the Family Limited Partnership.  And if

3  you will please turn to the balance sheet itself, under the

4  assets column.

5      A.    Balance sheet on the profit and loss or the --

6      Q.    The balance sheet, please, assets.  At the top it

7  says Galmor Family Limited Partnership --

8      A.    I've got that.

9      Q.    -- balance sheet.

10     A.    I've got the all -- but it says all transactions,

11 all transactions.

12     Q.    Yep, all transactions.

13     A.    Sir?

14     Q.    Let me take a look, please.  Thank you.

15          Here's where it begins.

16          MR. RIES:  Thank you.

17          THE WITNESS:  Thank you, sir.

18 BY MR. RUKAVINA:

19     Q.    Now, my first question for you is, I'm not an

20 accountant, but I don't think you are either.

21          Do you have any idea why these assets here is

22 listed with negative numbers?  Some of them, not all of

23 them.

24     A.    No, sir.

25     Q.    Okay.  And near the bottom, it talks about other

1  assets, loan receivable Carter.

2      A.   Yes, sir.

3      Q.   Are you -- Are you there, sir?

4      A.   Uh-huh.

5      Q.   Do you know who that Carter is?

6      A.   No, sir.

7      Q.   Could it be only Deena Carter or some other

8  Carter?

9      A.   I don't think it'd be Deena.

10     Q.   Okay.

11     A.   I don't know what that might be.

12     Q.   Okay.  So I guess you don't know my next question

13 either, which is, did the family partnership make a loan to

14 any Carter, to your knowledge?

15     A.   Not that I'm aware of.

16     Q.   Okay.  The next line item is loan receivable Steve

17 Galmor.  Do you have any idea why that's listed there?

18     A.   No, sir.

19     Q.   Did the partnership ever make a loan to you?

20     A.   No, sir.

21     Q.   Okay.  And then if you go on the very last page,

22 there's a series of partner's draws under equity.  Let me

23 know when you're there.

24     A.   Total liabilities and equity?

25     Q.   Yes.  Right above it you'll see a -- a heading

1   that says partner's draw.

2        A.   Okay, sir.

3        Q.   Do you have any idea what partner's draw means?

4        A.   No, sir.

5        Q.   Okay.  Do you have any idea why there's a negative

6   60,000, et cetera, listed for home expense?

7        A.   No, sir.

8        Q.   Okay.  Any idea why there's at the end there a

9   negative 113,000 listed for personal?

10       A.   No, sir.

11       Q.   Okay.  You don't know anything about what these

12   line items under partner -- partner's draw means, do you?

13       A.   What?

14       Q.   Hold on a second, got some loud cars.

15            Do you have any idea what these entries under

16   partner's draw mean?

17       A.   No, sir, I have no idea.

18       Q.   Did you, sir, ever take out money from the family

19   partnership for yourself or your -- your expenses?

20       A.   No, sir.

21       Q.   Okay.  If you ever did that, would Ms. Carter have

22   -- have, to your understanding, somehow put it in the books?

23       A.   No, sir.

24       Q.   This is just a topic that you don't know anything

25   about?

```
 1        A.    No, I don't know.

 2        Q.    Fair enough.  Fair enough.

 3              I'm just preparing our next exhibit.  It'll just

 4  take me a second.

 5              Sir, I'm going to give you Exhibit 18, which is

 6  called a deed of trust.

 7              (WHEREUPON, Exhibit 18 was marked for

 8  identification.)

 9  BY MR. RUKAVINA:

10        Q.    Do you know what a deed of trust is?

11        A.    Transferring the land, I think.

12        Q.    Okay.  This looks like it's an -- an October 7,

13  2014 deed of trust from you to the family partnership, for

14  $50,000; borrower, Michael Stephen Galmor; lender, Galmor

15  Family Limited Partnership.  Do you see that, sir?

16        A.    I see it there, yes, sir.

17        Q.    Okay.  And it says, maturity date, July 1, 2019.

18  Do you --

19        A.    Yes, sir.

20        Q.    -- see that?

21        A.    Mm-hmm.

22        Q.    Do you know what this is?

23        A.    I sure don't.

24        Q.    Okay.  It talks about property, see Exhibit A.

25  Now, the property is metes and bounds.
```

1          Exhibit A is the last page of that.  It should be

2   the last page or the second-to-last page.

3       A.   Yes, sir.

4       Q.   It has Track 1 and Track 2.  Do you see that?

5       A.   Yes, sir.

6       Q.   Do you have any idea what these properties are?

7       A.   Well, the first one is the Gin Yard.

8       Q.   Okay.

9       A.   And the second one, I'm not sure which track it

10  is, but it shows that it's the Hefley.  And then --

11      Q.   That's --

12      A.   -- the third one is Jacey.  And --

13      Q.   The last --

14      A.   I think -- I think what happened right there,

15  Jacey bought this Hefley property, and then I traded her the

16  house at the Gin Yard for the transaction.

17      Q.   Okay.  Do you remember being indebted to the

18  family partnership for $50,000?

19      A.   No, sir, I do not.

20      Q.   Do you remember ever signing this document?

21      A.   Well, I -- it's my signature.  But I'm not -- I

22  don't think this is all complete.

23      Q.   Okay.  What -- What do you think is incomplete

24  about it?

25      A.   'Cause I remember this transaction because there

1  was a house sits on the Gin Yard that belonged to -- my

2  daddy sold to Jacey.  And when she got a chance to buy the

3  property next to Deena, well, she went to the -- she bought

4  that for 50,000 and then I bought the other one back from

5  her for the 50,000.  We traded properties, basically.  I'm

6  not -- I'm not sure -- I think there should be some more

7  documents to go with this.

8      Q.    What?

9      A.    I mean, because I didn't -- there was no money

10 owed right then.  I mean, it was a slick transition.  But

11 I'm not going to argue what I'm seeing.  That's my

12 signature, those are what happened.  But I know we traded a

13 -- the property on the corner, the 592 and 83, Jacey bought

14 it and I ended up back with the -- the house that was in the

15 Gin Yard property back; put the Gin Yard all back together.

16     Q.    What other documents do you think there might be

17 related to that transaction?

18     A.    Well, and 'cause here's the -- the Miller

19 property, too.  All those transactions happened at the same

20 time, pretty close.

21     Q.    Do you believe that this lien was ever released?

22     A.    I'm sure it has been.  I mean, I -- I -- 'cause --

23     Q.    Do you believe that this lien was invalid or this

24 is a mistake?

25     A.    Well, I -- I'm not going to say what it is or what

**NAEGELI**
DEPOSITION & TRIAL    (800)528-3335
NAEGELIUSA.COM

1    it's not.  I'm -- I'm not familiar with this transaction.  I

2    know -- I know what did happen.

3        Q.    Okay.

4        A.    And that's what I said, I traded properties with

5    her, and I know that.

6        Q.    Okay.  Please -- okay.  I'm going -- I'm going to

7    ask you now to be very detail-oriented, please, and try to

8    avoid words like they or we.

9            So, so start again.  What -- What happened in this

10    transaction with the Gin Yard?

11        A.    When we started our conversation, we visited about

12    me having to give the $3,000 back to Jack Ledford.

13        Q.    Okay.

14        A.    I don't know if you remember that or not.

15        Q.    Yeah.

16        A.    Well, my dad sold that property and he didn't own

17    it.

18        Q.    Okay.

19        A.    Well, the corner on that property was still should

20    have been my dad's, but Mr. Tindal refused and said it was

21    his.

22        Q.    Okay.

23        A.    So they put it up to sell.

24        Q.    Who's they, Tindal?

25        A.    Yes, sir.  And they put it, I think Richard Hefley

1    or someone was the one that sold it.  Or there was somebody

2    there that sold it.

3              Well, my daddy sold the corner of the Gin Yard,

4    the north part of the Gin Yard, part of it to the county and

5    part of it to Jacey Carter.  And when Jacey made a deal with

6    Mr. Tindal to buy that corner back next to her mother, and

7    then I bought that house that's on the Gin Yard back from

8    her.

9         Q.   So Jacey Carter owned that house?

10        A.   Yes, sir.

11        Q.   And you bought it back from her?

12        A.   Yes, sir.

13        Q.   Did the Family Limited Partnership ever -- ever

14   own that, that --

15        A.   No, that was -- I'd already bought this out from

16   the --

17        Q.   And, and you're saying that no money changed

18   hands?  There was just a land-for-land swap?

19        A.   Well, there's probably some money changed so we

20   could get it all said and done, but there -- I didn't borrow

21   any money from the family limited partners.

22        Q.   Okay.  That's what I'm getting at.

23              So to your memory, you did not borrow, if any

24   money changed hands, you didn't borrow it --

25        A.   No.

1    Q.    -- from the family limited partners?

2    A.    No.  No, I don't --

3    Q.    And you have no understanding of why there might

4  be a lien out there?

5    A.    No.  We need to go check it.  I mean, I'll check

6  that.  But, no, there should -- that ought to have been a

7  clean --

8    Q.    Okay.

9    A.    -- trade.

10    Q.    Remember we looked at the balance sheet and there

11  was a Carter that we didn't know?  Could that have been

12  Jacey Carter?

13    A.    I don't think so.

14    Q.    Okay.  Is Jacey Carter related to Deena Carter?

15    A.    That's her daughter.

16    Q.    Okay.  Okay.  I'm going to make one more exhibit,

17  so it'll just take me a minute.

18    A.    Okay.

19    Q.    This exhibit will be Exhibit 19.  I'll give it to

20  you so you can start looking at it, while I prepare it for

21  the other gentlemen.

22    A.    Okay.

23    Q.    May I -- May I have that back for a second just to

24  make sure that I got the full thing.

25          MR. SHERWOOD:  Steve?

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

```
 1   BY MR. RUKAVINA:

 2       Q.   May I have that back just for a second?  Thank

 3   you.

 4            (WHEREUPON, Exhibit 19 was marked for

 5   identification.)

 6   BY MR. RUKAVINA:

 7       Q.   Mr. Galmor, do you recognize Exhibit 19?

 8       A.   Yes, sir.

 9       Q.   Okay.  It's actually more than one document.  The

10   first one is a unanimous written consent.  And then the

11   second one is a warranty deed with vendor's lien.  Do you

12   see that, sir?

13       A.   Yes, sir.

14       Q.   Okay.  All right.  First, do you recognize the

15   property that's listed on Exhibit A to the unanimous written

16   consent?

17       A.   I'm not sure what Section 3 reads.  I'm not -- I'm

18   not sure where that's at.

19       Q.   This -- This is not your homestead, is it?

20       A.   Huh?

21       Q.   Is this your homestead?

22       A.   Well, I see Section 64 on the back on Track 2.

23       Q.   Okay.

24       A.   Section 64 is the homestead.

25       Q.   Okay.  But the homestead's a lot bigger than 7.15
```

1  acres, right?

2      A.    I think that's just the house and the barns.

3      Q.    Okay.  What do you remember about this unanimous

4  written consent and -- and what -- what was being sold to

5  you and why?

6      A.    Well, and I'm not going to answer that for sure,

7  because I'm not sure what all this other on the front is.  I

8  don't know what Track 1 in Section 3 is.

9      Q.    Okay.

10     A.    And Track 2, I don't know; 2.4 acres out of

11 Section 3, I'm not sure what Section 3 means.

12     Q.    Okay.  Well, do you recall buying some property

13 from the family partnership for $70,000 back in the summer

14 of 2014?

15     A.    I bought two properties.

16     Q.    Which one?

17     A.    I bought the place that you're -- the Gin Yard and

18 I bought the, what we call the trailer house next to my mom

19 and dad's right there.

20     Q.    Could that be that -- this property?

21     A.    I'm thinking that's what it might be.  I mean...

22     Q.    And what do you mean you bought the Gin Yard?  I

23 thought you swapped the Gin Yard with -- with Jacey Carter.

24     A.    Well, the -- there's -- the Gin Yard's in three

25 different sections.  My daddy sold Jacey the north part of

```
 1  that Gin Yard.  And --
 2       Q.   And we talked about that.
 3            But did, did you buy any part of the Gin Yard from
 4  the Family Limited Partnership?
 5       A.   No.
 6       Q.   I'm sorry, sir.  I just asked you a minute ago did
 7  you buy any property from the Family Limited Partnership,
 8  and I thought you said you bought two lands.
 9       A.   I did.
10       Q.   One of them was the Gin Yard.
11       A.   No.  I -- I did buy -- you're correct.  I bought
12  the Gin Yard and I bought the -- the trailer house on the
13  south side of my mother's house.  And it was a transaction
14  like $70,000.
15       Q.   Okay.  So that's -- that's what this might be
16  referring to?
17       A.   May be.  It may be.
18       Q.   Could that prior deed of trust we just looked at
19  as the last exhibit, be the one for the Gin Yard you
20  purchased?
21       A.   Oh, I don't know.
22       Q.   Okay.
23       A.   I don't know that.
24       Q.   Well, again, this metes and bounds, you know, it's
25  Greek to us.  I get it.
```

```
 1              But you do recall a transaction where you

 2    purchased land from the Family Limited Partnership for

 3    $70,000?

 4         A.    Yes, sir.

 5         Q.    Okay.  And you didn't pay that 70,000.  You were

 6    going to pay that over time.  Well --

 7         A.    No.

 8         Q.    -- you -- you paid 20,000 of it.

 9         A.    I paid it off at -- at the same -- at the time of

10    the transaction.

11         Q.    Okay.  Then why -- why is -- why is the next page

12    on that have a warranty deed with vendor's lien?

13         A.    Now, the home place in Section 64, my mother gave

14    me her half of that estate, my mom and dad's estate.  And we

15    appraised it at 50,000.  My mother did the appraisal, what

16    it was worth.  And I had to buy my dad's half out, and it

17    was like for $250,000, or something.  And we set it up, Ken

18    Fields or somebody made payments on it so we could all --

19    we'd make payments every month on it to purchase it back, to

20    purchase my dad's part of the Section 64.

21         Q.    I -- I get it, sir.  But, but these documents say

22    that the seller is the Family Limited Partnership, not your

23    mom or not your dad.

24         A.    Well, it was the partnership; they sold it, yes,

25    sir.
```

```
 1        Q.   And, and do you remember signing a -- a warranty

 2   deed with vendor's lien obligating you to repay back

 3   $50,000?

 4        A.   No, sir.

 5        Q.   Okay.  So it's your testimony that you paid the

 6   full amount of $70,000 in cash?

 7        A.   Yes, sir.

 8        Q.   Do you know if you ever paid back this $50,000 of

 9   this vendor's lien?

10        A.   I never -- I don't remember that $50,000 at all.

11        Q.   So let's just again be super clear.  Currently

12   today, how many acres is your homestead?

13        A.   Like 174, approximately.

14        Q.   Was it always 174, or did you add onto it over

15   time?

16        A.   It's always been that since I've lived there.

17        Q.   So your mom and your dad, at one point in time,

18   owned 174 acres, right?

19        A.   Whatever's in that Section 64.

20        Q.   Well, sir, a section is 640 acres.

21        A.   Whatever's listed for their homestead is what's

22   there.

23        Q.   Okay.

24        A.   I didn't buy anything else or -- I mean, I bought

25   where I was raised and that land behind it.
```

1    Q.    And, and your mom gave you her half of that

2    homestead, right?

3    A.    Yes, sir.

4    Q.    And you had to buy out your dad's right?

5    A.    Yes, sir.

6    Q.    And for -- you said the number.  I forget --

7    A.    Two hundred fifty thousand, I believe, or

8    something like that.

9    Q.    And did you end up paying that $250,000?

10    A.    I was paying it 'til this litigation come up, yes,

11    sir.

12    Q.    Who were you paying it to?

13    A.    To the Galmor family limited partners.

14    Q.    Why were you paying it to the Galmor family

15    limited partners if they didn't own that property before you

16    bought it?

17    A.    Whoever I was making my payments to was what Ken

18    Fields and them told me to make the payment to.

19    Q.    So that the -- the -- the bank statements of the

20    family partnership will show periodic monthly payments from

21    you until this --

22    A.    Like 1,000 or 1,100 dollars, yes.

23    Q.    Per month?

24    A.    Yes, sir.

25    Q.    Towards that $250,000?

 1     A.    Towards that 250, yes, sir.

 2     Q.    And you have --

 3           And that 250,000 is separate from this 50,000 that

 4   you don't have any memory of?

 5     A.    No, that -- those -- that should be cleared.  I

 6   don't know where those numbers came from.

 7     Q.    Okay.

 8     A.    And I don't -- I don't remember any of that.

 9     Q.    And looking at these metes and bounds, that 7.15

10   acre tract of land out of Section 64, that's separate land

11   from the 170 acres that was always owned by your parents?

12     A.    Yes, sir.

13     Q.    Is that the trailer house you said, or something?

14     A.    No.  They took those out for tax purposes.  They

15   coded it different is all -- what I was always told.  'Cause

16   my dad had some barns and some stuff there, and they coded

17   that -- they took, for tax purposes, they took that seven

18   point whatever that number is, out of the deal and it was

19   taxed different than the -- the land.

20     Q.    Okay.  So was your parents land at some point in

21   time before more than 170 acres and then they reduced it by

22   the seven acres?

23     A.    I -- I can't answer that until I look at the -- I

24   don't -- I know what was bought and we surveyed it and I

25   know what's there.

NAEGELI
DEPOSITION & TRIAL          CELEBRATING 40 YEARS IN BUSINESS          (800)528-3335
                                                                      NAEGELIUSA.COM

1     Q.   Do you think that today you own this land that's

2 on Exhibit A to this unanimous written consent?

3     A.   Well, that was what was supposed to happen, yes,

4 sir.

5     Q.   And you think Tract 1 might be the Gin Yard?

6     A.   I'm not going to answer that.  I don't know what

7 those -- I don't recognize those numbers, sir.

8     Q.   Okay.  Exhibit 20.

9     Before we go to that, going back to the 170 acres

10 that's your homestead, did you buy your -- your dad's half

11 while he was alive?

12     A.   Why would I buy it when he was alive?

13     Q.   So you bought it after he died?

14     A.   Yes.

15     Q.   Okay.  So who sold it to you, the probate estate

16 or the -- his trust?

17     A.   My mother.  I don't know how it was sold.  I'm not

18 gonna go through all that again.

19     Q.   But -- okay.  I got it.  I got it.

20     Did you buy your mother's half -- or I'm sorry.

21 Did you buy your mother's interest while she was still

22 alive?

23     A.   No, sir.

24     Q.   So when did you acquire the 170 acres?

25     A.   My mother after she passed away, it was her will

 1  that I get that hundred and --

 2      Q.   Okay.

 3      A.   I got half of the property.  And then when we went

 4  to do this other, that's what she told me.  She said, you

 5  have to -- I can't give you your dad's half, you'll have to

 6  pay for it, but I'll give you anything I've got.

 7      Q.   And did she tell you why she can't give you your

 8  dad's half and you have to pay for it?

 9      A.   Because she didn't have control of that half.

10      Q.   It was --

11      A.   It'd have to be -- That was controlled by these

12  entities that you're talking about.

13      Q.   Okay.  I think I understand.

14           So it sounds like your mom wanted to fair to the

15  other siblings by having you pay over time a fair amount?

16      A.   Well, yes, sir, to pay the difference of what the

17  properties were worth, supposedly.

18      Q.   Okay.  When did you start living in that house?

19      A.   Oh, probably three years before my mother died;

20  three or four years.

21      Q.   Did you ever build an outdoor kitchen there?

22      A.   Yes, sir, I did.

23      Q.   About how much did that cost?

24      A.   I think I spent 38,000 or 40,000.

25      Q.   Did the family partnership pay for that?



1        A.    I paid for that myself.

2        Q.    Okay.  And you mentioned the bathroom, the -- was,

3   did you say $70,000?

4        A.    I don't know the numbers on it.  I mean we can

5   look back what she paid.

6        Q.    Your -- It's your testimony that the family

7   partnership did not pay for that?

8        A.    No.  I'm not sure how my mother paid for it.  My

9   mother paid for the bathroom.  I don't know where the money

10  came from.

11       Q.    Exhibit 20, Mr. Galmor.  Thank you.

12             (WHEREUPON, Exhibit 20 was marked for

13  identification.)

14  BY MR. RUKAVINA:

15       Q.    This is a series of invoices.  I just want to know

16  generally what's going on here, and here's my question.

17             It looks like it's an invoice from Galmor's/G&G,

18  bill to the Galmor Family Limited Partnership and remit to

19  Galmor's/G&G.

20             Do you know what these invoices are for?

21       A.    It shows there that they're work at the farm on

22  the first ones.  I mean they're all -- and they'll all be in

23  the computer, because these boys all got paid from these

24  work orders and that's why we generated that stuff.

25       Q.    Okay.

1    A.    That's how they get paid.  And when they were --

2  When my dad or when they asked us to come help, that's what

3  we done so they'd get paid.

4        Q.    Okay.  So let's look at this first invoice, which

5  is invoice number 121090 for $80,880.

6        A.    Okay.

7        Q.    So dirt work at farm.  What's farm?

8        A.    In Section 64.

9        Q.    Your homestead?

10       A.    Yes, sir.

11       Q.    Okay.  So why is the Galmor Family Limited

12 Partnership paying Galmor's for work done on your homestead?

13       A.    I didn't own it then.

14       Q.    You did not own it in 2014?

15       A.    I don't think so.

16       Q.    Okay.  To the best of your recollection, when did

17 you purchase the homestead?

18       A.    After my dad passed away.  I'm not sure what the

19 date was on it.

20       Q.    The next, the next invoice, Mr. Galmor, is 127966.

21 It's for $72,540.

22             Do you remember this invoice at all?

23       A.    Seven -- 27966?

24       Q.    Yes, sir.  Dated 9/30/2016.

25       A.    Yep, those are the cowboys and the people that

 1  work for us, that's their insurance and wages.

 2      Q.    Okay.  Who do these cowboys work for?

 3      A.    The FLP.

 4      Q.    So why is Galmor's/G&G billing the FLP for these

 5  cowboys?

 6      A.    Because my dad -- My brother got crushed with a

 7  combine in like '11 or '12.  My dad didn't have any

 8  liability on those farms.  So when he started expanding his

 9  self, I told him, I said, Daddy, you're gonna have to get a

10  payroll company or someone to help you 'cause you can't have

11  these people out there working without some type of

12  insurance on them.

13          So he said, well, you bill me.  I don't want to

14  mess with that.  You bill me, and I'll reimburse you the

15  money.  And that's what these transactions are.

16      Q.    Okay.  So Galmor's/G&G had employees that it --

17  that it was paying, but those employees were doing the work

18  of the family partnership?

19      A.    Yes, sir.

20      Q.    And the family partnership was reimbursing those

21  employees?

22      A.    They were supposed to.

23      Q.    Okay.  Are you --

24          Do you believe that this invoice was never paid?

25      A.    I can't answer that.



1      Q.    Okay.  And the other invoices here, they all look

2  to be very similar for cowboys, if you want to look through

3  it.  Is it generally the same?

4      A.    Yes, sir.

5      Q.    Okay.  So these are 2014, 2016, and 2017 invoices?

6      A.    Yes, sir.

7      Q.    Okay.  And these invoices would be some --

8  somewhere reflected in the books and records of

9  Galmor's/G&G?

10     A.    Yes, sir.

11     Q.    Okay.  And whether or not these invoices were

12  paid, would that also be reflected in the books and records?

13     A.    I would assume so.

14     Q.    Okay.  We talked about the -- the debt owed by the

15  family partnership to Galmor's/G&G.

16          Do you think that all of that debt would be

17  somehow the subject of more invoices like this?

18     A.    I'm sure they are.

19     Q.    Was it -- Do you know whether it was ordinary

20  course for Galmor's/G&G to send an invoice to the family

21  partnership every time that Galmor's/G&G made an advance to

22  the family partnership?

23     A.    No, sir.

24     Q.    You don't know or that didn't happen?

25     A.    Well, I'm not gonna answer.  I don't -- I don't

 1  think --

 2      Q.    You don't remember?

 3      A.    Yeah.

 4      Q.    Okay.  The QuickBooks, I -- I'm not sure I asked

 5  you this question; I apologize if I did.  The QuickBooks

 6  files that you think might be on the --

 7          Do you think that the computer that Mr. Ries took

 8  has QuickBook files on it?

 9      A.    I'm sure there are, yes, sir.

10      Q.    Do you know if those are password protected?

11      A.    If they are, I mean, we got Deena, she can unlock

12  them, if that's what we need.

13      Q.    Do you know what --

14          Do you personally know what those passwords would

15  have been?

16      A.    I never know, no, sir.

17      Q.    You don't remember passwords like butthole2?

18          I'm not trying to be smart.  That is a password on

19  one of these QuickBook files.

20      A.    I have no idea.  I've never heard that.

21      Q.    It would be Ms. Carter that would have set up the

22  passwords?

23      A.    I'm not going to say who said any of that.  I know

24  that, like I told you earlier in the day, we worked through

25  that computer outfit there at -- at Elk City, Dynaturn, and

```
 1  they all worked together.  I mean, I don't know any of

 2  those.

 3      Q.    Did you --

 4            Do you remember ever you or Ms. Carter giving Mr.

 5  Ries passwords for the QuickBooks?

 6      A.    I don't -- I don't remember that.

 7      Q.    Because at -- at the Chapter 7 meeting of

 8  creditors on the CD, he asked you for it and you say you'll

 9  get them to him.  Do you have any memory of that at all?

10      A.    I hope Deena gave them to him; I don't know.

11      Q.    Do you know if you ever wrote down the passwords

12  for the files on some piece of paper or somewhere?

13      A.    No, sir, I -- I don't know any of that, what

14  you're asking me.

15      Q.    That's fine.

16            You -- So you had nothing to do with the

17  passwords?

18      A.    I had nothing to do with the computer.

19      Q.    Okay.  There are several businesses that popped up

20  here and there that I don't know what they are.  I'm just

21  going to ask you very briefly if you know what they are, to

22  tell me what they are.

23            A company called Galmor Land and Cattle, you ever

24  hear of that company?

25      A.    It's a dba of mine.
```

1    Q.    Okay.  You ever hear of a company called Galmor's

2  Rock?

3    A.    No.

4    Q.    Okay.  You ever hear of a company called MSG Oil

5  and Gas?

6    A.    That's me.

7    Q.    Okay.  Is that a formal company or a dba?

8    A.    DBA.

9    Q.    Okay.  Is that where you ran your oil and gas

10  interests through?

11    A.    Yes, sir.

12    Q.    Okay.  A company called SGM Management, do you

13  know that company?

14    A.    I know of it.  That's what we discussed earlier.

15  I'm not sure -- A lot of those things were built, but none

16  of them were ever used.

17    Q.    Okay.  You don't think that SGM Management was

18  ever vested with any property?

19    A.    Not that I'm aware.

20    Q.    Okay.  SGM Real Estate, you ever hear of that

21  company?

22    A.    Yeah.

23    Q.    Okay.  What about --

24          Was that a company or just a dba?

25    A.    Like I said, those gentlemen come in and built all

1  that stuff, and I think the -- none of it ever got populated

2  or used.

3      Q.   Okay.  So to your understanding, SGM Real Estate

4  was never vested with property?

5      A.   Not that I'm aware of.

6      Q.   Okay.  You hear of a company called G&G Leasing?

7      A.   A long time ago.  I mean, that's where we kind of

8  started then with -- before the SGM, I think, something like

9  that.  But it never did get off the ground either.

10     Q.   Okay.  Not vested with any assets to your

11 knowledge?

12     A.   No, sir.

13     Q.   Okay.  And the last company, Brandon Galmor Ranch.

14 You ever hear of that?

15     A.   No.

16     Q.   Okay.  Is Brandon --

17     A.   That's my son.

18     Q.   -- the one that was here?

19     A.   Yes, sir.

20     Q.   Gotcha.

21          Okay.  At one point in time, you caused 10 or 15

22 acres of land to be transferred to Deena Carter, right?

23     A.   Yes, sir.

24     Q.   Okay.  Was it 10 or 15?

25     A.   No, my mother did.  It's ten acres, yes, sir.



1    Q.    **You did not -- You did not sign the deed?**

2    A.    Well, I may have signed the deed.  But the

3    transaction we were just discussing, Mr. Ledford, and that

4    Tindal place on the corner, my dad sold Deena all those

5    properties and those properties weren't his to sell.

6        So when they claimed -- they put the sign up in

7    front of my mother, said we told you we was going to pay

8    you, you -- we bought -- what you bought, take the ten acres

9    behind your house since we lost this other land.

10    Q.    **Okay.  Did Ms. Carter pay any money for that ten**

11    **acres?**

12    A.    I think she bought it when she bought the -- she

13    bought all the Carlton Place there that -- the house --

14    there was two houses, I think, and a -- and an old store or

15    something there.

16    Q.    **And I apologize.  The $250,000 that you paid by**

17    **way of promissory note for your father's interest in the**

18    **homestead, you stopped paying that when the litigation**

19    **started?**

20    A.    Yes, sir.

21    Q.    **Do you know how much was outstanding at that point**

22    **in time?**

23    A.    No, I sure don't.  It'll be in that computer

24    'cause we kept track what we were doing.

25    Q.    **Are you not worried about being foreclosed on**



1  that?

2      A.   Sir, all the crap I've been through, that'd be the

3  simple deal for me.

4      Q.   I'm informed that at your dad's passing he owned a

5  gun collection of some 36 guns; is that true?

6      A.   He owned a lot of guns, yes, sir, he did.

7      Q.   Okay.  Do you know what happened to those guns?

8      A.   They're all still around there somewheres.  I mean

9  what hadn't been stole.  Brandon stole a bunch of them.

10 Just a bunch of guns that are missing.  I got serial numbers

11 on them and -- but I'm not going to say what -- I don't know

12 what he owned.  I know what the serial numbers were, but I

13 don't know what all's there.  But the gun safes are still

14 there.

15     Q.   Did your dad maintain a -- a written document of

16 all the guns he owned at some point in time with serial

17 numbers?

18     A.   No, sir.

19     Q.   Okay.  So how do you -- how do you know what the

20 serial numbers are?

21     A.   Well, he wrote some of them down.  I found a sheet

22 of paper --

23     Q.   Okay.

24     A.   -- that the -- had numbers on them.

25     Q.   Can you tell me approximately how many guns

1  remain; 10? 20?

2       A.   There's 20 maybe, something like that.

3       Q.   And are they in your possession?

4       A.   They're at my mother's house, yes, sir.

5       Q.   Okay.  Do you have any understanding of who owns

6  those guns?

7       A.   No.

8       Q.   Do you have any understanding that those were

9  transferred to the family partnership?

10      A.   I'm not sure of any of that.

11      Q.   Okay.  So why are -- why are they with you if you

12  don't know who owns them?

13      A.   Well, my family owns them, sir.

14      Q.   Okay.  Do you have any idea of the value of those

15  guns?

16      A.   I have no idea.

17      Q.   Okay.  Do you believe that you personally own any

18  of those guns that your dad had before he died?

19      A.   No.  I know what I own and I know what my brother

20  owns.  I mean, but I -- I wouldn't claim none of his.  Why

21  would I do that?

22      Q.   Okay.  Do you remember what some of those guns

23  were that were his?

24      A.   I'd have to look at them and see.

25      Q.   Any -- Anything particularly exotic or antique or



```
 1   valuable?

 2        A.   No, not -- I mean, most of the guns he bought were

 3   transactions that people come by, needed money for

 4   something, and he'd buy a gun off of them.  I don't remember

 5   him ever buying anything real fancy.

 6        Q.   And, and you mentioned that there's a gun safe.

 7   Is that at your house as well?

 8        A.   Yes, sir.

 9        Q.   Okay.  And you and I can talk about it afterwards.

10   I'm not going to burden you with argument.

11             Do you recall that, that -- that Ms. Carter, Deena

12   Carter owed money to the family partnership that she was

13   paying on every month?

14        A.   Yes, sir.

15        Q.   Okay.  Was that a different transaction than the

16   ten acres?

17        A.   It was all the same transaction.

18        Q.   Okay.

19             THE REPORTER:  I'm sorry, sir.  Can you repeat

20   that?  The engine --

21             THE WITNESS:  It was the same transaction.

22             THE REPORTER:  Thank you.

23   BY MR. RUKAVINA:

24        Q.   At the time of filing bankruptcy, Galmor's/G&G

25   owed a lot in unpaid IRS taxes, right?
```

```
 1      A.   Yes, sir.

 2      Q.   1.2 million or something?

 3      A.   Sounds familiar.

 4      Q.   Okay.  Why wasn't Galmor/G&G paying those taxes?

 5      A.   I guess there wasn't any money to pay them.

 6      Q.   But Galmor's/G&G was withholding those moneys from

 7 employees?

 8      A.   I'm sure we did.

 9      Q.   Okay.  Do you remember a $91,000 and change IRS

10 payment made by the Family Limited Partnership in late 2013?

11      A.   No, sir.

12      Q.   Do you remember if the Family Limited Partnership

13 had its own tax liabilities of any size in the year 2013?

14      A.   No, sir.

15      Q.   Okay.  Did there come a time when oil and gas

16 revenues that should have been payable were suspended after

17 your dad died?

18      A.   Yes.

19      Q.   What -- What happened with those?

20      A.   I can't explain the whole tenor of it all.  But I

21 know that after my dad passed away, he didn't put all the

22 leases into one -- instead of the two corporations, the

23 Galmor Family Trust and the FLP.  So after he passed away,

24 we had to build an entity to receive the money to have its

25 own code, tax code to receive the moneys before we could get
```

1  our money from the Barkers.

2      Q.    Was that done?  And was the -- were the funds

3  released?

4      A.    Yes, sir.

5      Q.    Do you remember about how much was suspended?

6      A.    No.  I mean, it'll be -- it'll show when it come

7  into the checkbook.

8      Q.    Okay.  Was your mother asking about those

9  royalties, the suspended royalties?

10     A.    She didn't ask a lot about them.  It concerned her

11 that we hadn't got the money because we were running short

12 of money.

13     Q.    Let me -- Let me ask you generally.

14           Did your mom, I mean was she hands-on with respect

15 to all these family assets or did she just kind of let you

16 run them and trust that you'd run them right?

17     A.    My mother and I talked pretty much about

18 everything we done --

19     Q.    Okay.

20     A.    -- after it was all happening, 'cause I didn't

21 want her to be blindsided by something that I might have

22 done.

23     Q.    So she was pretty hands-on?

24     A.    My mother was smarter than a tack.  I mean she

25 could do it all.  She was pretty intelligent.

1      Q.    Okay.   Did -- Did your parents own a vintage red

2   Volkswagen bug?

3      A.    Yes, sir.

4      Q.    Does that car still exist?

5      A.    Yes, sir.

6      Q.    Where is it, sir?

7      A.    It's in the barn.

8      Q.    Do you have an understanding of who owns that?

9      A.    I assume it's the family limited partners.

10     Q.    Do you recall a Wiley's Jeep that was in

11  camouflage paint?

12     A.    Yes, sir.

13     Q.    Okay.   Does that vehicle still exist?

14     A.    Yes, sir.

15     Q.    And where is it, sir?

16     A.    It's at Elk City.

17     Q.    Okay.   What property in Elk City?

18     A.    Well, that -- it was signed over to my son.

19     Q.    Okay.   Do you know who owned that car before it

20  was signed over?

21     A.    My dad.

22     Q.    Okay.   When was it signed over to your son?

23     A.    It's on the -- like '12 or '13, something --

24     Q.    So long --

25     A.    -- like --

1        Q.    -- time ago?

2        A.    Yes, sir.

3        Q.    Okay.  A green Ford LTD that -- Was there ever a

4    green Ford LTD in the family?

5        A.    It's my grandmother's.

6        Q.    Okay.  Does that car still exist?

7        A.    Sitting at the barn.

8        Q.    Okay.  Do you have an understanding of who owns

9    that car?

10        A.    FLP, I guess.

11        Q.    And the Lincoln Navigator we talked about, was

12    that your -- your mother's car?

13        A.    She had two or three of those Navigators.  And my

14    dad, he would go buy a new one and I would buy her old one.

15    So I'm not sure.  We'll have to look at the numbers and what

16    we've got there, sir.

17        Q.    We talked about a bunch of cars.  And obviously

18    cars, at least I guess in the last 50 years, have

19    certificates of title.

20            Are you aware of what a certificate of title is?

21        A.    Yes, sir, I am.

22        Q.    Okay.  Do you know or have possession or access to

23    certificates of title for some or all of these cars that

24    we've talked about; the bug, the Navigator, the handicap

25    van?

```
 1      A.   I think there's -- there's records there somewhere

 2 in my dad's office.

 3      Q.   Okay.  Do you recall if he kept a physical file of

 4 certificates of title?

 5      A.   No.  He had a book.

 6      Q.   Where's your dad's office?

 7      A.   There at the house at Section 64.

 8      Q.   Okay.  When I -- Whenever I sent you that

 9 subpoena, did you look through your dad's office for any --

10 any documents that could respond to that?

11      A.   No, sir.

12      Q.   Was there ever a Ford Excursion in the family?

13      A.   Yes, sir.

14      Q.   Okay.  Does that car still exist?

15      A.   Yes, sir.

16      Q.   Where is that car?

17      A.   It's in Elk City.  Well, that's in Arkansas right

18 now.

19      Q.   Was that transferred out at some point?

20      A.   I bought that from my father, yes, sir.

21      Q.   So you actually purchased that for yourself?

22      A.   There should be a canceled check to show it, yes,

23 sir.

24      Q.   Okay.  There was a -- also like a white older

25 Cadillac, correct?
```

 1      A.   Yes, sir.

 2      Q.   **Okay.  Does that car still exist?**

 3      A.   Yes, sir.

 4      Q.   **What -- Do you know what the make and model of**

 5 **that is?**

 6      A.   I don't know that.

 7      Q.   **Where is that car?**

 8      A.   It's there at Shamrock.

 9      Q.   **In Shamrock?**

10      A.   Mm-hmm.

11      Q.   **In whose possession, do you know?**

12      A.   Kuco's driving it right now, my Mexican boy.

13      Q.   **Okay.  Is that your car?**

14      A.   Yes, sir.  My dad gave it to me.

15      Q.   **Was there ever a board of directors for the**

16 **quarry?**

17      A.   I don't think so.

18      Q.   **Okay.  Was -- Were there ever two lots in**

19 **Clarendon, Texas, the Peyton Place?**

20      A.   They're still there, yes, sir.

21      Q.   **Okay.  Were they ever transferred to the Family**

22 **Limited Partnership?**

23      A.   I don't know those things.

24      Q.   **Do you -- Do you have any idea who owns those**

25 **properties?**

1    A.    The last -- When I was still managing the FLP, I

2  paid the taxes on them.  So I don't know who owns them now.

3    **Q.    Okay.  Can you tell me what you know about those**

4  **two lots?  Are they big? small? crap land? good land?**

5    A.    Never -- I just heard about them all my life.

6  I've never saw them.

7    **Q.    And forgive me.  Where is Clariton -- Clarendon?**

8    A.    It's a little south.

9    **Q.    Little south --**

10    A.    South and west by Clarendon Lake.

11    **Q.    Okay.  And those were called the Peyton Place?**

12    A.    I have no idea, sir.

13    **Q.    Well, why was the Family Limited Partnership**

14  **paying taxes on those if you have no idea about those**

15  **properties?**

16    A.    They was something my dad acquired.  And rather

17  than just let it go to taxes, I -- I thought that was what I

18  was supposed to do.

19    **Q.    Do you have any idea if eventually it went to**

20  **taxes or who the current owner is?**

21    A.    I didn't anything with them after Leslie took over

22  the managing part.  I -- I didn't make any more decisions on

23  any of that.

24    **Q.    Got it.**

25        **I know this has been difficult for you.  But have**

 1  I been courteous and professional with you today?

 2       A.   Yes, sir.

 3            MR. RUKAVINA:   Okay.   Thank you, sir.   I'll pass

 4  the witness.

 5  **EXAMINATION**

 6  **BY MR. RIES:**

 7       **Q.   Mr. Galmor, we've met a few times before.**

 8       A.   Yes, sir.

 9            MR. RUKAVINA:   You need a microphone.

10  **BY MR. RIES:**

11       **Q.   Mr. Galmor, we've met a few times before.  My name**

12  **is Kent Ries and I was the trustee and still am in your**

13  **bankruptcy case and in your corporate case.  You remember**

14  **all that?**

15       A.   Yes, sir.

16       **Q.   If you would look at a couple exhibits, Exhibit 2**

17  **and Exhibit 8 out of that pile.**

18       A.   There it is.  Okay.

19       **Q.   I'm going to have you look at Exhibit 8 first, and**

20  **that's the 2016 partnership return for Galmor Family Limited**

21  **Partnership.  You see that?  On the front page.**

22       A.   On the front page?

23       **Q.   And if I could have you go back --**

24       A.   Okay.

25       **Q.   Little more than half, two-thirds of the way**

```
 1   through there are some pages marked Schedule K-1 2016.

 2          MR. RUKAVINA:  This?

 3          MR. RIES:  K-1s.

 4          MR. SHERWOOD:  Steve, should look like this.

 5          THE WITNESS:  I'm looking, guys.

 6   BY MR. RIES:

 7      Q.   On the very top left it'll say, kind of smaller

 8   letters, it'll say Schedule K-1.

 9      A.   I see -- I'm on Schedule K.

10          MR. RUKAVINA:  Is it the actual K-1 or the

11   Schedule K?

12          MR. RIES:  It says Schedule K-1.

13          THE WITNESS:  You're going to have to find it for

14   me.

15          MR. SHERWOOD:  Let me help you.

16          THE WITNESS:  My eyes is playing now.  Look at

17   you.  Thank you.

18          MR. SHERWOOD:  Mm-hmm.

19          THE WITNESS:  Okay.

20   BY MR. RIES:

21      Q.   All right.  There's some letters, boxes -- all

22   these boxes have letters and numbers by them.  There's a box

23   number F that talks about partner's name.

24      A.   Yes, sir.

25      Q.   Do you see that?
```

 1    A.    Mm-hmm.

 2    Q.    What's -- What's typed inside that?

 3    A.    Galmor Family Contribution Trust.

 4    Q.    Okay.  And then you see a few more lines down

 5 there's a --

 6        MR. RUKAVINA:  Kent, I'm sorry.  Are you on

 7 Exhibit 8?

 8        MR. RIES:  On Exhibit 8 on Schedule K-1.

 9        MR. RUKAVINA:  Let me come over to you.

10        MR. RIES:  Well, there's more than one K-1.

11        MR. RUKAVINA:  Ahh.

12        MR. RIES:  There's three.

13        MR. RUKAVINA:  Got it.

14        MR. RIES:  There should be three.  That -- I think

15 that's the second one.  Yeah, it's the second one.

16        MR. RUKAVINA:  Okay.  Thank you.

17 BY MR. RIES:

18    Q.    Okay.  You see a few lines further down on J where

19 it says Partner's share of profit, loss, and capital?

20    A.    Yes, sir.

21    Q.    And it's got a whole bunch of beginning, ending,

22 profit, loss, capital numbers, but they're all the same.

23 What's the percentage for that?

24    A.    49.5 percent on both sides.

25    Q.    Okay.  So is it your understanding from that then



```
 1   that the Galmor Contribution Trust owns 49.5 percent of the

 2   Galmor Family Limited Partnership, at least at the end of

 3   2016?

 4        A.   Yes, sir.

 5             MR. RUKAVINA:  Objection; legal conclusion.  GO

 6   ahead and answer.

 7             THE WITNESS:  Yes, sir.

 8   BY MR. RIES:

 9        Q.   Go a few more pages, there's another K-1.  And

10   just so you notice it, on Part F, I'm going to ask you this,

11   it should state Galmor Management L.L.C.  You see that?

12        A.   Got Management L.L.C., yes, sir.

13        Q.   Do you see that?

14        A.   Yes, sir.

15        Q.   And then a few lines down it -- on J, it talks

16   about what the partner's share is for that entity, and what

17   is that?

18        A.   One percent.

19        Q.   Okay.  And let's go a few more pages, and there's,

20   I think the final K-1.

21        A.   Okay.

22        Q.   And on F, who is -- who's the owner?  Who's the

23   other partner listed?

24        A.   Galmor Family Trust.

25        Q.   Okay.  And on J, what are the percentages of that?
```

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

```
 1        A.    49.5 and 49.5.

 2        Q.    Okay.  And I forgot to ask you, on number -- on

 3   letter G, there's a -- there's a box checked.  Does it say -

 4   - What does that box say?

 5        A.    Domestic partner.

 6        Q.    No.  On G.  You're looking at H.

 7        A.    G.  Oh, G is limited partner of other LLC member.

 8        Q.    Okay.  I'm sorry.  And I meant to ask you that

 9   same thing on -- if you go back a few pages to the one

10   that's Galmor Management, the K-1 that's Galmor Management.

11        A.    Okay.

12        Q.    On G, what's checked in there?

13        A.    Limited partner or other LLC member.

14        Q.    On Galmor Management L.L.C.?

15        A.    The Galmor Contribution -- I got the Galmor Family

16   Limited Partnership in B.

17        Q.    Okay.  And what's on F?

18        A.    F says Galmor Contribution Trust.

19        Q.    Okay.  And on that one it says G is checked.  You

20   said limited partner --

21        A.    Limited partner of (sic) other LLC.

22        Q.    Okay.  So let's get the one in the middle.

23        A.    Okay.

24        Q.    The one that's -- where F is Galmor Management

25   L.L.C.
```

```
 1        A.    Okay.

 2        Q.    Okay.  And on G, what's checked?  Of those two,

 3   what's checked?

 4        A.    It says Galmor partner or LLC member.

 5        Q.    What's the first word?

 6        A.    General partner or --

 7        Q.    Okay.

 8        A.    -- LLC member.

 9        Q.    Okay.  I may have heard the wrong -- I thought you

10   said Galmor.

11              So it's your understanding then that the -- for

12   the Family Limited Partnership, for the Galmor Family

13   Limited Partnership, the ownership was Galmor Management

14   L.L.C. one percent and then these two trusts the other 99

15   percent split in half?

16        A.    That's what it's saying there, yes, sir.

17        Q.    Okay.  And the limited partner, limited partner

18   were the two trusts and the general partner was Galmor

19   Management L.L.C.?

20        A.    That's what it's showing there.

21        Q.    So when you testified earlier that you -- you

22   thought your siblings might be the owners of the limited

23   partnership, in fact, it's the two trusts in -- in the

24   management company?

25        A.    I don't -- Yeah, I guess that's right.
```

1    Q.   We'll skip '17.  '17, just for the record, shows

2  the same things, if -- if that needs to be mentioned, the

3  same ownership.

4        And I think you were asked -- You know you were

5  asked a lot of questions today about this -- the debt that

6  we're here about, the debt that you scheduled on your two

7  bankruptcy schedules, your corporate loan from G&G and on

8  your personal one, Galmor's correct?

9    A.   Yes, sir.

10   Q.   And, and that's the basis of -- of why we're here

11  is my lawsuit saying that those need to be paid to the

12  estate by the Family Limited Partnership; you understand

13  that?

14   A.   Yes, sir.

15   Q.   Okay.  So you were asked a little bit about who

16  knows about those and who knew about these debts and, and

17  how they all arose and so forth.  We're not going to go over

18  all the details of that; the -- the records show some of

19  that.  There are other records that show it.

20        But, now, you've given a lot of context about

21  generally how those debts arose, correct?

22   A.   Yes, sir.

23   Q.   You know, whether it was advances, I think part of

24  it was advances that -- that G&G made that exceeded the

25  amount that the Family Limited Partnership paid back

1  essentially in rock, in -- in royalties that you owed,

2  correct?

3       A.   Yes, sir.

4       Q.   And then we just went through I think the very --

5  I think it was the last exhibit, Exhibit 20, there's another

6  -- an amount owed to G&G that was G&G employees paying --

7  being paid by G&G that were actually employees' time that

8  was being used for the benefit of the Family Limited

9  Partnership, correct?

10      A.   Yes, sir.

11      Q.   So you mentioned something about, well, you

12  weren't sure how many other people knew.  I mean, you kind

13  of had different -- different things about how many other

14  people knew about this.

15           But there were a number of other people that kept

16  the records, the actual detailed records of all these

17  amounts, correct?

18      A.   Yes, sir.

19      Q.   Like you talked about the rock quarry, there were

20  people that weighed it in and then sent invoices and -- and

21  then somebody else put the invoices in.  That really wasn't

22  something you did, though, on a daily basis, was is --

23      A.   No, sir.

24      Q.   -- that you personally did?

25      A.   No, sir.

1    Q.    They -- You knew the process of how all that

2    worked --

3    A.    Yes, sir.

4    Q.    -- and you've explained that as best you can today

5    --

6    A.    Yes, sir.

7    Q.    -- the best you can?

8          But the details of it were also known by several

9    other people.  And I just want to kind of make sure I know

10   who all those people are in case we need to talk to each of

11   them.

12         But, but the most obvious ones were Deena Carter;

13   is that right?

14   A.    Yes, sir.

15   Q.    And she did a lot of the data on this infamous

16   computer we talked about today --

17   A.    Yes, sir.

18   Q.    -- that I have?  Matt --

19   A.    Brooks.

20   Q.    -- Brooks, okay.

21   A.    Yes, sir.

22   Q.    And he worked for G&G as well?

23   A.    Yes, sir.

24   Q.    Okay.  And so he did some of the data input as

25   well?

1      A.   Yes, sir.

2      Q.   And he did some of the analysis that was -- we've

3  gone over here today, for example, some of those reports,

4  the spreadsheet and the royalties and so forth?

5      A.   Yes, sir.

6      Q.   Okay.  And we've also talked about Kellye Fuchs

7  who's -- who would have taken all the source documents and

8  turned them into a tax return and maybe financials as well,

9  correct?

10     A.   Yes, sir.

11     Q.   All right.  Besides -- I know those are the people

12 I've heard you say the most and you talked the most about.

13          Was there anybody else that -- that on a day-to-

14 day basis had something more than just -- and I'm -- and I

15 want to exclude the people that, you know, maybe weighted

16 the scales what the rock was.  And we, you know, probably

17 not -- hopefully we don't have to go take depositions of --

18 of every clerk that worked at the place.  But people that

19 were more, I'd say more management, like Deena or you or

20 Matt or obviously Kellye, although she didn't work for you.

21          Any other people that -- besides those ones?

22     A.   No, 'cause that -- that's -- I basically based on

23 Deena and -- and there at the last Matt, you know.

24     Q.   Okay.  And they all knew about this -- they

25 actually did the invoices, for example, as they went along

```
 1  --

 2       A.   Yes, sir.

 3       Q.   -- correct?

 4            So like they would be the ones that knew how much

 5  was owed, how much was advanced to the Family Limited

 6  Partnership and then how much rock was and -- and royalties

 7  were due to -- to the Family Limited Partnership?

 8       A.   Yes, sir.

 9       Q.   And they would have known -- did --

10            I assume they prepared like all the payroll checks

11  and so forth and -- and the insurance checks that were for -

12  - for all these different employees that were in the

13  invoices, they would have prepared all those kind of

14  invoices and checks?

15       A.   Well, Deena wouldn't have prepared the payroll.

16  Jacey Carter did most of the payrolls.

17       Q.   Okay.  So she would --

18            She might know some of that?

19       A.   Yes, sir.

20       Q.   Okay.  Do you think --

21            Now, Deena and Matt were familiar with the

22  information that went into your bankruptcy schedules about

23  what was owed, correct?

24       A.   Yes, sir.

25       Q.   Would Jacey Carter also know some of that?
```

1        A.    No, sir.

2        Q.    She just did the pay -- actual payroll, like she'd

3   get timesheets and do payroll for people?

4        A.    Yes, sir.

5        Q.    But she didn't really keep track of that's --

6   that's somebody that's doing work at the Family Limited

7   Partnership versus that's somebody who's doing work for G&G?

8        A.    No.

9        Q.    Okay.  So we're back to Deena and Matt and Kellye;

10  is that right?

11       A.    Yes, sir.

12       Q.    Anyone -- Am I missing anybody else then?

13       A.    Not that I know of.

14       Q.    Okay.  But all those people knew about, not just

15  you, but Deena and Kellye, all those people knew about these

16  transactions, these kind of inter-company transactions --

17       A.    Even --

18       Q.    -- correct?

19       A.    -- my mother.  I mean, she knew what we were

20  doing.

21       Q.    Well, we can't depose her.

22       A.    Oh.

23       Q.    But she would have known about those is what --

24       A.    Yes, sir.

25       Q.    -- you're saying?

1      A.     Mm-hmm.

2      Q.     She knew what was happening as it was happening?

3      A.     Yes, sir.

4      Q.     Okay.  And, and just to clear -- make this clear.

5             From what I understand from your testimony, for a

6  while there were a number of years where the limited

7  partnership had oil and gas income that was sufficient to --

8  to pay its bills; is that right?

9      A.     Yes, sir.

10     Q.     And then in the downturn, which it's oil and gas,

11 so the downturn in prices, there became a time where G&G

12 essentially had to fund all the operations the FLP had?

13     A.     Yes, sir.

14     Q.     The rock quarry, running -- there's a number of

15 sections of land.  I mean I've sold, I can't remember, but I

16 think I've sold eight or nine sections -- not all full

17 sections, but tracks of land that the partnership owned.

18     A.     Yes, sir.

19     Q.     And that's -- that stuff all has to be operated.

20 I mean, you still have to keep track of it.  There's a lot

21 of work that has to be done on land, I take it?

22     A.     Yes, sir.

23     Q.     Okay.  There was a -- the question asked about

24 whether G&G owed the Family Limited Partnership money at the

25 time of the bankruptcy filing for royalties.  But my

1 understanding of -- of the exhibit, the spreadsheet was that

2 at the -- from 2017 through the time you filed -- I think

3 you filed -- let me just give you the exact date.

4        You filed your Chapter 11 case on June 19th of

5 2018, okay.

6    A.   Yes, sir.

7    Q.   At that time, your schedules for G&G showed not

8 that it owed the Family Limited Partnership money, but that

9 it had advanced the Family Limited Partnership more money

10 than it owed it in royalties back; is that right?

11   A.   Yes, sir.

12   Q.   And that amount was roughly $186,000?

13   A.   Mm-hmm.

14   Q.   Does that sound right?

15   A.   Yes, sir.

16   Q.   So there was no debt owed to the Family Limited

17 Partnership that wouldn't have been scheduled, it was the --

18 it was the opposite?

19   A.   Yeah, that's right.

20       MR. RIES:  I'll pass the witness.

21 FURTHER EXAMINATION

22 BY MR. RUKAVINA:

23   Q.   I have one more.  It's going to be Exhibit 21.

24 Pardon me.  Let me...

25       MR. SHERWOOD:  Thank you.

```
 1          (WHEREUPON, Exhibit 21 was marked for

 2   identification.)

 3   BY MR. RUKAVINA:

 4      Q.   Mr. Galmor, have you ever made any allegation or

 5   any suspicion against Deena Carter at all regarding what she

 6   did for you?

 7      A.   No, sir.

 8      Q.   Okay.  Never accused her of any kind of

 9   embezzlement of company funds?

10      A.   No, sir.

11      Q.   No reason to suspect that that's what happened?

12      A.   No, sir.

13      Q.   Are you and her friends?

14      A.   Yes, sir.

15      Q.   You still trust her?

16      A.   Yes, sir.

17      Q.   Does she do any work for you today?

18      A.   No, sir.

19      Q.   Okay.  Do you all hang out socially or see each

20   other from time to time?

21      A.   First time I talked to Deena was Monday after I

22   got this paperwork from -- from you all.

23      Q.   When was the -- the last time you talked to her

24   before that?

25      A.   Oh, probably a month and a half.  She had a horse
```

 1  die, and we buried a horse.

 2      Q.    Do you recognize the exhibit I put in front of you

 3  here, the amended and -- amendment and ratification of

 4  compromise and settlement agreement and then the next

 5  document being the compromise and settlement agreement?  Do

 6  you recognize this?

 7      A.    Yes, sir, I think so.

 8      Q.    You remember that this was the result of the

 9  mediation we discussed earlier?

10      A.    Yes, sir.

11      Q.    And this was signed by -- Well, I'm not sure it

12  was signed by Rudas.  But it was signed by you, correct?

13      A.    I've signed it where my name is, yes, sir.

14      Q.    And Leslie signed it?

15      A.    Yes, sir.

16      Q.    Okay.  Please go to section 4.03.  It's on page 8.

17  Do you see that, sir?

18      A.    Yes, sir, 4.8.

19      Q.    Section 4.03, it's labeled Disposition of Trust

20  Assets; do you see that?

21      A.    I see a 4.01.

22      Q.    Go to the next page.

23      A.    4.03, yes, sir.

24      Q.    Okay.  Take a moment to read that and refresh your

25  memory.

1       A.   (Reviews document)

2  Okay.

3       Q.   Okay.  I think we've already established that you

4  don't really know much about the contribution trust or the

5  family trust, do you?

6       A.   No, sir.

7       Q.   Have you ever taken the position that one or both

8  of those trusts failed?

9       A.   No, sir.

10      Q.   Okay.

11           You have never told any of your siblings that

12  those trusts failed because your dad failed to follow

13  certain legal requirements in order to create them?

14      A.   I assume.

15      Q.   No, no.  I don't want to say assume.

16           Have you -- Did you ever tell any of your

17  siblings, Shawn, that the trusts failed because your daddy

18  or his lawyer messed some documentation up?

19      A.   I don't remember any of that, no, sir.

20      Q.   You never told any of your siblings that the

21  trusts failed, right?

22      A.   No, sir.

23      Q.   Okay.  And you don't remember if you were the

24  trustee of those trusts at any point in time, do you?

25      A.   No, sir.

1      Q.    Okay.

2            Do you remember who the --

3            Do you know what a beneficiary of a trust is?

4      A.    Yes, sir.

5      Q.    Okay.  Who were the beneficiaries after your mom

6  died, of those trusts?

7      A.    I can't answer that, sir.

8      Q.    Well, you all agreed at the mediation that you

9  would basically distribute the assets of the trusts, right?

10     A.    That's what it says here, yes, sir.

11     Q.    So why did you think that you and Leslie and Rudas

12 and Traci were able to decide how to distribute those trusts

13 unless you all were the beneficiaries of those trusts?

14     A.    I -- I can't answer that.  I don't know what --

15 really what you're saying.

16     Q.    Okay.  Well, what -- and I'm not -- Again, I'm not

17 trying to attack you.

18           But what -- what made you think that you had the

19 right to agree to distribute with your siblings the assets

20 of those trusts?

21     A.    Through that mediation that day, I guess.  I mean,

22 we discussed all of it.

23     Q.    Can you think of any beneficiary of those trusts,

24 now that your parents are dead, other than you and three of

25 your siblings?

```
 1        A.    That's correct.

 2        Q.    Okay.  There -- you don't --

 3              You can't think of any possible other beneficiary,

 4   can you?

 5        A.    No, sir.

 6        Q.    Okay.

 7              Is it fair to conclude that -- that you all

 8   decided, well, we're the only beneficiaries and we can

 9   pretty much do what we want, so we're just going to split

10   those assets as this provides?  Is that a fair

11   characterization?

12        A.    Yes, sir.

13        Q.    Okay.  And is it also fair to say that because you

14   had filed bankruptcy, you might not be able to control your

15   share and it might be Mr. Ries that controlled your share?

16   Is that fair to say that that was a -- a concern?

17        A.    Yes, sir.

18        Q.    Okay.  And that's why it talks about later on how

19   if Mr. Ries succeeds, he'll basically step into your role;

20   do you remember that?

21        A.    Yes, sir.

22        Q.    Okay.  So let me just jump to the chase.

23              Whoever owned the Family Limited Partnership prior

24   to this mediation, you all agreed that you would cut right

25   through that and just basically find that the four siblings
```

1  would own that limited -- those limited partnerships,

2  correct?

3      A.   I assume, if that's what this reads, yes, sir.

4      Q.   Well, we -- we've seen that at one point in time

5  the contribution trust owned 49.5 percent of the family

6  partnership, right?

7      A.   Yes, sir.

8      Q.   And at one point in time the family trust owned 49

9  percent of the Family Limited Partnership, right?

10     A.   Yes, sir.

11     Q.   Do you know of any other assets at that point in

12  time that the contribution trust would have owned?

13     A.   No, sir.

14     Q.   Okay.  Do you know of any other assets at that

15  point in time that the family trust would have owned?

16     A.   No, sir.

17     Q.   Is it fair to say that by the time of this

18  mediation, the only assets that the contribution trust and

19  the family trust owned were its limited partnership

20  interests in the family partnership?

21     A.   I assume.  I don't...

22     Q.   Okay.  And is it -- is it a fair characterization

23  that -- that because of the complexity with respect to

24  trusts and what your dad did, you and the other siblings

25  just said, let's cut through that crap and just split the

 1  actual assets as it provides here?

 2      A.   Okay.

 3      Q.   Is -- Is that fair or not?  I'm -- I wasn't there.

 4      A.   Well, I'm not sure -- Lovell and them did this

 5  all.

 6           And for me to sign this document, the deal was

 7  that I renege, give up the operations of all the properties.

 8  I give up all my oil and gas interests that I had in any of

 9  this stuff, and she gives me the homestead and the home and

10  then I -- that's all I get out of the whole mess.

11      Q.   Okay.  And that -- That's your understanding of

12  this?

13      A.   Yes, sir.

14      Q.   And all the rest is just legal detail?

15      A.   Well, that's -- that was what -- that's what they

16  told me we were doing when I signed these documents.

17      Q.   I understand.  That's the economic deal in your

18  mind?

19      A.   Yes, sir.

20      Q.   Okay.  Here's one thing that I do not understand.

21  Was Mr. Ries at that mediation?

22      A.   I don't -- Yeah, I think he was.  I think he was

23  in the other room, weren't you?  Maybe or --

24      Q.   Well, did Mr. --

25      A.   I don't know.

1      Q.    Mr. Ries didn't sign this document, right?

2      A.    No, sir.

3      Q.    Okay.  Why did you and the others thing that --

4   that you all could do the settlement if Mr. Ries doesn't

5   approve it?

6      A.    Well, I -- I'm just going by what Joe Lovell and

7   them asked me to do.

8      Q.    Okay.  Were they your lawyers?

9      A.    Yes, sir.

10     Q.    Well, we don't want to go into what they told you,

11  okay.

12          So, but was there any discussion with the other

13  parties there as to, oh, my, we can't do this without Kent's

14  signature?  No -- No one raised that?

15     A.    Well, I -- I don't know any of those things.

16  We're all in different rooms and we're all talking.

17     Q.    Okay.

18     A.    I mean, that's -- I just know that they come in

19  and told me that this would be the best way to get through

20  this, Leslie -- me resign, I end up with my home; my mom and

21  dad's estate, I mean, and the -- and the land, and I give up

22  my gas interests and I walk away from it.  That's what I do

23  know.

24     Q.    Do you know whether -- whether you or anyone

25  working for you ever asked Mr. Ries to sign this contract?

```
 1        A.    I had no idea about that.

 2              MR. RUKAVINA:  Thank you, sir.  I'll pass the

 3  witness.

 4              MR. RIES:  I don't have any questions.

 5              MR. SHERWOOD:  No questions.  I would like him to

 6  have the opportunity to read and sign the deposition.

 7              MR. RUKAVINA:  Oh, yeah.  There's no rush on this.

 8              MR. SHERWOOD:  I don't need a copy, but I just

 9  need the ability to let him have a copy to review.

10              MR. RIES:  You want to send it to me and then I'll

11  send it to Matt or just send it direct to Matt.

12              MR. RUKAVINA:  Send it direct to Matt and copy me.

13              MR. RIES:  Okay.

14              MR. RUKAVINA:  And sir, let's be on the record a

15  little bit longer.  So your lawyer has just asked to read

16  and review.  You have 30 days to do that after you receive

17  the -- the transcript.  If you do not make changes to the

18  transcript -- there'll be a sheet at the back for you to

19  make changes.  If you do not make changes in those 30 days

20  and return them to me, then you will not be able to change

21  it later on.  Do you understand that?

22              THE WITNESS:  Yes, sir.

23              MR. RUKAVINA:  Okay.  Very good.  Thank you.

24              THE REPORTER:  So just to clarify, Mr. Rukavina.

25              We're going to send the original to you and you're
```

 1  going to get the --

 2          MR. RUKAVINA:  No.  No.  No.  Do it however you

 3  usually do it.

 4          THE REPORTER:  Okay.

 5          MR. RUKAVINA:  Don't rely on me not messing

 6  something up.

 7          THE REPORTER:  You'd like the transcript.

 8          MR. RUKAVINA:  I just want to know -- I just want

 9  to know what -- what Matt gets and when he gets it, so that

10  I can see when the changes come, if any, and what they are,

11  that's all.

12          THE REPORTER:  No problem.  But you want the

13  transcript, right?

14          MR. RUKAVINA:  Yeah.  Yeah.  And there's no --

15  there's no urgency on this.  So let's not, you know --

16          THE REPORTER:  No rush.

17          MR. RUKAVINA:  -- burn everyone's budget on this.

18          THE REPORTER:  And Mr. Ries, would you like a copy

19  of the transcript?

20          MR. RIES:  If somebody wants to send me one,

21  that's fine.

22          THE REPORTER:  Well, do you want to order one?

23  That's how it works.

24          MR. RUKAVINA:  Save the $800.

25          MR. RIES:  I don't -- I don't really -- If you're

1  going to send me one, I don't need to buy an extra copy.

2              THE REPORTER:  Okay.

3              MR. RUKAVINA:  Good.  Then we'll see each other at

4  10:00.

5              VIDEOGRAPHER:  Going off record.

6              (WHEREUPON, the deposition of MICHAEL STEPHEN

7  GALMOR was concluded at 5:00 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                           CERTIFICATE

2

3          I, Ryan Batterson, do hereby certify that I

4     reported all proceedings adduced in the foregoing

5     matter and that the foregoing transcript pages

6     constitutes a full, true and accurate record of said

7     proceedings to the best of my ability.

8

9          I further certify that I am neither related

10    to counsel or any party to the proceedings nor have any

11    interest in the outcome of the proceedings.

12

13         IN WITNESS HEREOF, I have hereunto set my hand this

14    16th day of April, 2021.

15

16

17

18    _____

19                Ryan Batterson

20

21

22

23

24

25
```

1  Date:       April 16, 2021      Assignment #: 36389-1

2  Attorney: Matt W. Sherwood, Esquire

3  Deponent: Michael Galmor

4  Case:       Galmor vs. Galmor Family Limited

5            Partnership

6

7

8  **ATTORNEY - NO TRANSCRIPT ORDERED:**  Signature of your

9  client is required.  It will be necessary for you to call our

10 offices and arrange for an appointment for your client to come

11 in to read and sign their transcript.

12

13

14

15

16

17

18 CC:  Naegeli Deposition & Trial

19

20

21

22

23

24

25

NAEGELI
DEPOSITION & TRIAL        (800)528-3335
                          NAEGELIUSA.COM

```
 1                    CORRECTION SHEET

 2  Deposition of: Michael Galmor    Date: 3/24/2021

 3  Regarding:    Galmor vs Galmor Family Limited

 4                Partnership

 5  Reporter:     Batterson/Sprague

 6  _____

 7  Please make all corrections, changes or clarifications

 8  to your testimony on this sheet, showing page and line number.

 9  If there are no changes, write "none" across

10  the page.  Sign this sheet on the line provided.

11  Page   Line   Reason for Change

12  _____  _____  _____

13  _____  _____  _____

14  _____  _____  _____

15  _____  _____  _____

16  _____  _____  _____

17  _____  _____  _____

18  _____  _____  _____

19  _____  _____  _____

20  _____  _____  _____

21  _____  _____  _____

22  _____  _____  _____

23  _____  _____  _____

24             Signature_____

25                    Michael Galmor
```

NAEGELI
DEPOSITION & TRIAL                (800) 528-3335
                                  NAEGELIUSA.COM

```
 1                        DECLARATION

 2   Deposition of: Michael Galmor    Date: 3/24/2021

 3   Regarding:     Galmor vs Galmor Family Limited

 4                  Partnership

 5   Reporter:      Batterson/Sprague

 6   _____

 7

 8   I declare under penalty of perjury the following to

 9   be true:

10

11   I have read my deposition and the same is true and

12   accurate save and except for any corrections as made

13   by me on the Correction Page herein.

14

15   Signed at _____, _____

16   on the _____ day of _____, 2021.

17

18

19

20

21

22

23              Signature_____

24                     Michael Galmor

25
```

NAEGELI DEPOSITION & TRIAL    CELEBRATING 40 YEARS IN BUSINESS    (800)528-3335    NAEGELIUSA.COM

**$**

**$1** 140:2

**$1,310,807** 176:25

**$1.31** 177:23 180:14

**$10** 25:6 25:7

**$10,000** 149:21

**$100,000** 90:8 90:17 158:17 179:23 180:4 190:10

**$111,000** 203:23

**$115,000** 203:25

**$15,000** 147:2 201:25 202:12 202:15

**$174,000** 173:9 184:9 185:6

**$186,000** 144:8 145:11 146:20 152:14 152:17 152:22 166:7 190:20 276:12

**$2** 27:25 28:3 30:9 133:15 134:17 137:18 138:5 138:7 206:23

**$2.5** 180:5

**$22,000** 109:5

**$24,000** 162:2 163:20 191:4

**$25,000** 88:17

**$250,000** 238:17 240:9 240:25 252:16

**$3,000** 232:12

**$384,000** 153:4 153:19 154:25 155:10 164:6 164:11 165:2 190:24

**$4.2** 168:6

**$40,000** 202:21

**$45,000** 204:8

**$5** 192:13

**$50,000** 229:14 230:18 239:3 239:8 239:10

**$500,000** 158:1 160:1 161:24 191:7

**$6** 192:13

**$6,014,000** 211:3

**$6.5** 212:11 213:12

**$640,000** 172:24

**$7,000** 149:21 201:17

**$70,000** 236:13 237:14 238:3 239:6 244:3

**$72,540** 245:21

**$76,000** 204:5

**$80,000** 179:8

**$80,880** 245:5

**$800** 286:24

**$9** 129:9

**$91,000** 256:9

**$96,000** 179:6

**$99,000** 183:13 183:19

**0**

**01** 82:22 85:22

**03** 85:23

**06** 80:15 80:17 81:5

**08** 79:9 82:9

**09** 24:23 79:20

**1**

**1** 37:25 38:1 74:10 95:2 211:2 229:17 230:4 236:8 242:5

**1,000** 240:22

**1,100** 240:22

**1.2** 206:7 206:12 256:2

**1.3** 134:19 206:7 206:12

**1.4** 134:20

**1:00** 132:2

**1:10** 132:7

**10** 11:5 24:23 54:23 168:10 169:22 197:19 197:20 200:1 215:11 251:21 251:24 254:1

**10,000** 130:19 130:20

**10:00** 287:4

**10:37** 62:2

**10:45** 62:4

**100** 203:22 213:5

**1040** 203:16 203:20 203:21

204:12

**1065** 178:21 179:3 183:9

**10th** 216:8

**11** 34:20 142:25 151:15 151:16 167:18 175:2 182:9 199:8 199:9 200:2 200:4 246:7 276:4

**1120S** 212:9 212:10 212:21 213:12

**113,000** 228:9

**12** 11:5 200:20 200:22 226:1 246:7 258:23

**12:01** 132:4

**121090** 245:5

**127966** 245:20

**13** 17:15 22:4 169:21 169:24 209:17 209:19 258:23

**137,000** 179:12

**14** 17:15 212:4 212:5

**1400** 97:21

**15** 79:10 79:10 79:15 176:19 176:20 187:22 201:15 214:11 214:12 225:15 251:21 251:24

**152** 34:21

**15th** 75:11

**16** 108:23 133:5 133:6 135:10

140:7 140:7
187:22
216:2 216:3
218:16 218:20

**16725** 150:9

**17** 80:16 108:23
173:8 185:6
187:22
217:8 217:9
218:1 218:5
218:6
218:10 218:14
218:17
269:1 269:1

**170** 241:11
241:21
242:9 242:24

**174** 239:13
239:14 239:18

**174,000** 185:8

**17th** 36:22

**18** 107:21
108:23 135:14
187:22
218:5 229:5
229:7

**18-20209-RLJ-
7** 9:8

**18-20210-RLJ-
7** 9:9

**19** 105:4
219:1
234:19
235:4 235:7

**1955** 175:8

**1975** 23:9 23:17
29:1 31:8

**1990** 85:22

**1991** 101:11

**1999** 29:5
30:4 32:7

**19a** 172:19

**19b** 172:23

**19th** 276:4

─────── 2 ───────

**2** 73:19 73:20
134:20 170:21
178:19
230:4
235:22 236:10
263:16

**2,848.68** 150:15

**2.3** 139:20

**2.4** 139:20
236:10

**2:12** 186:3

**2:26** 186:5

**20** 51:21
96:24
176:19 176:20
242:8
244:11 244:12
254:1 254:2
270:5

**20,000** 238:8

**200** 25:12

**2000** 28:5 207:3

**2000s** 33:4

**2005** 76:6

**2006** 86:24 96:2

**2008** 80:16

**2009** 75:11

**2010** 34:22 54:3
81:13

**2011** 76:17

**2013** 185:11
189:20 204:24
256:10 256:13

**2014** 159:2
185:11 196:17
229:13 236:14

245:14 247:5

**2015** 42:25
147:2 147:5
185:11 216:18

**2016** 22:9 42:25
107:2
111:20 122:25
123:9
133:25 162:10
162:13 162:16
163:16
168:5 170:7
183:1
183:19 184:13
212:2 212:4
213:12 214:10
216:14 216:18
216:23
247:5
263:20
264:1 266:3

**2017** 42:25
73:18 75:1
78:3 78:6
79:10 79:16
79:21 79:25
80:3 82:10
87:14 95:2
97:19 97:24
103:12 103:20
107:2
111:20 122:22
123:8 123:9
134:2
162:18 162:19
162:22
163:5
163:13 163:18
170:22 173:12
179:5
193:10 203:13
203:23 204:14
204:17 204:21
209:17
212:1 247:5
276:2

**2018** 42:25

74:20 105:5
107:2
150:13 151:18
152:13 152:20
204:24
216:8 276:5

**2019** 104:24
105:3
151:19 229:17

**20-2003** 9:9

**2021** 9:4 9:10

**21** 175:20 204:8
276:23 277:1

**23** 162:23

**23rd** 22:8
162:17 162:25
163:18

**24** 9:4

**24th** 9:10

**25** 31:19 108:17
108:18

**25,000** 88:6

**250** 241:1

**250,000** 241:3

**27** 147:2 162:23

**27966** 245:23

**28** 122:5

─────── 3 ───────

**3** 32:16 87:5
87:6 142:18
142:21 142:24
147:21 152:25
152:25 168:10
169:5
190:14 190:15
235:17
236:8
236:11 236:11

**3:00** 212:17

**3:21** 225:20

**3:48** 225:22

**30** 131:17
176:21 215:11
215:13 285:16
285:19

**30th** 150:2
150:13 152:13
152:20

**31** 78:3 78:6
79:21

**32** 143:15
143:15 143:19
143:20
144:2 190:18

**341** 15:13 51:18

**36** 36:21 253:5

**38,000** 243:24

**384,000** 153:5
154:22

**3rd** 22:4

---
4
---

**4** 16:25 32:16
32:18 99:16
102:12 102:13
102:20 102:23
112:21
146:8 146:9
146:12 146:14
146:16 149:13
150:1 150:5
166:8 167:6
167:10 168:10
168:14 168:14
169:6
169:19
173:9 175:8
185:3 185:7
185:7

**4.01** 278:21

**4.03** 278:16
278:19 278:23

**4.1** 175:8

**4.8** 278:18

**40** 34:20
51:21
112:18
113:2
125:17 132:10
132:20

**40,000** 243:24

**401(k** 205:2
205:14

**44A** 11:19

**49** 282:8

**49.5** 265:24
266:1 267:1
267:1 282:5

**4960** 98:18 99:3

---
5
---

**5** 89:12 89:13
99:14 99:15
99:16
112:22 128:19
167:7 167:8
167:17 172:10

**5:00** 287:7

**50** 108:12
108:19 144:12
144:14 144:17
259:18

**50,000** 231:4
231:5
238:15 241:3

**50/50** 108:15

**54** 36:22 80:15

**55** 11:5 36:22

**58,000** 101:24
101:25

**592** 85:18
231:13

**593** 172:24

---
6
---

**6** 103:19 143:15
143:20
144:2
169:22
175:1 175:4
190:18

**60** 36:23 215:11

**60,000** 228:6

**603** 92:23

**63** 175:24

**64** 28:12
37:12 117:2
175:22 235:22
235:24 238:13
238:20 239:19
241:10
245:8 260:7

**640** 95:12
239:20

**65** 28:12

**6535** 11:9

**677,000** 184:9

---
7
---

**7** 40:17 41:7
104:24 151:15
151:16 151:17
182:8
182:10 229:12
249:7

**7.15** 241:9

**7.50** 129:10

**7.15** 235:25

**70,000** 238:5

**70s** 36:9

**73** 16:24

**74** 17:1 144:5

**75** 16:19
23:10 24:2

24:6 132:13

**759** 214:22

**78,000** 101:25

---
8
---

**8** 183:3 183:4
263:17 263:19
265:7 265:8
278:16

**80** 137:20 196:8

**800,000**
137:21 141:7

**80s** 33:4 36:9

**83** 11:9 115:2
231:13

**84,'85** 14:24

**85** 24:7 24:12
24:14 24:16

**8903** 210:21
210:22 210:23

**8th** 216:23

---
9
---

**9** 143:19 193:10
193:12 203:12

**9/30/2016**
245:24

**9:45** 9:5 9:11

**90** 131:17

**90-day** 169:6

**90s** 33:4

**91** 83:10

**9300** 98:18
101:7

**93000** 99:21

**96,000** 179:20

**9600** 98:18
101:11

**97** 82:6

**99** 27:11
27:23 28:5
28:13 28:16
30:15 31:2
44:18 268:14

___

A

**a.m** 9:5 9:11

**ability** 12:11
136:7 285:9

**able** 30:7
35:5 75:4
106:21 129:17
177:12 280:12
281:14 285:20

**accent** 12:6
190:15

**access** 44:21
45:2 45:7
45:14 46:18
46:19 78:19
165:17
174:1 201:5
206:5 259:22

**accessed** 45:15

**accidentally**
49:25 50:2

**accomplish** 55:2
56:5

**According** 213:4

**account** 33:22
87:20 98:10
101:2 101:4
101:6
109:25
110:2 110:4
110:11 110:17
122:3
126:23 204:25
205:1 205:5
205:17 205:19

**accountant** 35:9
35:21 60:24
74:7 113:14

126:18 184:21
204:12 226:20

**accounted** 155:7

**accounting**
217:19 217:23
219:5 219:8
219:25 221:24
222:22 224:6

**accounts**
110:4 110:5
110:18
125:6
126:11 198:20
201:9 205:21

**accrue** 165:3

**accrued** 154:25

**accuracy** 168:2

**accurate**
25:13 48:19
78:24 153:17

**accused** 277:8

**acquire** 25:15
31:11 35:5
242:24

**acquired** 35:1
35:2 75:11
76:17 80:16
86:23
137:23 262:16

**acquiring** 34:3

**acre** 241:10

**acres** 92:23
95:12 236:1
236:10 239:12
239:18 239:20
241:11 241:21
241:22
242:9
242:24 251:22
251:25
252:8
252:11 255:16

**across** 84:12

85:2 180:25

**action** 166:12

**actual** 129:16
129:17
131:1
146:17 146:24
150:20 178:20
213:14 264:10
270:16
274:2 283:1

**actually**
26:16 29:14
45:13 100:5
102:5
103:19 114:16
124:20 125:13
126:19 127:11
129:19
133:3
136:22
148:9 157:1
157:2
170:10
181:2
181:14 187:10
187:18 204:13
210:21 211:23
225:1 235:9
260:21
270:7 272:25

**add** 155:10
239:14

**address** 11:8
11:14 11:15
43:19 219:21

**addresses** 75:19

**advance**
144:19
147:1 147:4
148:20 149:14
150:1 150:2
164:8
164:11 164:23
164:24
177:6
177:12 183:21

185:8 185:9
191:8 247:21

**advanced** 144:22
146:18 147:23
183:18
190:5
190:21
273:5 276:9

**advances** 123:23
147:10
149:2 149:4
149:18 155:11
164:16 164:25
170:16 173:15
173:17
174:2
174:20 174:21
178:2 186:8
199:5 199:6
200:10
216:9
216:14 216:24
269:23 269:24

**advancing** 145:1
145:5
188:18 188:23
204:20

**Advantage** 26:21
26:23 27:1
118:22
133:1 133:2
134:6 135:5
136:15 136:21
137:18 137:24
138:18 138:20
139:5
139:10 140:22
141:6 170:1
170:6
170:10
206:6 207:1
207:23 207:24
208:2 208:6
208:21

**adventure**
192:11

adversary 9:9
  15:8

advised 170:18

affairs
  167:18 182:9

affect 12:11

affirm 10:18

affixed 84:21

afford 106:12

afloat 104:4
  104:5

afraid 136:8

afterwards
  255:9

against 15:23
  108:23
  109:1
  123:23
  142:9
  166:12 186:16
  223:13 277:5

age 225:25

ago 22:8
  36:12 38:13
  43:17 63:18
  64:4 66:22
  88:13 88:22
  90:11
  118:25 120:13
  121:4 143:8
  145:13
  237:6 251:7
  259:1

agreed 53:10
  280:8 281:24

agreement
  157:13 157:16
  157:18 159:16
  159:16 161:21
  170:22 177:22
  278:4 278:5

Ah 136:18

ahead 57:12
  58:25 62:5
  62:12 266:6

Ahh 265:11

aid 153:13
  191:1

air 163:8

aircraft
  175:8 175:9
  175:13 175:15
  175:17 175:25

Aircraftsman
  16:15

airport 16:15
  176:10 176:11

alive 19:10
  112:13
  113:7 113:8
  130:12
  131:4 162:7
  196:4
  242:11 242:12
  242:22

allegation
  277:4

alleging 223:16

allowed 125:3
  125:4

alls 196:25

all's 253:13

alone 29:8
  44:10

already 46:3
  51:15 54:11
  62:15 85:13
  110:23 119:10
  149:14 189:22
  189:24
  201:4 208:7
  233:15 279:3

Altus-Lugert
  11:22

am 82:3
  141:21 185:24
  204:12
  224:8
  224:10 224:13
  259:21 263:12
  274:12

Amarillo 41:10

amended 175:2
  278:3

amendment 278:3

amongst 115:11

amount 132:16
  144:6
  145:11
  153:3
  155:13 157:14
  157:19 158:15
  176:24
  178:1
  183:15
  185:7
  205:12
  206:3
  206:15
  207:2
  215:19
  239:6
  243:15 269:25
  270:6 276:12

amounts 15:24
  176:21
  215:1 270:17

Amy 111:14

analysis 272:2

animals 86:4
  86:5

ankle 156:18

Annie 109:8

announce 61:6
  61:9

announced 60:19
  62:17 62:19

62:20

announcement
  60:10

annual 24:25
  158:15

answer 13:18
  31:6 39:13
  45:23 46:16
  56:10 59:3
  65:22 66:13
  67:11 70:23
  82:13 82:15
  82:17 82:19
  82:20 82:20
  89:7 104:18
  105:8 106:5
  106:7 123:7
  123:13 140:25
  141:18
  145:8 147:6
  147:8 148:3
  148:23
  149:5
  149:24 150:24
  151:12 152:19
  160:3 161:4
  165:8
  166:25
  170:6
  170:18
  173:4
  173:19 177:10
  177:14 186:14
  190:11 191:21
  193:24
  194:2 194:8
  194:20 204:23
  206:14 206:25
  208:9
  208:15 209:13
  211:16 213:20
  219:4 236:6
  241:23
  242:6
  246:25 247:25
  266:6 280:7
  280:14

answering 69:2

answers 12:1
  18:24 22:15

antique 254:25

Anton 100:17

anybody 88:14
  174:15 272:13
  274:12

anymore 106:13

anyone 12:17
  13:21 32:5
  45:19 45:20
  47:14 48:2
  48:6 48:12
  49:1 50:6
  50:14 50:15
  50:16 59:22
  67:22 70:24
  71:9 78:13
  111:10 120:11
  121:25 181:13
  223:3
  224:25 274:12
  284:24

anything
  12:13 44:11
  44:23 48:3
  50:12 51:7
  58:20 58:22
  58:23 64:9
  72:22 79:22
  84:21 93:13
  93:23 97:18
  97:25 100:4
  105:4
  105:19 108:24
  109:24
  120:2
  120:18 120:19
  128:12 130:10
  131:20 134:14
  135:16 137:13
  138:20 138:22
  141:18 159:16
  169:16

198:4
205:23
219:7
228:11 228:24
239:24
243:6
254:25
255:5 262:21

anyways 32:18

anywhere 47:2
  96:7 205:24
  205:25 224:7

apologize 99:10
  116:1 133:2
  134:7
  162:15 168:16
  179:14
  184:3
  190:15
  212:3 219:3
  248:5 252:16

apparently
  60:15 103:12

appear 174:17

applies 62:11
  62:23 62:25

apply 62:23

appraisal
  238:15

appraisals
  40:13

appraised
  238:15

approve 167:4
  284:5

approximately
  9:11 18:13
  24:22 25:10
  27:25 29:25
  104:17 138:17
  188:11 239:13
  253:25

April 22:4

24:14 150:2
  150:11 152:13
  152:20 162:17

aren't 60:18
  60:18 173:16

argue 231:11

argument 255:10

arise 162:3
  165:3

arisen 163:17
  166:8

Arkansas 260:17

arose 269:17
  269:21

arrears 131:20

arrested 17:2

Arrow 132:25
  134:4

ascertained
  163:10

aside 153:1
  182:24 197:17
  224:19

asset 106:24
  136:19
  139:8
  183:22 198:25
  200:5 207:19

assets 26:11
  26:12 35:4
  37:16 78:4
  136:21
  137:1 137:2
  140:22 198:15
  202:2 202:6
  219:14
  226:4 226:6
  226:21
  227:1
  251:10 257:15
  278:20
  280:9
  280:19 281:10

282:11 282:14
  282:18 283:1

assistance
  197:5 197:6
  219:9

assistant's
  197:6

associate
  62:7 63:2

assume 19:23
  51:14 66:1
  89:24 97:10
  114:9
  148:10
  152:6 162:1
  174:14
  197:7
  210:13
  213:7
  213:16 214:20
  215:13 215:16
  217:3
  247:13
  258:9
  273:10 279:14
  279:15
  282:3 282:21

assumed 30:10
  31:2 48:17
  141:3 145:9
  165:17

attach 173:5

attack 280:17

attempt 63:14

attorney
  12:15 40:19
  40:22 40:23
  41:9 41:12
  41:24

attorneys
  10:2 27:16
  35:22 36:11
  56:17 65:17
  67:10 67:12

67:19 141:3
194:7

**audio** 10:6

**August** 96:2

**authentic** 182:2

**authenticity**
13:4

**authorized**
84:13

**Automotive**
202:21

**available**
173:24 173:25

**average** 123:18

**avoid** 39:15
187:5 232:8

**aware** 50:7
50:10 57:21
65:8 72:23
88:3 94:20
154:1
171:13 174:11
183:23 186:18
193:9
210:16 214:17
227:15 250:19
251:5 259:20

**away** 20:8 20:19
20:19 21:11
23:2 66:2
73:5 79:15
94:14 99:20
117:3
117:16 117:21
119:11 119:20
158:19 160:11
161:25
196:5
242:25 245:18
256:21 256:23
284:22

**awesome** 124:20

**awhile** 31:23

66:22 121:4

---

B

**backed** 43:9

**background**
16:10

**backup** 47:11
47:25

**backups** 47:1
48:7

**bad** 33:23

**balance**
184:19
185:5
197:24
198:4
198:10 198:13
198:25
199:3
199:12
200:5
200:21
201:7 202:5
224:5 226:2
226:3 226:5
226:6 226:9
234:10

**bank** 35:24
35:25 36:1
100:22
101:2
109:25
110:1
110:19 137:22
155:19 156:22
157:10 186:21
186:23 187:21
240:19

**bankruptcy** 9:16
9:21 13:3
13:7 14:22
15:7 23:18
24:2 40:5
49:7 50:24
65:24 74:23

88:24
113:21
117:9
118:19 128:16
138:24
140:6
141:24 142:25
151:14 181:20
181:24 215:18
215:23
220:6 224:7
225:4 225:9
255:24 263:13
269:7
273:22 275:25
281:14

**banks** 187:7

**Barber** 37:6

**Barker** 33:8
35:11 35:11
35:12 97:3
108:12 108:17
108:18
109:4 109:5
109:8

**Barkers** 189:3
257:1

**Barker's** 97:4

**barn** 85:9 85:22
258:7 259:7

**barns** 90:9
90:10 91:4
236:2 241:16

**bars** 90:18

**bartered**
100:5
101:16 137:13
138:9
138:10 139:23

**Bartlett** 76:20

**based** 26:12
78:5 130:6
224:1 272:22

**basically** 23:16

45:18 48:12
117:14 150:22
186:11
187:4 231:5
272:22
280:9
281:19 281:25

**Basil** 33:9

**basis** 123:11
149:9 149:9
149:10 269:10
270:22 272:14

**bathroom**
196:3 244:2
244:9

**bear** 142:16

**became** 23:2
109:22 275:11

**Becky** 17:18
156:15 156:23

**become** 29:10
189:2

**becomes** 27:22

**beginning** 16:21
53:17 66:25
77:15
216:13 265:21

**begins** 226:15

**behalf** 201:1
217:20

**behind** 239:25
252:9

**belief** 81:4
81:5 81:6
113:9
113:13 123:5

**believe** 62:10
66:6 66:8
73:4 73:7
78:8 78:20
82:19 121:2
143:7
153:16 155:22

158:4
164:21 168:23
181:18 181:22
183:17 204:11
220:17 231:21
231:23
240:7
246:24 254:17

**believed**
52:12 78:25
159:6

**believes** 78:24

**bell** 114:1

**belly** 79:21

**belong** 55:22

**belonged**
92:17
100:25 231:1

**belonging** 110:8

**belongings**
114:5

**belongs** 81:20
81:25

**Ben** 210:4

**beneficiaries**
69:2 280:5
280:13 281:8

**beneficiary**
280:3
280:23 281:3

**benefit** 70:14
191:4 270:8

**benefited**
168:12

**Berghman** 60:20

**besides**
272:11 272:21

**best** 17:22
24:22 25:7
25:11 37:19
50:22 52:16
58:8 70:10

101:21 107:10
108:11
111:8 113:1
126:21 126:21
166:7
171:10
187:6 197:8
222:14 225:19
245:16
271:4 271:7
284:19

**better** 58:15
102:21 114:21
167:2

**beyond** 225:9

**bigger** 95:20
156:21 235:25

**biggest** 206:3

**bill** 109:9
122:11 127:20
128:5
130:23 131:10
180:18 244:18
246:13 246:14

**billed** 127:13

**billing** 124:5
246:4

**bills** 87:21
104:6
105:14
109:4
127:23 127:25
133:22 137:11
137:17 137:22
138:15 144:21
144:22 144:23
145:3 145:7
147:23 147:24
189:4
190:22 275:8

**binder** 217:14
218:2 220:7
220:11
223:2 223:2

**binders**
217:18
220:9 220:10

**bindweed** 103:8

**bins** 83:15
85:12

**birth** 11:4

**bit** 11:13
12:4 16:16
108:2
115:21 118:25
129:8 168:9
182:23
212:8
269:15 285:15

**blame** 49:11
223:12

**blank** 172:21

**blindsided**
257:21

**board** 35:24
261:15

**Bob** 98:21 99:20
106:13 187:25

**Bobby** 22:2

**bonds** 172:23

**Bonnie** 17:21

**book** 26:11
260:5

**Booker** 54:13

**bookkeeper**
126:18

**books** 27:12
37:6 46:5
46:7 48:20
49:2 49:23
50:4 50:17
79:18
105:24 106:11
116:20 118:20
119:4
120:13 177:17

177:17 184:16
184:19 184:22
199:17 199:21
199:23
202:8
228:22
247:8 247:12

**bore** 95:21

**born** 34:12
36:21

**borrow** 233:20
233:23 233:24

**borrower** 229:14

**boss** 145:19

**bottom** 27:9
77:15 87:7
97:7 97:21
150:9
183:12 198:17
214:22 216:15
226:25

**bought** 27:11
30:8 47:17
83:8 87:19
87:22 87:23
88:2 88:9
95:24 96:4
99:4 129:8
136:21 136:24
146:17 156:24
162:8
175:14 187:15
187:21 230:15
231:3 231:4
231:13
233:7
233:11 233:15
236:15 236:17
236:18 236:22
237:8
237:11 237:12
239:24 240:16
241:24 242:13
252:8 252:8
252:12 252:12
252:13

255:2 260:20

**bounds** 229:25
237:24 241:9

**box** 207:5
264:22
267:3 267:4

**boxed** 114:22

**boxes** 51:21
51:21 83:8
113:19 113:22
114:4 114:8
114:10 114:12
264:21 264:22

**boy** 36:15 91:17
96:16 188:1
261:12

**boys** 122:4
122:7 122:9
244:23

**Bradley** 85:9
92:22 108:18

**branded** 92:12

**Brandon** 61:17
251:13 251:16
253:9

**brands** 92:12
92:13

**break** 27:24
53:15 53:15
61:19 61:24
108:2 124:8
133:23 185:25
225:15

**briefly**
214:10
215:7 249:21

**broke** 24:8
156:13 156:17

**brokered** 138:10

**Brooks** 146:15
217:3
271:19 271:20

**brother** 20:21
24:6 28:2
28:2 28:21
30:13 31:10
99:4 195:8
195:10
246:6 254:19

**brought** 54:1
100:17 138:13
138:14 220:12

**BS** 156:14

**budget** 286:17

**buffalo** 104:11

**bug** 258:2
259:24

**build** 53:25
54:23 90:20
125:20 127:19
243:21 256:24

**building**
41:16
124:25 196:14

**buildings** 83:14

**built** 31:14
33:25 86:11
86:14 90:8
90:9 90:17
91:2 91:3
93:8 125:19
151:4
166:15
194:5
195:18
196:6 210:8
250:15 250:25

**bulk** 106:2

**bulls** 104:11

**bunch** 52:1
84:23 118:9
121:16
209:4
213:25 217:17
253:9
253:10 259:17

265:21

**burden** 170:12
255:10

**buried** 102:15
278:1

**burn** 50:11
286:17

**burned** 50:20

**business**
22:22 22:23
23:8 23:8
23:14 23:17
23:18 24:16
24:17 24:21
25:15 25:25
26:3 26:10
26:19 26:25
31:4 33:20
35:6 35:7
35:9 35:10
35:13 35:18
35:18 35:21
36:5 36:14
37:2 47:19
72:1 72:6
92:19 106:4
109:20 109:22
112:15
114:6 120:3
120:4 120:6
120:9
120:14 120:18
121:6
122:21 122:25
123:6 124:9
138:24
139:1
139:14 139:15
139:17 139:18
140:20 141:13
141:17
142:9
142:12 151:13
151:23
152:2
166:21 183:13

195:4
195:13
209:3 210:6
211:17 214:18
215:8 215:15

**businesses** 33:2
33:3 71:20
125:7
159:23 166:19
166:24 249:19

**busy** 45:3

**butthole2**
248:17

**button** 60:3

**buy** 30:7 133:14
136:22 136:23
231:2 233:6
237:3 237:7
237:11 238:16
239:24
240:4
242:10 242:12
242:20 242:21
255:4
259:14 259:14
287:1

**buyers** 128:8

**buying** 113:5
180:18 211:19
236:12 255:5

---

C

**cabinet**
127:22 127:25

**cabinets** 118:5

**Cadillac** 260:25

**cage** 92:13

**calculate**
131:14

**calculated**
145:12 152:15
153:19 179:19

**calculation**

145:23

**camouflage**
258:11

**canceled** 260:22

**cancer** 32:16
32:17 32:17
32:18 33:23

**capital**
172:19
184:7 185:6
186:21 186:23
203:25
204:3 215:1
265:19 265:22

**captured** 10:3

**car** 26:14 40:24
156:17 202:22
202:24
203:1 203:9
204:18
258:4
258:19
259:6 259:9
259:12 260:14
260:16
261:2 261:7
261:13

**card** 165:24

**cards** 201:9

**care** 111:3
153:13
191:1
191:23
192:1
195:21 203:13

**careful** 148:24

**Carlton** 252:13

**carpenters**
196:11

**carport** 81:15

**carried** 79:18
134:15 134:17

**Carruth** 15:10

**carry** 134:17

**cars** 40:24 78:1
228:14 259:17
259:18 259:23

**Carter** 13:23
14:4 14:4
42:12 45:17
46:3 46:19
48:3 49:18
67:16 74:19
84:11 98:25
145:17 145:18
157:24 159:18
160:25 161:14
187:23
198:3
200:25 219:19
224:25
227:1 227:5
227:7 227:8
227:14 228:21
233:5 233:9
234:11 234:12
234:14 234:14
236:23 248:21
249:4
251:22 252:10
255:11 255:12
271:12 273:16
273:25 277:5

**Carter's** 84:2
84:5 84:25
161:2 197:5

**case** 9:8 9:9
12:23 48:20
96:24 133:7
142:25 167:18
168:12 168:19
175:3
179:22
182:9 215:5
225:4 225:9
263:13 263:13
271:10 276:4

**cash** 106:18

106:22 106:24
133:21 134:10
134:20 137:16
137:16 137:17
178:6 193:7
194:18
205:6
205:24 205:25
207:5
207:20 239:6

**casino** 195:2

**casinos** 195:6

**category**
83:14 85:21
87:7 104:10
166:6

**Caterpillar**
103:12 103:13

**cattle** 86:6
86:7 86:19
86:23 90:24
91:10 91:18
91:21 92:5
92:8 92:9
92:10 92:10
92:11 92:17
92:19 93:10
93:17 93:20
93:20 93:24
100:11 100:14
100:18 100:20
102:25
103:6 103:7
103:10 104:19
106:5 106:9
135:3 249:23

**caught** 160:23

**cause** 18:7
22:21 36:14
40:18 41:14
44:19 45:2
45:3 47:15
48:11 48:20
54:18 59:19
71:15 85:1
86:23 90:22

92:6 94:20
95:1 98:4
100:23
104:7
104:19
106:5
106:12 107:18
110:21
111:2 111:5
116:14 125:19
136:15 136:17
137:14 140:17
141:18 156:23
163:15
168:9
177:19 178:24
184:3
184:18 192:12
211:20
212:1
221:15 230:25
231:18 231:22
241:15 246:10
252:24 257:20
272:22

**caused** 223:13
251:21

**CD** 249:8

**ceased** 151:23
152:2

**cent** 125:17
132:10 144:12

**cents** 112:18
113:2
132:13 132:20
144:14 144:17

**certain** 39:23
132:11
197:9 279:13

**certainly**
82:5 200:11

**certificate**
163:7 259:20

**certificates**
259:19 259:23

260:4

**Cessna** 175:9

**cetera** 21:21
25:17
104:11 121:23
168:20 168:20
171:12 201:10
203:22 228:6

**CH85C** 103:12

**chance** 172:15
231:2

**change** 29:13
43:19 168:6
183:13
185:8
203:23
211:3 256:9
285:20

**changed**
132:17 233:17
233:19 233:24

**changes**
285:17 285:19
285:19 286:10

**Chapter** 40:17
41:7 104:24
142:25 167:18
175:2 182:9
249:7 276:4

**characterizatio
n** 281:11
282:22

**charge** 106:8
129:2

**charges** 102:6
108:23 108:25

**Charles** 71:14

**Charlotte** 18:12
60:25

**chase** 281:22

**cheap** 83:4

**check** 51:2

134:11 141:21
153:21 158:12
160:9 178:4
180:24 180:25
234:5 234:5
260:22

**checkbook**
109:11
155:1 257:7

**checkbooks**
178:15

**checked** 267:3
267:12 267:19
268:2 268:3

**checking**
33:22 87:20
101:6
109:25
110:1
110:11 110:18
205:20

**checkings**
205:20

**checks** 55:19
55:21 55:21
102:3
107:11 109:23
110:7
132:15
189:2
190:13
206:1
273:10 273:11
273:14

**children**
14:18 14:24
18:16 18:20
55:5 64:8
66:7

**city** 24:9
24:9 24:10
43:9 45:25
47:4 47:12
49:5 74:3
85:25 91:17

93:9 118:21
119:3
175:14 248:25
258:16 258:17
260:17

**claim** 176:25
254:20

**claimed** 15:10
78:3 94:15
252:6

**claiming** 99:8

**claims** 13:3
13:5 13:8
15:23

**Clarendon**
261:19
262:7 262:10

**clarify**
208:16 285:24

**Clariton** 262:7

**Clayton** 76:6

**clean** 125:21
234:7

**cleaned** 97:7

**cleaning** 23:8
97:9

**clear** 12:1
94:10
115:14
162:5
188:17
189:5
239:11
275:4 275:4

**cleared** 241:5

**clerk** 272:18

**client** 62:8
63:2

**Clinton** 195:5

**close** 21:8
22:25 35:21
41:22

133:10 206:16
231:20

**closed** 133:24
187:18 187:20

**closer** 21:18
23:2

**closest** 21:9

**cloud** 46:24

**co-counsel** 9:20

**code** 256:25
256:25

**coded** 197:9
241:15 241:16

**coffee's** 62:1

**cold** 32:3

**Coleman** 19:7

**collect** 166:13

**collected**
158:10 158:12

**collection**
253:5

**colon** 32:17

**column** 147:10
148:19 150:11
226:4

**columns** 148:25

**combination**
180:23

**combine** 98:18
98:20
101:11 246:7

**combined** 27:3

**comes** 43:11

**coming** 25:14
39:14 94:21
105:14
127:9
130:13 130:20
160:19
189:4 192:4

common 69:23

community 37:20

companies 31:21
56:6 72:6
118:23
125:3 125:7
125:11 125:12
161:3 161:11

company 23:19
23:20 23:22
23:23 24:3
26:25 27:7
28:6 28:11
29:14 31:11
31:17 47:9
47:10 74:3
108:13 108:14
116:12 158:18
160:21 199:20
207:15 207:17
211:14 246:10
249:23 249:24
250:1 250:4
250:7
250:12 250:13
250:21 250:24
251:6
251:13 268:24
277:9

compensation
159:7

complaint 13:15

complete
64:12 230:22

completed 56:20

completely
156:13

complexity
282:23

compliance 45:4

complicated
27:14 149:7
209:22

compromise

278:4 278:5

computed 145:16

computer 40:4
40:7 40:9
41:2 41:3
42:2 42:4
42:7 42:10
42:10 42:15
42:22 43:5
43:8 43:20
43:22 44:22
44:24 45:6
45:8 46:9
46:15 47:1
47:16 58:20
78:19 80:5
127:1 127:2
127:6
127:13 127:17
128:21 128:22
129:16
130:5
131:15 145:13
145:14 145:16
145:22 146:24
153:21
155:2 155:3
155:8 165:8
165:9
165:12
174:1 177:8
177:16 177:18
177:20 177:21
180:7 180:8
180:9
180:11 190:12
197:1 197:2
197:2 197:4
197:9
197:12 197:16
198:22 224:19
244:23
248:7
248:25 249:18
252:23 271:16

computers 41:21
43:9 43:21

44:21 50:11

computer's
130:6

concern 281:16

concerned
164:15 257:10

concerning
21:21

conclude
21:20 92:14
150:20
151:6 208:5
281:7

concluded 287:7

conclusion 70:8
266:5

cone 83:15

c-o-n-e 83:15

confidante 35:8

confused 212:2

confusing 212:1
212:1

Connie 18:2

consent
235:10 235:16
236:4 242:2

consideration
134:13

considered
164:6

consisted
139:14

consolidated
208:24

construction
26:3

contact 151:5

contacted 39:8

Contents 219:25

context 269:20

continue 32:6
32:9

contract 72:7
112:10 112:11
112:16
113:2
113:10 114:12
114:17 115:10
153:25 161:21
284:25

contracted
124:14

contractors
196:15

contracts
113:25

contributing
154:12

contribution
53:20 54:15
63:14 63:17
64:16 65:7
110:3
193:16
265:3 266:1
267:15 267:18
279:4 282:5
282:12 282:18

control 243:9
281:14

controlled
65:24
243:11 281:15

convenient 85:1

conversation
52:24
221:23 221:25
232:11

conversion
151:22

co-operators
148:17

copied 113:13

copies 128:1

copy 113:15
122:12
128:7 128:9
218:2
220:21
223:5 285:8
285:9
285:12 286:18
287:1

copying 219:24

corner 231:13
232:19
233:3 233:6
252:4

corporate
263:13 269:7

corporation
31:3 31:15
31:16

corporations
55:14 256:22

correct 13:13
29:5 46:5
52:10 52:14
78:23 95:4
124:22 142:18
142:19
143:4
144:24 145:25
151:9
155:23
158:4 177:2
177:5
182:21 182:22
189:6
194:10 213:15
237:11 260:25
269:8
269:21
270:2 270:9
270:17
272:9 273:3
273:23 274:18

278:12
281:1 282:2

correctly 30:14
75:6

correspondence
219:15

cost 109:7
196:7 243:23

costs 111:23
186:10 186:12

counsel 9:12
13:20 14:4
51:18

counterclaim
13:18

counties 125:6

Counts 17:18

county 129:7
129:10 129:18
129:19
142:6 142:9
142:12 233:4

couple 33:16
46:19
142:16
143:8
187:11
201:9
205:24 263:16

course 33:25
106:4 177:9
178:16
180:6 186:1
247:20

court 9:22
62:11 63:4

courteous 263:1

courts 84:11

cover 144:20
183:19 186:9

covers 139:18

COVID 53:11

60:7

cowboys
245:25
246:2 246:5
247:2

cows 104:11

CPAs 27:16

CPS 79:20

crap 56:25
125:25
253:2 262:4
282:25

crawl 156:21

create 63:14
65:9 279:13

created 29:14
64:3 64:7
66:21 72:19
121:22 213:8

credit 122:2
126:10 126:22
186:21 186:23
201:9 201:10

creditors
15:9 15:14
46:4 113:18
249:8

criminal 17:4

critical 118:11

crossed 146:18

crossroad
105:19

crossroads
100:17

crushed 246:6

current 73:9
81:4 116:23
117:8 173:9
184:10
185:6 187:5
215:22
216:7 223:3

262:20

Currently
239:11

custody 14:24

customer
124:6 125:2
129:3 129:4

customers
126:11 126:14
142:10

cut 56:25
59:4 68:14
97:15 103:5
103:8
124:21
129:8
281:24 282:25

Cutting 66:6

cyber 43:12

cycle 121:1

cycled 104:3

D

dad 16:17 16:20
21:12 21:14
22:21 23:2
23:9 23:20
27:18 28:6
30:17 31:4
31:12 32:6
32:9 32:12
32:15 33:1
33:6 33:11
33:25 34:17
34:22 36:2
36:6 36:24
37:17 37:18
37:20 37:21
51:8 53:24
54:3 54:9
54:23 55:1
56:5 56:8
57:1 58:1
65:8 66:23

67:1 67:25
68:13 72:7
77:19 79:12
79:14 79:15
86:11 88:9
90:1 90:19
91:2 91:14
92:14 93:8
94:9 94:12
94:14 95:24
97:6 97:23
99:4 103:8
107:18 108:11
111:12 112:11
112:12
113:2 113:7
113:8
114:13
117:2
130:11 130:25
158:14 158:17
160:11 161:17
161:18 166:15
175:17 189:25
192:10
193:7
193:16 194:18
194:21
195:6
195:11 195:18
196:5
232:16 238:23
239:17 241:16
245:2
245:18
246:6 246:7
252:4
253:15 254:18
256:17 256:21
258:21 259:14
261:14 262:16
279:12 282:24

**daddy** 231:2
233:3
236:25
246:9 279:17

**dad's** 22:1 27:7

30:25 63:19
70:16 73:13
92:13
105:20 109:24
110:17
114:6 114:7
175:15 199:20
232:20 236:19
238:14 238:16
238:20
240:4
242:10
243:5 243:8
253:4 260:2
260:6 260:9
284:21

**daily** 57:22
109:7
123:10
149:9 270:22

**Dallas** 108:19

**Dalmor** 28:7
199:20

**damn** 158:23

**Damor** 27:7
27:20 27:21
27:22 28:8
28:9 28:10
28:14 28:23
29:3 29:6
30:8 30:23
30:24 30:25
31:3 32:6
33:1 199:20

**D-a-m-o-r** 28:10

**data** 46:20
271:15 271:24

**date** 9:10
11:4 30:2
38:19 75:11
79:21 80:15
80:16 87:14
95:1 121:22
140:19 182:20
229:17 245:19

276:3

**Dated** 245:24

**dates** 27:15
27:16 29:11
104:11
134:1 134:3
166:8

**daughter** 60:7
234:15

**Davenport**
33:8 35:13

**Davor** 9:14
58:18 185:22

**day** 21:4
32:14 40:7
41:13 41:15
50:25 53:6
54:14 55:9
57:2 58:1
99:6 123:16
123:18 123:19
127:9
137:19 141:25
152:1
220:10 248:24
272:14 280:21

**days** 131:17
131:17 215:11
215:11 215:11
285:16 285:19

**day-to** 272:13

**day-to-day**
120:18

**dba** 31:5 249:25
250:7 250:8
250:24

**dead** 280:24

**deal** 15:6 19:25
43:12 57:24
104:16 104:22
111:13
117:9
133:11 133:20
135:22 135:22

137:2 137:7
137:9
137:15 137:16
138:9
138:10 138:14
140:8
165:24 211:11
233:5
241:18
253:3 283:6
283:17

**dealing** 41:20
69:24

**deals** 43:15
48:20

**dealt** 44:24
44:24 49:18
54:20 71:15
78:1 196:15
201:3 201:3

**death** 144:21
147:22 163:21
163:23
164:1 164:2

**debt** 30:9 30:10
98:12
123:22
138:5 146:2
150:23 163:17
163:20
181:5 181:8
181:22 206:10
224:8
224:20
225:1 225:4
247:14 247:16
269:5 269:6
276:16

**debtor** 144:6
144:10 144:19
144:22 147:23
153:3
155:14 157:20
176:24 190:21

**debts** 168:19
181:12 181:14

181:18
182:1
185:12
192:2
269:16 269:21

**decade-by-**
  **decade** 24:1

**December**
  75:11 78:3
  78:6 216:8

**decent** 33:25
  132:1 195:18

**decide** 280:12

**decided** 53:24
  54:23 281:8

**decimal** 149:22

**decisions**
  262:22

**declined** 111:17

**deducted** 152:22

**deed** 229:6
  229:10 229:13
  235:11 237:18
  238:12
  239:2 252:1
  252:2

**Deena** 47:5
  49:20 55:20
  67:9 78:18
  84:2 157:24
  159:18 159:24
  160:25
  161:2
  164:19 219:15
  219:19
  227:7 227:9
  231:3
  234:14 248:11
  249:10 251:22
  252:4
  255:11 271:12
  272:19 272:23
  273:15 273:21
  274:9

274:15
  277:5 277:21

**Define** 164:23

**degree** 67:16

**depend** 21:4
  24:18 92:11

**depends** 123:19

**depose** 160:25
  274:21

**deposed** 11:23
  14:20

**deposit** 101:1
  110:20 113:18
  113:22 207:5

**deposited**
  100:21 107:11

**deposition**
  9:1 9:7 12:14
  12:17 13:21
  14:5 14:12
  14:16 14:18
  15:3 15:21
  15:25 16:3
  53:7 53:10
  58:10 58:14
  62:20 63:3
  285:6 287:6

**depositions**
  62:11 272:17

**deposition's**
  62:15

**depreciation**
  74:10 74:14
  203:14

**Derek** 60:24

**describe**
  19:14 19:19
  20:12 21:7

**destroy** 49:22
  50:1 50:2
  50:16

**destroyed**

50:9 85:7
  118:15
  120:3
  120:13 120:16
  121:17

**detail** 124:8
  199:14 283:14

**detailed** 122:14
  122:17 270:16

**detail-oriented**
  116:1 232:7

**details** 33:20
  63:13
  219:13 269:18
  271:8

**die** 22:3 22:7
  32:15 278:1

**died** 32:13
  37:17 37:20
  67:25 131:6
  158:14 162:16
  162:22 163:13
  189:20 189:23
  195:20 242:13
  243:19 254:18
  256:17 280:6

**difference**
  243:16

**different** 26:14
  30:17 52:7
  53:25 56:17
  68:25 69:3
  75:25 90:11
  90:12 90:16
  92:12
  109:11
  110:4 110:5
  121:16
  129:3 129:8
  133:25
  183:8
  197:18 199:15
  199:21
  200:2 200:18

210:5
  236:25 241:15
  241:19 255:15
  270:13 270:13
  273:12 284:16

**difficult**
  262:25

**digital** 10:4

**dinner** 11:17

**direct** 71:16
  285:11 285:12

**directly** 34:4

**directors**
  261:15

**dirt** 26:5
  139:17 245:7

**disagree** 39:1

**disclosed**
  208:20 208:21

**discuss** 52:20
  55:1 55:4
  59:16 174:2
  214:9

**discussed** 12:23
  15:24 53:3
  63:12 70:21
  85:13 88:22
  148:1
  160:16 170:24
  181:10
  217:4
  250:14
  278:9 280:22

**discussing**
  168:21 174:16
  252:3

**discussion** 55:8
  111:7 129:1
  182:25 284:12

**Disposition**
  278:19

**dispute** 13:12

126:6
144:16 183:15

**disrespectful**
33:15 79:15
191:22

**dissect** 165:9

**distribute**
280:9
280:12 280:19

**distributed**
153:10 155:16
157:22

**divorce** 17:14
17:23

**divorced**
17:12 17:13
18:3 18:4
18:14

**divvied** 92:11

**doctor** 156:25

**document**
38:14 51:13
81:23 128:8
151:7 154:4
161:25 167:21
168:2 216:6
216:20 216:23
217:2 217:7
217:7 217:8
217:12 222:15
225:3
230:20
235:9
253:15
278:5 279:1
283:6 284:1

**documentation**
279:18

**documents** 39:18
39:20 39:21
39:23 40:1
40:2 40:3
40:16 42:21
44:17 44:19

51:16 51:17
52:9 52:17
52:21 58:8
58:16 58:16
114:25 115:11
115:16
116:4 116:7
116:11 116:11
116:19
117:1 117:3
117:7 117:8
117:10 117:15
117:19
118:1 118:3
118:7
118:10 118:13
118:25 119:18
119:21 120:10
120:21 120:24
121:5 121:5
121:10 121:11
121:12 121:13
128:7
128:15 128:17
133:8
133:12 134:16
142:16
197:3
197:11
198:1
200:18 200:25
231:7
231:16 238:21
260:10
272:7 283:16

**dollars** 15:11
25:1 25:2
34:23 98:13
101:24 139:21
173:14 184:14
190:6 196:8
201:16 202:15
205:24 206:17
206:20 206:22
240:22

**domestic**
211:2 267:5

**Don** 22:2

**done** 22:23
27:16 28:4
33:13 56:14
65:18 71:17
88:16 113:2
121:6 128:8
128:25 141:23
162:5 178:4
178:6
196:16 221:12
222:4
225:14 233:20
245:3
245:12
257:2
257:18 257:22
275:21

**Donna** 18:8

**dope** 27:8

**dot** 107:23
122:8 124:2
126:23
127:5
127:18 128:1

**double-page**
172:2

**double-paged**
184:4

**double-sided**
150:7

**doubt** 168:2
182:20

**downturn** 275:10
275:11

**draw** 31:15
141:22
228:1 228:3
228:12 228:16

**drawed** 160:9

**drawers** 115:1

**draws** 109:11
227:22

**drew** 67:10
67:12

**drinks** 21:3

**drive** 96:7

**drives** 50:11

**driving** 261:12

**dropped** 192:3

**drove** 54:18
59:15 59:15

**dually** 80:15
80:17 81:5
82:23

**due** 106:4
164:25 273:7

**duly** 10:22

**dump** 79:21

**Duncan** 92:8
106:12 187:25

**during** 24:25
25:16 35:5

**duties** 72:5

**duty** 68:22
69:12 69:15
69:17 70:2
70:6

**Dykes** 61:13

**Dynaturn** 47:3
47:6 47:15
47:19 48:19
49:5 248:25

———————
E
———————

**earlier** 85:20
95:9 163:15
248:24 250:14
268:21 278:9

**early** 28:5 37:5
113:18 124:15
151:19 187:24

**earned** 192:24

earn-out 134:13

easier 73:15

east 34:21 93:2

economic 283:17

educational
16:10

effectuate 57:2

eight 144:1
275:16

either 21:10
27:24 50:24
55:13
177:14
215:2
226:20 227:13
251:9

either/or 74:13

electric 189:15

electronic
43:11 130:4

electronically
127:3

Eleven 151:17

Elk 24:9 24:9
24:10 41:10
43:9 45:25
47:4 47:12
49:5 74:3
118:21 118:23
119:3
175:14 248:25
258:16 258:17
260:17

else 12:17
13:21 32:5
45:19 48:18
49:19 50:15
60:4 62:19
67:22 72:22
77:20 94:18
111:10 118:16
159:5
181:13 239:24

270:21 272:13
274:12

email 42:23
42:25 43:14
218:4
219:18 219:21
220:2 220:6

emails 43:5
43:10 43:16
43:17

embezzlement
277:9

Emeritt 89:10
90:5 91:20
95:8

employed 141:20

employees
24:3 25:10
153:12 187:23
188:2 188:5
190:25 246:16
246:17 246:21
256:7 270:6
270:7 273:12

employment
159:16 161:2

enable 199:5

energy 33:11

engine 255:20

engineer 129:13

English 69:23

entities
30:17 55:14
73:12 73:14
210:8 243:12

entitled
158:7 159:6
160:4

entity 65:11
65:14 86:10
256:24 266:16

entries 78:25

101:23
102:1 228:15

entry 46:20
95:22
103:11 103:18
153:2
157:19 190:20
202:18

equally 57:16
58:2

equip 143:22

equipment 25:17
25:18 25:19
25:20 25:22
40:6 47:17
47:17 95:15
95:17 96:17
98:4 98:6
102:1 102:8
113:5
133:18 133:19
137:10 137:12
137:24
138:1 138:8
138:18 138:21
139:13
140:1
141:11 141:16
141:25 189:24
210:2
211:19 211:22

equity 154:13
154:13 227:22
227:24

essentially
270:1 275:12

established
112:5
119:10 149:14
279:3

estate 54:4
54:5 54:10
54:12 55:2
57:3 65:9
70:16

105:20 195:18
238:14 238:14
242:15 250:20
251:3
269:12 284:21

estates 9:17
9:21 21:21

estimate 25:6
104:25
105:1
123:10 135:13
142:8
189:18 206:13
207:1

et 21:21
25:17
104:11 121:23
168:19 168:20
171:12 201:10
203:22 228:6

events 105:7

eventually
71:20 182:5
262:19

everybody 41:19
63:20 195:25

everyone 37:8
41:20 45:4
48:18 57:20
69:16
122:11
124:4 159:5
223:23

everyone's
61:23
223:22 286:17

everything
41:20 44:19
56:19 57:20
64:16 79:17
84:8 104:8
122:8 122:9
192:2 192:5
192:12 195:23

198:5 257:18

**evidence**
37:24 58:8
58:15
121:22 146:20
224:11

**evidencing**
177:23

**exact** 28:1
139:22 276:3

**exactly** 58:16
190:3

**EXAMINATION**
10:24 263:5
276:21

**examined** 10:23

**example** 71:18
80:14 95:20
272:3 272:25

**exceeded** 269:24

**Excellent** 126:5

**except** 121:1
135:2 186:18

**exclude** 272:15

**Excursion**
260:12

**exhibit** 37:25
38:1 73:19
73:20
142:18 142:21
142:24
146:8 146:9
146:12 146:14
146:16 147:21
149:13
150:1 150:5
152:25 152:25
153:1 166:8
167:6 167:6
167:7 167:8
167:10 167:17
170:21
175:1 175:4

178:19
182:8
182:10
183:3 183:4
190:14 190:15
193:10 193:12
197:17 197:19
197:20
199:8 199:9
200:4
200:20 200:22
203:12 209:17
209:19
212:4 212:5
214:11 214:12
216:2 216:3
217:8 217:9
218:1 218:6
218:14 218:17
218:19
226:1 229:3
229:5 229:7
229:24
230:1
234:16 234:19
234:19
235:4 235:7
235:15 237:19
242:2 242:8
244:11 244:12
263:16 263:17
263:19
265:7 265:8
270:5 270:5
276:1
276:23
277:1 278:2

**exhibits**
200:1
225:10 263:16

**exist** 47:2
83:18 203:1
258:4
258:13
259:6
260:14 261:2

**existence** 101:8

**existing** 96:6
113:15

**exists** 81:16
82:7 225:1

**exotic** 254:25

**expanding** 246:8

**expect** 154:10
158:21 161:10
182:3 182:5

**expected**
156:6 181:2

**expecting**
160:13

**expense**
125:25 147:13
168:18 189:16
193:3 193:4
193:4 228:6

**expenses** 106:16
144:20 147:14
147:15 147:20
148:2 148:6
148:9
188:15 188:23
189:14 189:22
189:22
190:7 191:8
191:12
192:9
192:18 196:19
197:9
204:17 221:20
221:21 228:19

**expert** 45:6
60:6 60:23
62:6 62:6
62:7 63:1

**explain** 71:18
196:22 256:20

**explained**
64:4 271:4

**explanation**
169:9
169:18 184:12

184:24 185:18
198:24
199:3
200:14 200:17
202:14 202:17
215:4
216:22 224:16

**explore** 195:17

**extent** 70:7
194:24

**extra** 287:1

**extract**
121:20 125:1

**extracted** 112:6
123:12 126:19
129:19
142:3 152:17

**extracting**
71:21
112:23 151:10
151:25 152:1

**extracts** 125:10

**extraordinary**
108:25 191:12
193:3 193:3

**extravagant**
191:15

**ex-wife's** 17:17

**eyes** 264:16

---

F

**F-150s** 156:21

**face** 82:18

**facility** 114:19

**fact** 51:16
68:24 166:3
192:21 268:23

**failed** 64:11
279:8
279:12 279:12
279:17 279:21

**fair** 21:20

33:24 51:10
66:13 88:11
102:19 139:25
150:20
151:6 190:5
208:5
215:17 223:14
223:23
229:2 229:2
243:14 243:15
281:7
281:10 281:13
281:16 282:17
282:22 283:3

**faith** 79:1

**fall** 38:16
53:10

**familiar**
65:11 65:14
143:1 232:1
256:3 273:21

**family** 13:8
15:24 16:9
23:4 53:17
53:23 56:12
63:19 63:22
65:7 65:12
65:20 65:24
66:4 66:21
67:1 68:1
68:10 68:22
69:13 69:19
70:5 70:16
71:23 72:2
72:5 72:18
72:18 73:8
73:18 73:24
74:19 75:1
75:15 77:5
77:19 77:23
78:3 78:7
80:3 80:11
80:24 81:1
81:20 82:1
82:2 84:22
88:1 88:19
89:23 90:1

90:25 91:25
93:4 93:22
94:17 94:19
95:16 99:2
100:10 100:13
101:1 101:3
101:19 101:20
102:8
102:22 103:23
104:13
105:2 105:9
105:22 105:24
106:8
106:14 106:21
107:1
107:11 107:15
108:3 108:7
109:14
110:8 111:9
112:7
123:22 125:18
126:7
129:25
130:8 131:7
144:6
144:11 144:19
145:2 145:6
148:9
148:10 148:16
149:4 149:8
150:22 152:14
152:21
153:3
153:11
154:1
155:14 155:17
156:2 156:5
157:13 157:20
157:23 157:25
158:8
158:10 158:22
159:7
159:19 160:18
160:20 161:15
161:16 166:12
166:15 166:18
169:3 169:8
169:14 169:15

169:19 170:16
171:5
171:11 173:13
173:14 173:17
174:3
174:21
176:5
176:24
177:7
177:13 177:16
178:8
178:12 179:23
180:3
180:17 180:18
180:19 180:24
181:3 181:5
181:12 181:19
181:23
182:6 183:2
183:18 183:21
184:14
186:8 186:9
186:12 186:16
186:24
187:1 187:8
187:18 187:22
188:14 188:21
188:22 189:21
190:5
193:25
194:1 196:1
196:12
199:1 199:6
200:6
200:21
201:1 202:8
203:9
204:20 206:21
207:21 207:25
208:6
214:19 215:10
215:18 215:22
216:10 217:20
219:9
219:13 220:14
221:16 223:14
224:1 226:2
226:7

227:13 228:18
229:13 229:15
230:18 233:13
233:21
234:1
236:13
237:4 237:7
238:2
238:22 240:13
240:14 240:20
243:25
244:6
244:18 245:11
246:18 246:20
247:15 247:20
247:22
254:9
254:13 255:12
256:10 256:12
256:23 257:15
258:9 259:4
260:12 261:21
262:13 263:20
265:3 266:2
266:24 267:15
268:12 268:12
269:12 269:25
270:8 273:5
273:7 274:6
275:24
276:8 276:9
276:16
279:5
281:23
282:5 282:8
282:9
282:15 282:19
282:20

**fancy** 255:5

**farm** 99:23
99:25 100:2
201:10
204:5
244:21
245:7 245:7

**farming** 167:1
179:11

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

farms 246:8

fast 67:7

faster 178:25
221:5

father 28:25
29:6 30:7
31:7 59:8
59:14 59:16
72:18 91:11
91:13
144:21 147:22
161:25 189:20
189:23 191:23
191:23 260:20

father's 252:17

federal 62:11
62:25 74:16
210:17

feel 68:18
68:22 69:12
70:4 182:22
194:9
213:21 223:21

fell 65:16
115:1 121:15

felt 166:14

fence 93:8

fertilizer
100:8

fiduciary
70:2 70:5

field 23:17

Fields 36:10
36:14 67:14
71:14 141:1
238:18 240:18

fifth 210:18

fifty 240:7

figure 84:11
126:19 129:18
192:24

file 46:14

127:22 127:25
164:4
222:13 260:3

filed 40:5
74:23 75:1
79:4 88:24
118:19 128:16
138:23 141:24
142:24
143:8 163:7
167:18
175:2 182:9
215:18 215:23
276:2 276:3
276:4 281:14

files 42:15
47:2 51:4
115:2
116:16 116:17
127:25
248:6 248:8
248:19 249:12

filing 161:25
168:12 168:19
255:24 275:25

fill 164:12

final 104:10
126:13 133:11
151:14 266:20

finally 32:19

finance
157:10 200:10

financed 155:18
180:6
186:19 186:23

finances 119:8

financial 46:13
167:18
182:9 202:21

financials 46:7
272:8

financing 180:4
192:8

fine 12:3
62:7 80:1
82:21
152:24 170:11
171:23 212:16
225:12 249:15
286:21

finger 174:15

finish 55:13
55:16 64:5
64:19 92:3

finished
55:12 118:4

fire 50:9

firm 36:6
36:8 67:15
133:10 168:22
217:8
220:11 220:13
223:4

first 18:6
18:11 35:12
36:1 36:11
37:5 37:24
38:13 40:8
55:10 74:18
75:9 93:8
112:25
147:1
155:18
157:9 166:6
166:6
178:20 182:14
203:14 213:11
218:4
219:18 226:19
230:7
235:10 235:14
244:22
245:4
263:19
268:5 277:21

fit 141:8

five 14:13 18:7
19:12 22:8

24:9 43:16
57:16 58:2
60:14 95:7
160:13
172:6 174:7
180:6 201:15

fixed 86:12

fixing 133:17

flat 199:16

flats 99:14
99:15 99:16
100:6
100:14 100:15

flaws 48:22

Fling 31:14

flip 178:25

flood 50:9

Floral 37:10

flow 106:18
106:22

FLP 54:24 64:18
64:19 104:6
105:21 108:20
110:3
110:20 147:13
147:16 147:19
149:13 149:16
149:17
152:4
158:18
160:6 160:8
160:12 188:20
188:24
246:3 246:4
256:23 259:10
262:1 275:12

FLP's 92:10

fluctuation
108:4

flush 174:23

focus 29:3
184:7 192:15

focused 123:3

folks 27:11
 123:4

foot 156:16

Ford 80:15
 80:17 81:5
 82:22 83:10
 259:3 259:4
 260:12

foreclose 187:8
 187:10

foreclosed
 252:25

foreclosure
 187:5

forged 223:17

forget 40:21
 71:2 240:6

forgive 262:7

forgiven 150:22

forgot 167:13
 267:2

form 116:21
 134:12 178:21
 179:3 183:9
 203:16 210:21
 212:8
 212:21 213:11

formal 130:9
 131:10 222:22
 250:7

formed 31:12

former 72:25

forth 149:1
 156:23 156:25
 269:17
 272:4 273:11

forward 63:6
 63:9 134:21

four-wheel
 95:22 96:1

96:7

Fox 14:7

frame 24:19
 43:1 108:22

free 189:5

Friday 164:21

Fridays 25:4
 198:5

friend 35:21

friends 277:13

front 73:16
 142:15
 236:7 252:7
 263:21 263:22
 278:2

Fuchs 14:7 14:9
 14:10 14:12
 14:13 44:21
 45:2 45:17
 46:18 73:25
 74:19 78:10
 78:13 78:20
 79:6 106:24
 151:2
 173:20
 174:2
 174:16 179:16
 179:19 184:24
 198:7 201:4
 209:14
 214:1 214:7
 224:25 272:6

Fuch's 174:13

fuel 83:11
 83:12

full 11:1 40:24
 51:17 52:1
 116:4
 234:24
 239:6 275:16

fully 55:12

fund 275:12

funded 194:15

funding 90:2

funds 153:9
 153:10
 154:9
 154:10 155:15
 155:17 157:21
 157:23
 164:9 177:7
 204:21
 257:2 277:9

funny 36:5
 165:12

furnished 100:7

future 48:14
 134:13 182:24
 223:3

———————

G

G&G 16:17 16:18
 23:7 23:13
 24:7 24:25
 26:19 26:25
 27:2 28:17
 28:24 28:25
 29:20 30:12
 30:16 30:22
 30:24 31:7
 31:12 32:10
 33:1 46:4
 49:7 71:20
 72:1 90:19
 91:1 91:5
 91:7 94:18
 112:5 112:7
 124:9
 124:13
 125:1 125:2
 125:10 125:19
 125:24 125:25
 126:1 126:6
 126:10
 130:9 136:4
 145:1 145:5
 149:8
 149:16 149:17

151:10 151:13
 151:25 167:18
 168:5
 169:14 170:15
 170:16 170:16
 173:14 173:18
 174:3
 174:19
 180:5
 181:13 181:23
 184:15
 185:1
 185:12
 186:7
 188:23 190:15
 190:20 197:10
 199:20
 207:1 215:2
 251:6 269:7
 269:24
 270:6 270:6
 270:7
 271:22
 274:7
 275:11 275:24
 276:7

G&Gs 206:22

G&G's 124:12
 124:19 124:23

gain 137:15
 203:25 204:3

Galmor 9:2
 9:8 9:19
 10:15 10:22
 11:1 11:3
 19:7 22:2
 46:13 53:20
 53:23 54:15
 54:24 61:17
 61:17 61:22
 61:22 63:12
 63:21 65:12
 65:15 65:19
 65:24 66:4
 68:1 68:10
 72:18 89:23
 90:19 101:2

108:20
110:3
110:20
132:9 140:9
142:24
144:6
144:11 144:19
153:3 153:8
153:11 155:14
155:15 155:17
157:20 157:21
157:23 157:24
157:25
158:8 164:9
167:12 167:17
172:18 176:24
178:8
178:19
179:2 183:2
186:7
197:19 198:10
200:20 201:11
201:19 201:24
202:12 203:20
204:25 205:21
206:4
206:18 212:21
214:9 221:8
225:24
226:7
227:17 229:14
229:14
235:7
240:13 240:14
244:11 244:18
245:11 245:20
249:23 251:13
256:23
263:7
263:11 263:20
265:3 266:1
266:2
266:11 266:24
267:10 267:10
267:14 267:15
267:15 267:18
267:24 268:4

268:10 268:12
268:13 268:18
277:4 287:7

**Galmor/G&G**
121:20 132:23
136:22
137:3
142:14 208:20
211:15
215:9
222:19 256:4

**Galmor's** 27:2
27:6 27:18
27:19 27:22
29:10 29:14
29:19 32:7
46:4 86:9
91:1 124:9
131:13
136:4
140:23 144:21
147:22 153:13
161:5 191:2
214:15
215:2
245:12
250:1 269:8

**Galmor's/G&G**
13:9 29:22
47:19 49:23
50:5 91:10
116:17 116:20
118:19
119:4 129:2
129:25
131:7
134:24
135:4
136:13 136:22
138:23
139:4
139:10 140:22
141:5
142:25 148:20
150:1 153:9
153:10
154:5 154:6

154:9
154:10 155:15
155:16 157:21
157:22 159:21
161:6 161:8
161:11 164:10
169:3
178:12 197:25
198:25
199:4
199:13 199:17
202:18 208:23
209:8
212:24
213:5
215:18 215:21
216:10 224:21
244:17 244:19
246:4
246:16
247:9
247:15 247:20
247:21 255:24
256:6

**gambling**
167:1
194:21 194:23

**gang** 103:10

**garbage** 50:19

**gas** 24:19
34:4 35:2
35:12
107:15 107:16
108:3 111:8
111:16 111:17
112:1 189:2
191:25
192:3 192:6
192:8
192:10 192:10
192:12 192:13
195:22 196:18
250:5 250:9
256:15
275:7 275:10

283:8 284:22

**gathered** 41:18

**general** 12:24
65:20 75:20
151:8 268:6
268:18

**generally** 95:17
139:13 209:24
244:16
247:3
257:13 269:21

**generate** 98:4

**generated** 42:21
100:21 100:25
101:5
127:11
130:6
177:20 244:24

**generating**
104:9

**gentleman** 49:14
54:14 54:21
146:23 150:25
210:3 217:4

**gentlemen**
234:21 250:25

**German** 179:14
179:17

**gets** 154:17
286:9 286:9

**getting** 36:13
43:17 48:21
55:18 87:18
109:4 118:4
125:23 128:13
160:22
164:4
221:10 225:14
233:22

**gin** 84:6
84:16 84:17
84:19 84:21
85:4 87:2
87:14 87:20

**NAEGELI**
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

**(800)528-3335**
NAEGELIUSA.COM

87:23 88:23
88:23 88:25
89:15 90:23
127:7
128:18
230:7
230:16
231:1
231:15 231:15
232:10
233:3 233:4
233:7
236:17 236:22
236:23 236:24
237:1 237:3
237:10 237:12
237:19 242:5

**girls** 37:8
43:24 45:15
45:17 45:22
45:24 46:19
57:22 92:6
127:5
127:11 128:3

**given** 78:16
113:14 126:24
149:13 171:25
206:4 207:2
218:1 269:20

**gives** 283:9

**giving** 249:4

**glasses** 74:12
144:2

**Glenda** 100:19
110:22 110:23
111:2

**Glover** 18:10
18:14

**GMC** 83:3

**God** 10:20
149:24

**gone** 62:9 62:13
105:24 272:3

**gonna** 71:11

151:20 152:10
174:14
191:9 191:9
242:18
246:9 247:25

**gotcha** 74:16
86:18 95:11
96:23 101:3
136:25 136:25
251:20

**government**
48:18

**graduated** 16:11
16:23

**grain** 82:6 83:3
83:7 83:15
85:12

**grandmother's**
259:5

**grasp** 67:8

**grass** 100:16

**graze** 91:23
93:24 100:13

**grazing** 92:20
93:11 93:13
93:15 93:16
100:6 103:1
103:2 103:3
166:21

**great** 131:24
186:21 186:23
187:9 187:21

**greater** 111:23

**Greek** 214:3
237:25

**green** 259:3
259:4

**greenhouse** 37:3
37:10

**grew** 24:7 34:15
34:16

**gross** 168:5

179:8 211:2
212:11

**ground** 86:14
102:16 102:16
210:7
210:10 251:9

**group** 26:4 26:5
26:6

**grow** 23:22 24:3
31:13 34:13
34:17 102:25

**GRS** 140:9

**guess** 18:7 20:8
20:18 20:21
45:14 45:23
55:14 57:25
59:17 76:4
105:15 117:17
124:25 129:15
145:9 154:3
170:15
176:5 190:2
202:22 207:13
224:14
225:2
227:12
256:5
259:10 259:18
268:25 280:21

**gun** 253:5
253:13
255:4 255:6

**guns** 253:5
253:6 253:7
253:10 253:16
253:25
254:6
254:15 254:18
254:22 255:2

**guru** 43:11

**guy** 31:14
33:9 33:19
85:25
108:18 145:20

146:15

**guys** 89:14
136:3
154:16 264:5

---

H

**half** 16:12
31:19 64:18
93:3 93:3
108:14 142:12
198:15 198:17
238:14 238:16
240:1
242:10 242:20
243:3 243:5
243:8 243:9
263:25 268:15
277:25

**hand** 10:16
106:9

**handicap** 155:18
156:3 156:6
156:9 259:24

**handing** 175:1

**handle** 156:23
156:24

**handled** 133:7
141:1

**handling** 106:10

**hands** 24:10
154:18 187:24
233:18 233:24

**handshake**
154:17

**hands-on** 257:14
257:23

**hang** 277:19

**hangar** 176:1
176:7
176:12 176:13
176:16

**happen** 53:13
135:21 192:21

232:2 242:3
247:24

**happened**
21:13 35:15
40:17 67:7
73:5 80:5
82:10 82:11
82:18 98:8
99:5 102:5
104:23 104:24
109:18 109:19
111:4
111:22
114:4
121:13
133:8 140:5
165:6 170:7
170:10 170:14
170:19 175:23
175:25 187:13
203:3
204:15 230:14
231:12 231:19
232:9 253:7
256:19 277:11

**happens**
105:15 106:6

**happily** 33:16

**happy** 100:22
101:2
109:25
110:1
110:19 203:17

**hard** 12:4
12:5 50:11
104:22 156:24
183:22

**hard-working**
34:7 195:18

**Harrows** 103:19

**haul** 125:21
127:20

**hauled** 26:6

**hauling** 114:25

**haven't** 21:10
97:9 174:6

**having** 10:22
21:13 21:22
27:13 79:25
104:8 205:5
205:16
206:4
232:12 243:15

**hay** 97:15 103:2
103:8

**Hayden** 92:8
106:12 187:25

**head** 22:10
22:12 30:16
90:13 104:19

**headcount** 92:17

**heading** 227:25

**hear** 12:3
12:7 12:16
58:20 58:22
58:23
130:24 249:24
250:1 250:4
250:20
251:6 251:14

**heard** 54:4
56:17 65:1
69:24 69:25
70:2 70:3
70:24
124:19 248:20
262:5 268:9
272:12

**hearing** 12:4
12:5 58:19

**hearsay** 57:10

**heat** 41:16

**he'd** 31:23
158:17 255:4

**Hefley** 230:10
230:15 232:25

**height** 26:10

**heir** 148:12

**held** 218:23

**he'll** 281:19

**help** 10:20
21:14 37:6
41:9 42:12
67:10 67:10
67:17 67:19
67:22 78:16
85:25 91:9
137:15
148:2 148:6
164:21 171:20
184:2
188:18
189:4 190:6
193:7
195:14 196:21
196:23
198:7
210:19 211:13
214:23
219:1 221:1
222:8 245:2
246:10 264:15

**helped** 78:13
133:10 143:11
164:12
209:4 222:22

**helping** 91:11
91:13 92:16
114:25 220:13
220:16

**helps** 99:17

**here's** 124:25
130:9
148:22 168:25
226:15 231:18
244:16 283:20

**herself** 21:16

**he's** 21:3 51:15
51:20 52:6
60:20 60:21

60:23 69:2
89:5 96:16
99:8 112:14
138:9 138:14

**Hey** 58:18 59:21

**high** 16:11
16:23
106:15
123:5 137:8

**highway** 11:19
122:10

**Hindman** 33:9

**hip** 92:13

**hired** 41:9

**Hmm-mm** 181:17

**Hobbs** 145:20

**hoe** 96:24

**hold** 59:21
105:1 228:14

**hole** 27:9

**home** 23:4 72:24
72:25 73:2
76:7 76:25
77:1 85:18
228:6
238:13
283:9 284:20

**homestead** 37:13
72:24 73:10
97:4 235:19
235:21 235:24
239:12 239:21
240:2
242:10
245:9
245:12 245:17
252:18 283:9

**homesteaded**
73:4

**homestead's**
235:25

**honest** 12:1

hoops 29:17

hope 249:10

hopefully
  272:17

hoping 192:6

horse 277:25
  278:1

hose 94:2

hospitals
  156:14

hour 61:21
  61:24
  120:13 131:23

house 23:4 51:2
  51:3 51:6
  75:9 75:16
  75:23 75:23
  76:1 76:1
  77:7 82:8
  83:1 83:9
  94:1 94:12
  96:19 107:8
  147:19
  189:5
  189:17 191:17
  196:2
  230:16
  231:1
  231:14
  233:7 233:9
  236:2
  236:18 237:12
  237:13 241:13
  243:18
  252:9
  252:13
  254:4 255:7
  260:7

houses 75:18
  75:25 252:14

housewife 37:8

How'd 175:13

How's 20:24

huge 124:20
  165:6

huh 42:3
  56:21 235:20

human 46:12
  224:20

humble 34:10
  34:11

hundred
  205:24
  240:7 243:1

Hurley 18:2

hurt 162:9
  162:9

hypothetical
  113:10

---
I
---

I'd 24:14
  32:2 33:12
  37:23 72:8
  75:14 96:11
  105:6 107:2
  123:9
  130:16 130:19
  130:21 135:14
  143:14
  145:9
  149:12 150:25
  163:15 170:21
  198:9
  199:16
  203:4
  203:16 203:17
  208:11 216:19
  233:15 254:24
  272:19

idea 24:24
  49:13 59:19
  63:16 75:10
  75:22 76:16
  76:23 83:16
  84:18 85:11
  85:19 85:23
  89:16 98:7

101:25 102:14
102:18 113:16
124:7
130:13 138:19
182:7
183:20
185:9 196:7
202:20
211:5 217:1
222:7
226:21 227:17
228:3 228:5
228:8
228:15 228:17
230:6
248:20 254:14
254:16 261:24
262:12 262:14
262:19 285:1

identification
  38:2 73:21
  142:22 146:10
  167:9 175:5
  182:11
  183:5
  193:13 197:21
  199:10 200:23
  209:20
  212:6
  214:13
  216:4
  217:10
  229:8 235:5
  244:13 277:2

I'll 38:10
  38:10 61:3
  63:9 63:9
  66:8 73:15
  79:19 88:15
  95:20 101:9
  160:25
  164:3 175:7
  185:4
  195:13 206:18
  213:25 213:25
  214:7 220:19

223:2 223:2
225:15 225:18
234:5
234:19
243:6
246:14
263:3
276:20
285:2 285:10

I'm 9:20 12:5
16:8 18:25
18:25 20:20
25:12 27:21
27:25 34:19
35:19 38:19
40:18 40:19
40:19 41:8
42:16 43:10
44:3 44:7
44:18 48:9
48:9 48:9
48:10 50:7
50:10 51:15
55:20 55:20
55:25 56:2
56:7 57:4
58:14 58:18
58:24 59:13
61:7 61:7
62:5 62:12
63:6 64:17
64:22 66:13
66:17 68:24
69:7 69:20
69:22 69:22
69:22 70:7
70:22 71:11
71:11 71:12
71:13 71:19
72:23 73:14
73:25 75:4
75:5 75:6
75:6 75:7
75:12 76:11
78:5 78:5
78:18 79:17
80:15 82:4
82:25 83:24

85:25 85:25
87:4 89:18
91:12 91:16
91:17 92:4
92:4 93:19
94:2 95:19
96:10 97:10
98:21 98:22
98:22 99:6
99:21 99:24
102:4
103:21
104:3
104:23
110:9
118:18
119:1
120:12
121:5 121:5
122:17 123:20
123:21 123:25
123:25 124:25
125:1 125:8
125:23 128:12
128:15 129:15
129:17 132:12
133:7 135:4
135:10
139:7 140:3
140:11 140:13
140:13 142:15
142:20 147:25
148:17
149:5 149:5
150:4 150:7
150:24 151:20
152:10 152:12
152:13 152:16
152:23 154:16
154:19
156:4
162:12 162:15
162:22
163:8
164:15 165:11
165:15 165:18
168:23 169:12
169:12 170:18

170:19 171:13
171:13 173:16
174:11 174:14
175:1 176:9
177:10
180:2
181:10
182:3 183:1
183:23 185:13
186:18 186:22
190:8
190:11 190:11
191:9 191:9
192:15 192:19
192:23 192:23
193:9
193:20 193:24
194:2
194:11 195:17
195:19 196:20
196:21 196:21
196:23 196:23
196:24
198:8
198:12
199:8
199:14
200:4 200:7
200:8 201:8
201:17
202:7
204:16
205:8
206:16 206:25
208:13 208:13
209:7
210:16 213:16
213:20 213:24
213:24 213:24
214:1 214:3
214:17 215:20
215:24 217:15
217:25
218:6 219:2
220:25
221:1
221:11 223:10
223:10

224:9
224:23
225:2 225:7
225:24 225:25
226:19 227:15
229:3 229:5
230:9
230:21
231:5 231:6
231:11 231:11
231:22 231:25
232:1 232:1
232:6 232:6
233:22 234:16
235:17 235:17
235:17
236:6 236:7
236:11 236:21
237:6 242:6
242:17 242:20
244:8
245:18 247:18
247:25
248:4 248:9
248:18 248:23
249:20 250:15
250:19
251:5 253:4
253:11 254:10
255:10 255:19
256:8
259:15 263:19
264:5 264:9
265:6
266:10
267:8
272:14 278:11
280:16 280:16
283:3 283:4
284:6

**immediately**
206:5 206:10

**implementing**
55:16 64:19

**improper** 79:1

**improvements**
75:9 76:19

77:8 85:21
90:4 90:5
93:7

**Inc** 153:9
153:10 155:16
155:16 157:22
157:22

**include** 33:12
192:21

**included** 36:3
40:2 47:25
119:7

**including**
168:18

**income** 37:7
213:17 275:7

**incomplete**
230:23

**incur** 125:25

**indebted** 230:17

**indifferent**
23:5

**indirectly** 34:4

**individual** 64:7
193:10 203:13

**individuals**
47:10

**infamous** 271:15

**information**
41:18 44:22
116:12 116:15
129:21 130:25
131:13
151:1
173:24 177:25
273:22

**informed** 253:4

**input** 201:2
271:24

**inside** 265:2

**insider**

168:12 168:19
169:3

**insiders** 169:7

**inspected**
156:15

**install** 100:8

**instead** 27:13
55:15 56:18
256:22

**instructed** 48:3

**insurance**
153:12 188:15
189:11 190:25
205:4 205:6
246:1
246:12 273:11

**intelligent**
257:25

**intended** 56:8
194:19

**intentionally**
49:22

**interact** 69:18

**inter-company**
274:16

**interest**
28:17 28:19
37:2 56:18
64:14 108:9
140:24 191:25
242:21 252:17

**interested**
104:23

**interests** 31:11
34:4 35:2
108:20 108:24
109:1
109:15
111:8
111:10 250:10
282:20
283:8 284:22

**International**
82:6

**interrupt** 58:19

**introduce** 37:24

**invalid** 231:23

**invited** 11:17

**invoice** 124:5
126:14 129:22
129:23
130:9
244:17
245:4 245:5
245:20 245:22
246:24 247:20

**invoiced** 130:16

**invoices**
124:4
126:23 127:12
128:1
129:17 129:21
130:4 130:5
150:21 244:15
244:20
247:1 247:5
247:7
247:11 247:17
270:20 270:21
272:25 273:13
273:14

**invoke** 62:5
62:12

**involved**
26:13
111:14 136:9

**Iron** 103:16

**IronPlanet** 98:1
103:15

**irrigation**
101:24
102:1 102:1
102:11 102:14
102:20 102:21
102:22

**irrigations**
102:7

**IRS** 116:24
120:21 120:23
255:25 256:9

**isn't** 63:1
189:6 218:7

**issues** 21:22
53:11

**it'd** 24:17
24:18 24:18
30:5 76:14
129:22 147:18
149:11
227:9 243:11

**item** 75:10 76:6
76:15 79:20
82:22 83:15
85:9 85:12
85:18 89:10
94:1 96:24
102:4 144:5
155:13
164:6
168:10 168:14
227:16

**items** 76:19
76:22 77:7
92:22 95:14
95:21 228:12

**it'll** 46:15
105:24
229:3
234:17 252:23
257:6 257:6
264:7 264:8

**I've** 32:14 40:6
42:8 56:16
65:1 69:25
70:3 171:25
172:1
194:25
206:1
206:18 218:1

218:12 218:12
226:8
226:10 239:16
243:6
248:20
253:2 262:6
272:12 275:15
275:16 278:13

---

J

**J.R** 37:6

**Jacey** 230:12
230:15
231:2
231:13
233:5 233:5
233:9
234:12 234:14
236:23 236:25
273:16 273:25

**Jack** 94:9 94:22
232:12

**Jack's** 94:1
94:2 94:12

**January** 79:21
87:14 95:2
97:19 97:24
103:12 103:20

**Jarman** 210:4

**Jason** 108:18

**Jason's** 170:25

**JD** 98:18
98:18 98:18
99:3 99:21
101:7 101:11

**JD9300** 99:21

**Jeep** 81:13
258:10

**jerk** 208:14
223:11

**Jernigan**
61:18 61:18

**Jerry** 9:20

jibs 108:24

Jim 31:14

Jo 22:6

job 11:25
  12:1 37:1
  161:10

jockeyed 139:23

Joe 284:6

jogs 220:4

judge 225:12

July 80:16
  162:10
  170:7 229:17

jump 281:22

June 79:10
  79:10 79:15
  82:10 140:7
  162:12 216:23
  276:4

Justin 133:20
  135:25
  136:1
  136:11 136:12
  138:18 138:20
  140:1 187:25

───────────
        K
───────────
K-1 264:1 264:8
  264:10 264:12
  265:8
  265:10
  266:9
  266:20 267:10

K-1s 264:3

Kellye 14:13
  44:21 45:1
  45:13 73:25
  78:19
  106:23
  201:3
  204:15
  213:9 213:19

272:6
272:20
274:9 274:15

Ken 36:10 36:14
  36:14 67:14
  71:14 141:1
  238:17 240:17

Kent 9:16 40:21
  41:8 41:21
  218:20
  221:2 223:4
  263:12 265:6

Kent's 284:13

kid 57:17 92:8

kids 57:9 57:13
  57:16 59:4
  66:23

kill 225:25

killed 32:19

kinds 107:14

King 53:25
  67:14 79:9
  82:9

kitchen 243:21

knew 33:14
  35:20 35:20
  54:25 69:16
  92:17 127:9
  141:3 147:7
  208:11 269:16
  270:12 270:14
  271:1
  272:24
  273:4
  274:14 274:15
  274:19 275:2

knowledge
  33:2 39:11
  49:25 50:4
  50:8 50:23
  52:16 78:6
  80:17 86:9
  86:24
  101:21 108:11

111:9
126:22 146:23
166:7
171:10
177:3
197:23 208:23
227:14 251:11

known 32:14
  271:8 273:9
  274:23

Kubota 95:22
  95:24 96:1
  96:6 96:9
  201:10

Kuco 188:1

Kuco's 261:12

───────────
        L
───────────
L.L.C 65:15
  65:20
  214:10 266:11
  266:12 267:14
  267:25 268:14
  268:19

label 53:22
  167:13 167:14

labeled 155:9
  278:19

labor 187:24

lading 122:11
  127:20 127:23
  128:5

ladings 128:1

lady 49:15
  145:18

lake 11:13
  11:21 11:22
  11:22 51:3
  51:5 51:6
  262:10

land 34:4
  35:2 37:11
  72:20 72:22

77:1 77:4
83:25 85:10
87:1 87:2
87:8 89:10
89:15 89:21
89:22 89:25
90:5 90:25
91:20 92:20
92:22 92:23
92:23 93:1
93:5 93:11
93:18 93:23
94:1 94:4
94:6 94:16
95:5 95:8
102:8
102:10 107:17
144:11 147:13
147:15 166:15
173:2
186:24
192:2
206:11 206:13
229:11
238:2
239:25 241:10
241:10 241:19
241:20
242:1
249:23 251:22
252:9 262:4
262:4
275:15 275:17
275:21 284:21

land-for-land
  233:18

lands 100:14
  186:13 186:16
  237:8

laptop 62:19

Laramie 61:18

large 177:12
  193:4 193:4
  206:15 211:22

largest 178:1

**Larry** 183:25

**last** 18:9 32:24
38:16 38:20
38:25 40:6
41:21 53:10
100:19
105:6 109:4
112:16 114:15
115:3
124:16
133:9
139:24 142:13
148:12
150:2
157:19 157:19
174:9
218:17 227:21
230:1 230:2
230:13 237:19
251:13 259:18
262:1 270:5
272:23 277:23

**late** 151:18
164:1 256:10

**later** 26:4
29:11 33:13
36:4 52:4
72:10
118:11
119:1
133:14 135:12
135:12 135:13
147:8
165:25 215:11
215:11 215:11
281:18 285:21

**latest** 163:18

**law** 36:6 36:8
62:22
217:24
219:5 219:24

**lawsuit** 12:25
13:13 13:16
15:4 269:11

**lawyer** 15:18

35:8 39:7
48:11 55:25
113:14
115:7
115:12
116:3 117:6
126:25
169:1
193:23
216:7 216:7
216:7
217:21 219:13
220:20
222:6
222:23 279:18
285:15

**lawyers** 50:25
75:7 119:11
208:3 221:1
222:22 284:8

**lawyer's** 59:16

**lead** 191:15

**lease** 110:23
110:24
111:6
112:20 112:21

**leased** 47:16
76:2 100:3
110:22

**leases** 108:9
108:15
118:8 256:22

**Leasing**
208:24 209:18
209:24
210:1 210:9
210:12 210:15
213:4 213:8
251:6

**least** 21:23
47:24 60:10
63:14 174:8
259:18 266:2

**leave** 57:5
57:13 57:16

63:20
191:23
193:7 223:2

**Ledford** 94:9
94:16
232:12 252:3

**leg** 156:13
156:18

**legal** 56:25
67:6 70:8
127:21
266:5
279:13 283:14

**legalese** 66:6

**lender** 229:14

**Leslie** 9:15
15:10 19:4
19:20 61:7
109:3
109:16
110:6 110:8
110:21 110:24
111:4 162:6
187:20 219:15
262:21 278:14
280:11 284:20

**Leslie's**
40:23 41:12
41:24 115:7
115:12
116:3 117:6
126:25 165:20

**less** 20:9
25:7 25:9
119:4 139:20

**let's** 27:4
34:22 53:14
53:16 58:7
61:5 61:5
61:6 61:23
87:1 106:14
124:8
133:23 133:23
142:14 146:19
152:25

170:7
203:12 225:14
239:11
245:4
266:19 267:22
282:25 285:14
286:15

**letter** 267:3

**letters** 264:8
264:21 264:22

**level** 47:25
106:15 137:8

**liabilities**
108:25 172:19
173:5 173:9
173:17
184:7 184:8
184:10
185:5 185:6
198:18
201:8 201:8
201:10
202:7 202:9
215:1
219:14 220:22
221:3 221:9
222:9
227:24 256:13

**liability** 27:14
199:4 200:9
202:21 222:19
246:8

**licensed** 74:6

**lien** 100:23
100:24 140:23
231:21 231:23
234:4
235:11 238:12
239:2 239:9

**liens** 186:16
186:18

**life** 26:4 32:25
33:25 35:5
191:15 191:20
193:5

194:19
195:7 205:4
205:6 262:5

**lifestyle**
204:18

**lime** 112:6

**limited** 65:12
65:21 65:24
66:3 66:4
66:21 68:1
68:11 69:7
69:13 72:19
73:3 73:8
73:8 73:24
89:23 93:23
101:3
108:16
109:6 139:9
144:6
144:11 144:20
148:15 148:16
153:3
153:11 155:14
155:17 157:20
157:23 157:25
158:8 176:5
176:24 177:16
178:9 179:5
183:2 219:9
219:13 220:14
220:14
226:2 226:7
229:15 233:13
233:21
234:1 237:4
237:7 238:2
238:22 240:13
240:15 244:18
245:11 256:10
256:12
258:9
261:22 262:13
263:20
266:2 267:7
267:13 267:16
267:20 267:21
268:12 268:13

268:17 268:17
268:22 269:12
269:25
270:8 273:5
273:7 274:6
275:6
275:24
276:8 276:9
276:16 281:23
282:1 282:1
282:9 282:19

**limiting** 63:4

**Lincoln**
202:20 202:25
203:6 259:11

**line** 75:9 75:10
76:6 76:15
76:19 76:22
77:7 77:13
77:14 79:20
80:15 83:15
85:9 85:12
85:18 89:10
92:22 94:1
95:14 96:24
96:24 144:5
155:13
164:5
168:10 168:10
168:14 168:14
172:19 172:23
173:8
176:21
185:6
201:11 202:18
203:20
204:8 211:2
227:16 228:12

**lined** 196:15

**lines** 265:4
265:18 266:15

**line's** 168:13

**lineup** 164:5

**liquidate** 30:18
136:15

**liquidating**
133:17 136:4

**liquidation**
104:16 136:7

**list** 94:24
95:19
168:17 169:24
170:1 182:1
184:25 185:12

**listed** 95:17
96:11
108:20 129:22
147:10
156:6
169:19 173:17
177:19 181:12
181:22 222:19
226:22 227:17
228:6 228:9
235:15 239:21
266:23

**listening** 60:16

**listing** 83:10
181:18

**lists** 82:6
203:22

**literally**
164:17

**litigation**
20:15 21:21
21:22 48:14
49:3 74:22
114:20
136:9 141:9
223:13 223:22
240:10 252:18

**little** 11:13
12:3 12:5
16:16 42:24
72:7 73:15
83:7 95:21
108:2
115:21 118:25
129:7 140:20

168:9
176:10 182:23
195:20 220:18
262:8 262:9
263:25 269:15
285:15

**live** 11:6
192:20

**lived** 239:16

**livestock** 91:10
91:15 91:18
91:21
100:11 104:11
104:14 104:15
105:2
105:10 105:12
105:15 105:23

**living** 18:22
142:1 243:18

**LLC** 267:7
267:13 267:21
268:4 268:8

**load** 107:23
122:1

**loaded** 40:24
51:17 51:25
122:8 122:9
127:5

**loaders**
121:25 122:4

**LOADRITE** 121:25

**loan** 155:8
157:9 164:7
177:6
177:13 184:25
197:9 199:1
200:6
201:11 201:19
201:21 201:22
201:24 202:11
202:18 207:20
222:12
227:1
227:13 227:16

227:19 269:7

**loaned** 153:9
154:9
155:15 157:21
164:9
183:18 206:20
206:21 206:22
207:22 208:6

**loaning** 178:8
178:11 178:12
208:7

**loans** 167:4
170:15 172:19
173:15 173:16
174:3
174:20 174:21
178:2 184:8
196:22 215:2

**local** 36:15

**location** 127:23
128:17

**long** 19:18
21:10 36:8
36:10 36:19
49:11 54:22
111:10 111:11
116:15 118:21
128:9 135:8
251:7 258:24

**longer** 19:10
52:13
104:14 105:10
105:12 225:15
285:15

**long-term**
107:19 192:13
201:10

**lose** 195:6

**losing** 133:19
179:23 180:4

**loss** 166:19
179:11 179:19
183:13 197:24
204:5 204:8

226:5
265:19 265:22

**losses** 183:19

**lost** 43:10
43:15 120:8
120:9
121:14
179:6
187:19
195:8
195:15 252:9

**lot** 21:3
25:14 25:18
34:24 35:15
36:6 42:12
65:18 67:6
67:7 78:1
79:12 82:16
83:5 95:24
96:17 99:17
102:4
133:19
195:6
195:12 195:24
216:14 235:25
250:15
253:6
255:25 257:10
269:5
269:20 271:15
275:20

**lots** 33:3
100:12 123:15
261:18 262:4

**loud** 89:7
228:14

**love** 19:24

**Lovell** 217:8
220:11 220:13
223:4 283:4
284:6

**LTD** 259:3 259:4

**lunch** 127:14
128:25 131:23

132:1

**luncheon** 132:6

**lung** 156:14

**lungs** 32:18
32:19

**lying** 75:6
140:13

———————
M

**ma'am** 163:1

**Mac** 210:4

**machine** 124:20

**machinery** 25:16
25:24 95:15
95:17

**machines** 125:20

**main** 43:22
43:22

**mainly** 117:13
124:17

**maintain** 199:16
253:15

**maintained**
199:24

**Maison** 59:21
60:21

**man** 34:7 195:18
209:3 210:4

**management**
45:20 65:15
65:20 109:3
214:9
214:15 250:12
250:17 266:11
266:12 267:10
267:10 267:14
267:24 268:13
268:19 268:24
272:19

**manager** 68:1
68:4 68:23
69:12 70:5

109:19 111:10
111:12 160:20

**managers** 67:2

**managing**
159:7
160:21
262:1 262:22

**March** 9:4
9:10 22:8
36:22
162:17 163:18

**Marion** 118:8

**marital** 64:24
65:7 194:12

**mark** 19:7 20:21
30:19 31:10
73:18
175:20
197:5 209:17

**marked** 38:1
73:20
142:21
146:9 167:8
175:4
182:10
183:4
193:12 197:20
199:9
200:22 209:19
212:5 213:2
214:12
216:3 217:9
229:7 235:4
244:12
264:1 277:1

**market** 88:11
129:11 192:6

**markets** 24:20

**markup** 129:2

**married** 17:7
17:9 33:16
36:19 36:20
36:21 36:23

**NAEGELI**
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

**Martha** 108:17

**matched** 88:10
112:21

**material**
127:5 129:8

**matrices** 128:1

**matrix** 107:23
122:8 124:2
126:23
127:6 127:18

**Matt** 9:18
146:15
151:2 151:5
172:4 172:8
217:3
221:10 271:18
272:20 272:23
273:21
274:9
285:11 285:11
285:12 286:9

**matter** 10:2
92:15

**Matthew** 219:19

**Matt's** 151:4

**maturity** 229:17

**Max** 197:5

**maximum** 205:12

**may** 75:4
76:17 91:22
94:25 140:8
143:23
147:2
148:22 148:23
155:11 167:12
234:23 234:23
235:2
237:17 237:17
252:2 268:9

**maybe** 15:15
16:19 46:19
58:24 65:7
72:10 73:5

74:18 74:24
76:20 77:9
88:6 98:2
98:2 99:7
118:24
134:8
149:15 151:19
162:23
191:7 192:6
196:9 197:2
225:15
254:2 272:8
272:15 283:23

**mclaughlin** 9:20
10:12

**McLaughlin** 9:20
10:11

**mean** 19:23
20:25 21:2
21:15 21:18
21:18 23:16
24:1 25:3
25:23 25:24
26:15 29:11
29:16 30:3
31:18 33:15
36:3 36:4
36:4 40:5
42:9 42:14
44:8 45:21
45:23 48:17
51:7 54:24
57:24 59:19
60:12 63:20
64:5 64:12
67:9 69:20
70:11 70:22
71:11 71:15
71:16 73:5
74:21 76:13
76:13 77:25
79:14 80:13
81:5 81:22
82:16 83:12
84:2 84:20
88:8 88:15
90:18 93:13

93:20 96:10
98:4 99:8
99:25 102:4
109:8
109:17
111:3 113:5
113:25 114:24
115:2
115:20
117:2 120:6
120:7
120:10 120:21
121:2
121:16
123:1 123:2
128:7
128:10 130:14
130:15 132:14
136:11 137:12
138:10 140:19
145:6 145:9
147:8
147:19 147:20
148:12 148:18
151:16
155:1 155:8
160:22 160:24
162:17
163:7
163:21 164:14
164:23 165:10
170:5 171:2
176:9
177:10 179:24
180:2
180:19
185:4
186:20
189:2
191:22
193:3
196:13 196:14
204:17 205:18
205:24 207:14
208:11
209:3 209:5
213:9
222:12 222:13

225:10 228:16
231:9
231:10 231:22
234:5
236:21 236:22
239:24
244:4
244:22 248:11
249:1 251:7
253:8
254:20
255:2 257:6
257:14 257:24
270:12 274:19
275:15 275:20
280:21 284:18
284:21

**meanings** 208:16

**means** 10:6
34:10 40:19
54:7 70:1
72:12 72:16
79:13 85:17
94:2 106:18
106:19 129:13
228:3
228:12 236:11

**meant** 58:17
267:8

**meantime** 135:15

**mediation** 109:2
218:23 220:16
278:9 280:8
280:21 281:24
282:18 283:21

**medical**
153:12 153:13
190:25 191:1

**Medicare** 189:8

**medication**
12:10

**meeting** 15:8
15:9 15:14
46:4 51:18
113:17

195:4 249:7

**member** 35:23
35:24 267:7
267:13
268:4 268:8

**memorialized**
146:2

**memory** 16:3
17:23 49:10
65:3 67:4
78:6 79:11
79:22 80:2
80:7 80:10
80:17 81:6
82:10 82:11
82:14 113:1
114:15 131:19
144:13 169:16
174:16 177:25
186:15
219:7
219:11
220:4 220:8
221:8
222:14 222:24
233:23
241:4 249:9
278:25

**mentioned**
23:7 30:12
35:1 36:12
41:2 50:25
56:13 76:7
82:24
101:13 103:22
107:5 112:4
113:17 113:24
126:10 132:22
142:2 188:6
244:2 255:6
269:2 270:11

**merge** 199:21

**merged** 27:14
29:19 30:1

**merger** 199:20

**Merriott** 219:19
219:23

**mess** 21:9 56:21
171:25 246:14
283:10

**messed** 279:18

**messing** 286:5

**met** 14:3 14:3
54:14 263:7
263:11

**meters** 109:7

**metes** 229:25
237:24 241:9

**method** 10:5

**Mexican** 188:1
261:12

**Michael** 9:2 9:8
10:22 11:3
46:12 153:8
153:13 155:14
157:20 157:24
164:9 191:1
229:14 287:6

**microphone**
263:9

**middle** 94:12
201:12 202:11
204:1 267:22

**Mike** 145:20

**mile** 93:3

**miles** 34:20
34:20

**Miller** 231:18

**million** 13:6
15:11 25:7
25:8 27:25
28:3 30:9
133:15
134:8 134:9
134:15 134:17
134:20 137:18
138:5 138:8

139:21
140:2 168:6
173:14 177:23
180:5
180:14 184:14
190:6
202:15 206:12
206:16 206:20
206:21 206:23
211:20 212:12
213:12 256:2

**millions** 25:1
25:2 34:23

**mind** 55:7
174:20 193:22
283:18

**mine** 145:14
150:7 184:3
249:25

**mined** 142:3
142:4 142:5

**mineral** 72:8
108:15 108:15
108:20 108:24
109:1
109:15 111:8

**mines** 211:10

**minimal** 189:2

**mining** 211:7
211:8 211:9
211:10 211:14
211:23

**minute** 234:17
237:6

**minutes** 88:22
90:11 225:15

**Mischaracterize
s** 58:6

**misheard** 118:24

**mislead** 69:23

**missing**
200:15 253:10

274:12

**misstating** 75:7

**mistake**
163:16 174:12
174:13 218:11
231:24

**Mm-hmm** 18:21
37:14 46:21
47:21 68:15
77:18 83:23
87:12
117:20 117:23
137:4
150:14 186:25
198:21 216:12
229:21 261:10
264:18
265:1 275:1
276:13

**Mmm** 157:11
205:2

**Mobeetie**
34:14 34:18
34:19

**mobile** 76:6
76:7 76:7
76:25 77:1
85:18

**model** 261:4

**mom** 21:12 21:14
22:25 23:3
31:18 37:1
64:25 66:23
67:1 67:25
87:19 92:15
104:1 104:2
105:20 108:11
109:24 110:17
111:12 130:12
130:25
131:6
147:11 147:12
147:14 156:10
162:7 162:7
162:16 162:22

163:13 166:15
188:19
189:1 189:5
189:8
189:14 191:12
193:4 193:7
195:21 196:17
196:23 203:10
236:18 238:14
238:23 239:17
240:1
243:14 257:14
280:5 284:20

**moment** 61:5
217:6 278:24

**momma's** 87:20

**mom's** 22:5
98:10 145:7
189:22
190:7 194:19

**Monday** 12:23
277:21

**money** 13:9 13:9
29:17 34:9
41:16 87:19
87:20 88:7
94:16 94:22
98:4 98:8
98:11 98:11
100:16 100:20
100:24
101:5
103:24
104:4 104:9
105:13 105:23
107:19 107:21
107:22 109:12
110:10 110:13
110:16 110:17
111:3 111:5
131:1 134:4
134:10 135:21
136:3
137:11 137:14
138:15 141:6

144:22
145:1 145:5
145:10 145:10
147:8
147:23
152:6 152:8
158:22
159:1 159:2
163:22 169:15
169:25 170:17
174:22 177:11
177:11
178:8
178:11 178:12
181:2
181:20 181:23
183:21
188:9
188:18 188:23
189:1 189:3
189:3
189:25 190:21
191:23
192:1 192:4
192:5
192:19 192:24
193:7
194:18
195:6
195:12 195:20
195:24 204:13
204:16 204:20
204:22
205:3
205:12 205:14
206:3 206:9
206:15 206:22
206:24
207:2
207:20 207:22
207:22 207:25
208:5 208:7
215:18
224:2
228:18
231:9
233:17 233:19
233:21 233:24

244:9
246:15 252:10
255:3
255:12
256:5
256:24
257:1
257:11 257:12
275:24
276:8 276:9

**moneys** 101:1
105:17
110:7
154:20 166:12
166:13
182:6 256:6
256:25

**Monique** 61:22

**month** 130:12
130:17 135:12
238:19 240:23
255:13 277:25

**monthly** 149:9
149:11 240:20

**months** 43:17
135:12 135:14
139:24 160:11
174:10

**Mooney** 175:20

**Morgan** 156:15

**morphine** 32:24

**mortgage** 173:2

**mortgages**
172:23
184:9 186:13

**mostly** 116:21

**mother** 20:8
20:18 20:19
21:11 28:1
28:21 30:13
30:16 30:19
31:11 33:14
33:21 36:13
54:13 54:19

59:8 66:1
70:16 73:12
88:3 88:9
88:15 92:5
94:19
144:22 144:23
145:2 145:5
145:9 147:6
147:18 147:19
147:22 147:24
148:3 148:6
148:11 148:15
153:14 154:20
155:18 190:21
191:2 196:5
196:13 196:13
196:15
233:6
238:13 238:15
242:17 242:25
243:19
244:8 244:9
251:25
252:7 257:8
257:17 257:24
274:19

**mother's** 51:7
80:20 83:1
92:9 96:18
157:6 162:4
188:23
191:8 192:9
192:15
196:2
202:22 223:17
237:13 242:20
242:21
254:4 259:12

**motor** 76:24

**mouth** 66:17

**move** 53:10
84:18 87:1
106:6
114:19
115:4
118:13 197:18

moveable 86:13

moved 24:15
84:6 84:8
84:12 84:24
84:25 85:3
90:23 97:8
115:18 115:20
115:22
116:8
116:16 117:24
118:22 118:25
119:3
119:14
120:1
120:24 122:9

moves 102:17

moving 53:12
121:15

MSG 250:4

mulberry 89:15

multiple
43:21 165:5
177:9

mute 58:21 59:1
59:22 59:22
60:3

myself 24:6
66:1 68:3
93:21 114:2
212:2 244:1

———————

N

nature 25:19
25:22 25:23
201:9

Navigator 203:6
259:11 259:24

Navigators
259:13

Nearer 97:21

nearly 55:11

necessarily

59:19 191:14

necessitated
165:6

negative 107:16
109:6
226:22
228:5 228:9

negotiated
136:10 137:2

neighborhood
25:14

net 34:23
131:17 131:17
204:8

news 140:18

Newsom 14:22

night 11:12

nine 275:16

nod 22:12

nodding 29:24

Nods 22:10

non 166:23

none 36:3
51:8 73:4
85:7 195:12
209:5 210:8
210:9
250:15
251:1 254:20

non-legal 48:10

nor 204:12

normal 189:16

north 97:4
140:2 233:4
236:25

note 134:18
134:18 135:15
140:24
146:3 154:1
154:5
154:15 157:13

177:23 187:21
252:17

notes 172:23

nothing 10:20
50:20
116:23
117:2
118:16 120:17
121:9
135:23
220:4
249:16 249:18

notice 266:10

noticed 53:10

———————

O

oath 40:15
50:23 143:3
225:1

object 51:15
52:6 56:7
57:6 58:11
58:13 68:24
69:4 70:7
224:9 225:7

objection
58:3 58:5
69:5 266:5

obligating
239:2

obligations
153:11 190:25

obvious 271:12

obviously 15:18
17:4 19:4
62:8 106:15
106:16 191:17
259:17 272:20

October 38:25
229:12

office 14:23
15:2 38:16
38:23 38:25

39:12 40:8
41:22 51:8
52:9 54:20
115:5
115:25 119:23
122:4 122:7
217:18
260:2 260:6
260:9

offices 59:16

O'Gorman 106:13
187:25

oh 38:19
45:11 99:13
123:7
163:23 189:12
198:8 221:5
237:21 243:19
267:7
274:22 277:25
284:13 285:7

oil 24:19
34:4 35:2
35:12
107:15 107:16
108:3 108:5
111:8
111:16 111:17
118:8 120:4
125:7
191:25 196:18
250:4 250:9
256:15
275:7
275:10 283:8

oilfield
23:16 24:17
26:3

oilfields 23:15
27:8

okay 11:10
11:16 11:23
11:25 12:3
12:6 12:8
12:13 12:16
12:21 12:24

| | | | |
|---|---|---|---|
| 13:8 13:15 | 48:2 48:10 | 86:12 86:15 | 123:14 123:18 |
| 13:18 13:20 | 49:5 49:10 | 86:18 86:23 | 123:20 124:12 |
| 13:25 14:2 | 49:14 49:21 | 87:1 87:9 | 124:19 124:23 |
| 14:15 15:1 | 50:4 50:19 | 87:17 87:22 | 124:25 |
| 15:17 16:2 | 50:22 51:2 | 87:25 88:11 | 125:8 126:5 |
| 16:5 16:14 | 52:5 52:12 | 88:25 89:3 | 126:10 126:13 |
| 16:23 17:2 | 52:16 52:20 | 89:10 90:7 | 126:17 126:21 |
| 17:4 17:19 | 52:24 53:3 | 90:15 90:21 | 127:8 |
| 17:22 17:25 | 53:7 53:14 | 90:25 91:15 | 128:23 129:15 |
| 18:3 18:6 | 53:18 53:19 | 91:20 93:11 | 129:21 |
| 18:9 18:16 | 54:2 54:17 | 93:13 93:17 | 130:8 |
| 18:20 18:24 | 55:4 55:24 | 94:8 95:1 | 130:22 |
| 19:2 19:6 | 55:25 56:13 | 95:5 95:5 | 131:6 |
| 19:9 19:12 | 58:24 59:7 | 95:8 95:11 | 131:10 131:19 |
| 19:14 20:6 | 59:11 59:14 | 95:11 95:14 | 131:22 131:22 |
| 20:9 20:21 | 60:4 61:23 | 95:20 96:1 | 132:13 132:22 |
| 20:25 21:6 | 63:21 64:10 | 96:6 96:13 | 133:3 |
| 21:25 22:3 | 65:3 65:6 | 96:21 96:23 | 133:13 133:16 |
| 22:9 22:25 | 65:14 65:23 | 97:12 97:16 | 133:23 |
| 23:7 23:14 | 66:20 66:25 | 97:21 98:13 | 134:4 134:4 |
| 23:20 24:13 | 67:16 67:25 | 98:17 98:24 | 134:12 134:19 |
| 24:24 25:10 | 68:7 68:13 | 99:2 99:21 | 134:23 |
| 25:15 25:19 | 68:18 69:15 | 100:13 101:15 | 135:1 |
| 26:8 26:10 | 69:23 70:20 | 101:19 102:10 | 135:18 135:24 |
| 26:22 27:4 | 71:4 71:23 | 102:13 103:18 | 136:2 |
| 27:18 27:21 | 72:17 72:24 | 104:1 | 136:18 136:18 |
| 28:6 28:13 | 73:17 74:6 | 104:17 | 136:21 |
| 28:16 28:20 | 74:9 74:15 | 105:5 105:9 | 137:7 |
| 28:25 29:3 | 74:16 75:4 | 105:12 106:21 | 137:23 |
| 29:4 29:10 | 75:13 75:19 | 107:1 | 138:7 |
| 29:19 29:22 | 76:3 76:10 | 107:14 | 138:17 138:23 |
| 30:12 31:1 | 76:15 76:19 | 108:7 110:1 | 139:4 139:7 |
| 31:7 32:5 | 76:22 77:1 | 110:18 | 139:12 139:16 |
| 32:9 32:15 | 77:4 77:7 | 111:1 112:4 | 139:25 |
| 33:24 34:22 | 77:12 77:23 | 113:9 | 140:5 |
| 35:1 35:8 | 79:3 79:9 | 113:21 115:10 | 140:21 141:13 |
| 36:8 36:18 | 79:20 79:24 | 116:7 | 141:16 141:23 |
| 37:15 37:23 | 80:6 80:10 | 116:10 116:13 | 142:8 |
| 38:24 39:3 | 80:14 80:21 | 116:19 | 142:14 142:14 |
| 39:6 39:10 | 81:11 81:13 | 117:5 | 143:3 143:6 |
| 39:17 39:25 | 82:3 82:4 | 117:18 | 143:10 143:12 |
| 40:13 40:15 | 83:1 83:3 | 118:1 | 143:17 143:18 |
| 41:6 42:1 | 83:14 83:18 | 118:24 119:10 | 144:10 144:16 |
| 42:6 42:14 | 83:22 84:4 | 119:17 119:20 | 144:19 |
| 42:22 43:4 | 84:10 84:16 | 120:4 | 145:1 |
| 44:14 45:12 | 84:18 84:25 | 120:12 | 145:11 145:23 |
| 46:3 46:18 | 85:3 85:9 | 121:8 | 146:2 146:5 |
| 46:24 47:13 | 85:12 85:25 | 122:21 122:25 | 146:14 146:16 |

| | | | |
|---|---|---|---|
| 146:19 146:23 | 170:11 170:12 | 203:22 | 232:3 232:6 |
| 147:1 147:9 | 170:12 170:21 | 204:5 | 232:6 |
| 147:14 | 171:8 | 204:11 205:10 | 232:13 232:18 |
| 148:5 148:8 | 171:10 | 205:16 205:23 | 232:22 233:22 |
| 148:19 149:12 | 172:5 172:9 | 206:7 | 234:8 |
| 149:25 | 172:11 172:13 | 208:13 208:14 | 234:14 234:16 |
| 150:7 | 172:17 172:20 | 209:2 | 234:16 234:18 |
| 150:12 150:17 | 173:5 | 209:14 209:17 | 234:22 |
| 150:25 | 173:22 | 210:14 210:17 | 235:9 |
| 151:6 | 174:9 | 210:25 | 235:14 235:23 |
| 151:10 151:21 | 174:12 | 211:2 | 235:25 |
| 151:25 | 175:1 176:4 | 211:13 211:13 | 236:3 236:9 |
| 152:4 152:8 | 176:13 176:16 | 211:18 211:25 | 236:12 237:15 |
| 153:8 | 176:19 | 212:2 | 237:22 |
| 153:19 153:25 | 177:2 177:6 | 212:10 212:14 | 238:5 |
| 154:12 154:15 | 178:6 179:8 | 213:2 213:3 | 238:11 |
| 154:24 | 179:10 | 213:24 | 239:5 |
| 155:5 | 180:2 | 214:8 | 239:23 |
| 155:13 155:21 | 180:22 181:22 | 214:21 214:24 | 241:7 |
| 155:25 | 182:3 | 215:4 215:7 | 241:20 |
| 156:2 156:9 | 182:23 183:11 | 215:14 215:21 | 242:8 |
| 157:5 157:7 | 183:17 183:24 | 216:17 216:22 | 242:15 242:19 |
| 157:12 157:18 | 184:13 184:18 | 217:1 217:4 | 243:2 |
| 158:7 | 185:3 | 217:6 | 243:13 243:18 |
| 158:21 | 185:11 185:15 | 217:19 | 244:2 |
| 159:9 | 185:21 186:12 | 218:1 218:3 | 244:25 |
| 159:15 159:18 | 186:20 186:22 | 218:22 | 245:4 245:6 |
| 160:25 | 187:7 | 219:3 219:7 | 245:11 245:16 |
| 161:5 | 187:17 | 219:23 | 246:2 |
| 161:10 161:20 | 189:1 189:8 | 220:4 220:7 | 246:16 246:23 |
| 162:2 163:6 | 189:13 190:14 | 220:11 220:16 | 247:1 247:5 |
| 163:10 163:15 | 190:23 191:17 | 220:18 | 247:7 |
| 163:17 163:25 | 192:8 | 222:2 222:8 | 247:11 247:14 |
| 164:5 | 193:25 194:11 | 222:17 222:21 | 248:4 |
| 164:15 164:23 | 194:14 194:23 | 223:1 223:6 | 249:19 |
| 165:2 166:2 | 196:17 197:13 | 223:10 223:16 | 250:1 250:4 |
| 166:5 166:6 | 197:17 197:19 | 223:21 | 250:7 250:9 |
| 166:10 166:17 | 198:12 198:13 | 224:4 | 250:12 250:17 |
| 166:17 166:23 | 198:14 198:17 | 225:17 226:25 | 250:20 250:23 |
| 167:6 | 198:22 | 227:10 227:12 | 251:3 251:6 |
| 167:23 | 200:4 200:9 | 227:16 227:21 | 251:10 251:13 |
| 168:1 168:5 | 200:13 200:17 | 228:2 228:5 | 251:16 251:21 |
| 168:8 | 201:4 201:7 | 228:8 | 251:24 252:10 |
| 168:15 168:25 | 202:1 | 228:11 228:21 | 253:7 |
| 169:1 169:5 | 202:10 202:13 | 229:12 229:17 | 253:19 253:23 |
| 169:21 169:23 | 202:17 202:20 | 229:24 | 254:5 |
| 169:24 | 202:23 203:8 | 230:8 | 254:11 254:14 |
| 170:4 170:8 | | 230:17 230:23 | 254:17 254:22 |

255:9
255:15 255:18
256:4 256:9
256:15
257:8
257:19
258:1
258:13 258:17
258:19 258:22
259:3 259:6
259:8
259:22
260:3 260:8
260:14 260:24
261:2
261:13 261:18
261:21
262:3
262:11
263:3
263:18 263:24
264:19
265:4
265:16 265:18
265:25 266:19
266:21 266:25
267:2 267:8
267:11 267:17
267:19 267:22
267:23
268:1 268:2
268:7 268:9
268:17 269:15
271:20 271:24
272:6
272:24 273:17
273:20
274:9
274:14
275:4
275:23
276:5 277:8
277:19 278:16
278:24
279:2 279:3
279:10 279:23
280:1 280:5
280:16

281:2 281:6
281:13 281:18
281:22 282:14
282:22
283:2
283:11 283:20
284:3 284:8
284:11 284:17
285:13 285:23
286:4 287:2

**Oklahoma** 49:5
54:13 92:5
113:19 195:1

**old** 113:25
116:3
116:22 117:13
120:3 120:6
120:7
120:16 121:11
124:16 252:14
259:14

**older** 119:14
260:24

**oldest** 19:12
59:17

**old-fashioned**
33:19

**ones** 78:1
102:16 119:11
119:14
149:1 172:1
186:18 244:22
271:12 272:21
273:4

**one's** 104:25

**one-year** 169:7

**onto** 39:14
77:16 239:14

**open** 42:7
42:8 42:10
63:3 115:1
134:17

**operate** 47:11
102:5

114:21 136:17
148:12 158:18
190:1

**operated**
27:11 103:9
144:10 275:19

**operating** 90:22
109:12 138:24
139:1
147:13 178:10
178:13 189:16
204:8

**operation**
92:7 106:9
141:14 141:19
147:18 148:11
179:11 188:21
188:22

**operations**
57:23 109:7
158:18 275:12
283:7

**opportunity**
285:6

**opposed** 64:3
69:1 80:24

**opposite** 276:18

**order** 63:4
199:5
279:13 286:22

**orders** 244:24

**ordinary** 183:12
247:19

**original**
88:12
220:25 285:25

**originally** 90:1

**others** 43:21
284:3

**otherwise**
169:25

**ought** 144:4

160:17
163:9 234:6

**ours** 184:3

**ourselves**
106:13 136:11

**outdoor** 243:21

**outfit** 26:7
248:25

**outside** 121:18

**outstanding**
252:21

**override** 108:9

**owe** 130:10

**owed** 15:10
27:25 68:22
98:11 104:2
133:15 134:20
136:3 138:5
141:6 144:6
152:14
153:3
155:13 157:19
166:11 168:19
169:15 173:14
176:24 180:14
184:14 184:25
215:18 221:16
224:21 231:10
247:14 255:12
255:25
270:1 270:6
273:5
273:23 275:24
276:8
276:10 276:16

**owes** 13:9
13:9 123:22
176:22
199:4 224:2

**owing** 181:14
181:19 215:1

**owned** 31:18
31:19 31:19
71:23 72:1

72:2 72:21
73:9 77:5
77:21 78:4
80:2 84:7
88:1 88:18
89:4 89:22
90:25 91:14
93:5 101:19
101:20
102:8
102:22
105:3 105:4
105:10
108:8
108:11 108:14
108:19
110:1 112:7
114:3
124:15
135:4 135:5
136:4 137:1
156:2 156:5
156:20
157:2
186:17 186:24
187:19
189:5
207:13
213:4 233:9
239:18 241:11
253:4 253:6
253:12 253:16
258:19 275:17
281:23
282:5 282:8
282:12 282:15
282:19

**owner** 28:13
92:20
134:24 148:11
156:5
210:12 262:20
266:22

**owners** 268:22

**ownership** 94:15
133:13 268:13
269:3

**owning** 99:3
205:19

**owns** 81:4 81:19
81:24 99:18
176:4 254:5
254:12 254:13
254:20
258:8 259:8
261:24
262:2 266:1

---

P

**P&L** 198:4
199:12 200:20

**p.m** 132:5 132:7
212:17 287:7

**page** 38:13
74:10 74:10
77:15 77:16
87:5 87:6
98:17
103:18 103:19
143:15 143:15
149:25
150:3 150:4
150:6 150:8
153:2
168:10 169:22
169:24
172:8
172:10 176:19
178:20 190:18
201:13 210:18
210:18 212:23
212:24 213:11
213:13 214:22
218:4
219:18 227:21
230:1 230:2
230:2
238:11 263:21
263:22 278:16
278:22

**page-by-page**
218:2

**pages** 171:16

175:7
178:20 178:23
183:10 183:24
198:9
203:14 212:14
264:1 266:9
266:19 267:9

**paid** 47:19
48:24 80:11
88:5 91:1
91:4 91:5
91:5 98:11
104:2 109:4
109:11 110:23
111:5 126:7
128:10 128:10
135:17
138:3
138:20 138:22
141:7
141:10 144:11
147:7
147:11 147:19
152:18 158:16
160:13 160:13
160:22 160:23
161:14 163:21
163:23 191:13
191:17
196:9
196:10 196:12
196:13 206:11
206:13
238:8 238:9
239:5 239:8
244:1 244:5
244:8 244:9
244:23
245:1 245:3
246:24 247:12
252:16
262:2
269:11 269:25
270:7

**painful** 32:22
32:23

**paint** 258:11

**Pampa** 34:21
36:17 36:18

**pan** 209:5

**Panhandle** 16:12

**paper** 51:3
121:21 127:25
130:3
249:12 253:22

**papers** 31:15
38:23 88:21
114:7 115:2

**paperwork** 27:14
40:24
114:10 114:19
160:6 277:22

**Pardon** 37:24
143:24 276:24

**parents** 21:21
21:25 22:19
36:19 53:16
58:17 72:25
241:11 241:20
258:1 280:24

**park** 11:19
11:20

**partial** 135:23

**particular**
22:21 96:3
151:7

**particularly**
254:25

**parties** 103:4
107:7 126:2
284:13

**partner** 33:7
33:8 35:10
60:21 65:20
68:19
148:15
154:4
228:12 266:23
267:5 267:7
267:13 267:20

267:21
268:4 268:6
268:17 268:17
268:18

**partners**
35:12 66:4
68:5 68:10
68:21 69:1
69:7 69:13
70:17 70:18
89:23 94:19
97:6 108:15
167:3
172:19
176:5 184:8
210:14 233:21
234:1
240:13 240:15
258:9

**partner's**
227:22
228:1 228:3
228:12 228:16
264:23 266:16

**Partners**
70:19
108:16 109:6

**Partner's**
265:19

**partnership**
13:9 15:24
53:17 65:12
65:21 65:25
66:4 66:21
67:1 68:2
68:5 68:11
68:23 69:8
69:13 69:19
70:5 71:24
72:2 72:5
72:18 72:19
73:3 73:8
73:19 73:24
74:20 75:2
75:16 77:5
77:20 77:23

78:3 78:7
80:3 80:11
80:24 81:1
82:1 82:2
88:2 88:19
90:2 90:25
91:25 93:4
93:23 94:17
95:16 99:2
100:10 100:13
101:3
101:20 101:21
102:8
103:23 104:14
105:2
105:10 105:22
105:25
106:9
106:14 106:21
107:1 107:7
107:12 107:15
108:3 108:8
109:14
110:8 111:9
112:7
123:22 125:18
126:7
129:25
130:8 131:8
144:6
144:11 144:20
145:2 148:9
148:15 148:16
149:4 149:8
150:22 152:14
152:21
153:4
153:11 153:12
154:2
155:14 155:17
156:2 156:5
157:13 157:20
157:23 157:25
158:8
158:11 158:22
159:7
159:19 160:18
160:20 161:15

161:16 166:13
166:18
169:3 169:8
169:14 169:15
169:19 170:16
170:22
171:5
171:11 173:12
173:13 173:14
174:4
174:21 176:25
177:7
177:13
178:9
178:12
179:6
179:23
180:3
180:17 180:18
180:19 180:24
181:3 181:5
181:13 181:19
181:23
182:6 183:1
183:2 183:2
183:18 183:21
184:14 184:25
186:8 186:9
186:12 186:16
186:24
187:1 187:8
187:19 187:22
188:14 189:21
190:6 196:1
196:12 196:23
199:1 199:6
200:6
200:11 200:21
201:1 203:9
204:21 206:21
206:23 207:21
207:21 207:25
208:6
214:10 214:19
215:10 215:19
215:22 216:10
217:20 219:9

220:14
224:1 226:2
226:7
227:13 227:19
228:19 229:13
229:15 230:18
233:13 236:13
237:4 237:7
238:2
238:22 238:24
240:20 243:25
244:7
244:18 245:12
246:18 246:20
247:15 247:21
247:22
254:9
255:12 256:10
256:12 261:22
262:13 263:20
263:21
266:2
267:16 268:12
268:13 268:23
269:12 269:25
270:9 273:6
273:7 274:7
275:7
275:17 275:24
276:8 276:9
276:17 281:23
282:6 282:9
282:19 282:20

**partnerships**
282:1

**partnership's**
145:7
173:18 177:16
202:8 219:14

**party** 112:23

**pass** 20:19 38:4
263:3
276:20 285:2

**passed** 20:8
20:18 21:11
22:19 23:2

36:24 66:2
73:5 79:15
94:14 99:20
158:19 160:11
161:25 191:24
193:8
193:17 194:18
196:5
210:22 242:25
245:18 256:21
256:23

**passing** 55:5
59:9 253:4

**passionate**
188:18

**password** 248:10
248:18

**passwords**
42:6 166:4
248:14 248:17
248:22
249:5
249:11 249:17

**past** 30:5

**Patrick's** 52:1

**pay** 30:9 72:8
73:13 87:21
88:17 91:2
91:25 92:20
93:22 100:4
104:1 104:6
105:14 106:12
107:7 112:7
119:14 125:17
125:24
126:3
129:25
131:7
131:14 133:22
134:18 135:16
136:7
137:11 137:17
137:18
138:6 138:7
138:15 144:22
144:23

145:2 145:7
147:23 147:24
148:2 148:6
148:9 149:8
152:6 152:8
153:11
154:2 154:6
154:10 155:17
157:14 157:23
158:17 158:24
159:1 159:2
159:4 159:4
169:14 188:19
188:24
189:4 190:6
190:22 190:24
196:1
196:18
206:9
215:10
238:5 238:6
243:6 243:8
243:15 243:16
243:25
244:7 252:7
252:10
256:5 274:2
275:8

**payable**
172:23 198:20
201:9
201:11 201:21
201:22 201:24
202:12 202:18
256:16

**paycheck** 160:7

**paying** 49:7
107:25 112:20
135:15 135:19
136:3
137:22
152:4
176:13 180:18
188:10 188:13
188:22 189:21
189:22 205:11
240:9

240:10 240:12
240:14 245:12
246:17 252:18
255:13
256:4
262:14 270:6

**payload** 116:11

**payment**
130:10 131:16
131:20 149:22
150:2
240:18 256:10

**payments**
73:11 73:13
107:18 107:19
107:20 134:13
147:13 147:15
148:20
149:3
149:13 149:16
149:17 149:18
150:1
150:17 152:20
168:11 168:17
169:6 169:7
169:7
169:18
187:2 187:4
192:13
197:9
215:22
216:9
216:18 216:24
238:18 238:19
240:17 240:20

**payroll**
116:16 116:17
116:21 117:14
119:15 120:17
153:11 188:13
190:25 246:10
273:10 273:15
274:2 274:3

**payrolls** 273:16

**pen** 86:1 86:3
86:4 86:12

86:19

**penalty** 143:3
167:23 182:17

**Penn** 24:7

**penny** 150:18

**pens** 85:22
86:10 86:23
90:8 90:10
90:17 90:20
91:1 91:2
91:3 91:4
102:5

**people** 26:5
43:9 60:14
60:16 62:6
62:8 62:14
62:18 79:6
111:14 114:24
116:14 121:15
124:18
125:3 142:1
161:3
163:16 175:14
188:5 195:9
196:14 218:24
245:25 246:11
255:3
270:12 270:14
270:15 270:20
271:9
271:10 272:11
272:15 272:18
272:21
274:3
274:14 274:15

**people's** 219:9

**per** 126:7 129:3
129:4
144:12 144:17
161:8
184:19 240:23

**percent** 31:20
44:18
108:12 108:17
108:18 108:19

213:5
265:24
266:1
266:18 268:14
268:15
282:5 282:9

**percentage**
28:18 142:9
265:23

**percentages**
266:25

**perfection**
55:25

**perhaps** 15:13
15:21

**period** 24:25
134:23 154:25
165:3

**periodic**
187:2
188:14 240:20

**periodically**
11:11

**periods** 21:12

**perjury** 143:4
167:24 182:17

**person** 47:7
60:11 74:25

**personal**
33:15 40:10
40:11 46:7
51:2 80:7
80:10 91:21
93:17 93:24
96:18 104:7
119:7
144:20
175:2
177:17
182:9
197:23 204:21
228:9 269:8

**personally**
46:12 49:22

50:5 52:8
69:18 81:5
106:10 145:23
177:6
178:11 180:18
185:13
186:7
204:14 204:25
205:21 248:14
254:17 270:24

**Peyton** 261:19
262:11

**phonetic** 188:1

**physical**
25:16
205:25 260:3

**physically**
45:10
125:13 131:7

**picked** 44:19
118:8 127:12

**picking** 163:8

**pickup** 77:16
79:10 82:9
82:23

**pickups** 78:7
156:20

**pictures** 92:6

**piece** 31:20
98:21 99:13
249:12

**pieces** 55:12

**pile** 220:9
263:17

**piles** 117:3

**pipeline** 26:6
31:24

**pissing** 223:23

**pit** 46:1 107:20
107:24
108:1
114:23 114:24

115:19 115:21
115:22 115:25
116:8
116:20 117:11
117:24 119:15
119:21 120:25
121:12 127:11

**Pitcock** 75:24
77:10 84:1
97:4 97:7

**pits** 104:8
107:22 145:20

**pit's** 107:22

**PK** 74:3

**places** 11:11
93:20 100:9
156:18

**Plains** 186:21
186:23
187:9 187:21

**plan** 210:6

**planning** 54:4
54:5 54:10
54:12 55:2
56:11 57:3
65:9 103:16

**planted**
100:17 103:9

**play** 54:19

**playing** 264:16

**pleasant** 32:20

**please** 9:12
9:22 10:15
11:1 11:8
12:7 14:21
16:10 56:10
57:12 69:5
89:14 91:16
142:17 169:21
171:16 176:19
183:25
201:7 202:4
210:11

217:6
217:13 222:18
223:1
225:24
226:3 226:6
226:14
232:6 232:7
278:16

**pleasure** 10:1

**plugging** 108:25

**plumb** 52:1
57:20

**plumber** 26:9

**plus** 12:6 192:2

**pocket** 154:21

**point** 29:19
31:10 35:23
54:9 57:19
73:9 92:7
106:3
117:19 119:17
123:5
132:19 133:14
135:5
174:14
175:7
180:13 199:19
203:17
206:4 207:2
218:23
225:3
239:17 241:18
241:20 251:21
252:21 253:16
260:19 279:24
282:4 282:8
282:11 282:15

**policy** 205:4
205:6

**poor** 106:24

**popped** 249:19

**populated** 251:1

**portion** 172:18

position
  109:3
  154:13 279:7

positive 106:18
  106:23

positively
  106:22

possession
  40:11 44:17
  52:14 52:18
  88:24
  122:12
  254:3
  259:22 261:11

possibility
  113:10

possible 281:3

post 38:16
  38:23 38:25
  39:12

potential
  213:18

power 84:23

precision 105:1

prefer 19:16

preferring
  57:17

prepare 12:13
  74:4 78:13
  198:7
  200:25
  222:8
  222:22 234:20

prepared
  74:20 78:10
  146:14 169:13
  173:20 182:21
  213:10 216:20
  217:1 221:9
  222:3
  225:10 273:10
  273:13 273:15

preparing

217:19
219:8 229:3

present 9:12
  10:3 10:4
  60:10 81:18

presented 225:8

preserve 48:3
  48:13 48:20
  49:2 49:12

preserving 10:5

presumably
  147:5

pretty 16:7
  21:8 22:25
  33:25 52:1
  74:22 98:16
  98:16
  102:10 104:22
  123:1 152:1
  166:20 191:16
  194:23 231:20
  257:17 257:23
  257:25 281:9

price 24:19
  108:4 129:3
  134:19 139:20

priced 95:21

prices 192:3
  195:22 275:11

primarily
  128:20

principle 194:5

print 80:1
  168:9
  168:16 201:16

printed 216:8

prior 74:14
  216:7
  237:18 281:23

Pritchard
  9:15 19:20
  20:7 60:25

61:7 61:7
163:5
217:21 218:23
223:12

Pritchard's
  51:18
  219:12
  222:6 222:23

private
  116:12 189:10

probably 21:9
  21:14 21:18
  24:23 25:9
  34:23 36:22
  49:20 67:3
  142:13 144:15
  147:3 152:3
  168:7
  189:10 197:23
  209:16 233:19
  243:19 272:16
  277:25

probate 162:4
  162:5 164:4
  242:15

problem 39:10
  60:17 80:25
  141:10
  150:8
  178:24 194:21
  194:23 286:12

proceeds
  80:11 82:12
  98:2 98:9
  104:1

process 32:23
  38:15 38:18
  38:24 39:11
  39:14 212:3
  271:1

produce 39:18
  39:23

produced
  51:12 51:16
  51:20 216:6

217:8

producing 192:1

product 126:4
  126:14 144:12

production
  108:12 108:14
  109:5
  111:23 211:2

Productions
  97:3

professional
  10:1 10:4
  263:1

profit 197:24
  226:5
  265:19 265:22

profitable
  166:24

profits 192:11

program 127:16

project 211:7
  211:8 211:9

promise 77:14
  225:17 225:18

promises
  154:2 154:6
  157:14

promissory
  140:24
  146:3 154:1
  154:5
  154:15 157:12
  177:23 252:17

pronounce
  14:8 97:13
  179:17

propane 41:15
  41:16

properties
  40:13 75:17
  86:11 90:20
  94:7 96:8

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

100:25
101:6 107:5
110:22 118:11
120:2 230:6
231:5 232:4
236:15 243:17
252:5 252:5
261:25 262:15
283:7

**property**
25:16 37:12
37:13 37:20
39:15 75:15
80:21 80:24
80:24 84:2
84:5 84:7
84:25 85:4
86:12 86:15
88:18 94:9
94:10 94:11
94:11 94:15
96:7 96:18
97:4 97:8
97:9 98:21
98:25 99:13
99:19
100:23
103:5
110:22
112:6 114:2
117:7
117:15 117:18
117:22
118:2 118:4
120:8
124:23
139:9
168:11 169:25
170:25
171:1 171:6
171:11 171:12
176:16
187:8
187:19 229:24
229:25 230:15
231:3
231:13 231:15
231:19 232:16

232:19 235:15
236:12 236:20
237:7
240:15
243:3
250:18
251:4 258:17

**propose** 62:21

**prostate** 32:16

**protect** 43:12
154:13

**protected**
248:10

**protested** 162:6

**protesting** 13:3

**prove** 133:8
133:12

**provide** 55:5
58:2 59:8
219:13

**provided** 222:5

**provides** 281:10
283:1

**prudent** 121:9

**pull** 153:22

**pump** 135:3

**pumps** 27:9

**purchase**
88:12
118:11 119:24
119:25 139:20
183:22 238:19
238:20 245:17

**purchased**
29:5 77:24
88:9 96:2
122:1
156:10 156:12
156:22
157:1
237:20
238:2 260:21

**purchases** 88:10

**purports** 224:6

**purpose** 63:16
63:24 79:1

**purposes** 208:24
241:14 241:17

**putting** 55:12
55:15 56:19
64:15 66:17
107:21 184:22
224:19

―――――――
Q
―――――――
**qualified**
213:21

**quantity** 122:15
122:19

**quarry** 71:21
71:23 72:1
95:6 112:4
121:21
132:9 135:2
139:1 139:5
142:3
144:10 151:11
152:1
164:10
169:8
211:11
215:8
261:16 270:19
275:14

**question** 12:7
52:7 56:10
59:3 69:2
69:3 74:18
110:14 148:23
168:25
169:5 169:5
169:6
169:12 169:21
175:8 180:2
180:20 193:24
194:8 194:11

200:5
209:15 226:19
227:12 244:16
248:5 275:23

**questions**
12:1 16:8
18:25 19:3
19:17 52:4
69:6 89:19
104:18 165:19
194:2 214:1
223:3 269:5
285:4 285:5

**quick** 9:24 16:7
46:5 58:18
67:7 193:15

**QuickBook** 248:8
248:19

**QuickBooks**
42:15 42:19
42:21 44:20
46:5 46:8
46:13 47:2
127:16
201:5 248:4
248:5 249:5

**quickly** 82:4

**Quincy** 99:20

**quit** 43:8 64:15
188:13 205:11

**quite** 212:8

―――――――
R
―――――――
**rail** 156:16
156:17 192:3

**raise** 10:15

**raised** 239:25
284:14

**raising** 92:19

**ran** 31:4 100:20
103:10 145:20
250:9

**ranch** 79:10

106:9 251:13

**Range** 82:9

**rather** 150:18
156:20 185:16
262:16

**ratification**
278:3

**RB&J** 112:20

**RBJ** 112:23

**re** 9:8

**reach** 174:9

**reading** 75:6

**reads** 235:17
282:3

**ready** 127:14
164:4

**real** 20:20
33:23 58:18
69:20 75:12
106:23 187:19
193:15 214:15
250:20
251:3 255:5

**realize** 55:6
62:18

**realized** 119:25
188:9

**really** 20:18
21:20 33:6
54:19 56:20
67:9 83:6
92:15 97:20
147:17 158:21
166:25
207:4 210:3
210:7
210:10 270:21
274:5 279:4
280:15 286:25

**reason** 53:12
64:11 68:14
76:14 78:20

84:4 92:8
114:11 118:16
120:9
129:17
143:7
144:16
168:1
172:12 182:13
182:20 183:15
183:17
209:7 222:2
277:11

**reasonably**
126:17

**recall** 15:3
15:23 16:5
17:24 18:3
75:23 85:16
97:18 106:2
113:6 141:5
145:19 217:19
236:12
238:1
255:11 258:10
260:3

**receipts**
179:8 211:3
212:11

**receivable**
227:1 227:16

**receivables**
201:19

**receive**
109:23 110:17
134:4 160:7
256:24 256:25
285:16

**received** 39:4
39:22 43:25
52:21 90:24
109:24
110:7
110:10 111:24

**receiving** 55:19
108:3

110:13 110:16
174:22 196:18
220:2

**recent** 15:2
119:11

**recess** 62:3
132:6 186:4
212:18 225:21

**reckon** 16:23

**recognize** 235:7
235:14
242:7 278:2
278:6

**recollection**
51:20 245:16

**reconciliation**
146:20

**record** 9:13
9:25 10:5
11:2 13:4
17:4 18:25
51:5 60:10
61:1 62:2
80:4 132:4
186:3 186:5
212:15 212:19
225:20
269:1
285:14 287:5

**recorded** 225:4

**recording** 10:5

**records** 40:20
46:13 48:3
48:7 48:13
48:18 48:19
49:2 49:12
49:23 50:1
50:5 50:8
50:17 50:23
51:4 78:16
80:5 105:24
113:25 116:20
116:21 116:22
116:23 117:13

117:14 118:20
119:4
119:15
120:7
120:14 120:16
120:17 122:14
122:17
124:2
126:18 126:22
126:24 129:16
146:24 179:25
202:9 225:8
247:8
247:12
260:1
269:18 269:19
270:16 270:16

**recreation** 51:6

**red** 258:1

**re-discuss**
55:11

**reduced** 241:21

**refer** 102:1

**referred** 75:11

**referring**
13:5 15:13
59:4 76:20
85:19 85:23
87:15 87:17
89:11 95:2
97:22 237:16

**refers** 77:9

**reflect** 106:1
109:10

**reflected**
107:24
247:8 247:12

**refresh**
144:13
220:18 278:24

**refused** 232:20

**refusing** 194:8

refute 225:10

regarding 277:5

register 155:1

registered
176:6

regular 149:3

reimburse 94:17
246:14

reimbursed
94:16
110:23 111:6

reimbursements
168:18

reimbursing
246:20

related 149:2
231:17 234:14

relationship
19:14 19:19
20:1 20:6
20:11 20:16
20:24 21:7
22:18 55:22

relatives 50:16

released
51:24 141:5
231:21 257:3

relied 67:16
67:19 145:25

rely 67:22 79:6
286:5

remain 118:1
119:18 254:1

remember 15:5
15:20 16:1
16:4 17:15
18:9 18:13
25:12 26:11
27:19 36:11
41:15 43:20
49:14 49:16
73:23 75:19

88:5 90:3
94:23 98:5
99:2 110:7
110:13 110:15
110:16 111:21
112:16 112:19
113:4
113:19 131:16
157:1 157:9
158:13 163:13
168:21 168:24
170:23 170:25
179:24
180:1
182:14 188:12
193:2 205:5
205:16 205:18
205:19
206:4
207:19
213:8 215:9
215:12 218:22
219:16
220:2
221:15 221:19
221:19 221:22
221:22 221:24
222:2
230:17 230:20
230:25 232:14
234:10
236:3 239:1
239:10
241:8
245:22
248:2
248:17
249:4 249:6
254:22
255:4 256:9
256:12
257:5
263:13 275:15
278:8
279:19 279:23
280:2 281:20

remembered
65:18

remembers 58:15

Remind 60:24

remit 244:18

remodel 196:1

remote 45:7
45:11

removal 121:23

remove 124:13
125:1 125:2
125:4
125:13 126:1

removed
121:12 122:15
122:15 122:19

renege 283:7

renegotiated
135:22 135:22

rent 75:9 75:16
75:18 77:7
107:7 107:11

rental 107:4

repaid 94:23
152:17 174:21

repair 48:24

repay 94:22
239:2

repaying 150:23

repayment
140:24

repeat 12:8
255:19

report 216:9

reporter 9:22
9:24 10:2
10:4 10:9
10:11 10:13
10:15 10:18
22:11 22:16
61:1 142:19
163:1 167:7
167:11 218:12

218:14 218:17
255:19 255:22
285:24
286:4 286:7
286:12 286:16
286:18 286:22
287:2

reports 25:4
272:3

represent
9:13 9:15
9:16 9:18
75:5 222:21

request 44:4
217:20 219:12

requested 40:16

requests 39:18

required 49:12

requirements
279:13

residence
11:8 11:10
11:12

resign 284:20

respect 35:19
69:18
220:13 257:14
282:23

respectful
223:10

respond 260:10

response
44:12 51:13
52:9 52:13
52:18 219:12

responsibility
145:7

responsive
52:22

rest 62:8 103:9
118:5
118:17 283:14

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

restate 12:8

result 136:6
278:8

retained 140:23

retire 32:12

retirement
63:19 66:23

return 73:18
100:4 112:8
171:16 173:12
178:20
183:2
193:11 203:13
209:10 209:18
209:22
212:1 212:4
214:10 263:20
272:8 285:20

returns 40:10
73:23 74:4
74:20 75:1
78:10 78:14
79:3 183:1
185:11
198:7
208:20 208:21
209:8 224:4

revenue 24:5
24:25
106:15
107:1 107:3
107:4
107:14 107:15
107:22
108:3
111:15 111:16
111:17 111:24
112:5 123:6
168:5 186:9
192:8
196:18 213:12
214:16

revenues 24:4
256:16

reverse

128:11 129:12
129:18

review 79:3
201:1 285:9
285:16

reviewing 45:2

Reviews 279:1

rib 92:12

rich 106:24

Richard 232:25

rid 128:13

Ries 9:16
9:16 10:13
10:14 12:19
12:21 13:21
38:4 39:8
39:21 39:24
39:25 40:3
40:8 40:17
40:21 41:3
41:23 42:1
42:4 42:6
42:8 43:8
43:21 44:1
44:11 44:15
44:23 50:24
51:15 51:20
51:24 52:4
52:20 52:25
53:4 53:5
56:7 57:4
57:6 57:8
57:10 58:5
58:7 58:10
58:12 58:14
60:4 60:12
60:14 60:18
60:22 61:3
61:11 61:13
62:5 62:12
62:17 62:24
63:1 63:6
68:24 84:13
84:16 88:23
89:5 114:18

115:4 115:6
115:11 115:15
116:3 117:6
117:21 119:10
119:20
121:6
126:24
155:3
162:18
163:7
163:11 165:16
165:25
182:5 197:1
198:23
209:8 209:9
210:19
218:5
218:16
221:4 223:6
223:25
224:9
224:11
225:7
226:16
248:7 249:5
263:6
263:10 263:12
264:3 264:6
264:12 264:20
265:8
265:10 265:12
265:14 265:17
266:8
276:20 281:15
281:19 283:21
284:1 284:4
284:25
285:4
285:10 285:13
286:18 286:20
286:25

Ries'll 197:2

rift 223:13

right-hand
150:11

rights 108:15

rigs 27:8

ring 114:1
222:23

risk 63:10

road 84:12

robust 199:13

rock 26:6
46:1 71:21
95:5 104:8
107:20 107:21
107:22
108:1 112:4
112:6
112:15 112:24
113:5
114:23 114:23
115:19 115:21
115:22 115:25
116:8
116:20 117:10
117:24 119:15
119:21 120:24
121:12 121:20
122:1 122:4
122:15 122:19
122:21 122:25
123:3 123:6
123:12
124:9
124:21
125:2 125:4
125:11 125:13
125:19 125:19
126:8
126:19 127:11
127:20 128:19
129:18
132:9 135:2
139:1 139:4
142:2 142:5
144:10 144:23
145:20 147:23
151:10 151:25
152:1
152:17 164:10
169:15 190:21

213:15 213:18
215:7 215:8
250:2 270:1
270:19 272:16
273:6 275:14

**Rodney** 35:11
97:3 97:6
108:17

**Rodney's** 97:8

**rods** 23:15

**role** 70:10
281:19

**room** 14:1 62:14
283:23

**rooms** 284:16

**rope** 27:7

**roughly** 276:12

**round** 111:7
129:1
149:20 182:25

**roustabout** 26:8
139:17 140:9

**roustabouts**
26:5

**Roy** 35:12

**royalties**
123:23
149:9
150:21
152:4
152:18 152:21
169:8
215:10 215:19
257:9 257:9
270:1 272:4
273:6
275:25 276:10

**royalty** 72:8
109:23
112:7
125:18 125:24
126:3 126:7
130:1 130:7

130:20
131:1 131:8
131:14 132:11
132:17 132:19
144:12
147:1 147:4
149:2 149:3
149:13 149:17
149:22 215:22
216:9 216:9
216:14 216:17
216:23 216:24

**Rudas** 19:7
20:22 20:23
20:25 20:25
31:19 31:21
57:23 99:6
278:12 280:11

**rude** 179:18

**ruined** 121:18

**Rukavina** 9:14
9:14 10:7
10:8 10:25
22:17 38:3
38:10 38:11
51:19 52:3
56:9 57:11
58:10 58:13
58:21 59:1
59:2 59:21
59:25 60:6
60:13 60:17
60:20 60:23
61:4 61:9
61:19 61:21
61:23 62:1
62:10 62:15
62:21 62:25
63:3 63:9
63:11 69:4
69:10 70:13
73:22 87:13
89:9 131:22
131:25
132:8
142:20 142:23
146:11 162:21

163:2 163:6
163:9
163:12 167:10
167:12 167:16
172:7
172:10 172:12
172:14
175:6
182:12
183:6
185:24
186:1 186:6
193:14 197:22
199:11 200:24
201:23 203:19
209:21 210:20
212:7
212:20
214:6
214:14
216:5
217:11
218:6
218:11 218:15
218:19 218:21
220:24
221:5 221:7
221:17
223:7 223:9
224:10 224:12
225:12 225:18
225:23 226:18
229:9 235:1
235:6
244:14 255:23
263:3 263:9
264:2
264:10
265:6 265:9
265:11 265:13
265:16
266:5
276:22
277:3 285:2
285:7
285:12 285:14
285:23 285:24
286:2 286:5

286:8
286:14 286:17
286:24 287:3

**rule** 62:6 62:10
62:13 62:23

**run** 41:15 47:17
63:9 100:18
121:1
122:10 141:25
164:13 211:14
257:16 257:16

**running** 87:19
107:19
108:1 108:1
166:18 189:25
257:11 275:14

**runs** 109:16

**rush** 285:7
286:16

_____

S

**safe** 113:18
113:22 255:6

**safes** 253:13

**safety** 207:5

**salary** 158:16
158:24
159:1 159:3
159:4 160:7
161:8 161:22

**sale** 27:5 80:10
82:11 98:16
103:14 103:20
103:23
105:6 106:2
132:23
133:3 133:3
133:24
134:5
134:19 136:19
139:8
169:25
170:1
170:10 170:13

185:7 185:9
187:11 187:15
187:18
208:2
208:21 213:14
213:18

**San** 100:17

**sat** 54:22
164:20

**satisfy** 121:6

**Saturday**
38:13 53:6
164:21

**save** 213:25
286:24

**saved** 205:24
205:25

**saving** 205:3

**savings**
204:24
205:1 205:5
205:16 205:19

**saw** 38:13 39:20
39:24 40:7
40:8 97:9
114:16
115:3 166:8
220:9 262:6

**scales** 121:25
272:16

**scanned** 223:4

**schedule**
74:11 78:8
171:17 171:18
172:3 172:3
172:3
172:18 174:17
180:13 183:25
184:5
184:19
185:3
203:15 204:11
210:17 214:22
264:1 264:8

264:9
264:11 264:12
265:8

**scheduled** 269:6
276:17

**schedules**
142:24
143:1 156:7
175:2
188:13 190:15
269:7
273:22 276:7

**school** 16:11
16:23 37:9

**scope** 63:4

**screen** 125:21

**second** 18:8
59:21 82:23
146:7
149:25
150:3 150:4
150:6 172:2
183:7
197:18 209:23
210:11 212:15
212:23 217:12
228:14
229:4 230:9
234:23
235:2
235:11 265:15
265:15

**second-to-
last** 230:2

**secretaries**
78:18

**secretary**
143:11 147:25
164:12 164:17
168:21

**section** 15:13
37:12 89:12
89:13 93:2
95:12 99:14

99:15 99:16
102:12 102:13
102:20 102:23
112:21 112:22
128:19 169:19
235:17 235:22
235:24
236:8
236:11 236:11
238:13 238:20
239:19 239:20
241:10
245:8 260:7
278:16 278:19

**sections** 236:25
275:15 275:16
275:17

**secure** 47:4
84:24 140:24

**securities**
207:7 207:11

**security** 140:23
141:22
207:8
207:10 207:12

**seeing** 98:3
112:16
220:7
221:20 231:11

**Seems** 222:16

**seen** 38:12 40:6
146:12 167:21
198:1
217:14 222:14
222:15 282:4

**self** 69:24 99:8
104:7
136:12 137:10
246:9

**sell** 26:17
28:16 94:10
103:4 106:3
111:9
125:16
126:2 139:4

232:23 252:5

**sellable** 126:3

**seller** 238:22

**selling** 80:12
123:3
129:10 207:19

**sells** 125:11

**send** 52:8 109:9
130:9
222:23 247:20
285:10 285:11
285:11 285:12
285:25 286:20
287:1

**sense** 181:7

**sent** 53:6
117:10
128:7
130:23 219:15
260:8 270:20

**separate**
27:12
127:16 127:17
241:3 241:10

**separately**
161:15

**September** 38:20
38:25

**septic** 76:16

**serial** 96:11
96:21
253:10 253:12
253:16 253:20

**series** 16:8
77:16
227:22 244:15

**serious** 194:23

**serve** 10:1
39:12

**served** 38:15
38:19

**server** 38:15

38:18 38:24
39:11 39:14

**servers** 47:18

**service** 16:17
16:18 23:13
27:8 28:18
43:15 47:20
48:25 90:19
91:5 140:10
153:9
153:10 155:15
155:16 157:21
157:22 212:24

**serving** 39:11
39:15

**session** 225:16

**sets** 27:12
27:13
199:17 199:23

**setting** 56:6
210:5

**settlement**
278:4 278:5
284:4

**seven** 11:9
163:6
241:17 241:22
245:23

**Seventeen** 218:9
218:13

**seventh** 172:7

**Seventy-five**
196:8

**several** 79:24
98:17
101:23 101:23
249:19 271:8

**SG&M** 209:10

**SGM** 208:24
209:18 209:24
210:1 210:9
210:12 210:15
211:14 211:19

212:4 213:4
213:8
213:17 250:12
250:17 250:20
251:3 251:8

**shake** 154:18

**shaking** 90:13
127:4

**Shamrock** 11:7
16:11 16:16
34:16 36:16
37:9 108:16
109:6
118:23
176:3 176:7
176:11
261:8 261:9

**shape** 126:1

**share** 33:20
159:9
265:19 266:16
281:15 281:15

**shared** 114:4

**shareholders**
210:15

**sharply** 111:18

**Shawn** 19:7 21:6
21:13 57:19
59:5 61:10
61:11 68:13
163:4 279:17

**S-h-a-w-n** 61:12

**she'd** 160:4
274:2

**sheet** 184:19
185:5
197:24
198:4
198:10 198:13
198:25
199:3
199:13
200:5 200:21

201:7 202:5
226:2 226:3
226:5 226:6
226:9
234:10 253:21
285:18

**sheets** 224:5

**sheriff's**
187:11 187:15
187:18

**Sherwood** 9:18
9:18 10:9
10:10 22:12
22:15 38:6
38:9 39:7
58:3 58:6
58:18 58:24
59:23 60:2
60:9 61:15
61:20 61:25
70:7 71:1
71:3 87:11
89:7 131:24
132:3
167:15
172:5 172:9
172:11 172:13
185:22 185:25
186:2
201:21 203:18
212:16
214:5 218:8
218:10 220:23
221:13 225:17
234:25
264:4
264:15 264:18
276:25
285:5 285:8

**she's** 19:24
21:15
160:23 213:9

**shipped** 90:24

**Shirley** 22:6

**shop** 45:25

135:3 220:10

**short** 61:24
87:19
107:19 257:11

**shortly** 30:4
161:24

**showed** 40:22
122:8 276:7

**showing**
201:17
202:9 268:20

**shown** 79:24

**shows** 81:20
82:9 146:17
200:5 200:9
212:11
215:1
216:13 216:23
230:10 244:21
269:1

**shuffling** 104:4

**shut** 43:14
107:21

**siblings**
14:15 18:22
19:4 19:6
19:9 19:12
19:15 21:23
66:24 68:12
68:20 69:9
159:10 159:13
243:15 268:22
279:11 279:17
279:20 280:19
280:25 281:25
282:24

**sic** 103:16
169:24 203:20
267:21

**sick** 55:18 60:7

**sides** 265:24

**sign** 28:22
30:13 30:19

30:19 30:19
73:25
122:10 167:23
252:1 252:6
283:6 284:1
284:25 285:6

**signature**
230:21 231:12
284:14

**signed** 28:4
30:20 72:7
74:1 88:20
143:3 168:3
252:2
258:18 258:20
258:22 278:11
278:12 278:12
278:13 278:14
283:16

**significant**
35:4 37:16
51:21 207:19

**signing** 73:23
182:14 230:20
239:1

**similar** 247:2

**simple** 163:16
191:16 253:3

**single** 51:13
225:3

**single-page**
172:1

**single-paged**
184:3

**single-sided**
178:25

**single-space**
172:1

**sir** 10:17 10:21
11:6 11:14
11:21 11:24
12:2 12:9
12:12 12:18
12:20 13:1

13:5 13:11
13:14 13:17
13:22 13:24
14:6 14:11
14:17 14:19
15:5 15:19
15:22 16:4
16:22 17:3
17:6 17:8
18:5 18:15
18:17 19:11
19:13 20:5
21:2 21:25
22:5 22:7
22:14 22:24
23:10 23:19
23:21 23:24
25:18 25:21
26:20 26:22
26:24 27:2
28:10 28:15
28:17 28:18
29:7 29:9
29:16 29:21
29:23 30:11
31:9 32:8
32:11 32:21
32:25 33:7
33:18 33:21
34:2 34:6
34:8 35:3
35:25 36:2
36:7 36:25
37:3 37:14
37:22 37:25
38:12 38:17
38:23 39:2
39:5 39:16
39:19 40:12
40:14 41:5
41:25 42:5
42:8 42:9
42:13 42:20
44:13 45:11
46:6 46:15
46:17 46:23
46:25 47:23
48:1 48:5

48:8 48:15
49:4 49:6
49:8 49:17
49:20 49:24
50:10 50:13
50:18 50:21
51:1 51:23
52:11 52:15
52:19 52:23
53:2 53:8
54:1 54:6
54:8 54:16
55:3 55:7
56:12 56:20
56:22 59:6
59:10 59:13
63:15 63:23
64:1 64:6
64:20 65:2
65:5 65:10
65:13 65:18
66:5 66:12
67:6 67:18
67:21 67:24
68:6 68:17
69:20 71:22
71:25 72:3
72:9 72:20
73:1 73:23
74:1 74:5
74:8 74:11
74:21 75:3
76:5 76:21
77:3 77:6
77:11 77:25
78:2 78:12
79:2 79:5
79:8 79:14
79:18 80:9
80:13 80:19
81:2 81:17
82:8 83:13
83:17 83:19
83:24 84:12
84:15 85:2
85:6 85:8
85:9 85:24
86:8 86:14

86:17 86:22
86:25 87:4
87:16 87:24
89:2 89:8
90:3 90:6
90:14 91:8
91:11 91:19
91:22 91:24
92:1 92:25
93:1 93:6
93:12 93:25
94:3 94:5
94:6 95:10
95:13 95:19
96:5 97:23
98:1 98:7
98:15 98:23
99:11
100:12 101:14
101:18 101:22
101:23
102:9
102:18 103:21
103:25
104:4
104:15
105:7
105:11 105:21
106:1
106:17 106:20
107:6 107:9
107:13
108:6
110:10 111:19
112:3 112:9
112:11 112:15
112:19 112:25
113:12 113:16
113:20 114:14
115:8
115:23
116:6 116:9
116:18 117:12
117:25
118:3 119:6
119:9
119:13 119:16
119:19 122:16

| | | | |
|---|---|---|---|
| 122:20 122:24 | 151:24 152:23 | 174:18 174:25 | 196:25 |
| 123:17 123:24 | 152:25 | 175:7 | 197:7 |
| 124:3 | 153:2 153:6 | 175:10 175:12 | 197:12 197:18 |
| 124:11 124:24 | 153:7 | 175:16 175:18 | 197:23 |
| 126:9 | 153:14 153:15 | 176:15 176:18 | 198:2 198:5 |
| 126:12 126:16 | 153:18 | 176:21 176:23 | 198:16 198:19 |
| 126:20 | 154:3 154:7 | 177:1 177:8 | 199:2 199:7 |
| 127:1 | 154:11 154:14 | 177:10 177:24 | 199:18 199:22 |
| 128:12 129:20 | 154:23 | 177:25 | 199:25 |
| 130:2 | 155:4 155:6 | 178:3 178:5 | 200:3 |
| 130:19 130:24 | 155:13 155:24 | 178:7 | 200:16 200:19 |
| 131:9 | 156:1 156:8 | 178:14 178:18 | 201:6 |
| 131:12 131:15 | 156:11 157:15 | 178:21 | 201:12 201:14 |
| 131:18 131:21 | 157:17 | 179:4 179:7 | 202:1 202:9 |
| 132:12 132:21 | 158:2 158:3 | 179:10 179:13 | 202:16 202:19 |
| 132:24 | 158:6 158:9 | 179:21 | 203:2 203:7 |
| 133:5 | 159:8 | 180:7 | 203:12 203:21 |
| 133:15 134:11 | 159:11 159:14 | 180:15 180:21 | 203:24 |
| 134:22 134:25 | 159:17 159:20 | 181:4 181:6 | 204:2 204:4 |
| 135:6 | 159:22 159:25 | 181:9 | 204:7 |
| 135:24 | 160:10 160:12 | 181:15 181:21 | 204:10 204:19 |
| 136:5 136:8 | 160:15 160:17 | 181:25 | 205:15 |
| 136:20 136:23 | 161:7 | 182:7 182:8 | 206:8 |
| 137:6 | 161:12 161:19 | 182:16 182:18 | 206:24 |
| 137:20 137:25 | 161:23 | 182:22 | 207:4 207:6 |
| 138:22 138:25 | 162:3 162:9 | 183:7 | 208:1 |
| 139:3 139:6 | 162:17 163:19 | 183:14 183:16 | 208:12 208:22 |
| 139:11 141:21 | 164:12 164:22 | 183:24 184:10 | 209:22 209:25 |
| 141:25 | 165:2 | 184:11 184:20 | 210:24 |
| 142:7 | 165:21 | 184:23 | 211:4 211:6 |
| 142:11 | 166:9 | 185:2 | 211:12 211:24 |
| 143:1 143:2 | 166:20 166:22 | 185:10 185:17 | 212:13 213:16 |
| 143:5 | 167:5 | 185:20 186:25 | 213:23 214:20 |
| 143:14 143:16 | 167:15 167:20 | 187:3 187:6 | 215:3 215:6 |
| 143:20 | 167:21 167:22 | 187:9 | 216:6 |
| 144:7 144:9 | 167:25 | 187:12 | 216:11 216:12 |
| 144:15 144:24 | 168:4 | 188:3 | 216:19 216:21 |
| 144:25 | 168:13 | 188:16 188:25 | 216:25 |
| 145:4 | 169:4 | 189:7 189:9 | 217:5 |
| 145:24 | 169:11 169:17 | 190:17 190:19 | 217:22 218:22 |
| 146:1 146:4 | 169:20 170:21 | 191:3 191:6 | 218:25 |
| 146:12 146:13 | 171:18 171:19 | 191:16 192:15 | 219:6 |
| 146:22 146:22 | 171:21 172:22 | 193:6 | 219:10 219:17 |
| 146:25 148:13 | 172:25 | 193:10 193:18 | 219:22 219:25 |
| 148:21 | 173:1 173:7 | 193:21 | 220:1 220:3 |
| 150:3 150:5 | 173:11 173:21 | 194:2 | 220:15 |
| 150:8 | 173:23 | 194:16 194:22 | 222:1 |
| 150:16 150:19 | 174:1 174:5 | 196:3 | 222:10 222:15 |

222:20 222:25
223:1
223:10 223:15
223:18 223:20
223:24 223:25
224:2 224:3
224:4
224:14 224:17
225:6
226:13 226:17
226:24
227:2 227:3
227:6
227:18 227:20
228:2 228:4
228:7
228:10 228:17
228:18 228:20
228:23
229:5
229:15 229:16
229:19
230:3 230:5
230:19 232:25
233:10 233:12
235:8
235:12 235:13
237:6 238:4
238:21 238:25
239:4 239:7
239:20
240:3 240:5
240:11 240:24
241:1
241:12
242:4 242:7
242:23 243:16
243:22 245:10
245:24 246:19
247:4 247:6
247:10 247:23
248:9
248:16 249:13
250:11 251:12
251:19 251:23
251:25 252:20
253:2 253:6
253:18

254:4
254:13
255:8
255:14 255:19
256:1
256:11 256:14
257:4 258:3
258:5 258:6
258:12 258:14
258:15
259:2
259:16 259:21
260:11 260:13
260:15 260:20
260:23
261:1 261:3
261:14 261:20
262:12
263:2 263:3
263:8
263:15 264:24
265:20
266:4 266:7
266:12 266:14
268:16
269:9
269:14 269:22
270:3
270:10 270:18
270:23 270:25
271:3 271:6
271:14 271:17
271:21 271:23
272:1 272:5
272:10
273:2 273:8
273:19 273:24
274:1 274:4
274:11 274:24
275:3 275:9
275:13 275:18
275:22
276:6
276:11 276:15
277:7
277:10 277:12
277:14 277:16
277:18

278:7
278:10 278:13
278:15 278:17
278:18 278:23
279:6 279:9
279:19 279:22
279:25
280:4 280:7
280:10
281:5
281:12 281:17
281:21
282:3 282:7
282:10 282:13
282:16 283:13
283:19
284:2 284:9
285:2
285:14 285:22

**sis** 195:14

**sister** 19:24
  20:11 21:6
  60:8 61:7

**sit** 50:22

**site** 45:24
  45:24

**sits** 176:17
  231:1

**sitting** 15:17
  15:20 52:16
  74:24 81:8
  81:12 81:15
  84:2 84:4
  97:3 97:11
  98:20 99:7
  101:12 110:14
  143:6
  153:16 154:16
  155:22
  157:8 158:5
  164:19
  168:1 176:1
  193:2 259:7

**six** 18:19 18:20
  34:20 47:10
  95:7 135:12

139:24
180:6 211:20

**size** 256:13

**skip** 269:1

**skirting** 76:22

**slash** 32:7
  90:19

**slaughter** 93:14
  105:16

**slick** 231:10

**slim** 192:12

**slipped** 156:17

**slow** 82:5

**slowly** 106:3

**small** 168:9
  168:16 201:16
  262:4

**smaller** 264:7

**smart** 126:18
  176:9 248:18

**smartass**
  89:18 91:17
  120:12 180:3

**smarter** 257:24

**Smith** 18:12
  18:14

**soap** 27:8

**Social** 141:22

**socially** 277:19

**sold** 26:19
  26:20 26:22
  26:25 27:7
  32:7 72:9
  79:10 79:21
  79:25 80:3
  80:16 82:10
  84:6 84:16
  84:17 85:5
  87:14 88:23
  89:6 94:9

95:2 95:24
97:18 97:24
98:1 98:2
98:4 98:5
101:16
103:5
103:12 103:17
103:20 104:12
105:16 105:17
105:22 110:21
114:24
118:4
118:22
123:2
124:15 124:17
130:11 130:12
130:19 133:12
139:10 139:14
140:21 140:22
142:5
144:23 147:23
190:21
206:6 207:1
231:2
232:16
233:1 233:2
233:3 236:4
236:25 238:24
242:15 242:17
252:4
275:15 275:16

**sole** 70:4
134:24
161:2 210:12

**solemnly** 10:18

**somebody**
26:15 60:4
118:11
233:1
238:18 270:21
274:6 274:7
286:20

**somehow**
137:23
155:7 155:9
155:9

228:22 247:17

**someone** 31:15
35:10 35:20
35:21 38:22
49:19 77:20
106:8
106:10 115:18
153:22 153:24
170:18 176:22
222:3 233:1
246:10

**Somewhat** 141:15

**somewhere** 38:20
94:18 101:8
113:19
247:8
249:12 260:1

**somewheres**
25:13 54:13
83:13 101:9
253:8

**son** 59:17
133:15 133:20
135:9
135:22
137:1
137:23
138:8
139:25 251:17
258:18 258:22

**son's** 96:15
135:24 141:13
170:24
171:6 171:12

**sorry** 27:21
34:19 58:25
83:24 87:4
91:12 92:4
92:4 99:21
118:18 122:17
125:1
142:20
150:7
162:12 162:15
162:22 165:15
182:4 205:8

218:6
221:11 225:24
237:6
242:20 255:19
265:6 267:8

**sound** 19:3
151:18
191:7
204:13 209:11
209:11
213:5 276:14

**sounds** 31:3
85:13
195:17 243:14
256:3

**source** 272:7

**south** 20:7 94:2
237:13
262:8 262:9
262:10

**Spanish** 96:16

**speak** 179:14

**speaking** 69:5
164:17

**speculation**
56:8 57:10

**spend** 11:11

**spending** 105:13
195:12

**spent** 154:20
195:16 243:24

**split** 64:14
268:15
281:9 282:25

**spoke** 21:10

**spot** 185:22

**spreadsheet**
153:1
167:11 167:13
169:13
272:4 276:1

**Square** 24:7

**stable** 70:15

**stage** 32:16
32:18

**standard** 215:14

**start** 16:18
23:19 27:7
27:18 27:20
28:11 42:10
54:9 118:18
190:4 232:9
234:20 243:18

**started** 14:22
16:17 16:20
21:22 23:7
23:20 24:10
27:6 27:20
28:6 28:25
30:16 31:8
34:3 34:3
36:13 37:5
37:9 43:17
54:3 54:12
54:15 62:16
64:15 64:17
64:18 74:22
87:18 93:8
106:13 108:16
112:14
113:5 114:3
117:2
135:20
140:8
140:12 140:20
140:20 174:22
189:21
190:4 205:3
210:7 211:5
232:11
246:8 251:8
252:19

**starting** 31:13

**state** 9:12 11:1
11:19 16:12
36:1 62:23
100:22 101:2

**NAEGELI**
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

**(800)528-3335**
NAEGELIUSA.COM

109:25
110:1
110:19 155:19
157:9 223:3
266:11

**statement**
9:24 13:7
92:3 167:17
173:6 173:9
182:8 185:7
185:7

**statements**
224:1 240:19

**stay** 11:10
11:13 70:11
86:16 104:4
104:5 109:5
117:15 192:13

**stayed** 116:24

**steam** 16:17
16:18 23:8
23:8 23:8
23:13 23:15
23:15 28:18
90:19 91:5
153:9
153:10 155:15
155:16 157:21
157:22 212:24

**steaming** 25:25

**Steiger** 97:22
97:23

**step** 281:19

**Stephen** 9:2 9:8
10:22 11:3
46:13 153:8
153:13 155:15
157:21 157:24
164:9 191:1
229:14 287:6

**stepped**
109:18 109:22
110:6 110:9
156:16

**steps** 40:1
44:16

**Steve** 9:18 38:4
38:7 61:8
144:21 147:22
201:11 201:19
201:24 202:12
204:25 205:21
206:4
227:16 234:25
264:4

**Steve's**
144:21 147:22

**sticky** 221:11

**stipulate** 10:3

**stock** 28:22
28:23 30:20
30:21 30:24
85:22 86:1
86:3 86:10
86:12
207:14 207:15

**stocks** 28:5

**stole** 253:9
253:9

**stolen** 50:5

**stop** 32:12
151:10
188:2 188:5

**stopped** 49:9
74:23
187:14 252:18

**storage** 127:23

**store** 252:14

**stored** 84:11
127:3

**stories** 194:25

**straight**
82:18
100:21
101:2 101:6
149:17 180:25

**street** 85:2

**strip** 142:4
211:10 211:10

**stripped** 145:14

**Stroup** 187:25

**struggle** 24:17

**struggling** 48:9

**stuff** 25:4
29:18 33:12
34:5 35:22
36:3 40:4
43:2 77:13
84:18 84:24
95:21
107:18
113:4 118:5
118:8 118:8
118:12 118:15
120:1
120:22
128:9 135:3
188:15
196:3
198:20
206:2
206:11
210:5
211:24 213:10
221:20 221:21
222:12 241:16
244:24
251:1
275:19 283:9

**stupid** 19:1

**style** 83:15

**subject** 130:3
247:17

**subpoena**
37:24 38:12
38:16 39:3
39:7 39:17
39:22 43:25
44:12 51:4
51:13 52:9

**street** 85:2

52:13 52:18
52:21 52:25
53:4 260:9

**Suburban**
40:24 51:17

**succeeds** 281:19

**successful**
23:23 34:7

**sue** 160:17
160:18 160:21
182:5

**sued** 224:1

**suffer** 160:24

**sufficient**
275:7

**suggesting**
128:12

**suitable** 219:16

**summarize** 51:10

**summer** 219:1
236:13

**sums** 177:13

**super** 239:11

**supplemental**
189:10

**support** 63:20
157:25 161:22
191:1 194:19
224:20

**supported**
192:10

**supporting**
146:20

**supposed**
56:19 91:2
138:6 138:7
195:23
215:9 242:3
246:22 262:18

**supposedly**
243:17

**sure** 20:20 32:2
38:19 40:19
42:16 44:3
44:7 44:18
59:13 59:22
69:16 69:20
70:22 71:11
71:13 73:14
73:25 75:12
76:13 78:18
79:17 82:25
89:7 93:19
95:19 96:10
98:22 98:22
99:6 99:24
102:4
103:21
104:3
104:21 104:21
123:21
132:3
132:12 147:25
149:5 156:4
157:11 158:23
168:23 170:18
170:19 177:10
198:8 200:8
206:16 206:25
212:16 213:20
217:15 217:25
219:2
229:23
230:9 231:6
231:22 234:24
235:17 235:18
236:6 236:7
236:11
244:8
245:18 247:18
248:4 248:9
250:15 252:23
254:10
256:8
259:15 270:12
271:9
278:11 283:4

**surrender** 41:3

**surrendered**
40:21

**surrendering**
80:25

**surveyed**
94:11 241:24

**suspect**
114:11 114:12
277:11

**suspended**
256:16
257:5 257:9

**suspicion** 277:5

**SUVs** 116:4

**swap** 233:18

**swapped** 236:23

**swather** 97:12
98:2

**s-w-a-t-h-e-r**
97:12

**swear** 9:22
10:18

**Swindell**
41:11 41:12
41:23 115:7
115:11
116:3 117:6
126:25

**sworn** 10:22

**system** 101:24
102:1
102:15 193:21

**systems** 102:7

———————
T
———————

**tab** 220:19
220:21
221:2 221:9
222:8

**table** 138:14

**tack** 257:24

**taking** 55:15
56:18 94:2
184:22 204:16

**talk** 12:17
12:19 12:21
12:22 13:21
13:23 13:25
14:4 14:12
14:15 21:16
27:4 27:4
37:23 39:7
49:15 54:11
58:8 72:10
95:14
106:14
107:2
111:14 150:25
165:23 165:25
190:24 211:20
213:21 221:18
255:9 271:10

**talked** 14:13
28:1 28:1
53:5 71:3
71:4 85:20
99:6 110:24
111:15 111:16
133:19
174:6
174:19 196:14
221:15
237:2
247:14 257:17
259:11 259:17
259:24 270:19
271:16
272:6
272:12 277:21
277:23

**talking** 13:20
25:1 25:20
36:9 41:14
58:7 68:25
81:9 90:10
96:14
111:25 117:1

123:14
128:4
142:14 150:10
164:10 164:11
171:4
211:11 243:12
284:16

**talks** 79:9
83:14 85:21
85:22 86:23
87:2 97:12
97:21
104:10 148:19
172:18
175:8
176:21 198:15
198:17 212:24
216:17 219:24
226:25 229:24
264:23 266:15
281:18

**tanks** 93:10
120:1

**Tarbox** 148:1
181:11 182:3

**Tarbox's** 143:11
164:12 168:22
197:6

**tax** 29:17 40:10
73:18 73:23
74:4 74:20
75:1 156:7
171:16 178:20
185:11 193:10
198:7
208:20 208:21
208:24
209:8
209:10
224:4
241:14 241:17
256:13 256:25
272:8

**taxed** 241:19

**taxes** 141:11
189:15 255:25

256:4 262:2
262:14 262:17
262:20

**temporarily**
84:10

**ten** 97:10
123:18 251:25
252:8
252:10 255:16

**tenants** 111:16

**Tennessee** 210:4

**tenor** 256:20

**tens** 98:14

**tenth** 210:18

**term** 54:4
65:1 69:24
69:25 70:2
70:3 72:16
106:19 106:24
112:20 129:12

**terminology**
89:15 93:14

**terms** 71:12
131:16

**terribly** 121:11

**testified** 10:23
51:16 268:21

**testify** 12:11
224:25

**testifying**
40:15

**testimony**
10:3 10:19
58:6 239:5
244:6 275:5

**Texas** 11:7
34:14
217:23
219:5
219:24 261:19

**text** 43:3

**Thank** 22:16
167:13 167:15
179:1 184:6
203:18 226:14
226:16 226:17
235:2
244:11 255:22
263:3
264:17 265:16
276:25
285:2 285:23

**Thanks** 172:9
186:2 221:13

**that'd** 253:2

**That'll**
209:14 209:14

**themselves**
125:12

**thereafter** 54:3

**there'd** 80:4
177:8

**there'll** 285:18

**there's** 25:14
35:22 40:3
47:10 47:14
51:5 51:5
56:17 58:15
59:23 59:23
59:25 60:2
62:18 63:3
63:4 65:18
73:11 75:7
76:1 77:15
79:20 81:10
82:16 83:3
83:6 83:6
83:10 83:15
84:23 85:12
95:22 96:9
96:9 96:13
96:17 96:24
98:17
102:18 103:11
103:11 103:18
104:19 104:19

109:10
110:5 114:9
114:9
118:16 120:17
121:9
127:24 128:12
141:9
167:11 168:10
176:11 176:20
184:9
198:10 202:17
210:3 212:8
216:14 217:17
220:9
220:19 220:21
227:22
228:5 228:8
233:19 236:24
254:2 255:6
260:1 260:1
264:21 264:22
265:5
265:10 265:12
266:9
266:19
267:3 267:3
270:5
275:14 275:20
285:7
286:14 286:15

**they'd** 127:21
130:13 134:15
136:7 245:3

**they'll** 133:8
244:22

**they're** 46:9
49:5 80:4
81:7 81:12
83:8 83:8
83:12 83:21
84:2 84:4
86:14 86:15
105:15 116:22
121:18
127:2
128:22
155:1 155:2

169:9
177:19 182:21
196:25 244:21
244:22
253:8 254:4
261:20 265:22

**They've** 139:23

**thick** 141:2

**thin** 163:8

**third** 103:4
107:7
112:23
126:2 150:8
230:12

**Thomas** 60:20

**thousand**
98:13
192:14
196:8
201:15 240:7

**thousands** 98:14

**threw** 117:2

**throw** 38:3

**thrown** 50:19

**Thursday** 164:21

**ticket** 121:21

**tied** 114:20
127:6

**tight** 87:18
92:15

**til** 24:7
33:22 66:1
66:2 118:21
240:10

**timesheets**
274:3

**Tindal** 94:7
94:14
232:20 232:24
233:6 252:4

**title** 94:10

157:2
259:19 259:20
259:23 260:4

**titled** 156:4
157:3 203:9

**today** 12:11
15:17 15:20
19:20 20:2
20:12 20:14
20:24 21:7
41:17 50:22
52:17 74:24
109:13 110:15
113:11 113:15
124:2
141:14 141:17
141:20
143:6
153:16 155:22
156:16
158:5 168:1
171:12
193:2
222:15 223:25
225:8
225:10 239:12
242:1 263:1
269:5 271:4
271:16
272:3 277:17

**today's** 9:10
10:2 10:5
12:13 13:21

**tomorrow** 161:1

**ton** 82:23
112:18
113:3 126:8
129:9
132:10 132:13
132:20 144:12
144:17

**tonnage** 121:22

**tons** 81:10
122:5
123:12 130:19

130:20

**top** 60:3
74:16 74:17
87:4 87:5
87:5 87:6
143:14 143:16
143:20 172:10
176:20
179:3 179:9
198:15
226:6 264:7

**topic** 15:3
197:18 228:24

**top-level** 23:25

**tornado** 50:9

**total** 130:16
227:24

**towards** 193:4
195:7
216:13 240:25
241:1

**town** 90:22 93:2

**Traci** 19:7
20:12 60:6
280:12

**track** 47:16
122:13
181:1 230:4
230:4 230:9
235:22
236:8
236:10 252:24
274:5 275:20

**tracking** 96:24

**tracks** 275:17

**tract** 241:10
242:5

**tractor** 26:14
95:22 96:2
96:7 97:6
97:10 97:22
99:3 99:5
99:8 99:22

99:23 99:23
100:7 101:7
101:16

**tractors**
95:25 96:9
96:13 96:15
96:16 98:17
98:25
170:24 171:5

**tractor's** 96:11
98:22

**trade** 92:21
169:25 234:9

**traded** 78:1
138:4
230:15
231:5
231:12 232:4

**trading** 79:12
94:13

**trailer** 75:23
76:1 76:7
76:9 76:10
77:9 79:21
107:8
121:16 236:18
237:12 241:13

**transacted**
71:21

**transacting**
72:5

**transaction**
88:3 109:18
141:1 208:7
230:16 230:25
231:17
232:1
232:10 237:13
238:1
238:10
252:3
255:15 255:17
255:21

**transactions**

94:25
105:18 105:19
149:1 151:8
197:11 226:10
226:11 226:12
231:19 246:15
255:3
274:16 274:16

**transcript** 16:2
285:17 285:18
286:7
286:13 286:19

**transfer**
29:15 77:19
138:8 180:16

**transferred**
85:4 90:1
251:22
254:9
260:19 261:21

**Transferring**
229:11

**transfers**
168:11 168:17
169:24

**transition**
27:10
185:22 189:24
231:10

**transmission**
100:1

**transmission's**
99:24

**trashed** 85:7

**Trew** 60:25

**tricky** 220:18

**tried** 26:17
65:8 174:9

**triggered**
55:9 147:10

**trivial** 128:15

**trouble** 21:13

21:15 104:8
107:17 114:24
120:22

**troubles**
57:19 71:15
192:14

**truck** 79:11
82:6 83:3
83:11
121:24
122:5 122:6
123:16 124:16

**trucking** 139:15

**truckload**
125:16

**trucks** 33:10
77:17 77:20
78:7 80:12
83:7 83:12
122:3
122:11 123:11
123:18 124:13
124:15 125:21
127:20 128:6

**true** 51:14
52:17 67:3
67:3 78:21
79:19 80:23
144:24 153:17
155:25
158:4 168:7
177:2 197:7
253:5

**trust** 53:17
53:20 53:23
54:1 54:15
55:22 58:9
63:14 63:17
63:22 63:25
64:3 64:16
64:24 64:24
65:8 71:10
110:3
193:16 193:25
194:1 194:12

229:6
229:10 229:13
237:18 242:16
256:23 257:16
265:3 266:1
266:24 267:18
277:15 278:19
279:4 279:5
280:3 282:5
282:8
282:12 282:15
282:18 282:19

**trusted** 173:22

**trustee** 70:20
70:25 71:10
71:14 89:5
193:16 193:19
193:23
194:1
194:12 263:12
279:24

**trustee's** 13:15

**trusts** 53:18
56:5 56:13
59:11 63:12
64:3 64:7
64:11 65:6
70:21 70:25
194:15 194:15
194:18 268:14
268:18 268:23
279:8
279:12 279:17
279:21 279:24
280:6 280:9
280:12 280:13
280:20 280:23
282:24

**truth** 10:19
10:20 10:20
19:23

**truthful**
78:21 82:20

**try** 39:15
40:1 48:9
71:18 73:15

75:5 88:11
143:20
187:7 221:1
223:10 225:15
232:7

**trying** 14:23
48:10 48:10
55:2 55:5
56:5 57:1
57:16 58:2
58:19 59:8
59:17 69:22
69:22 70:14
89:18 104:6
119:24 120:12
125:8
129:15 133:18
140:13 152:12
165:11
176:9 180:3
192:15 192:24
195:17 195:19
196:21 196:21
196:23 196:24
208:13
214:2
223:11 224:23
248:18 280:17

**tubing** 23:15

**Tulsa** 195:3

**turn** 20:16 48:6
122:22
124:4 153:9
155:16 157:22
190:18 226:3

**turned** 40:16
272:8

**TV** 180:19

**Twenty** 163:6

**Twenty-seven**
162:20

**twice** 195:3

**Twitty** 40:6
41:13 46:2

50:25 76:16
76:22 77:2
77:4 83:21
83:22 83:25
90:23
117:18 117:21
118:2
118:14 118:15
118:20 118:23
118:25
119:5
119:18 119:22
119:24 127:6

**two-page**
218:8 218:19

**two-thirds**
220:19 263:25

**type** 22:23
25:20 29:15
33:12 45:14
246:11

**typed** 148:3
265:2

**types** 107:3

**typewriter**
164:13

**typical** 24:17

**typically** 92:20

**typing** 164:18

---
U
---

**U.S** 11:9

**Uh-huh** 76:11
227:4

**ultimately**
126:13 196:12

**unanimous**
235:10 235:15
236:3 242:2

**underneath**
102:15

**understand**

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

11:25 12:7
13:12 15:12
30:14 39:22
43:10 45:5
53:9 55:24
56:16 57:1
57:23 58:12
64:17 66:11
66:16 66:18
66:19 67:8
67:17 67:20
67:22 68:1
68:9 68:10
69:15 71:12
71:13 72:12
73:7 88:4
89:6 89:14
89:17 89:20
89:25 91:9
91:15 91:16
93:4 116:2
120:20 123:21
125:9 136:2
148:23 165:11
180:20 193:21
194:4 194:9
196:24 197:15
211:13 223:25
224:2
243:13 269:12
275:5
283:17 283:20
285:21

**understanding**
12:24 13:2
37:19 47:24
56:2 56:4
56:15 57:15
59:7 63:24
64:2 64:10
65:19 65:23
66:3 66:20
68:5 69:17
72:4 72:17
74:6 81:18
81:24 84:20
89:5 89:21
89:22 95:16

107:10 109:13
124:1
140:16 148:14
161:14
169:2
193:22 194:14
194:17
197:8 200:1
228:22
234:3 251:3
254:5 254:8
258:8 259:8
265:25 268:11
276:1 283:11

**understood**
64:13 64:21
64:23 67:9
70:12 73:6
73:7 102:24
133:18 194:4

**Underwood**
36:6 67:15
133:7 133:10

**unexpected**
193:3

**unfair** 223:16

**University**
16:12

**unless** 147:6
280:13

**unlock** 248:11

**unpaid** 15:24
215:19 255:25

**unprocessed**
125:25

**upon** 55:5 59:8

**upset** 55:9

**urgency** 286:15

**usually**
154:17 286:3

**utilities**
188:15 191:18

---
V
---

**valuable** 255:1

**value** 26:11
84:8 88:12
254:14

**van** 52:1 155:18
156:3 156:6
156:9
156:22 156:24
157:2 157:2
157:5
157:10
162:2 162:5
162:8
163:23
191:4 259:25

**various** 39:18
104:12

**Vasek** 60:21
60:23

**V-a-s-e-k** 60:23

**vehicle** 81:9
81:16 81:19
81:24 82:7
83:11 171:1
258:13

**vehicles**
25:24 77:17
77:20 77:24
78:7 79:24
80:2 81:8
171:11

**vendor's** 235:11
238:12
239:2 239:9

**verbal** 22:15

**verge** 133:19

**Vernon** 35:13

**version** 199:13

**versus** 274:7

**vessels** 23:16

**vest** 72:12
72:13

**v-e-s-t** 72:15

**Vest** 72:15

**vested** 250:18
251:4 251:10

**VIDEOGRAPHER**
9:7 9:22 62:2
62:4 132:4
132:7 186:3
186:5
212:17 212:19
218:13 225:20
225:22 287:5

**videotape** 9:7

**videotaped** 16:6

**view** 187:17

**vintage** 258:1

**visit** 21:17
151:5 194:7

**visited** 12:15
232:11

**visual** 10:6

**Volkswagen**
258:2

**volume** 129:4

---
W
---

**wages** 157:24
158:1 158:7
158:10
160:2 160:5
203:22 246:1

**walk** 38:10
284:22

**warranty** 235:11
238:12 239:1

**wasn't** 24:8
33:7 33:22
41:16 84:21
107:17
111:3 123:2

135:21
145:5
147:12 147:12
159:1
175:15
188:9 189:3
189:3 192:4
219:16
256:4 256:5
270:21 283:3

**waste** 223:22

**wasting** 185:16

**water** 31:25
33:10 93:9
93:10

**waters** 32:1
102:17

**ways** 107:25

**weak** 98:16
106:6

**wealth** 34:1

**Weatherly** 84:23
99:18 99:20
100:3 100:4
100:19 100:20
101:17 110:21
110:24

**Weatherly's**
98:21 99:7
99:10 99:12
101:12 101:15

**we'd** 36:3 41:15
96:21
100:18
126:3
130:11 130:16
147:7
195:22 238:19

**WEDNESDAY** 9:4

**week** 21:4 38:13
196:9 196:10

**weekends** 164:22

**weekly** 123:11

149:9

**weeks** 32:24
143:13

**weighed** 270:20

**weighted** 272:15

**welding** 31:24

**we'll** 37:23
60:13 60:13
61:4 61:4
72:10 73:18
77:12 77:12
165:23 165:25
170:13 197:17
197:18
213:9 223:2
259:15
269:1 287:3

**wells** 72:21
72:22
107:16
108:8
109:12 109:14
112:1 141:22

**we're** 13:3
24:25 48:21
58:7 68:25
71:13 77:13
94:21
127:14 128:25
131:25 142:18
164:10 164:11
183:24 195:11
198:22 209:17
225:14
269:6
269:10 269:17
274:9 281:8
281:9
284:16 284:16
285:25

**west** 34:20
262:10

**we've** 22:23
51:25 51:25
55:13 58:8

58:16 60:12
60:14 60:16
85:13 94:20
96:12
111:15 111:16
119:10 149:14
224:4 224:5
224:5 224:5
225:8
259:16 259:24
263:7
263:11
272:2 272:6
279:3 282:4

**What'd** 162:11

**whatever**
30:18 37:18
37:21 42:8
43:12 50:9
50:23 52:12
53:5 68:14
70:10 86:15
88:6 88:6
88:8 88:9
88:12 88:14
99:5 105:21
105:23
106:2 106:6
107:8
109:19 112:20
113:2
114:25 116:24
121:21 125:18
126:1
129:11 129:16
132:17 132:18
135:4
137:15 137:16
142:1
145:14 151:21
151:22 159:24
180:19 189:25
204:16
206:8 210:6
241:18

**whatever's** 13:6
94:24

184:22 239:19
239:21

**wheat** 100:6
100:7
100:18 102:25
103:2 103:5
103:10

**Wheeler** 34:20

**whenever**
26:21 37:19
40:17 61:20
105:22 106:11
109:17
141:6
151:14 151:15
260:8

**whereby** 157:13

**Where'd** 16:14
177:11

**Where's** 260:6

**WHEREUPON**
38:1 62:3
73:20 132:6
142:21
146:9 167:8
175:4
182:10
183:4 186:4
193:12 197:20
199:9
200:22 209:19
212:5
212:18 214:12
216:3 217:9
225:21
229:7 235:4
244:12
277:1 287:6

**whether** 14:20
23:5 34:3
44:16 48:2
51:3 57:15
64:10 72:4
73:2 74:19
82:7 82:11

89:25 98:24
102:15
108:7
108:22 109:13
110:7
120:13 127:15
127:22 127:24
128:15 128:16
131:19 138:20
141:5
149:15
155:7
157:12
169:2
169:13 186:15
194:17
209:8
215:10 215:21
222:5
224:24 247:11
247:19 269:23
275:24 284:24
284:24

**whirlwind** 15:6

**white** 81:13
260:24

**whoever** 63:1
88:18 151:4
240:17 281:23

**whole** 10:20
92:7 95:12
122:12 193:21
194:5
256:20 265:21
283:10

**whom** 9:12

**who's** 45:17
60:10
232:24 266:22
266:22
272:7 274:7

**whose** 92:17
261:11

**widower** 17:12

**wife** 17:19

17:25 18:6
18:8 33:20
195:19

**wife's** 18:11

**Wiley's** 258:10

**wintertime**
100:18

**withholding**
256:6

**witness** 9:23
10:17 10:21
22:14 38:5
38:8 51:23
51:25 57:5
57:7 57:9
58:4 58:23
60:6 69:9
70:9 87:12
89:8 162:20
172:6
201:22
218:9
221:14 224:24
226:17 255:21
263:4 264:5
264:13 264:16
264:19
266:7
276:20
285:3 285:22

**wondering** 35:19

**work** 16:13
16:14 16:16
24:8 24:8
26:5 26:9
31:21 31:23
100:5
139:18 141:23
141:25 143:13
159:18
161:3 161:5
161:11 161:15
168:8
244:21 244:24
245:7 245:12

246:1 246:2
246:17 272:20
274:6 274:7
275:21 277:17

**worked** 16:15
23:16 25:4
32:14 37:6
43:23 43:24
156:14 159:21
159:24 160:12
161:6 209:5
248:24
249:1 271:2
271:22 272:18

**working** 24:10
32:6 32:9
32:12 32:13
48:13 50:16
62:1 108:9
116:14
123:3
158:22 164:20
246:11 284:25

**works** 96:16
188:1 286:23

**worried** 136:6
252:25

**worse** 20:17
122:22

**worth** 26:15
26:18 30:9
34:23 83:4
90:8 138:18
140:1
238:16 243:17

**wow** 191:19

**wrap** 225:15

**writing** 146:3
219:24

**written** 102:4
112:10
146:3
153:25 154:4

157:13 157:18
159:15 161:21
163:15 177:22
235:10 235:15
236:4 242:2
253:15

**wrong** 23:5 68:9
128:13
143:7
143:21
171:3
171:14 171:14
200:7
209:11 224:13
268:9

**wrote** 112:11
132:15 134:11
178:14 178:15
190:13 249:11
253:21

———————

Y

**yard** 84:6 84:16
84:17 84:19
84:22 85:4
87:2 87:14
87:20 87:23
88:23 89:1
89:15 122:3
127:7
128:19
230:7
230:16
231:1
231:15 231:15
232:10
233:3 233:4
233:7
236:17 236:22
236:23
237:1 237:3
237:10 237:12
237:19 242:5

**Yard's** 236:24

**year-by-year**
24:1

**Yep** 10:8
  87:11
  172:16 226:12
  245:25

**yet** 171:19

**you'll** 11:1
  87:7 134:16
  142:16 143:15
  143:16
  146:6
  171:15
  180:7 183:7
  227:25
  243:5 249:8

**Young's** 14:23
  15:2

**yours** 15:23
  38:5 172:7
  172:8 184:3

**yourself** 16:9
  49:23 52:2
  154:18 158:24
  206:20 206:22
  219:20 228:19
  260:21

**you've** 14:20
  130:20 141:23
  167:21 269:20
  271:4

———————
        Z
———————
**Zaiontz** 19:8
  61:10 61:15

**Z-a-i-o-n-t-z**
  61:16

**ZAIONTZ** 61:10
  61:12 61:14
  61:16
  162:19 162:25
  163:4

**zero** 173:6
  184:8 184:8

**Zoom** 60:2 60:11

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM